UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEVEN THARP, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | C.A. No. 17-cv-11504-WGY (Lead Docket) |
| Plaintiff, | ) ) | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION |
| vs. | ) ) | OF THE FEDERAL SECURITIES LAWS |
| ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAJ, and JOHN F. GAVIN, | ) ) ) ) | |
| Defendants. | ) ) ) | |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................1

II.    JURISDICTION AND VENUE ................................................................4

III.    PARTIES ..................................................................................................5

    A.    Plaintiffs ..........................................................................................5

    B.    Defendants ......................................................................................5

        1.    Defendant Acacia ............................................................5

        2.    The Individual Defendants ..............................................6

        3.    The Selling Defendants ...................................................8

        4.    The Underwriter Defendants ........................................11

IV.    BACKGROUND ....................................................................................11

    A.    Acacia's Business and Operations ................................................11

    B.    Acacia's Access to Reports and Information Regarding Its Customers' Product Demand, As Well As Business Trends in the Industry and China ........................15

    C.    Acacia's Initial Public Offering ..................................................20

    D.    Demand in China Was Uncertain and Unpredictable ................22

    E.    Acacia Misrepresented Demand in China ...................................25

    F.    ADVA Was Experiencing Delays Rolling Out its Products ................27

    G.    Item 303 of SEC Regulation S-K ...............................................29

V.    THE 1933 ACT ALLEGATIONS ..........................................................32

VI.    THE 1934 ACT ALLEGATIONS ..........................................................39

    A.    The August 11, 2016 Statements and 3Q16 Guidance ................39

    B.    The September 14, 2016 Statements ............................................50

    C.    The Offering Documents and Increased 3Q16 Guidance ............52

    D.    Revelations About Demand from ZTE and ADVA ....................53

**Page**

E.      The November 10, 2016 Statements and 4Q16 Guidance ....................................54

F.      The January 10, 2017 Statements ........................................................63

G.      The February 23, 2017 Statements ......................................................65

H.      The March 1, 2017 Statements ..........................................................75

I.      Acacia Continues to Make Assurances About its Business................................79

J.      Fallout from MACOM's April 25, 2017 Announcement ....................................80

K.      The May 9, 2017 Statements ............................................................83

L.      Acacia's May 31, 2017 Announcement....................................................87

M.      The June 7, 2017 Statements ..........................................................88

N.      The June 13, 2017 Statements ..........................................................90

O.      The July 14, 2017 Statements and End of the Class Period...............................92

P.      Acacia Continues to Experience Difficulties After the Class Period ....................94

VII.    ADDITIONAL SCIENTER ALLEGATIONS ..................................................97

VIII.   LOSS CAUSATION/ECONOMIC LOSS .....................................................101

IX.     PRESUMPTION OF RELIANCE ...........................................................104

X.      NO SAFE HARBOR .....................................................................105

XI.     CLASS ACTION ALLEGATIONS ..........................................................106

XII.    CLAIMS AGAINST DEFENDANTS .........................................................107

XIII.   JURY TRIAL DEMAND ..................................................................114

Lead Plaintiffs WKW Partners Fund I, L.P., Hui Zhang, and Chris Kebler, together with plaintiff Rina Rollhaus (collectively, "Plaintiffs"), allege the following upon personal knowledge as to themselves, and upon information and belief as to all other matters based upon the investigation of their counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Acacia Communications, Inc. ("Acacia" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.       This is a securities class action on behalf of: (i) all persons or entities who purchased or otherwise acquired the common stock of Acacia between August 11, 2016 and July 13, 2017, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act"); and (ii) all persons and/or entities who purchased Acacia common stock pursuant or traceable to its secondary public offering of common stock, which closed on October 13, 2016 ("Secondary Offering"), seeking to pursue remedies under the Securities Act of 1933 ("1933 Act").

2.       Defendant Acacia designs, develops, manufactures, and sells high-speed networking products.  During the Class Period, Acacia and its top-level officers – President and Chief Executive Officer ("CEO") Murugesan "Raj" Shanmugaraj ("Shanmugaraj") and Chief Financial Officer ("CFO") John F. Gavin ("Gavin") – represented that Acacia was experiencing stable, increasing demand for its products, particularly in China.  In truth, the demand Acacia experienced early in the Class Period was related to one phase of the broadband buildout in China, but could not continue. The next phase, which involved buildouts in China's individual provinces, was highly unpredictable. And yet Acacia continued to assure investors that demand was sustainable and, in fact, increasing.

3.      But demand was declining even before the backbone expansion phase of the buildout in China was nearing completion, in or about late-2016.  Acacia's largest customer – China-based ZTE Kangxun Telecom Co. Ltd. ("ZTE"), which accounted for 32% of Acacia's total revenue in 2016 – was experiencing declining demand, which, in turn, resulted in reduced orders for Acacia's products.  Similarly, Acacia's second-largest customer – ADVA Optical Networking North America, Inc. ("ADVA"), which was not materially exposed to China but accounted for 26% of Acacia's total revenue in 2016 – substantially cut orders for Acacia's products when it found itself saddled with inventory it could not sell and encountered delays rolling out its CloudConnect product.

4.      Meanwhile, Acacia's contracts with both ZTE and ADVA required them to provide Acacia with regular, rolling forecasts of their product demands.  In addition, Acacia's strategic partnerships with these customers – and presumably others – made the Company privy to changes in their business that would materially impact their orders.  Thus, Acacia had open access to reports and other information that would have informed it of ZTE's and ADVA's declining demand for its products, as well as negative trends in the industry and geographic region in which Acacia and its customers primarily operate.

5.      As this decline in demand (and its impact on Acacia) remained concealed from the public by the Company, Acacia's venture capital backers caused Acacia to complete the Secondary Offering so they and other insiders could sell their personally-held shares of Acacia common stock.  Generating gross proceeds for these insiders and Acacia of nearly half-a-billion dollars at $100 per share, Acacia completed its Secondary Offering in October 2016 – only five months after its May 2016 initial public offering ("IPO"), in which its stock first sold to the public at $23 per share.  A team of eight underwriters, whose analysts followed and wrote reports on the Company, underwrote the Secondary Offering; and many of them were also involved in the IPO, months earlier.

6.     Like other statements during the Class Period in SEC filings and conference calls, the representations set forth in the Prospectus and Registration Statement issued in connection with the Secondary Offering (together, the "Offering Documents") failed to disclose that demand in China and elsewhere was waning and unsustainable.  In fact, Acacia never described the buildout in China.  Thus, the Offering Documents did not contain the information required by the regulations governing their preparation, including Item 303 of SEC Regulation S-K, which requires disclosure of known trends, events and uncertainties reasonably likely to adversely affect an issuer's financial condition.  As a result, the Offering Documents, which were negligently prepared, were materially misleading.

7.     Nor did Acacia otherwise timely or completely disclose material information about a serious manufacturing quality issue, occurring over at least a four-month period, that affected a substantial portion of the Company's products – a problem first revealed in a press release dedicated to the issue and filed as an attachment to Form 8-K, which underscored its materiality.  In it, Acacia failed to disclose a reasonable range of potential losses, notwithstanding its understanding of the outermost warranty and expense costs then associated with the problem.  Moreover, prior to the revelation of the issue, Acacia misled investors into believing that its robust manufacturing protocols and quality controls – including its oversight of, and close interaction with, its three third-party contract manufacturers – were adequate to prevent this type of issue from occurring.  Due to this manufacturing quality problem, Acacia experienced significant supply constraints, rendering it unable to fully satisfy then-existing customer orders for its products and materially impacting the Company's financial results.

8.     As the truth was revealed regarding these issues, the trading price of Acacia's stock declined substantially.  In fact, as of the filing of this complaint, its stock trades below $40 per share

– far below the Secondary Offering price, and even below the lowest closing price reported during the entirety of the Class Period.

9.      Accordingly, as alleged herein, Defendants are liable for making false statements and failing to disclose adverse facts then known to them regarding Acacia.  This course of conduct: (i) deceived the investing public regarding Acacia's prospects and business; (ii) artificially inflated the prices of Acacia common stock; (iii) allowed Acacia and certain of its senior executives, insiders and venture-capital backers to cash out, selling $450 million of their personally-held common stock in the Secondary Offering alone, with certain sellers other than Acacia selling a total of $188 million in the Secondary Offering and other Class Period sales, combined; and (iv) damaged Plaintiffs and other members of the Classes (defined below), who purchased shares of Acacia common stock at artificially inflated prices.

10.     This action is intended to recover damages for investors who purchased stock in the Secondary Offering pursuant to the materially misleading Offering Documents or were otherwise defrauded during the Class Period as a result of the misconduct described herein.

## II.      JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5], as well as Sections 11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the 1934 Act and Section 22 of the 1933 Act.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c), because Acacia is headquartered in this District and many of the acts and practices complained of herein also occurred in substantial part in this District.

14.     In connection with the acts and conduct alleged herein, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

### III.     PARTIES

**A.     Plaintiffs**

15.     Lead Plaintiffs purchased the common stock of Acacia as set forth in their earlier-filed certifications, which are incorporated herein by reference, and have been damaged thereby. Additionally, as reflected in her earlier-filed certification, which is incorporated herein by reference, plaintiff Rollhaus purchased the common stock of Acacia in the Secondary Offering and has been damaged thereby.

**B.     Defendants**

**1.     Defendant Acacia**

16.     Defendant Acacia is headquartered at Three Mill and Main Place, Suite 400, Maynard, Massachusetts.  It designs, develops, manufactures, markets and sells high-speed coherent optical interconnect products for cloud infrastructure operators and content and communication service providers.  The Company's products include a series of low-power coherent digital signal processors and silicon photonic integrated circuits integrated into families of optical interconnect modules with transmission speeds ranging from 40 to 400 gigabits per second for use in long-haul, metro and inter-data center markets.  These products are generally designed to improve the capacity, performance, intelligence and cost of customers' communications networks.

17.     Acacia's common stock traded in an efficient market on the NASDAQ Global Select Market throughout the Class Period under the ticker symbol "ACIA."  As of July 28, 2017, Acacia had more than 39.2 million shares issued and outstanding.  In connection with the Secondary Offering, 4.5 million shares of Acacia common stock were sold.

18.     As alleged further herein, Acacia is strictly liable as an issuer for the materially false and misleading statements and omissions in the Offering Documents in connection with the 1933 Act claims, and is otherwise liable for all of the false and misleading statements and omissions throughout the Class Period in connection with the 1934 Act claims.

### 2.     The Individual Defendants

19.     Defendant Shanmugaraj is, and was at all relevant times, Acacia's President, CEO, and a member of its Board of Directors ("Board").  He began serving in those positions when he joined Acacia, in April 2010.  Shanmugaraj represented Acacia on earnings conference calls, made statements in press releases issued by the Company, signed off on the Company's SEC filings, and gave presentations on behalf of Acacia at conferences.  He also signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

20.     Defendant Gavin is, and was at all relevant times, the CFO of Acacia.  He represented Acacia on earnings conference calls, made statements in press releases issued by the Company, signed off on the Company's SEC filings, and gave presentations on behalf of Acacia at conferences. Gavin signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

21.     Defendant Francis J. Murphy ("Murphy") is, and was at all relevant times, Acacia's Corporate Controller and Principal Accounting Officer.  Murphy signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

22.     Defendant Benny P. Mikkelsen ("Mikkelsen") is, and was at all relevant times, Acacia's Chief Technology Officer ("CTO") and a member of its Board.  He began serving in those positions in August 2009 and is a co-founder of the Company.  Mikkelsen attended and spoke at certain earnings conference calls during the Class Period.  He also signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

23.     Defendant Eric A. Swanson ("Swanson") is, and was at all relevant times, Acacia's Chairman of the Board, a position he has held since August 2009.  Swanson signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

24.     Defendant Peter Y. Chung ("Chung") is, and was at all relevant times, a member of the Board, a position he has held since April 2013.  He is a managing director and CEO of Summit Partners, L.P. ("Summit Partners"), a venture capital firm with offices in Massachusetts, California and London, which he joined in August 1994.  Since December 2010, Chung has also served on the board of directors of MACOM Technology Solutions Holdings, Inc. ("MACOM"), which, through its subsidiaries, supplies products to Acacia through the Company's contract manufacturers.  In fact, during the three and nine months ended September 30, 2016, MACOM made sales to these contract manufacturers of approximately $0.5 million and $1.4 million, respectively.  Several investment vehicles associated with Summit Partners invested in Acacia, and those entities (described further below) sold stock in the Secondary Offering.  Chung signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

25.     Defendant Stan J. Reiss ("Reiss") is, and was at all relevant times, a member of the Board, a position he has held since August 2009.  He is a general partner of Matrix Partners, a venture capital firm specializing in technology companies with offices in Massachusetts and California, where he has worked since July 2000.  An investment vehicle associated with Matrix Partners invested in Acacia, and that entity (described further below) sold stock in the Secondary Offering.  Reiss signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

26.     Defendant John Ritchie ("Ritchie") is, and was at all relevant times, a member of the Board, a position he has held since April 2015.  According to its website, Summit Partners recruited

Ritchie to serve on the Board and as Chairman of the Audit Committee.  Ritchie signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

27.     Defendant Vincent T. Roche ("Roche") is, and was at all relevant times, a member of the Board, a position he has held since June 2016.  He was, at all relevant times, President, CEO and a member of the board of directors of Analog Devices, Inc. ("ADI"), which supplies products to Acacia through the Company's contract manufacturers.  In fact, during the three and nine months ended September 30, 2016, ADI made sales to these contract manufacturers of approximately $1.5 million and $3.3 million, respectively.  Additionally, Bruce Evans, a managing director of Summit Partners and Chairman of Summit Partners' Board of Managers, is also a director of ADI.  Roche signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering.

28.     Defendants Shanmugaraj, Gavin, Murphy, Mikkelsen, Swanson, Chung, Reiss, Ritchie and Roche are collectively referred to herein as the "Individual Defendants."

### 3.     The Selling Defendants

29.     In addition to Defendants Shanmugaraj, Gavin, Swanson, Mikkelsen, Reiss and Ritchie, the following defendants sold Acacia common stock in the Secondary Offering:

(a)     Defendant Matrix Partners VIII, L.P. ("Matrix"), an entity affiliated with Matrix Partners and Reiss;

(b)     Defendants Summit Partners Venture Capital Fund III-A ("Summit III-A"), Summit Partners Venture Capital Fund III-B ("Summit III-B"), Summit Investors I, LLC ("Summit Investors"), and Summit Investors I (UK), L.P. ("Summit UK" and collectively with Summit III-A, Summit III-B and Summit Investors, "Summit"), entities affiliated with Summit Partners and Chung;

(c)     Defendant Commonwealth Capital Ventures IV L.P. ("Commonwealth"), an entity affiliated with former Acacia director Elliot M. Katzman, a general partner of Massachusetts-

- 8 -

based investment firm Commonwealth Capital Ventures who purportedly resigned from the Board prior to the effectiveness of the Registration Statement in connection with the Secondary Offering;

(d)     Defendant The Malini Shanmugaraj 2016 QTIP Trust ("Shanmugaraj Trust"), an entity affiliated with Shanmugaraj, who purportedly has indirect beneficial ownership of its common stockholdings in Acacia;

(e)     Defendant Mehrdad Givehchi ("Givehchi"), a co-founder of the Company who served as Vice President of Hardware and Software since June 2015 and as Director of Hardware and Software from June 2009 to June 2015;

(f)     Defendant Givehchi LLC, an entity affiliated with Givehchi, who purportedly has indirect beneficial ownership of Givehchi LLC's common stockholdings in Acacia;

(g)     Defendant John LoMedico ("LoMedico"), Acacia's Vice President of Sales and Business Development since August 2009;

(h)     Defendant Bhupendra C. Shah ("Shah"), Acacia's Vice President of Engineering since June 2009;

(i)     Defendant Bhupendra Shah 1999 Trust U/A DTD 10/06/1999 ("Shah Trust"), an entity affiliated with Shah, who purportedly has indirect beneficial ownership of its common stockholdings in Acacia;

(j)     Defendant Christian Rasmussen ("Rasmussen"), a co-founder of the Company who served as Vice President of Digital Signal Processing and Optics since June 2015 and previously served as Director of Digital Signal Processing and Optics from June 2009 to June 2015;

(k)     Defendant OFS Fitel, LLC ("Fitel"), a private telecommunications company and longtime investor in Acacia;

(l)     Defendant Egan Managed Capital III, L.P. ("Egan"), a venture capital firm based in Massachusetts focused on investing in corporations principally based in New England; and

(m)     Defendant Weston & Co. VIII, LLC ("Weston"), an entity affiliated with Matrix Partners which shares the same address as Reiss and Matrix in Massachusetts, owned common stock in Acacia directly, and held stock as a nominee for Matrix and potentially others.

30.     Defendants Matrix, Summit, Commonwealth, Shanmugaraj Trust, Givehchi, Givehchi LLC, LoMedico, Shah, Shah Trust, Rasmussen, Fitel, Egan, Weston, Shanmugaraj, Gavin, Swanson, Mikkelsen, Reiss and Ritchie are collectively referred to as the "Selling Defendants."

31.     The following chart, adapted from Acacia's April 6, 2017 Definitive Proxy Statement on Schedule 14A, provides information on the participation of the Selling Defendants in the Secondary Offering (footnotes omitted), with aggregate proceeds net of underwriters' discounts and commissions:

| Name | Nature of Relationship | Shares | | Aggregate Proceeds (1) |
|---|---|---|---|---|
| Murugesan "Raj" Shanmugaraj | Executive Officer | 108,163 | $ | 10,437,730 |
| John F. Gavin | Executive Officer | 25,501 | $ | 2,460,847 |
| Benny P. Mikkelsen | Executive Officer | 98,846 | $ | 9,538,639 |
| Christian J. Rasmussen | Executive Officer | 98,846 | $ | 9,538,639 |
| Mehrdad Givehchi | Executive Officer | 98,846 | $ | 9,538,639 |
| Bhupendra C. Shah | Executive Officer | 47,917 | $ | 4,623,991 |
| Entities Affiliated with Matrix Partners | Significant Stockholder | 1,448,493 | (2) $ | 139,779,575 |
| Commonwealth Capital Ventures IV L.P. | Significant Stockholder | 726,426 | $ | 70,100,109 |
| Entities Affiliated with Summit Partners, L.P. | Significant Stockholder | 346,202 | (3) $ | 33,408,493 |
| Eric Swanson | Director | 2,640 | $ | 254,760 |
| Stan Reiss | Director | 1,448,493 | (2) $ | 139,779,575 |
| John Ritchie | Director | 2,640 | $ | 254,760 |

32.     As alleged herein, the Seller Defendants variously sold common stock and solicited purchasers of common stock in connection with the Secondary Offering, and caused the Company to effectuate the Secondary Offering and presumably the IPO, before it.

33.     Specifically, pursuant to the April 17, 2013 Amended and Restated Investors' Rights Agreement (the "Investor Agreement"), Selling Defendants associated with Acacia's venture-capital backers, as well as others, exercised the right, embodied in Section 2 thereof (entitled "Registration

Rights"), to require Acacia to issue the Offering Documents and complete the Secondary Offering. Thus, these insiders – including Matrix, Summit, Commonwealth, LoMedico, Reiss, Shanmugaraj and Swanson – collectively controlled Acacia, and, at a minimum, exercised the ability to cause it to issue the Offering Documents during the Class Period.

### 4.     The Underwriter Defendants

34.     Defendants Goldman Sachs & Co. ("Goldman Sachs"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Needham & Company, LLC ("Needham"), Cowen and Company, LLC ("Cowen"), William Blair & Company, LLC ("William Blair") and Northland Securities, Inc. ("Northland") served as underwriters for the Secondary Offering and did business within this District in connection with the Secondary Offering.  Collectively, Goldman Sachs, Merrill Lynch, Deutsche Bank, Morgan Stanley, Needham, Cowen, William Blair and Northland are referred to herein as the "Underwriter Defendants."

35.     As alleged further herein, the Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters for the Secondary Offering and were negligent in failing to ensure that the Offering Documents were prepared properly and accurately, free of misstatements or omissions.

## IV.     BACKGROUND

### A.     Acacia's Business and Operations

36.     Defendant Acacia develops, manufactures, and sells high-speed coherent optical interconnect products in the Americas, Europe, the Middle East, Africa, and the Asia-Pacific region. The Company's product offerings include a series of low-power coherent digital signal processor application-specific integrated circuits (or DSP ASICs) and silicon photonic integrated circuits (or silicon PICs), which it has integrated into families of optical interconnect modules with transmission

speeds ranging from 40 to 400 gigabits per second (or Gbps) for use in long-haul, metro and inter-data center markets.  These products facilitate high-speed networking by converting electrical signals from devices (such as routers) into optics, enabling increased transmission speeds.  During the Class Period, Acacia derived substantially all of its revenue from the sale of its products within its 100 and 400 Gbps product families.

37.     Acacia sells most of its products to network equipment manufacturers for ultimate sale to communications and content service providers and data center and cloud infrastructure operators, which it refers to together as cloud and service providers, and has indicated that it expects network equipment manufacturer customers to be the primary market for its products for the foreseeable future.

38.     Acacia's negotiated terms and conditions of sale do not allow for returns, meaning that customers take a long time to decide what product to purchase because they cannot return it. According to Acacia, "[c]ustomer orders are complex and difficult to complete because prospective customers generally consider a number of factors over an extended period of time before committing to purchase the products [it] sell[s]" and those "[c]ustomers often view the purchase of [its] products as a significant and strategic decision and require considerable time to evaluate, test and qualify [its] products prior to making a purchase decision and placing an order."

39.     Acacia also says that its "product revenue is typically characterized by a life cycle that begins with sales of pre-production samples and prototypes followed by the sale of early production models with higher average selling prices and lower volumes, followed by broader market adoption, higher volumes, and average selling prices that are lower than initial levels."  In addition, it says that "product revenue may be affected by contractual commitments to significant

customers that obligate [the Company] to reduce the selling price of [its] products on an annual or semi-annual basis."

40.     Acacia's products are supposed to be fully functional at the time of shipment and not require production, modification or customization.  The Company says it recognizes revenue from product sales only after persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collection is reasonably assured.  Indeed, according to Acacia, its "fee is considered fixed or determinable at the execution of an agreement, based on specific products and quantities to be delivered at specified prices, which is evidenced by a customer purchase order or other persuasive evidence of an arrangement."

41.     While these factors can make the Company's sales cycle long, it also affords Acacia significant foresight into customer demand and upcoming sales to its customers.  In fact, at all times relevant, a handful of customers accounted for the overwhelming majority of Acacia's revenues, including: ZTE, a subsidiary of ZTE Corporation based in Shenzhen, China; ADVA, a subsidiary of Germany-based ADVA Optical Networking SE ("ADVA SE"); and Coriant, Inc. ("Coriant"), a company based in Munich, Germany.  Indeed, as the Company disclosed before the Class Period in the May 13, 2016 Prospectus associated with its IPO:

> We have historically generated most of our revenue from a limited number of customers.  In 2013, 2014, 2015 and the three months ended March 31, 2015 and 2016, our five largest customers in each period (which differed by period) collectively accounted for 79.5%, 77.7%, 72.6%, 82.9% and 82.2% of our revenue, respectively.  In 2013, 2014, 2015 and the three months ended March 31, 2015 and 2016, ADVA Optical Networking North America, Inc. accounted for 13.6%, 23.4%, 22.2%, 32.5% and 18.2% of our revenue, respectively, and ZTE Kangxun Telecom Co. Ltd., or ZTE, accounted for 32.1%, 35.4%, 27.6%, 25.8% and 46.3% of our revenue, respectively.  In addition, during 2015 and the three months ended March 31, 2015 and 2016, Coriant, Inc. accounted for 13.1%, 13.2% and 11.5% of our revenue, respectively, and during 2013, Alcatel-Lucent accounted for 19.2% of our revenue.

42.     The IPO Prospectus also represented that Acacia's close collaboration with customers provided visibility into their business, as follows:

> ***Customer collaboration provides deep understanding of market needs***. We collaborate closely with our customers, as well as directly with many cloud and service providers, and solicit their input as they design their network equipment and as we design our next-generation products. This provides us with deep insights into the current and future needs of our customers and the market, which in turn enables us to develop and deliver products that meet customer demands and anticipate market developments. [Emphasis in original.]

43.     As detailed below, Acacia repeated these disclosures in the Offering Documents associated with the Secondary Offering, thereby assuring investors that it had insight into the needs of its customers and market demand for its products.

44.     And yet, before the Class Period, it was well known to participants in the networking and telecommunications industry that telecommunications equipment manufacturers expected – and, in some cases, were then experiencing – a slowdown in demand in China, as detailed further below.

45.     For example, a November 19, 2015 article published by the *Nikkei Asian Review*, entitled "Industry shivers as Chinese 4G investment cools," warned that "[t]elecommunications equipment manufacturers are bracing for a dry spell in Chinese wireless infrastructure investment." As the article reported:

> After spending heavily on fourth-generation, or 4G, technology, China's mobile carriers are beginning to shift their resources toward winning subscribers.  Demand is expected to be sluggish until fifth-generation technology hits the mainstream in 2020.

46.     The article, and others like it, further indicated that Chinese equipment makers, such as ZTE, had benefited from significant investment in China's 4G network infrastructure that was expected to decline or cease until the rollout and mainstream adoption of 5G technology in 2020.

47.     In addition, as detailed further below, the broadband expansion in China was a multi-phased project, the national backbone expansion portion of which was nearing completion by the end

- 14 -

of 2016.  The next phase of the expansion – the provincial buildouts, which involved installing and

upgrading the telecommunications infrastructure for each province in China – was unpredictable,

given the particular needs and requirements of each province; the variable timing associated with

approving, awarding and completing the work; and the lack of visibility with respect to the process.

48.     Furthermore, as alleged below, Acacia had access to non-public information about its

customers' needs, which necessarily provided insight regarding market demand.  Thus, for example,

ZTE's General Conditions of Purchase, which together with the Framework Contract or Purchase

Contract and Purchase Order (defined therein collectively as the "Contract") governed its product

purchases from Acacia, required ZTE to provide and update a "rolling forecast" of its product needs,

and obligated ZTE to notify Acacia "in writing" when an event might "impact significantly the

implementation of the Contract . . . ."

49.     In fact, as Acacia indicated in various SEC filings during the Class Period: "some of

our customers have committed to purchase a specified share of their required volume for a particular

product from us"; and "[s]ome customers provide us with their expected forecasts for our products

several months in advance . . . ."

   **B.     Acacia's Access to Reports and Information Regarding Its Customers'
            Product Demand, As Well As Business Trends in the Industry and China**

50.     As discussed herein, both before and during the Class Period, Acacia received non-

public information from customers regarding their product forecasts and demand for their products,

which provided guidance to Acacia concerning demand in the greater market for Acacia's products

and those of its customers.  In fact, Acacia's two largest customers during the Class Period – ZTE

and ADVA, which together consistently accounted for nearly 60% of Acacia's sales and revenue  –

were contractually obligated to provide this information to the Company on a rolling basis.  These

customers were also required to inform Acacia of business developments that could materially affect their orders.

51.     For example, ZTE's General Conditions of Purchase – which formed part of its Contract with Acacia – required ZTE to provide Acacia with updated forecasts of its product needs. Filed publicly (with confidential information redacted) as Exhibit 10.17 to Acacia's December 21, 2015 Form S-1, the General Conditions of Purchase were entered into in October 2010 for a one-year period and, pursuant to subpart (a) of Section 34 (entitled "Effective Period, Modification and Termination"), were subject to automatic renewal on a yearly basis thereafter.  Importantly, Section 7 (entitled "Lead Time") contemplated that ZTE, as the buyer, would "place PO [purchase orders] in advance according to the lead time agreed upon mutually between the parties," while subpart (a) of Section 11 (entitled "Forecast and Inventory") required ZTE to provide Acacia, the supplier, with a "rolling forecast," updated regularly.  Specifically, Section 11(a) provides as follows (with redacted information represented by a double asterisk):

> (a) Buyer provides Supplier with a [**] weeks' rolling forecast which is updated [**]. The forecast information Buyer provides to Supplier is only for reference usage and shall in no event be construed as an obligation of purchase.

52.     Additionally, Section 19 of the General Conditions of Purchase (entitled "Important Information Exchange") required ZTE and Acacia to immediately advise each other of any event that could significantly impact the Contract – which includes, as noted above, the performance of any purchase orders.  Specifically, Section 19 provides as follows:

> Both Supplier [Acacia] and Buyer [ZTE] will notify each other in writing immediately when event occurs which may impact significantly the implementation of the Contract hereunder. Both parties shall make efforts to reduce any losses to each other.

53.     Moreover, to facilitate their business relationship and enable sharing of non-public information regarding their respective operations, ZTE and Acacia entered into a Non-Disclosure

Agreement in October 2010.  Attached as Appendix 2 to the General Conditions of Purchase and filed publicly (with confidential information redacted) with Acacia's December 21, 2015 Form S-1, the Non-Disclosure Agreement, referenced in Section 30 (entitled "Confidentiality") of the General Conditions of Purchase, contemplated that ZTE and Acacia might share "information relating to business plans, financial or technical matters, trade secrets, designs, know-how, inventions, test results, operations and any other information" exchanged in developing their business relationship – all of which was defined as "confidential" thereunder.

54.     Accordingly, Acacia had a contractual right to receive information regarding ZTE's product demands and forecasts, as well as information regarding any "event" that "may impact significantly" the performance of the Contract, including any purchase orders forming part of the Contract.  Further, ZTE and Acacia contemplated sharing non-public information regarding their operations.  These provisions provided Acacia with unparalleled insight into ZTE's business and, by extension, the demand for ZTE's products – particularly the "Forecast and Inventory" provision of the General Conditions of Purchase, which inherently also provided insight into ZTE's demand for Acacia's products.

55.     Likewise, Acacia had similar contractual arrangements with other major customers. For example, Acacia entered into a Strategic Partnering Agreement with ADVA on March 8, 2011, which, pursuant to Section 9.1 thereof (entitled "Term"), had an initial term of five years and was automatically renewable for one-year periods thereafter.  Filed publicly (with certain confidential information redacted) as Exhibit 10.16 to Acacia's December 21, 2015 Form S-1, the Strategic Partnering Agreement, as amended (several times), governed Acacia's "design and development" of products for ADVA, purchase orders, and the sharing of confidential information during the course of their relationship.  As defined therein, "confidential information" included "all financial, business

and technical information of the disclosing party or any of its affiliates, suppliers, customers and employees . . . ."

56.     Moreover, the Strategic Partnering Agreement, like ZTE's General Conditions of Purchase, contained a provision requiring ADVA to furnish Acacia with a "rolling forecast" of product requirements.  Specifically, Section 4.3.9 (entitled "Forecasts") provides as follows (with redacted information represented by a double asterisk):

> Forecasts. ADVA shall provide Acacia with a non-binding [**] rolling forecast of its requirements of Products for the following [**] period, provided Acacia will offer ADVA significantly shorter Product Lead Times for forecasted quantities as set forth in Section 4.3.6. Within [**] of receiving ADVA's forecast, Acacia shall acknowledge the receipt of the forecast and confirm to ADVA in writing that it can deliver all forecasted Products. If Acacia foresees any problems (i.e. manufacturing capacity, material availability etc.) to meet the forecasted requirements, Acacia must advise ADVA before the end of the [**] period.

57.     Additionally, Section 4.4.2 (entitled "Lead Times") governs "Lead Times," defined in the Strategic Partnering Agreement as "the time between the date of issuance of the Purchase Order by ADVA and the Delivery Date."  Specifically, Section 4.4.2 provides, in part, that "Lead Times for forecasted Products shall be a maximum of [**] weeks and the Lead Times for non-forecasted Products shall be a maximum of [**] weeks."

58.     Notably, Section 11.1 (entitled "Amendments/Notices") required all notices under the Strategic Partnering Agreement to "be in writing, in English" and sent to ADVA's parent company, ADVA AG Optical Networking, in Germany.

59.     Accordingly, based on the Strategic Partnering Agreement, Acacia had a contractual right to receive information regarding ADVA's product demands and forecasts.  Further, ADVA and Acacia contemplated sharing non-public information regarding their operations; and Acacia had a line of communication directly to ADVA's parent company, given the manner in which notice was prescribed under the Strategic Partnering Agreement.  All of these provisions provided Acacia with

- 18 -

insight into ADVA's business and operations and the demand for ADVA's products that utilized parts sourced from Acacia.

60.     Furthermore, at least two members of the Board were directors and/or management in entities that supplied products to the Company's contract manufacturers and otherwise participated in the same industry as Acacia. These individuals, who have longstanding relationships with these suppliers, are Defendants Chung and Roche. And their extensive involvement in the industry in which Acacia operates naturally afforded the Company with insight into some of the same industry trends facing MACOM and ADI.

61.     Chung, a member of the Acacia Board since April 2013, has served on MACOM's board of directors since December 2010. Headquartered in Lowell, Massachusetts, MACOM sells devices, including integrated circuits, that facilitate high-speed networking. For MACOM's 2016 fiscal year ended September 30, 2016, China was the largest single contributor of revenue, dropping to second-largest for its 2017 fiscal year. And Huawei accounted for 15% of MACOM's revenue for fiscal year 2016 and 10% for fiscal year 2017. Thus, MACOM was particularly susceptible to trends in China. In its August 2, 2017 Form 10-Q for the fiscal quarter ended June 30, 2017, for example, MACOM disclosed the following:

> *[I]n fiscal 2017 we experienced decreased demand in China for our products* targeting 2.5 Gigabit passive optical networks (PON), metro/long-haul optical network deployments and other carrier-side applications, as carriers began migrating from 2.5 Gigabit to 10 Gigabit PON *and the pace of provincial network deployments in China slowed*.

62.     Roche, a member of the Acacia Board since June 2016, joined ADI in 1988 and has served as ADI's President since 2012 and as its CEO and a member of its board of directors since 2013. Headquartered in Norwood, Massachusetts, ADI designs, manufactures and sells products, including integrated circuits, that leverage high-performance technology to facilitate networking.

China accounted for 17% of ADI's revenues for fiscal year 2016 (the year ended October 29, 2016), and 16% of its revenues for fiscal year 2017 (the year ended October 28, 2017). In its August 30, 2017 Form 10-Q for the fiscal quarter ended July 29, 2017, ADI disclosed that an increase in sales in China primarily resulted from a corporate acquisition and demand in the industrial and automotive end markets, partially offset by a decline in the communications end market, as follows:

> The sales increase in China in the three- and nine-month periods ended July 29, 2017 , [sic] as compared to the same periods of the prior fiscal year, was primarily a result of the Acquisition and an increase in demand of our products sold into the industrial and automotive end markets, ***partially offset by a decrease in demand in products sold into the communications end market***.

63.     Accordingly, Acacia had access to information regarding downward business trends and uncertainties relating to China not only from its own experience in the region, but also based on the forecasts and non-public information shared by customers, other market participants, and Board members such as Chung and Roche.

### C.     Acacia's Initial Public Offering

64.     On May 18, 2016, Acacia completed its IPO, in which the Company issued and sold 4,570,184 shares of common stock and certain selling stockholders sold an additional 604,816 shares to the public at $23 per share, with the Company receiving more than $105 million in gross proceeds (or approximately $97.8 million, net of underwriters' discounts and commissions, before deducting expenses of approximately $3.8 million). All of the Underwriter Defendants, except for William Blair, were involved in underwriting the IPO, with Goldman Sachs, Merrill Lynch and Deutsche Bank serving as joint bookrunners and Needham, Cowen and Northland acting as co-managers. According to Summit Partners' website, the Company's IPO was "the first venture-backed tech IPO of 2016 . . . ."

65.     The "selling stockholders" in the IPO included Defendant Shanmugaraj, who sold 50,000 shares, receiving $1.15 million in gross proceeds; Defendant Gavin, who sold 7,500 shares,

receiving $172,500 in gross proceeds; and three other Acacia executives, who together sold another

413,816 shares of their personally-held Acacia common stock receiving more than $9.5 million in

gross proceeds.

66.     The principal and selling stockholders in the IPO, many of whom also sold stock in

the Secondary Offering and are named as defendants herein, are reflected in the chart below (except

that certain affiliates who also sold stock are not identified), adapted from Acacia's May 13, 2016

IPO Prospectus (footnotes omitted):

| Name | Shares Beneficially Owned Prior to Offering | | Number of Shares Offered | Shares Beneficially Owned After Offering | | Shares to be Sold if Underwriters' Option is Exercised in Full | Shares Beneficially Owned After Offering if Underwriters' Option is Exercised in Full | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percentage | | Number | Percentage | | Number | Percentage |
| **5% Stockholders** | | | | | | | | |
| Entities affiliated with Matrix Partners(1) | 12,098,220 | 38.8% | — | 12,098,220 | 33.9% | — | 12,098,220 | 33.9% |
| Commonwealth Capital Ventures IV L.P.(2) | 6,077,341 | 19.5% | — | 6,077,341 | 17.0% | — | 6,077,341 | 17.0% |
| Entities affiliated with Summit Partners, L.P.(3) | 2,896,329 | 9.3% | — | 2,896,329 | 8.1% | — | 2,896,329 | 8.1% |
| **Named Executive Officers and Directors** | | | | | | | | |
| Murugesan Shanmugaraj(4) | 1,140,000 | 3.7% | — | 1,140,000 | 3.2% | 50,000 | 1,090,000 | 3.1% |
| Benny Mikkelson | 1,099,107 | 3.5% | — | 1,099,107 | 3.1% | 103,772 | 995,335 | 2.8% |
| Mehrdad Givehchi(5) | 1,099,107 | 3.5% | — | 1,099,107 | 3.1% | 103,772 | 995,335 | 2.8% |
| Eric Swanson(6) | 412,118 | 1.3% | — | 412,118 | 1.2% | 65,000 | 347,118 | * |
| Elliot Katzman(7) | 6,077,341 | 19.5% | — | 6,077,341 | 17.0% | — | 6,077,341 | 17.0% |
| Peter Chung | — | — | — | — | — | — | — | — |
| Stan Reiss(8) | 12,098,220 | 38.8% | — | 12,098,220 | 33.9% | — | 12,098,220 | 33.9% |
| John Ritchie | — | — | — | — | — | — | — | — |
| All executive officers and directors as a group (11 persons)(9) | 23,628,575 | 75.2% | — | 23,628,575 | 65.8% | 463,816 | 23,164,759 | 64.3% |
| **Other Selling Stockholders** | | | — | | | | | |
| OFS Fitel LLC(10) | 951,212 | 3.1% | — | 951,212 | 2.7% | 95,100 | 856,112 | 2.4% |
| Bhupendra C. Shah (11) | 462,613 | 1.5% | — | 462,613 | 1.3% | 30,000 | 432,613 | 1.2% |
| Christian Rasmussen (12) | 1,053,069 | 3.4% | — | 1,053,069 | 2.9% | 103,772 | 949,297 | 2.7% |
| John LoMedico(13) | 465,290 | 1.5% | — | 465,290 | 1.3% | 45,900 | 419,390 | 1.2% |
| John Gavin(14) | 187,000 | * | — | 187,000 | * | 7,500 | 179,500 | * |

67.     By virtue of their intimate knowledge of the Company and involvement in the IPO,

including in preparing the soliciting materials associated with the IPO, these Defendants were privy

to non-public information about the Company's business and operations.  As alleged below, they

failed to conduct adequate due diligence, or uncovered information they otherwise failed to ensure was disclosed, in connection with the October 2016 Secondary Offering, which occurred only five months after the May 2016 IPO.

### D.     Demand in China Was Uncertain and Unpredictable

68.     In or about 2015, China announced a five-year plan associated with upgrading its wireless and telecommunications infrastructure, known in the industry as the China "buildout" or "expansion." The objective of the plan was to provide broadband access to all urban and rural areas by 2020.

69.     The plan was designed to be completed in phases, with each phase involving orders for services and equipment from vendors chosen as principal suppliers by, or on behalf of, China's three main wireless carriers: China Mobile; China Telecom; or China Unicom.

70.      Among these principal suppliers were China-based telecommunications equipment and systems companies ZTE and Huawei Technologies, Inc. ("Huawei"), which, in turn, placed orders with component part manufacturers, such as Acacia. At all relevant times, ZTE was Acacia's largest customer, which acutely exposed Acacia to the vagaries of ZTE's business and, by extension, the market in China.

71.     By the start of the Class Period, Acacia was supplying products to ZTE in connection with the national backbone expansion phase of the China buildout. This phase focused on upgrading the nation's core infrastructure by, among other things, increasing the number of national "nodes" that enabled access in China to the internet.

72.     During this phase of the buildout, the tender offers – in essence, requests for proposal – for services and products variously issued by China Mobile, China Telecom and/or China Unicom involved large and valuable orders, which ZTE, Huawei and a select few other suppliers were tasked to fulfill. Given the scope of these orders and the work required, manufacturers for these suppliers,

such as Acacia, received extensive business and experienced explosive growth during this phase, particularly in early to mid-2016 – *i.e.*, immediately before the Class Period.

73.     In October 2016, only five months after the IPO, Acacia consummated the Secondary Offering.  By that time, however, demand in China was on the precipice of a slowdown and industry participants – such as Acacia – knew it.

74.     In fact, warning signs of a slowdown in China were known to industry participants long before the Secondary Offering closed.  In connection with its issuance of an April 20, 2015 research report entitled "China Wireless Infrastructure Industry 2015 Outlook," Earl Lum, the principal of industry analyst EJL Wireless Research, warned that "[w]ireless equipment demand has sharply declined since the middle of Q1 2015 and our current outlook for Q2 and the second half of 2015 is cautious with an extremely negative bias . . . ."  As he explained, ZTE was particularly vulnerable even then to the "slowdown in China," and the situation was only expected to worsen:

> "The wireless infrastructure equipment ecosystem has suffered through a feast and famine situation since early 2014 due to the roll out of 4G TDD-LTE by China Mobile.  This has severely strained the supply chain within the industry as double and triple bookings and expedited orders have been replaced with order push outs and cancellations.  ***Our analysis reveals that three base station equipment OEMs have the greatest exposure from the slowdown in China.  They are Alcatel-Lucent, Huawei Technologies, and ZTE.***"[1]

75.     Likewise, as noted above, a November 19, 2015 article in the *Nikkei Asian Review*, entitled "Industry shivers as Chinese 4G investment cools," cautioned that "[t]elecommunications equipment manufacturers are bracing for a dry spell in Chinese wireless infrastructure investment." As the article reported:

> After spending heavily on fourth-generation, or 4G, technology, China's mobile carriers are beginning to shift their resources toward winning subscribers.  Demand is expected to be sluggish until fifth-generation technology hits the mainstream in 2020.

---

[1]     All emphasis is added unless otherwise indicated.

76.     The article indicated that Chinese equipment makers, such as ZTE, had benefited from significant investments in China's 4G network infrastructure that was expected to cease until the rollout and mainstream adoption of 5G technology in 2020, as the three large carriers in China – China Mobile, China Telecom and China Unicom – focused on increasing mobile customers.

77.     Moreover, ZTE itself announced its shifting focus to 5G. In a May 18, 2016 "article" published on its website, entitled "At ZTE 5G Is Now – Ubiquitous Connectivity and the Internet of Things," ZTE explained that "unlike the cases of 3G and 4G, there is now a business demand driven by end-users for the deployment of 5G." Stating that "[a]t ZTE 5G is now," ZTE further represented that "ZTE sees 5G as an enabler for new services in multiple industries, and hence also an enabler for new businesses."

78.     Similarly, a July 18, 2016 article published by the *South China Morning Post*, entitled "China nears full mobile broadband coverage on back of increased 4G adoption," reported that ZTE spokesperson David Dai Shu commented that "expectations are rife that 'China could accelerate the roll-out of 5G mobile services' to support high-bandwidth applications like augmented reality and virtual reality, which 4G networks would be hard-pressed to handle as demand grows." This article further expressed ZTE's view that demand for 4G equipment in China would continue to decrease as China pursued the wide-scale implementation of 5G technologies, infrastructure and mobile users.

79.     All of these developments preceded the Secondary Offering, which was completed in October 2016.

80.     Nevertheless, the national backbone expansion of China's broadband initiative plan was almost complete by then. The next phase – the provincial buildout, which involved upgrading the infrastructure of numerous individual provinces in China – had not yet begun; nor had the metro buildouts, which involved upgrading the infrastructure of metropolitan areas and cities.

- 24 -

81.     The timing and performance of the provincial buildout was far more unpredictable than the backbone expansion because it involved a series of smaller offers for products and services on a province-by-province basis, which clouded visibility of the timing and amount of the business. Indeed, China has 23 provinces, each of which was theoretically responsible for identifying its own specifications, requirements, and timing for the buildout.

82.     By contrast, the national backbone expansion was centralized and involved relatively few orders, largely overseen and/or initiated by China's three large carriers – promoting visibility into the timing and amount of the business associated with that particular phase.

**E.     Acacia Misrepresented Demand in China**

83.     Given the complications and delay inherently associated with the provincial buildout, work had not yet begun in earnest on the provincial phase even as of March 2017.  Indeed, certain of Acacia's competitors had openly acknowledged by then that visibility into the timing of the business was limited, and that their customers – suppliers, such as ZTE and Huawei, who contracted directly with the three mobile carriers – had a buildup of inventory awaiting deployment as a result.

84.     Despite understanding that the national backbone expansion in China would soon be complete and Acacia would no longer receive business from it, Acacia continued to represent during the Class Period that demand was strong and sustainable – and even increasing – in China.  Yet the work associated with the provincial buildout – which was then uncertain and far more unpredictable – was not yet offered or awarded, and product orders were not yet placed.

85.     For example, as detailed further below, Shanmugaraj stated during the Company's August 12, 2016 earnings conference call: "ZTE . . .  in Q1 was pretty large, 46% revenue. And that was because of the backbone build-outs. And then in Q2 they've dropped down to 31%."  Yet he represented: "we see continual strong backlog as well from ZTE going into the rest of the year.  We

don't see a whole lot of slowdown . . . in terms of backlog coming from ZTE, or growth prospects for them in terms of expansion."

86.     Then, at the January 10, 2017 Needham Growth Conference, Shanmugaraj discussed the provincial portion of the buildout as a catalyst for demand in China, as follows: "we still see very strong demand from China, going first in the provincial backbone, provincial metro and getting into the metro access networks."  Moreover, while he acknowledged "some quarter-to-quarter variation," he nevertheless stated unequivocally: "if you look at the demand as well as the projection for the next few years, we see very continued strong demand in China.  We don't see a subsiding any of the demand that we've seen earlier."

87.     In May 2017, however, Acacia acknowledged that the provincial buildout involved multiple parts/deals and was not yet approved, and that visibility would be limited for a few months. As Gavin represented during the May 9, 2017 earnings conference call, "[t]he provincial network expansion . . . is going to come in smaller pieces" and could receive approval within "30 to 60 days," which meant Acacia "need[ed] a few months to get clarity on the provincial piece . . . ."  Despite the importance of this information, Acacia's SEC filings failed to disclose it – before or after that date.

88.     Nevertheless, by June 7, 2017, Acacia's "clarity" was no better.  On that date, Acacia took part in the BofA Merrill Lynch Global Technology Conference, in which Shanmugaraj stated: "this year is the provincial networks, and some of the deployments ha[ve] been delayed," noting there are "over 20 provinces, so these are all going to be multiple [purchase orders]" with the timing of the business "hard to predict . . . ."

89.     Similarly, a week later, on June 13, 2017, Shanmugaraj was forced to admit that the timing of the provincial buildout was "not clear," ominously stating that business awards could occur "in July or in September or in November, it's hard to tell."

90.     Thus, as shown further below, uncertainty associated with the timing of provincial business in China persisted well after the Class Period, which Acacia was forced to admit even as of November 2, 2017.

**F.     ADVA Was Experiencing Delays Rolling Out its Products**

91.     As ZTE was experiencing waning demand associated with the China buildout, ADVA was experiencing delays in rolling out its CloudConnect product – delays that decreased ADVA's demand for Acacia's products.

92.     In its third quarter 2016 earnings conference call on October 27, 2016, Ulrich Dopfer ("Dopfer"), the CFO of ADVA SE, ADVA's parent company, acknowledged that the "FSP 3000 CloudConnect is slightly behind schedule, but it's starting to ramp up." Elaborating on the delay, Brian Protiva ("Protiva"), CEO of ADVA SE, stated "[w]e're about three months behind," further explaining:

> "We had set initial shipment in Q2, low single digit millions in Q3 and then moving to double digit millions in Q4. And we shipped first products. We got a handful of customers in Q3, small volumes, first shipments. This quarter in Q4, we'll do low millions and then we'll move to double digit starting early next year. *So, we're about three months behind the curve on the CloudConnect*."

> "And the reasons were a number of issues from just yields, scaling output, software and hardware challenges, but we have them all under control and we're moving forward at this point. But we lost some time."

93.     Given the approximately three-month delay described during the October 27, 2016 call, ADVA evidently began experiencing difficulties rolling out its CloudConnect product no later than the end of July 2016 (three months before late-October 2016), and possibly earlier.

94.     The situation was still dire, however, when ADVA SE held its fourth quarter 2016 earnings conference call on February 23, 2017. On that date, Protiva indicated that ADVA was still experiencing difficulties in ramping up CloudConnect, stating, in part, as follows:

> "[W]e are now starting to ramp our FSP 3000 CloudConnect solutions, as seen by the bookings of double digit millions of orders in Q4, 2016. **We are still challenged with the ramp up of manufacturing**, but this is within the standard challenges of bringing on cutting edge technologies and ramping growth with these new technologies within a very short period of time."

95.     Moreover, as he further explained, ADVA generated "seasonally less business" in the fourth quarter of 2016, which harmed the rollout and adoption of CloudConnect technology.  In fact, Protiva noted that ADVA had experienced engineering and supplier-related delays, stating: "Some of the things took longer than expected from both our own engineering, but also specifically some of our suppliers there."

96.     In turn, Dopfer said that long "lead times" for "certain components" required ADVA to increase inventory levels, as follows:

> "I would add that for certain components, maybe the lead times are a little longer than we're used to and that's why we just have to account for that in order to make payment flexibility and to fulfill orders quickly. And that's why we increased some -- for some components the inventory levels as well."

97.     During its second-quarter earnings conference call on July 20, 2017, however, ADVA SE indicated that it was continuing to experience complications rolling out CloudConnect and also a slowdown in business.  In his opening remarks, for example, Protiva commented: "Our results are strong but our forecast demonstrates a slowing of our business while we consolidate our margins and focus on introducing our new product architectures to market."  With respect to CloudConnect, he further stated: "From a product perspective we saw our FSP 3000 CloudConnect ramping in the first half but **the growth projection seems to be slowing in Q3**."

98.     Moreover, when asked about "relatively weak Q3 guidance" and "why the margin guidance is also pretty low," Protiva blamed the "CloudConnect product" as one of two contributing issues.  Indeed, as he later explained, when noting ADVA was experiencing delays in converting some customers to CloudConnect technology: "it is taking us longer than we had anticipated to get

into some of our key customers." In fact, Protiva admitted: "CloudConnect is not ramping as fast as we had hoped or anticipated"; "[a]nd in Q3 as indicated, CloudConnect doesn't look like it is growing quickly . . . ."

99.     On October 26, 2017, ADVA SE issued a press release announcing disappointing third-quarter financial results, reporting that "[q]uarterly revenues decreased to EUR 111.2 million from EUR 144.2 in Q2 2017," which "marks a decrease of 30.3% year-on- year (YoY) (Q3 2016: EUR 159.5 million) . . . ." In his comments, Protiva characterized the third quarter of 2017 as "one of the most challenging quarters in our company's history," adding: "[*w]e had to lower our guidance within a financial quarterly period for the first time since Q2, 2008*."

100.     Accordingly, for a substantial portion of the Class Period, ADVA was experiencing significant setbacks and delays in rolling out the CloudConnect product to its customers, as well as rising inventory levels and disappointing financial results. But neither the Offering Documents nor Acacia's other SEC filings or public statements adequately apprised investors of these problems, nor the impact that these issues could have on Acacia's own financial condition and prospects.

**G.     Item 303 of SEC Regulation S-K**

101.     SEC Regulation S-K requires an issuer to prepare the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section ("MD&A") in compliance with Item 303 [17 C.F.R. §229.303]. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on its future prospects.

102.     Thus, instruction 3 to Item 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." Instruction 3 to Item 303(a) further provides: "This would include descriptions

and amounts of (A) matters that would have an impact on future operations and have not had an

impact in the past, and (B) matters that have had an impact on reported operations and are not

expected to have an impact upon future operations."

103.    Specifically, Item 303(a)(3) requires that the MD&A section of a company's filings

with the SEC (*e.g.*, Forms 10-Q and 10-K), among other things:

> (i)     Describe any unusual or infrequent events or transactions or any significant
> economic changes that materially affected the amount of reported income from
> continuing operations and, in each case, indicate the extent to which income was so
> affected. In addition, describe any other significant components of revenues or
> expenses that, in the registrant's judgment, should be described in order to
> understand the registrant's results of operations.

> (ii)    Describe any known trends or uncertainties that have had or that the registrant
> reasonably expects will have a material favorable or unfavorable impact on net sales
> or revenues or income from continuing operations. If the registrant knows of events
> that will cause a material change in the relationship between costs and revenues
> (such as known future increases in costs of labor or materials or price increases or
> inventory adjustments), the change in the relationship shall be disclosed.

104.    Furthermore, in its May 18, 1989 interpretive release [Management's Discussion and

Analysis of Financial Condition and Results of Operations, Release Nos. 33-6835; 34-26831, 1989

SEC LEXIS 1011, at *19 (May 18, 1989)], the SEC set forth the following standard to determine

whether Item 303 requires disclosure:

> Where a trend, demand, commitment, event or uncertainty is known, management
> must make two assessments:

> (1)     Is the known trend, demand, commitment, event or uncertainty likely
> to come to fruition? If management determines that it is not reasonably likely to
> occur, no disclosure is required.

> (2)     If management cannot make that determination, it must evaluate
> objectively the consequences of the known trend, demand, commitment, event or
> uncertainty, on the assumption that it will come to fruition. Disclosure is then
> required unless management determines that a material effect on the registrant's
> financial condition or results of operations is not reasonably likely to occur.

105.    Item 303 is applicable to the Offering Documents, Forms 10-Q and Form 10-K filed during the Class Period, as follows:

(a)    *Registration Statement/Prospectus*: Item 11(h) of Part I of the Instructions to the Form S-1 registration statement ("Information Required in Prospectus") requires the prospectus to include the "[i]nformation required by Item 303 of Regulation S-K (§229.303 of this chapter), management's discussion and analysis of financial condition and results of operations[.]"

(b)    *Form 10-Q*: Item 2 ("Management's Discussion and Analysis of Financial Condition and Results of Operations") of Part I ("Financial Information") of the Instructions to Form 10-Q requires it to include "the information required by Item 303 of Regulation S-K (§ 229.303 of this chapter)."

(c)    *Form 10-K*: Item 7 ("Management's Discussion and Analysis of Financial Condition and Results of Operations") of Part II of the Instructions to Form 10-K requires it to include "the information required by Item 303 of Regulation S-K (§ 229.303 of this chapter)."

106.    As alleged herein, waning demand in China as the broadband expansion continued (for Acacia's products and those of its largest customer, ZTE), coupled with the unpredictable timing of business associated with the provincial portion of the buildout in China and a reduction in demand from another key customer (ADVA), presented known trends and uncertainties that were reasonably likely to – and, when they came to fruition during the Class period, did – adversely affect Acacia's revenues and/or results of operations.  Accordingly, Item 303 required disclosure of these trends and uncertainties, as well as the impact they were reasonably likely to have on the Company's financial condition, in the Offering Documents, Forms 10-Q and Form 10-K during the Class Period.

107.    These filings failed to disclose the known trends and uncertainties associated with declining and unpredictable demand for Acacia's products, or those of its customers, in China and

elsewhere. The omission of this information violated the disclosure obligation imposed by Item 303, further substantiating the claims brought under Section 11 and 12(a)(2) of the 1933 Act as to the Offering Documents and Section 10(b) of the 1934 Act as to the Offering Documents, Forms 10-Q and Form 10-K.

108.    Moreover, the Offering Documents, Forms 10-Q and Form 10-K were materially misleading because they each represented, and/or a reasonable investor would understand, that they were prepared in conformity with the regulations governing their preparation. Yet these filings were not prepared in compliance with Regulation S-K or the instructions governing their preparation, because they lacked the disclosures required by Item 303. In this respect, the Offering Documents, Forms 10-Q and Form 10-K contained half-truths, because they conveyed to investors that they disclosed all information required by Item 303, when, in fact, they did not.

## V.    THE 1933 ACT ALLEGATIONS[2]

109.    On September 26, 2016, Acacia filed a Form S-1 registration statement with the SEC, which indicated that the Company intended to issue and sell approximately $125 million worth of its common stock and that certain selling stockholders would sell additional amounts of their personally held shares.

110.    On October 4, 2016, Acacia amended its Form S-1 registration statement, which was declared effective on October 6, 2016 by the SEC. On or about October 7, 2016, Acacia priced the Secondary Offering at $100 per share and filed its final prospectus (the "Prospectus"), which formed part of the registration statement (the "Registration Statement" and with the Prospectus, collectively, the "Offering Documents"), with the SEC. In the Secondary Offering, which closed on October 13,

---

[2]    For the avoidance of doubt, this section does not, and is not intended to, incorporate by reference the "1934 Act Allegations" section below. Any allegations of fraud in that section, or any other section herein, are expressly disclaimed, and not incorporated by reference, in this section.

2016, Acacia issued and sold 1,210,302 shares of common stock, receiving more than $121 million in gross proceeds; and the Selling Defendants sold approximately 3,289,698 of their personally held shares, receiving approximately $328.9 million in gross proceeds.

111.     The Offering Documents emphasized ongoing, strong demand for Acacia's products, stating in part that Acacia had "experienced rapid revenue growth over the last several years," noting that its "revenue for 2015 was $239.1 million, a 63.5% increase from $146.2 million of revenue in 2014," and that its "revenue for the six months ended June 30, 2016 was $200.7 million, a 91.0% increase from $105.1 million of revenue in the six months ended June 30, 2015."  For the quarter ending September 30, 2016, the Offering Documents stated that Acacia expected "revenue of $130 million to $133 million," an increase of more than 100% over the $65.4 million reported in the third quarter of 2015.

112.     The Offering Documents stated that Acacia's "revenue ha[d] generally increased . . . due to increased demand for products in [its] 100 Gbps product family, as well as the introduction of new products in [its] 400 Gbps product family."   The Offering Documents also stated that Acacia's "Competitive Strengths" included "[c]ustomer collaboration provid[ing a] deep understanding of market needs." Acacia represented that it "collaborate[s] closely with [its] customers, as well as directly with many cloud and service providers, which allows [it] to better understand their needs and anticipate next generation product and service requirements."

113.     The Offering Documents further stated that as Acacia "continue[d] to enhance and expand [its] product families, and as [its] existing customers [sought] to expand and improve their network equipment technology, [Acacia] expect[ed] to generate additional revenue through sales to these customers." The Offering Documents stated that Acacia's products and existing customers

"will drive more network equipment manufacturers to purchase their optical interconnect products

from [Acacia]."

114.     Addressing the design and manufacture of products, the Offering Documents stated,

in part, as follows:

Our modules are rooted in our low-power coherent DSP ASICs and/or silicon PICs, which we have specifically developed for our target markets. Our coherent DSP ASICs are manufactured using complementary metal oxide semiconductor, or CMOS, and our silicon PICs are manufactured using a CMOS- compatible process. CMOS is a widely-used and cost-effective semiconductor process technology. Using CMOS to siliconize optical interconnect technology enables us to continue to integrate increasing functionality into our products, benefit from higher yields and reliability associated with CMOS and capitalize on regular improvements in CMOS performance, density and cost. Our use of CMOS also enables us to use outsourced foundry services rather than requiring custom fabrication to manufacture our products. In addition, our use of CMOS and CMOS compatible processes enables us to take advantage of the major investments in manufacturing and the technology and integration improvements driven by other computer and communications markets that rely on CMOS.

Our engineering and management teams have extensive experience in optical systems and networking, digital signal processing, large-scale ASIC design and verification, silicon photonic integration, system software development, hardware design and high-speed electronics design. This broad expertise in a range of advanced technologies, methodologies and processes enhances our innovation, design and development capabilities and has enabled us to develop and introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009. . . . In the course of our product development cycles, we continuously engage with our customers as they design their current and next-generation network equipment, which provides us with insights into current and future market needs.

115.     Additionally, the Offering Documents described Acacia's manufacturing protocols

and procedures, stating, in part, as follows:

We contract with third parties to manufacture, assemble and test our products. We utilize a range of CMOS and CMOS-compatible processes to develop and manufacture the coherent DSP ASICs and silicon PICs that are designed into our modules. We select the semiconductor process and foundry that provides the best combination of performance, cost and feature attributes necessary for our products. For several of our products, a single foundry fab is selected for semiconductor wafer production.

We contract with three third-party contract manufacturers to test, build and inspect modules incorporating our coherent DSP ASICs and silicon PICs for high-volume production of our modules. Our contract manufacturers also implement many customer-specific configurations and packaging before customer shipments. We build the test systems used by our contract manufacturers. We also directly manufacture prototype products and limited production quantities during initial new product introduction.

We believe our outsourced manufacturing model enables us to focus our resources and expertise on the design, sale, support and marketing of our products to best meet customer requirements. We also believe that this manufacturing model provides us with the flexibility required to respond to new market opportunities and changes in customer demand, simplifies the scope of our operations and administrative processes and significantly reduces our working capital requirements, while providing the ability to scale production rapidly.

We subject our third-party manufacturing contractors and foundries to qualification requirements in order to meet the high quality and reliability standards required of our products. ***Our engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that component sourcing strategies are in place to support our manufacturing needs.***

116. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

117. Specifically, the Offering Documents failed to disclose that Acacia's manufacturing, quality control and oversight processes were insufficient to prevent basic quality issues from occurring. As revealed during the Class Period, a defective circuit-board cleaning process used by one of Acacia's three contract manufacturers, which by independent accounts caused rust formation, resulted in the spoliation of a significant number of products. This issue adversely affected Acacia's revenues and required it to institute more rigorous quality control processes – processes it should have had in place earlier during the Class Period, but that investors believed were already in use given Acacia's representations in the Offering Documents.

118.    Further, the Offering Documents did not disclose that the Company was experiencing declining demand for its products from its most important customers, or that demand associated with the next phase of business in China – the provincial buildouts – was unpredictable, which would also impact its revenues.

119.    In a section entitled "Customers," Acacia disclosed its substantial and continued dependence on two key customers – ADVA and ZTE – for 2014, 2015 and the six-month period ending June 30, 2016, representing:

> We have historically generated most of our revenue from a limited number of customers. In 2014, 2015 and the six months ended June 30, 2015 and 2016, our five largest customers in each period (which differed by period) collectively accounted for 77.7%, 72.6%, 79.2% and 79.8% of our revenue, respectively. In 2014, 2015 and the six months ended June 30, 2015 and 2016, ADVA Optical Networking North America, Inc. accounted for 23.4%, 22.2%, 28.8% and 23.6% of our revenue, respectively, and ZTE, accounted for 35.4%, 27.6%, 29.0% and 37.9% of our revenue, respectively. In addition, during 2015 and the six months ended June 30, 2015 and 2016, Coriant, Inc. accounted for 13.1%, 12.0% and 10.7% of our revenue, respectively. The loss of any a large customer, which could be due to reasons beyond our or their control, could materially harm our business, financial condition, results of operations and prospects.

120.    Moreover, the Offering Documents stated that Acacia generated most of its revenue from the Asia-Pacific region, indicating that such revenue increased 182% in the six months ended June 30, 2016 as compared to the prior-year period, as the following chart illustrates:

| | Six Months Ended June 30, 2015 | As a % of Total Revenue | Six Months Ended June 30, 2016 (dollars in thousands) | As a % of Total Revenue | Change in $ | % |
|---|---|---|---|---|---|---|
| Americas | $        18,766 | 18% | $        43,753 | 22% | $24,987 | 133% |
| EMEA | 51,328 | 49% | 58,188 | 29% | 6,860 | 13% |
| APAC | 34,996 | 33% | 98,740 | 49% | 63,744 | 182% |
| Total revenue | $      105,090 | 100% | $      200,681 | 100% | $95,591 | 91% |

121.    But the Offering Documents did not disclose waning demand for Acacia's products in China (as further explained herein), nor that ADVA and ZTE were experiencing declining demand and sales that could adversely affect Acacia's business or revenues.  In fact, the Offering Documents did not even describe the broadband expansion in China, including the phased nature of the business,

the fact that the national backbone expansion in China was nearly complete, or the unpredictability and uncertainty associated with business from the following phase – the provincial buildouts, whose timing was dependent on 23 individual provinces.  Given the importance of ADVA, ZTE and the broadband expansion in China to Acacia's business, the omission of this key information rendered the Offering Documents materially misleading.

122.    Rather, in a lengthy and generic disclosure under the heading "The industry in which we operate is subject to significant cyclicality," Acacia represented that its industry is "cyclical." Indeed, without disclosing the specific risks and uncertainties that the Company faced as a result of the phased buildout in China, the Offering Documents represented, in pertinent part, as follows:

> Capital expenditures can be highly cyclical due to the importance and focus of local initiatives, such as the ongoing telecommunications build out and upgrade in China, government funding and other factors, thus resulting in wide fluctuations in product supply and demand. From time to time, these factors, together with changes in general economic conditions, have caused significant industry upturns and downturns that have had a direct impact on the financial stability of our customers, their customers and our suppliers.

123.    The Offering Documents, however, did not disclose enough information about the buildout in China for investors to reasonably appreciate the risks and uncertainties associated with that portion of the Company's business.  Indeed, although the above disclosure referenced "local initiatives," it did not disclose that the ongoing phase of the expansion project in China would soon conclude, only to be followed by the provincial phase of the buildout, comprised of numerous small purchase orders whose timing and award was unpredictable and highly dependent on various factors outside of Acacia's control.

124.    Moreover, while the Offering Documents mentioned "risks" related to ownership of the Company's common stock, those risks were not adequately detailed; and the Company did not disclose the risks that were then, in fact, transpiring or adversely affecting its business.  For example,

the Company identified, in part, the following examples of "[s]ome of the factors that may cause the market price of our common stock to fluctuate":

- "**announcements by our customers** regarding significant increases or decreases in capital expenditures"; and

- "changes in general economic, industry and market conditions and trends, **including the economic slowdown in China** that began in 2015 and the uncertainty arising from the June 2016 referendum vote in the United Kingdom in favor of exiting from the European Union."

125.    This language failed to take into account: (a) internal information, presumably shared with Acacia and its management team, concerning the current and prospective needs of its largest customers, such as ZTE and ADVA; and (b) the vagaries of the provincial buildout, whose timing and purchase order awards were uncertain and impossible to predict, and therefore undermined the guarantees that Acacia and its management team made regarding demand in China or otherwise for its products.  Nor did this language disclose the potential impact likely to result from the trends and uncertainties facing Acacia resulting from declining and/or uncertain demand for its products.  Yet the adverse trends, events and/or uncertainties associated with these issues were reasonably likely to have a material impact on Acacia's profitability, revenues and results of operations, and, therefore, were required to be disclosed in the Offering Documents.

126.    Accordingly, the Offering Documents failed to disclose known trends, events and uncertainties under Item 303, which also rendered it materially misleading.  Unsurprisingly, when the truth was revealed regarding the condition of Acacia's relationship with its two top customers and the Company's pervasive manufacturing problems (described below), the price of Acacia's common stock declined significantly.  Based on the full disclosure of the truth between October 27, 2016 and July 13, 2017, the stock price closed at $39 per share on July 14, 2017 – far below the $100 per share price of the common stock sold in the Secondary Offering.

## VI.    THE 1934 ACT ALLEGATIONS

### A.    The August 11, 2016 Statements and 3Q16 Guidance

127.    The Class Period starts on August 11, 2016.  On that date, Acacia issued a press release, which it filed with the SEC as an exhibit to Form 8-K after the market closed, announcing its financial results for the second quarter ended June 30, 2016 ("2Q16") – its first quarter as a public company – and providing financial guidance for the forthcoming quarter ending September 30, 2016 ("3Q16").  Specifically, for 2Q16, Acacia reported net income of $17.60 million under Generally Accepted Accounting Principles ("GAAP") (or $0.43 per diluted share) on revenue of $116.19 million, compared to GAAP net income of $4.71 million on revenue of $57.85 million for the same period in the prior year – a year-over-year increase in revenue of 101% and net income of 274%.

128.    Commenting in the press release on the 2Q16 financial results, Acacia's President and CEO Shanmugaraj and CFO Gavin stated, in pertinent part, as follows:

"Our record second quarter results exceeded our expectations across the board and reflect the success of our disruptive technology in transforming cloud, content and communications networks. These results are a testament to our strategy and demonstrate our leadership position in the high-growth 100G plus optical networking market," said Raj Shanmugaraj, President and CEO of Acacia Communications, "***We continue to see strong global demand for our products***, driven by metro and inter-data center network infrastructure buildouts."

"We are delighted to have completed our IPO during the second quarter and are excited about the many opportunities ahead of us," said John Gavin, CFO of Acacia Communications, "The IPO enabled us to strengthen Acacia Communications' balance sheet while providing substantial capacity to further grow the business."

129.    Additionally, with respect to 3Q16 guidance, the Company disclosed the following information in the press release:

| Quarter Ending September 30, 2016 | | | | |
|---|---|---|---|---|
| Revenue (millions) | $ | 120.0 | to $ | 128.0 |
| Non-GAAP Net Income (millions) | $ | 26.0 | to $ | 31.0 |
| Non-GAAP Diluted Earnings Per Share | $ | 0.64 | to $ | 0.76 |

130.    The statements above regarding "global demand for our products" and "substantial capacity to further grow the business" were materially misleading, because they failed to disclose the phased structure of the China broadband expansion and the unpredictability that came with the next phase involving provincial buildouts.  Instead, these statements led investors to believe that demand for Acacia's products – including demand in China, generally and from its largest customer, ZTE – was continuing, sustainable and even increasing.

131.    Also on August 11, 2016, Acacia filed with the SEC its Form 10-Q for 2Q16 (the "2Q16 Form 10-Q"), which repeated the 2Q16 financial results disclosed in the press release and provided additional information regarding the Company's financial condition and prospects.  The 2Q16 Form 10-Q also contained substantially similar, if not identical, risk disclosures as compared to those in the Offering Documents and quarterly/yearly Class Period filings.  The 2Q16 Form 10-Q was signed by Shanmugaraj and included Certifications, signed by Shanmugaraj and Gavin and dated August 11, 2016, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

132.    In their SOX Section 302 Certifications, Shanmugaraj and Gavin represented, in pertinent part, the following:

I, [defendants Shanmugaraj and Gavin], certify that:

1.    I have reviewed this this Quarterly Report on Form 10-Q of Acacia Communications, Inc.;

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

3.    Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows* of the Registrant [Acacia] as of, and for, the periods presented in this report;

4.      The Registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

(c)      Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.      The Registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

133.    In their SOX Section 906 Certifications, Shanmugaraj and Gavin represented, in

pertinent part, the following:

In connection with the Quarterly Report on Form 10-Q of Acacia Communications, Inc. (the "Company") for the period ended June 30, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), [Murugesan Shanmugaraj, as President and Chief Executive Officer of the Company; or John F. Gavin, as Chief Financial Officer of the Company], hereby certifies, as of the date hereof, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and *the information*

*contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company* at the dates and for the periods indicated.

134.     These Certifications were false and misleading because they represented that: (i) the SEC filing to which they relate "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," when information regarding declining demand in China and elsewhere was omitted; (ii) the "financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows," when Item 303 and other disclosures were absent; (iii) Shanmugaraj and Gavin had designed effective internal controls and evaluated the effectiveness of such controls, when Acacia's controls were not calculated to result in the public disclosure of all material information the Company had a duty to provide; and (iv) "the information contained [therein] . . . fairly presents, in all material respects, the financial condition and results of operations of the Company," when that was not true based on the foregoing.

135.     Later, also on August 11, 2016, Acacia conducted a conference call with analysts and investors and provided further commentary about the Company's business metrics and financial prospects.  Among those participating in the call on behalf of Acacia were President and CEO Shanmugaraj, CFO Gavin and CTO Mikkelsen, who each discussed Acacia's products and financial performance.  Analysts from Deutsche Bank, Needham, BofA Merrill Lynch (an affiliate of Merrill Lynch), Cowen and Goldman Sachs also participated.

136.     During the conference call, Shanmugaraj and Gavin described robust demand for the Company's products, including increasing demand from customers based in China, and represented

that they believed demand would continue through 3Q16.   In his opening remarks, for example, Shanmugaraj stated, in pertinent part, as follows:

> *Geographically we are seeing demand across all regions, while demand from China is particularly strong*. Our customer base has grown from 8 customers in 2011 to more than 25 customers in the first half of 2016. We have seen substantial increases in customer revenue in the past four years from our original eight customers. They have increased both the volume and the number of products they purchase from us. And we believe we will see similar increases from our newer customers going forward.

> *Our growth is being driven by strong global demand* from metro and inter-data center network build-outs. We believe that the industry is in the early stages of a multiyear build-out cycle of 100G, 200G and 400G technology. These build-outs are happening in long-haul, including [submarine], and in metro and inter-data center networks.

> In the second quarter we saw a step-function increase in demand, *driven by deployments in all of our growth markets*. *We started to see this demand increase beginning late in the first quarter and continuing into the second quarter*, which enabled us to achieve a revenue growth rate of 91% year over year in the first half of 2016. *We expect similar growth to continue into the second half of 2016*.

137.   Additionally, Shanmugaraj referenced Acacia's 2Q16 financial results to underscore the "strength" of the Company's business, stating: "These results demonstrate the strength of both our business and operating leverage in our model."

138.   Further, Shanmugaraj ended his remarks by citing increasing "customer demand," stating: "In summary, we are very pleased with our strong financial performance and our ability to quickly scale *to meet growing customer demand*."

139.   In his opening remarks, Gavin reiterated the message conveyed by Shanmugaraj. Initially, he referenced Acacia's 2Q16 financial results to underscore its growth, explaining: "This growth was driven by continued strong global demand from metro and inter-data center network build-outs, with particularly strong demand from the China market."   Then, he reinforced the notion that there was strong demand for Acacia's products on a global scale, stating:

"We are very encouraged by *the continued strong demand for our products across our customer base coming out of the second quarter*, which provides us with good visibility to our business in the third quarter. *This ongoing demand is led by the same market drivers we saw in the second quarter; namely growth driven by continued strong global demand* from metro and inter-data center network build-outs, with customers of our legacy products now migrating to our next-generation silicon PIC products."

140.    Gavin then turned to 3Q16 guidance, noting that the 2Q16 results were representative

of the Company's anticipated performance in 3Q16 and the remainder of the year, stating:

"With that, I would like to turn to our outlook for the third quarter of 2016. As Raj [Shanmugaraj] previously stated, we achieved year-over-year growth of 91% in the first half of 2016. *We expect to see similar growth continue into the second half of 2016* with some history of seasonality in the fourth quarter."

141.    In closing, Gavin reiterated that the Company's "major demand drivers" during 2Q16

– presumably including demand from China – would continue for the foreseeable future, stating:

"We see continued strength in the major demand drivers of our business, and believe we are well-

positioned to take advantage of those growth opportunities."

142.    During the question-and-answer session with analysts and investors, Shanmugaraj

and Gavin continued to emphasize robust and continuing demand for Acacia's products, particularly

from customers based in China, including ZTE. ZTE, however, was then subject to U.S. sanctions

that prevented it from purchasing equipment from U.S. manufacturers, such as Acacia. Nonetheless,

Acacia was effusively optimistic, as the following exchange demonstrates:

**Alex Henderson** - *Needham & Company – Analyst*:

"If I could just ask one last question. You've obviously had a lot of conversations with people out of China. Can you give us a sense of where you think people are in China with respect to new RFPs that could be left in the remainder of the year? And update us on where ZTE is relative to the issues around that government issue? Thank you."

**Raj Shanmugaraj** - *Acacia Communications, Inc. - President & CEO*:

"Alex, again as you heard in some of the other calls, ***China's in the – in a cycle of a multiyear expansion of 100G, 200G and 400G***. Started out late last year with the backbone that worked from one carrier, namely China Mobile, that went through – all through the Q1 and into Q2."

"***We are seeing more activity in the provincial networks of China Mobile, as well. It's not going to be as big as the backbone, but it will be significant. And we see activity happening in those networks through the second half of this year into the first half of next year***. We [are] also hearing about the tenders from the other two carriers, China Unicom, Telecom as well. And so in the near-term we see the 100G, 200G expansion happening in those three carriers."

"Now as some alluded as well, there is the 13th five-year plan [f]rom the Chinese government that was released that talks about the expansion of broadband all the way from the axis to the backbone from 2016 to 2020. ***That should power through the midterm of the expansion***."

"***And again, as they are adding more access capacity, adding more mobile capacity, we see [there's a] multiyear expansion. And so we are in the early innings of that***. So that's part one of the question you asked."

"In terms of ZTE, as you know, ZTE is consistently one of the top five equipment providers in the world. And we're happy to have them as a big customer of ours. As they've demonstrated, they're working through the U.S. commerce issues. ***And we believe that they are going to put the issues behind them, and looking forward to working with them as they move forward***."

143.    Accepting that representation, Needham analyst Henderson commented: "Nice super-sized opportunity there."

144.    Likewise, in an exchange with BofA Merrill Lynch analyst Tai Liani, Shanmugaraj stated that ZTE's backlog was strong and was continuing to contribute to the growth of Acacia's business, as follows:

 **Tal Liani** - *BofA Merrill Lynch – Analyst*:

"Hi, guys. I have more ZTE- specific questions. And also gross margin. What was the contribution of China? I will just shoot a few questions, and then we can discuss. What was the contribution of China this quarter, percentage-wise?"

"And then, did you provide your number one customer? What was the contribution also percentage? I know you provided growth with original eight customers versus others. Because of the issues with ZTE, I'm trying to isolate ZTE."

- 45 -

"And then another question on ZTE was, entering the quarter you had backlog of $30 million, you disclosed it before, attributed specifically to ZTE. Did you draw on this backlog or did it go up this quarter?"

\*       \*       \*

**Raj Shanmugaraj** - *Acacia Communications, Inc. - President & CEO*:

"So we will try to address one by one, Tal, although you may have to repeat the last couple. On the -- let's start with the ZTE and the contribution. So if you look at what we had in the 10-Q, ZTE, as you know, in Q1 was pretty large, 46% revenue. And that was because of the backbone build-outs. And then in Q2 they've dropped down to 31%."

"So it is lower. So we had the other customers move up. ***In terms of backlog, we see continual strong backlog as well from ZTE going into the rest of the year. We don't see a whole lot of slowdown, if that's what you're getting at, in terms of backlog coming from ZTE, or growth prospects for them in terms of expansion***."

145.    Thus, Acacia continued to positively portray demand from China – both currently and for the foreseeable future – and led analysts and investors to believe the demand was sustainable.  In fact, Acacia did not disclose ZTE's susceptibility to the unpredictable timing of future business awards related to the broadband expansion in China, which was reasonably likely to adversely affect Acacia's own business.

146.    Quite the contrary: Acacia represented that it was supply constrained and unable to keep pace with demand.  When Cowen analyst Paul Silverstein asked whether the Company was "at all supply constrained" during 2Q16, for example, Shanmugaraj answered, in pertinent part:

"As you know, we were similarly constrained last year. And we put in place additional capacity to scale. And so one of the reasons for our Q2 achievement was our ability to scale our CM as well to be able to meet the demand. ***Now, we are not caught up on the demand at this point yet.  We see some residual demand, even in Q3 that is not going to be satisfied***."

"Because part of it is we are bringing in another CM, but we are also adding additional products like, as you know, the AC400 is ramping to high volumes. And then we have the ACO products. ***So we are in a continual move where we are bringing in new CM but also new products that makes it a little bit more***

- 46 -

***challenged to meet – challenging to meet all the demand we have***. But we made significant headway in meeting the demand in Q2, and we expect in Q3, as well."

147.    Following the issuance of the press release, the 2Q16 Form 10-Q and the conference call, the price of Acacia common stock spiraled upward more than 40% on August 12, 2016, trading as high as $98.75 per share in intraday trading and closing at $95.67, on unusually high volume of more than 5.1 million shares trading, or more than seven times the average daily volume over the preceding ten trading days.

148.    Analysts reacted positively to the Company's statements on demand and guidance. For instance, on August 12, 2016, analysts at Deutsche Bank issued a report entitled "Solid Beat and Raise Results," which stated, in pertinent part, as follows:

**Beat and Raise Story; Reiterate Buy; Raise PT: $60 to $90**

Solid Q2 beat and raise: $116.2M / 77c versus consensus: $85.8M (consensus EPS numbers are not comparable), and the Q3 guide: $120-128M / 64-76c versus consensus: $91.7M. ***The top-line beat was driven by strong global demand for ACIA's 100G and 400G Optical modules in Metro and Cloud Datacenter Interconnects***. We are bullish on ACIA's "disruptive" Optical Networking Growth Story - a +$4-5B Silicon Optical opportunity [DB view]. Our mid term [sic] view calls for +30% topline CAGR, high 40s gross margin, low 20s operating margin. We raise our PT from $60 to $90. Reiterate BUY.

149.    Likewise, on August 12, 2016, analysts at Cowen issued a report entitled "2Q16: Comes Out of the Gate Firing On All Cylinders," which stated, in pertinent part, as follows:

2Q16 operating results bolster our investment outlook: ACIA represents an exceptional company addressing a significant 100G+ optical upgrade cycle (***fueled by Metro, DCI and China***), ***which should continue to drive impressive growth and operating profitability***. We are significantly raising our operating forecasts and price target and reiterate our Outperform rating.

**Significantly Increasing Estimates Off of Significant Beat and Raise**

We have significantly increased our operating forecasts and price target in the wake of ACIA's 2Q16 extraordinary results and outlook. We have increased our CY16, 17 and 18 revenue forecasts by over $100M in each year and PF EPS estimates by $1.14, $0.83 and $0.32, respectively. 2Q16 $116.1M revenue and $0.77 EPS was ~ $30 mln (or 35+%) and over $0.46 (or ~ 150%) above our $86.3M/$0.31 and Street

- 47 -

consensus's $85.8M/$0.30 estimates. The significantly higher revenue (35+%) together with significantly higher GM (~4 pp) drove the 150% EPS upside relative to our and consensus's estimates. In addition, ACIA posted opex over $2M below consensus's estimate. Similarly, ACIA's $120 – 128M 3Q16 rev and $0.64 – 0.76 PF EPS guidance each significantly exceeded our $91.6M/$0.43 and consensus's $90.7M/$0.42 previous estimates—at the midpoint by over $32 mln (or 35%) and $0.27 (or ~ 65%), respectively. Alternatively viewed: reported 2Q16 EPS exceeded our EPS forecast for 2Q16 + 3Q16. ***Strong growth in backlog, lead times of 9 - 10 weeks on the low end to as much as 13 – 15 weeks on the higher end, and some degree of supply constraint provides good visibility***.

150.    The statements made by or on behalf of Acacia above variously in the August 11, 2016 press release, 2Q16 Form 10-Q and August 11, 2016 conference call regarding strong global demand for its products – particularly from China – were misleading in the absence of disclosure of the unpredictable timing of future business in China.  These statements include:

(a)    Shanmugaraj's statements, such as: "we are seeing demand across all regions, while demand from China is particularly strong"; "[o]ur growth is being driven by strong global demand from metro and inter-data center network build-outs"; and "[w]e expect similar growth to continue into the second half of 2016"; and

(b)    Gavin's statements, such as: "[t]his growth was driven by continued strong global demand from metro and inter-data center network build-outs, with particularly strong demand from the China market"; "[w]e expect to see similar growth continue into the second half of 2016"; and "[w]e see continued strength in the major demand drivers of our business."

151.    Likewise, Shanmugaraj's other statements – about the provincial buildout phase in China and ZTE's backlog and demand – were false and misleading in the absence of disclosure of the lack of visibility into the timing and amount of business awards associated with the provincial buildout and the reasonably likely adverse impact of the delay of such business on ZTE and, by extension, Acacia.  These statements include:

(a)     "We are seeing more activity in the provincial networks of China Mobile, as well. It's not going to be as big as the backbone, but it will be significant. And we see activity happening in those networks through the second half of this year into the first half of next year."

(b)     "In terms of backlog, we see continual strong backlog as well from ZTE going into the rest of the year. We don't see a whole lot of slowdown, if that's what you're getting at, in terms of backlog coming from ZTE, or growth prospects for them in terms of expansion."

152.     As the above statements reflect, Shanmugaraj failed to provide the necessary factual context for investors to understand the vagaries associated with the provincial expansion work, much less the impact on ZTE and Acacia.  Rather, he and Acacia falsely implied that they had investigated the issue and achieved a reasonable level of assurance that the provincial work "will be significant" and "happening . . . through the second half of this year into the first half of next year."  In other words, the provincial work would closely follow the completion of the national backbone expansion work in China, sustaining – if not increasing – demand for Acacia's products through the second half of 2016 and the first half of 2017 (*i.e.*, 3Q16, 4Q16, 1Q17 and 2Q17, as defined herein and below).

153.     In addition, Shanmugaraj and Acacia falsely implied that they had a sufficient basis to represent that they "see continual strong backlog . . . from ZTE going into the rest of the year" and "don't see a whole lot of slowdown . . . in terms of backlog coming from ZTE, or growth prospects for them in terms of expansion."  In fact, the slowdown and unpredictability in demand from China related to the provincial portion of the broadband expansion then threatened Acacia's receipt of business from ZTE, as well as "growth prospects" from ZTE "in terms of expansion."  But these factors were not mentioned in Acacia's public statements, leading investors to wrongly believe that Acacia and its management team were privy to information confirming that demand from China and ZTE was sustainable and even subject to increasing.

154.     Furthermore, the 2Q16 Form 10-Q was also materially false and misleading because it failed to disclose known trends, events and uncertainties under Item 303.  Specifically, business and demand from China represented a known uncertainty for Acacia, in that the timing and amount of the provincial piece of the work was inherently unpredictable in timing and amount.  Moreover, this unpredictability also presented a known uncertainty given its adverse consequences for ZTE and the correspondingly negative impact on Acacia.

**B.     The September 14, 2016 Statements**

155.     On September 14, 2016, Acacia participated in the Deutsche Bank Technology Conference, in which Shanmugaraj and Gavin presented on the Company, discussed its business – including demand in China – and answered questions.  Specifically, during the conference, Deutsche Bank analyst Vijay Bhagavath asked them to identify Acacia's "fundamental and near-term demand drivers," citing "buildouts in China," among other things.  In response, Shanmugaraj elaborated on the Company's demand drivers, focusing in part on China, as follows:

> "And then you have ***the infrastructure buildout like in China***, where you have lots more.  You have 750 million smartphones in there that they are trying to have high bandwidth services to.  They don't have fixed high-speed bandwidth to the homes as well, and ***so they are trying to get to 5G pretty quickly.  That's another big demand driver that we see*** that is driving.  That all adds to traffic, fiber-optic traffic."

156.     Reinforcing the sentiments expressed by Shanmugaraj, Gavin stated that demand was strong across-the-board – including China – representing: "I think all of those markets we're seeing strong growth from, from all the customer base.  ***It's really a global buildout cycle***.  It's not necessarily any one geographic area, but it's definitely – ***we're seeing that across the globe***."

157.     Moreover, Shanmugaraj again explicitly discussed the China buildout when asked for detail on demand from China and other regions, as the following excerpted exchange demonstrates:

**Vijay Bhagavath** - *Deutsche Bank – Analyst*:

"So speaking of geography, I want to get your viewpoint. Give us some geographical or an opportunity. Like in China in particular, do you see this as just multiple quarters or multiple years of this broadband optical buildout in China? And then, in various other parts of the world, where are you seeing activity and what is driving the demand for Acacia's products? So, like a geographic snapshot."

**Raj Shanmugaraj** - *Acacia Communications, Inc. - President & CEO*:

"***Yes. I think China is -- as you talked about, the broadband initiative is a five-year plan going from 2016 to 2021***. And they are trying to -- obviously, they -- China Mobile, just as a size, has got five times more -- five times the number of subscribers as Verizon Wireless does. So you have the share masses, and they are trying to build out smartphone infrastructure, getting video down to these smartphones at a rapid pace. And so, that is one area that we basically see that you hear China mobile."

"***And China is a pretty vast country as well, so they start out with a backbone infrastructure buildout and then they move into provincial networks***. And provincial networks are more like regional networks, and then you have the metro networks within there, and so it comes in multiple phases. And then, the second aspect of it is that you also got people like the China Unicom, China Telecom. They are smaller, but we are seeing tender offers from them, again increasing the fixed infrastructure bandwidth."

"And the other point to note is the Chinese carriers in general are also gaining market share outside of China. For example, in other parts of Asia, in Europe, they are growing. It doesn't mean every product that we ship into China, for example, ends up in China; it goes to our customers, it ends up in Europe, it ends up in South America, so it goes to different places as well. ***In the China piece, the big piece is the infrastructure buildout that's happening***."

"And I think if you look at the European carriers, again that goes through different phases. You have Deutsche Telekom planning something in the 2018 time frame, so you have different carriers having different cycles of moving to high-bandwidth services. But, again, from where we sit, it's the -- if you take all the metro players and if you take all the DCI players, they are roughly 30%, 40% each for us."

"So, it's a big chunk of upgrades that we see happening, and then China is another component of it, which is mixed in with this. Geographically, we see this, as John said, globally across all three regions."

158.    Again, the statements made by or on behalf of Acacia above during the September 14, 2016 Deutsche Bank Technology Conference regarding demand in China were materially false and misleading in the absence of disclosure of the unpredictability in timing and amount of the provincial

buildout in China, as well as the manner in which such waning demand was reasonably expected to impact ZTE's business. Instead, Shanmugaraj and Acacia continued to emphasize all aspects of the buildout in China – including the provincial piece – as a primary demand driver for the Company, without disclosing the known factors, such as limited (or nonexistent) visibility into the business, that undermined those representations.

### C. The Offering Documents and Increased 3Q16 Guidance

159. On September 26, 2016, Acacia filed a Form S-1 registration statement with the SEC which stated that the Company intended to issue and sell up to $125 million of its common stock and that certain selling stockholders would sell up to an additional $325 million more of their personally-held shares. As described above, Acacia ultimately amended its Form S-1 resignation statement on October 4, 2016, which the SEC declared effective October 6, 2016.

160. The Offering Documents contained materially false and misleading statements and omissions as described in the 1933 Act Allegations section above, incorporated by reference herein. The selling stockholders in the Secondary Offering included Shanmugaraj, who sold 127,250 shares, receiving more than $12.7 million in gross proceeds; Gavin, who sold 30,000 shares, receiving $3 million in gross proceeds; and several other Acacia officers and directors, who sold at least another 2,194,631 shares, receiving more than $219 million in gross proceeds.

161. Also on September 26, 2016, Acacia filed a Form 8-K with the SEC providing its "Unaudited Financial Outlook for the Third Quarter of 2016." In the Form 8-K, Acacia raised its 3Q16 revenue guidance, stating, in pertinent part, as follows:

> Based on preliminary unaudited information and estimates of the management of Acacia Communications, Inc. (the "Company") for the three months ending September 30, 2016, and subject to the completion of the 2016 third quarter and its financial closing procedures, in the three months ending September 30, 2016, *the Company expects revenue of $127 million to $131 million*, GAAP net income of $23 million to $27 million, non-GAAP net income of $29 million to $33 million,

GAAP diluted earnings per share of $0.58 to $0.67 and non-GAAP diluted earnings per share of $0.72 to $0.81.

162.    Accordingly, Acacia announced favorable guidance for 3Q16, continuing to reflect significant demand – and a robust market in China – for its products.

163.    On October 4, 2016, Acacia amended its Form S-1 registration statement, which the SEC declared effective on October 6, 2016; on October 7, 2016, Acacia priced the Secondary Offering at $100 per share and filed its final prospectus with the SEC; and on October 13, 2017, the Secondary Offering closed.  The materially misleading representations, and the omissions alleged, remained substantially similar, if not identical, in these iterations of the Offering Documents.

### D.    Revelations About Demand from ZTE and ADVA

164.    On October 27, 2016, only two weeks after the Secondary Offering, two of Acacia's largest customers – ZTE and ADVA – announced disappointing guidance that had its stock reeling, given Acacia's dependence on them for the majority of its sales and revenue.

165.    ZTE, which had provided approximately 38% of Acacia's sales during the first half of 2016, reported dismal 3Q16 sales and even worse FY16 sales guidance.  Specifically, ZTE issued weak forward sales guidance as demand for ZTE's 4G telecom infrastructure was slowing in China as major carriers completed network coverage.  Notably, ZTE's 3Q16 ended on September 30, 2016, shortly before the Secondary Offering.

166.    ADVA – Acacia's second largest customer, historically responsible for approximately 24% of its sales – also issued soft FY16 earnings guidance.  ADVA, however, said it had fallen about three months behind in rolling out its CloudConnect technology, which used Acacia's 400 gigabit coherent module.

167.    Investors immediately tied the news to Acacia, driving down its stock price.  Indeed, based on these developments, the price of Acacia stock declined approximately 14% on October 27,

2016, closing at $73.66 per share, on unusually high volume of more than 8.5 million shares traded, or more than four times the average daily trading volume over the preceding ten trading days.

168.    As reported in an October 27, 2016 article published by *Investor's Business Daily*, entitled "Acacia Communications Hammered On Customer ZTE's Sales Miss": "[s]hares of Acacia Communications (ACIA) were hammered . . . after the optical module maker's biggest customer, Chinese telecom gear firm ZTE, reported Q3 revenue that missed estimates."  Specifically, as the article recounted, ZTE "said Q3 revenue rose 5.2% to 23.8 billion yuan, missing analysts' estimates of 26.27 billion yuan."

169.    Likewise, in an October 27, 2016 article entitled "Acacia Investors Show Concern As 2 Top Customers Issue Soft Guidance," financial media outlet *Benzinga* reported that "ZTE Group, which is Acacia's top customer . . . profit and revenue growth for the third quarter, although revenues trailed estimates by some analys[t]s"; and "ADVA Optical Networking, which is Acacia's second-largest customer, issued below-consensus revenue guidance for the fourth quarter."

170.    Notwithstanding this dismal news or the profound impact it had on Acacia's stock price, the Company continued to speak favorably about its financial condition and demand for its products, as the statements below reflect.

**E.    The November 10, 2016 Statements and 4Q16 Guidance**

171.    On November 10, 2016, Acacia issued a press release, which it filed with the SEC as an exhibit to Form 8-K after the market closed, announcing its 3Q16 financial results for the quarter ended September 30, 2016 and providing financial guidance for the forthcoming quarter ending December 31, 2016 ("4Q16").  Specifically, the Company reported revenue of $135.3 million – up 107%, year-over-year – and an increase in net income of 295% year-over-year.

172.    Commenting on the results, Shanmugaraj attributed Acacia's financial performance to "strong global demand," while Gavin referenced the Company's product portfolio and increased production capacity, as follows:

> "*Our third quarter results exceeded our expectations driven by strong global demand for our products across metro and inter-data center networks*," said Raj Shanmugaraj, President and CEO of Acacia Communications. "*To satisfy this continued demand*, we further scaled our manufacturing capacity during the quarter. As was the case in the second quarter, we continued to diversify our revenue base, with two of our newer top tier customers ranking among the top five contributors to our revenue in the third quarter. Additionally, we recently announced sampling of our coherent CFP2-DCO module, leveraging our sixth DSP ASIC developed in 16nm CMOS, which we believe demonstrates our continued technology leadership position."

> "We are pleased that the continued market success of our highly-integrated product portfolio, *combined with our ability to increase production capacity*, led to enhanced profitability during the third quarter," said John Gavin, CFO of Acacia Communications. "We are also pleased to have completed our follow-on offering last month, which strengthened our balance sheet and provides us with financial flexibility to pursue our growth objectives and expand our product offerings."

173.    Additionally, with respect to 4Q16 guidance, the Company disclosed the following information in the press release:

**Quarter Ending December 31, 2016**

| | | | |
|---|---|---|---|
| Revenue (millions) | $136.0 | to | $141.0 |
| Non-GAAP Net Income (millions) | $36.0 | to | $39.0 |
| Non-GAAP Diluted EPS | $0.85 | to | $0.92 |

174.    Also on November 10, 2016, Acacia filed with the SEC its Form 10-Q for 3Q16 (the "3Q16 Form 10-Q"), which repeated the 3Q16 financial results disclosed in the press release and provided additional information regarding the Company's financial condition and prospects.  The 3Q16 Form 10-Q also contained substantially similar, if not identical, risk disclosures to those in the Offering Documents and quarterly/yearly Class Period filings.  The 3Q16 Form 10-Q was signed by Shanmugaraj and included Certifications, signed by Shanmugaraj and Gavin and dated November 10, 2016, pursuant to SOX Sections 302 and 906.  The Certifications were identical in all material

respects to those filed with the 2Q16 Form 10-Q, described above, and were materially false and misleading for the same reasons.

175.    Later that day, Acacia conducted a conference call with analysts and investors and provided positive commentary about the Company's business metrics and financial prospects. Among those participating in the call on behalf of Acacia were President and CEO Shanmugaraj, CFO Gavin and CTO Mikkelsen, who each discussed Acacia's products and financial performance. Analysts from Deutsche Bank, Cowen, William Blair, Goldman Sachs, BofA Merrill Lynch, Needham and Northland also participated.

176.    In his opening remarks, Shanmugaraj emphasized Acacia's continued dependence on strong demand from China to fuel growth, again explicitly referencing the infrastructure initiative in China and representing, in pertinent part, as follows:

> "Turning to the metro market, **growth is being driven both by major broadband investments in China with the government's China broadband initiative**, and by US carriers who are now focusing on updates to their metro networks. **We see continued demand in the China market as carriers transition** from backbone and provincial backbone network buildouts to provincial metro and access networks in 2017."

> "**We believe these investments and upgrades will continue to drive service provider spending** in the metro market. There, our CFP-DCO has seen wide market adoption, driven by cost, power, plugability, and integration benefits of our DCO solution."

177.    In fact, while discussing the topic of contributors to revenue, Shanmugaraj claimed that Acacia was "diversifying our customer base by ramping customers in the traditional switch router market *as well as new Chinese network equipment manufacturers*."

178.    Acknowledging that "our sector has a history of seasonality in the fourth quarter due to cloud and content providers' reluctance to disrupt their network traffic during the peak holiday season," Shanmugaraj nevertheless stated: "we currently do not anticipate any slowdown in the long-term demand from our customers."

179.     Finally, Shanmugaraj again ended his opening remarks by citing increasing "customer demand," stating:: "we are very pleased with our strong financial and business performance and our ability to scale *to meet growing customer demand*."

180.     For his part, Gavin echoed Shanmugaraj's sentiments and stated that the 3Q16 results were derived from strong demand, explicitly referencing China buildouts and explaining: "This growth was driven by continued strong global demand from metro and DCI network buildouts."  As he further represented, with a focus on demand from China:

> "*We continue to see strong demand from China due to the sustained buildout related to 100G and above optical networks, and we are executing on our strategy of diversifying our customer base in China*. During the quarter, revenue from newer customers outside our original 8 2011 customers grew 81% year over year and 37.2% sequentially compared to 117.3% year over year and 10.8% sequential growth for our original group of 8 customers."

181.     Gavin also reiterated Shanmugaraj's comments regarding the limited impact 4Q16 seasonality would have on the Company's business, noting that "continued strong demand" in the short-term and no slowdown in "long-term demand," as follows: "Outside of typical Q4 seasonality factors, *we are seeing continued strong demand for our products and do not currently anticipate any slowdown in long-term demand*."

182.     Closing his remarks with further statements about the strong demand for Acacia's products, Gavin stated: "We see continued strength in the *core demand drivers of our business*, including metro and DCI markets."

183.     During the question-and-answer session, Shanmugaraj and Gavin continued to emphasize strong and ongoing demand for Acacia's products, particularly from China.  For example, in response to questions from Deutsche Bank analyst Bhagavath about "the seasonality factors that we need to pay attention to heading into 2017" and "demand drivers" from original equipment manufacturers and end customers for certain Acacia products, Shanmugaraj indicated that the

Company is "seeing demand from all three markets, which [are] namely the metro and the long-haul and the data center interconnect markets."

184.    In turn, Gavin emphasized "buildouts in China" as the Company's persistent and principal growth driver, as follows:

> "Vijay, this is John. I will try to add to what Raj said around seasonality. If you look at -- when we talked about those two years out of the last three where our revenue was either flat or down sequentially, those were the 2013 and 2014 fiscal years."

> "And if you look at what happened in 2015, we actually had an increase in that particular quarter. That was driven by some of the growth that was happening in the buildouts in China. ***And in this year, we still see that continuing to happen*** as well as we're seeing now the benefit of adding the new customer base to our business. And those folks are definitely ramping their volumes over Q3 into Q4."

185.    Yet Gavin confirmed, in response to a question from William Blair analyst Dmitry Netis, that Acacia's largest geographic contributor to revenue for 3Q16 was the Asia-Pacific region, which included China, at 47%.  By contrast, North America contributed "roughly 24%" to revenues, while EMEA – comprised of Europe, Middle East and Africa – accounted for "about 32% or so."

186.    Likewise, based on Acacia's current performance, Shanmugaraj represented that business from new customers would offset any decline in revenue resulting from 4Q16 holiday seasonality.  But he failed to mention the current and impending decline in demand from China or the fact that much of the new customers' ordered product may have already been accounted for in Acacia's backlog or awaiting production or fulfillment, given the lengthy lead times associated with manufacturing equipment in accordance with the specifications of such new customers.

187.    As the following exchange demonstrates, Shanmugaraj also rejected the concern that "one [of Acacia's top three customers] already guided for pretty significant sequential declines in the fourth quarter," maintaining that Acacia could offset any such decline with continued business from that very same customer and revenue from new customers:

**Doug Clark** - *Goldman Sachs - Analyst*:

"Thanks for taking my questions. The first one I want to touch on is actually a bit of the customer concentration issues as well. And the 10-Q is out, so we can get a pretty detailed look at what those customers are."

"And what strikes me and what I want to get your response on is the three big customers that have been that way for the past few quarters were still 69% of sales, which is basically the same that it has been for the past two quarters during the year as well. So I'm wondering if you can give a little bit more detail onto that diversification."

"And then related to two out of those three big customers, ***one already guided for pretty significant sequential declines in the fourth quarter***. So I'm wondering as we look in the fourth quarter, should we really see a material ramp-up in the new customer revenue contributions ***to offset some of those potential declines***?"

**Raj Shanmugaraj** - *Acacia Communications, Inc. - President & CEO*:

"Yes, so good question. Let me take a crack at it, Doug, and maybe John can chime in. As we said, the customer concentration, while there is not an addition of another 10% customer, we made two references. One is that we have added two top-tier customers into our top five, which was not the case before. It was in Q2, but not before that. So we are happy with the ramp of our top-tier customers."

"Number two is these are 18- to 24-month lead time development. So in other words, it is not something that we take in and they plug in like a client side and off to market they go within a couple of months."

"These are 18 to 24. We -- they have to develop their product, integrate our product, then qualify our product and take it to their customers, qualify in their customers. So it is a -- it takes time. And that is the other piece of it."

"So while we don't have a new 10% customer, we have 2 of those in the top five. And also, as I said in my section, the new customers accounted for 37% sequential growth quarter over quarter. ***And we see that growth continuing, which is also what -- the point I made about the -- to offset some of the seasonality***."

"So it will take time at this point, and at the right time, obviously, we will share with you as soon as the customer crosses that 10% threshold. But the way to look at it as we have several of these that are not at the 10% level, but we're very happy with the progress of our newer customers."

*       *       *

"And again, the part B question was about what about the customers who guided, and I think I covered a little bit of that earlier. *One is that a customer like ZTE, for example, has all the way from mobile to handset to optical*."

"So is very hard. *We don't see any slowdown in the 100G and about optical segment from a customer like ZTE, for example*. So just because they claim they've guided some number, which we can't really comment on. *What we can say is that we don't see any slowdown in that ramp. And of course, it is being offset, as we talk about, with the new customers ramping up as well*."

188.    As Goldman Sachs analyst Clark clarified during the call, ADVA had "guid[ed] down . . . specifically for the fourth quarter."  Indeed, Needham analyst Alex Henderson later indicated on the call that ADVA's "guidance is down 17% sequentially."  Nevertheless, Acacia's message was clear: any revenue lost from customers that were either experiencing declining demand themselves, or reducing their own financial guidance, would be offset by revenue that Acacia would obtain from continued demand in China and new customers, in China and elsewhere.

189.    Additionally, when confronted by Needham analyst Henderson regarding ADVA's reduced guidance, Shanmugaraj stated that although Acacia expected "seasonality issues" in 4Q16, "we don't see any slowdown weakness in the long-term 100G coherent demand."  Yet Gavin acknowledged the long period between "initial selection" and production to "high-volume ramping," when discussing the growth from new customers in China, as the following exchange illustrates:

**Tim Savageaux** - *Northland Capital Markets - Analyst*:

"Hi, good afternoon. Congrats on a great quarter and continue to triple-digit growth. I want to go back at the guidance discussion. Assuming that it might be more difficult to replicate what was a very strong quarter with that. But in fact, *I would kind of assume that your business outside of that key customer is growing 15% or 20% sequentially into Q4, or something along those lines in line with what you are talking about from a new customer contribution standpoint*."

"And if -- to the extent you are not able to be granular about the new customers in particular, I was hoping you might be able to provide a little more color from perhaps a market segment standpoint, geographic standpoint. *Couple of areas I think you could be seeing some strength is China ex-ZTE, ZTE itself*, or directly with the cloud guys, or perhaps in the US metro space more broadly as well."

"So to the extent that you might be able to withstand some volatility in your customer base and still guide to sequential growth in the quarter, what is allowing you to do that maybe from a market segment standpoint[?]"

**John Gavin** - *Acacia Communications, Inc. - CFO*:

"Yes, Tim, this is John. I'll take a first run at that. So if you look at where our new customer growth is, it is really in a couple of spaces. One is -- as Raj had alluded to earlier even in his prepared remarks, *he talked about the fact that we are getting and executing on our diversification strategy with customers in China. And in that case, we are seeing growth there from a Q3/Q4 perspective*."

"Also we also referenced that over the original 8 customers is that new 17 customer set. *And they are kind of split amongst China in terms of non-ZTE China customers*. They are split amongst folks who are focused on the DCI market, and also folks that are coming from more of a traditional switch router background."

"*And in all those cases, we have seen in Q3 and expect in Q4 that those particular customers are now starting to come into the ramp* that we have expected them to come into relative to the time it takes, and Raj had alluded to this earlier, *that 24- to odd-month cycle to really get from initial selection into the high-volume ramping*. It just takes a while and these customers are now getting to that point where they are starting to begin those production ramps."

"So that's what we're seeing in terms of that overall growth driver outside of the core customer base, which, as you noted, also grew well in that Q3 time frame. So it's really coming from that group across those generic segments of the optical market."

190.    Indeed, as Shanmugaraj represented earlier in the call, "we have diversified with volt switch router vendors as well as additional customers in China" and "made good progress" doing so.

191.    The statements made by or on behalf of Acacia above variously in the November 10, 2016 press release, 3Q16 Form 10-Q and November 10, 2016 conference call regarding strong demand for its products – particularly from China – were misleading in the absence of disclosure of the unpredictable timing of business in China related to the provincial buildout of the broadband expansion.  These statements include:

(a)    Shanmugaraj's statements, such as: "growth is being driven both by major broadband investments in China with the government's China broadband initiative"; "[w]e see

continued demand in the China market as carriers transition from backbone and provincial backbone network buildouts to provincial metro and access networks in 2017"; "we currently do not anticipate any slowdown in the long-term demand from our customers"; "[w]e don't see any slowdown in the 100G and about optical segment from a customer like ZTE"; and "we don't see any slowdown in that ramp."

(b)　　　Gavin's statements, such as: "[w]e continue to see strong demand from China due to the sustained buildout related to 100G and above optical networks"; "we are seeing continued strong demand for our products and do not currently anticipate any slowdown in long-term demand"; and "[w]e see continued strength in the core demand drivers of our business."

192.　　　Indeed, despite their express reference to the China buildout, Shanmugaraj and Gavin failed to identify the factors that rendered unpredictable the timing of Acacia's receipt of business associated with the next phase of the broadband expansion in China – the provincial buildouts.  Yet they continued to represent that demand remained strong, was sustainable, and was increasing – all representations without a factual basis, given the slowdown Acacia's customers were experiencing and the lack of visibility into the award of business associated with the provincial buildout.  In fact, their dismissive tone when responding to questions on the impact of a potential or actual slowdown in the business of Acacia's top two customers – ZTE and ADVA – continued to mislead investors to believe that the Company was not materially exposed to headwinds facing the business of those two customers or China, more generally.

193.　　　Furthermore, the 3Q16 Form 10-Q was also materially false and misleading because it failed to disclose known trends, events and uncertainties under Item 303, given that business from China represented a known uncertainty for Acacia based on unpredictability associated with the provincial piece of the work and the slowdown in business ZTE and ADVA were then experiencing.

### F.      The January 10, 2017 Statements

194.      On January 10, 2017, Acacia participated in the Needham Growth Conference, in which Shanmugaraj and Gavin presented on the Company and discussed its business – again, including demand in China.  Needham analyst Alex Henderson hosted the conference.

195.      During the question-and-answer session, an attendee raised the "slowdown in China," asking Acacia's management to provide insight into demand, as follows: "Can you talk a little bit about the China market? There has been a lot of noise out of – *some slowdown in China in the communications industry in general* that I think people [indiscernible] . . . . Could you talk about what you're seeing?"  In response, Shanmugaraj answered: "if you look at the foreseeable next couple of years, we still see very strong demand from China . . . ."  Specifically, Shanmugaraj's entire response was as follows:

> "Sure. Yeah. I think, it's – as you all know, China was a big – the backbone build out happened last year in 2016, and *there is planning underway for the provincial networks, both for provincial backbone, provincial metro networks*. And again from a processing [ ] perspective, the backbone was all done in one fell swoop, I think it was – it all happened over a very short span of time. What we see over *the provincial networks is going to be more spread out, but it is still looking very strong and from everything we see it's happening. And if you look at the foreseeable next couple of years, we still see very strong demand from China, going first in the provincial backbone, provincial metro and getting into the metro access networks*."

> "And however the caution here is again that the number of ports that they deploy like for example last year was pretty significant, 100,000 coherent ports, and so it takes time to digest some of these things. *So you could see some quarter-to-quarter variation, but if you look at the demand as well as the projection for the next few years, we see very continued strong demand in China*. We don't see a subsiding any of the demand that we've seen earlier. It's just you could see some of the quarter-to-quarter fluctuation there."

196.      Further, in response to a follow-up question on whether demand in China "[support[s] growth [ ] in 2017 over 2016," Shanmugaraj added: "We believe it could be – the growth is not going to be as big as from 2015 to 2016, but we still see – *we believe from where we are sitting that we are – there's going to be growth from 2016 to 2017*."

197.    Notwithstanding Acacia's professed optimism, the market reacted negatively, driving Acacia's stock price down.  Indeed, as reported in a January 10, 2017 article published by *Investor's Business Daily*, entitled "Oclaro Rises, Acacia Dives As Optical Firms Debate China Demand": "Shares of Acacia Communications (ACIA) tumbled but Oclaro (OCLR) stock rose as several optical communications companies presented at a Needham & Co. conference and weighed in on demand from China and other growth trends."  Specifically, the article noted, "Acacia's stock sank 9.6% to [$]57.54 on the stock market today, the lowest since July."  As the article further reported, although Acacia and others purportedly attributed growth in revenue to demand from China, "[s]ome analysts speculated in late 2016 . . . that demand from China has softened, in particular from telecom gear maker Huawei. ZTE is another top Acacia customer."

198.    In fact, the statements made at the January 10, 2017 Needham Growth Conference reflected the partial revelation of the unpredictability concerning the provincial buildout phase of the broadband expansion in China.  Indeed, as analysts raised the profound "slowdown in China in the communications industry," Shanmugaraj was forced to admit that "the backbone build out happened last year in 2016" and "***there is planning underway*** for the provincial networks, both for provincial backbone, provincial metro networks."  Thus, he conceded that the timing and amount of business associated with the provincial buildout was uncertain, even going so far as to characterize it as "more spread out" than the national backbone expansion.

199.    Nevertheless, Shanmugaraj continued to conceal the impact on Acacia's business of the slowdown in China it was then experiencing, as well as the difficulties that ZTE and ADVA were experiencing in their own business, stating: "we believe . . . there's going to be growth from 2016 to 2017."  This deception continued to insulate some of the artificial inflation in Acacia's stock price, even as the stock price declined by approximately 10% on the news issued at the conference.

- 64 -

### G.      The February 23, 2017 Statements

200.      On February 23, 2017, Acacia issued a press release, which it filed with the SEC as an exhibit to Form 8-K after the market closed, announcing its 4Q16 and full-year financial results for the period ended December 31, 2016 and providing financial guidance for the forthcoming quarter ending March 31, 2017 ("1Q17").  Specifically, the Company reported revenue of $142.4 million – up 108%, year-over-year – and an increase in GAAP net income of 185% year-over-year. Commenting on the results, Shanmugaraj stated:

> "Our solid fourth quarter results were driven by continued strong global demand for our 100G and flex-400G products from the metro and DCI markets and the ramp of our newer customers, and we are very pleased to report that we added a hyper-scale cloud and content provider, who is a direct customer deploying our AC400 product, as a significant customer in the fourth quarter."

201.      In turn, Gavin commented that, during 4Q16, Acacia had "further diversified our revenue base, with sales to newer customers outside our original eight 2011 customers increasing to 35% of our total revenue from 14% in the first quarter of 2016," closing his comments in the press release as follows: "We believe our market strategy and business model are strong, and position us for further growth."

202.      Additionally, with respect to 1Q17 guidance, the Company disclosed the following information in the press release, which, incidentally, came in below analysts' consensus estimates:

| Quarter Ending March 31, 2017 | | | | |
|---|---|---|---|---|
| Revenue (millions) | $ | 108.0 | to $ | 114.0 |
| Non-GAAP Net Income* (millions) | $ | 27.0 | to $ | 30.0 |
| Non-GAAP Diluted EPS* | $ | 0.63 | to $ | 0.70 |

203.      Also on February 23, 2017, Acacia filed with the SEC its Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K") – its first-ever Form 10-K as a public company – which repeated the 4Q16 financial results disclosed in the press release and provided additional information regarding the Company's financial condition and prospects.

204.    The 2016 Form 10-K was signed by all of the Individual Defendants: Shanmugaraj,

Gavin and Murphy, as well as Swanson, Chung, Mikkelsen, Reiss, Ritchie and Roche in their

capacities as directors.  The 2016 Form 10-K also included Certifications, signed by Shanmugaraj

and Gavin and dated February 23, 2017, pursuant to SOX Sections 302 and 906.  The Certifications

were identical in all material respects to those previously filed with the Forms 10-Q, and were false

and materially misleading as follows:

> ▪    with respect to the SOX Section 302 Certifications, for representing that: (i)
> the 2016 Form 10-K "does not contain any untrue statement of a material fact
> or omit to state a material fact necessary to make the statements made, in
> light of the circumstances under which such statements were made, not
> misleading"; and (ii) "the financial statements, and other financial
> information included [therein] . . . fairly present in all material respects the
> financial condition, results of operations and cash flows" of Acacia; and

> ▪    with respect to the SOX Section 906 Certifications, for representing that: (i)
> the 2016 Form 10-K "fully complies with the requirements of Section 13(a)
> or 15(d) of the Securities Exchange Act of 1934"; and (ii) fairly presents, in
> all material respects, the financial condition and results of operations of the
> Company . . . ."

205.    In a section entitled "Customers," Acacia disclosed its substantial and continued

dependence on two key customers – ADVA and ZTE – for 2014, 2015 and 2016, representing:

> We have historically generated most of our revenue from a limited number of
> customers. In 2016, 2015 and 2014, our five largest customers in each period (which
> differed by period) collectively accounted for 78%, 74%, and 78% of our revenue,
> respectively. In 2016, 2015 and 2014, ADVA Optical Networking North America,
> Inc. accounted for 26%, 22%, and 23% of our revenue, respectively, and ZTE
> Kangxun Telecom Co. Ltd., or ZTE, accounted for 32%, 28%, and 35% of our
> revenue, respectively. In addition, during 2015, Coriant, Inc. accounted for 13% of
> our revenue.

206.    Moreover, by far, Acacia generated most of its revenue from the Asia-Pacific region,

as the following chart from its 2016 Form 10-K demonstrates:

| | Year Ended December 31, | | |
| | 2016 | 2015 | 2014 |
| | | (in thousands) | |
|---|---|---|---|
| Americas | $ 92,452 | $ 46,624 | $ 32,109 |
| EMEA | 147,548 | 103,150 | 60,101 |
| APAC | 238,412 | 89,282 | 54,024 |
| Total revenue | $ 478,412 | $ 239,056 | $ 146,234 |

:

207.     But the 2016 Form 10-K did not disclose weakening demand for Acacia's products in China (as further explained herein), nor the fact that ADVA and ZTE were themselves experiencing declining demand and sales that were reasonably likely to adversely affect the Company's business and revenues.  Given the importance of ADVA and ZTE to Acacia's business, the failure to disclose this information was a material omission and rendered the 2016 Form 10-K false and misleading.

208.     Likewise, in a section entitled "Risks Related to Our Business and Industry," Acacia disclosed the following: "A significant portion of our international sales are made to customers with delivery locations in China. In 2016, 2015 and 2014, we derived 41%, 36%, and 36%, respectively, of our revenue from sales to customers with delivery locations in China."  It did not, however, disclose the weakening demand from China.

209.     Rather, in a lengthy and generic disclosure, Acacia represented that its industry is "cyclical," never tethering the decline in demand that the industry was then experiencing to China, as the following passage reflects:

***The industry in which we operate is subject to significant cyclicality***.

Industries focused on semiconductor and optical network technologies can be highly cyclical and characterized by constant and rapid technological change and price erosion, evolving technical standards, increasing effects of competition, frequent new product introductions and technology displacement, short product life cycles both for semiconductors and optical technologies and for many of the end products in which they are used. In addition, product demand in the markets in which we compete is tied to the aggregate capital expenditures of telecommunications and network and content service providers as they build out and upgrade their network infrastructure. ***Capital expenditures can be highly cyclical due to the importance and focus of local initiatives, such as the ongoing telecommunications build out and upgrade in***

- 67 -

***China, government funding and other factors, thus resulting in wide fluctuations in product supply and demand***. From time to time, these factors, together with changes in general economic conditions, have caused significant industry upturns and downturns that have had a direct impact on the financial stability of our customers, their customers and our suppliers. Periods of industry downturns have been characterized by diminished demand for products, unanticipated declines in telecommunications and communications system capital expenditures, industry consolidation, excess capacity compared to demand, high inventory levels and periods of inventory adjustment, under-utilization of manufacturing capacity, changes in revenue mix and erosion of average selling prices, any of which could result in an adverse effect on our business, financial condition and results of operations. We expect our business to continue to be subject to cyclical downturns even when overall economic conditions are relatively stable. To the extent we cannot offset recessionary periods or periods of reduced growth that may occur in the industry or in our target markets in particular through increased market share or otherwise, our business can be adversely affected, revenue may decline and our financial condition and results of operations may be harmed. In addition, in any future economic downturn or periods of inflationary increase we may be unable to reduce our costs quickly enough to maintain profitability levels.

210.    The statement above – that "[c]apital expenditures can be highly cyclical due to the importance and focus of local initiatives, such as the ongoing telecommunications build out and upgrade in China, government funding and other factors, thus resulting in wide fluctuations in product supply and demand" – failed to apprise investors of the uncertainty and unpredictability associated with business related to the provincial buildout in China; the waning demand that certain of the Company's customers – including ZTE and ADVA – were then experiencing; or the actual impact that these issues could have, and were then having, on Acacia's operations and prospects. Consequently, the risk disclosure was itself false and misleading and failed to state material facts required to render the disclosure non-misleading.

211.    Moreover, while the 2016 Form 10-K mentioned certain "risks" related to ownership of the Company's common stock, those risks were neither adequately detailed nor did the Company disclose that those risks were then transpiring or affecting its business. For example, the Company

identified, in part, the following examples of "[s]ome of the factors that may cause the market price of our common stock to fluctuate":

- "**announcements by our customers** regarding significant increases or decreases in capital expenditures"; and

- "changes in general economic, industry and market conditions and trends, **including the economic slowdown in China** and the uncertainty arising from the June 2016 referendum vote in the United Kingdom in favor of exiting the European Union."

212.   This language, however, remained identical to that included in Acacia's prior filings, including the Offering Documents, even as developments occurred that undermined their accuracy. Before the issuance of the 2016 Form 10-K, for example, reports swirled around declining demand at ADVA and ZTE and, more generally, from China relating to the provincial buildout and otherwise.

213.   Moreover, without context, the "economic slowdown in China" referenced above could not meaningfully apprise investors of the slowdown in demand that China was experiencing throughout the Class Period, as described herein.   Rather, given Acacia's repeated and optimistic statements describing demand in China as a principal driver of the Company's growth, Acacia effectively negated the significance of such disclosure – regardless of what it meant.

214.   Furthermore, because Acacia provided this example as one of the "factors that may cause the market price of our common stock to fluctuate," investors could not appreciate how, if at all, a general slowdown in China's economy would or could impact the Company – rendering the warning meaningless.   In fact, during the Class Period, Acacia represented that many of its products, while supplied to Chinese mobile providers, were provided to end users of those providers located **outside** of China.   Thus, as Shanmugaraj explained at the September 14, 2016 Deutsche Bank Technology Conference:

"[T]he other point to note is the Chinese carriers in general are also gaining market share outside of China. For example, in other parts of Asia, in Europe, they are

growing. ***It doesn't mean every product that we ship into China, for example, ends up in China***; it goes to our customers, it ends up in Europe, it ends up in South America, so it goes to different places as well."

215.     Additionally, the 2016 Form 10-K contained extensive disclosure regarding ZTE's exposure to U.S. sanctions for "actions contrary to the national security and foreign policy interests," and the potential adverse consequences for Acacia's business that such sanctions could have if Acacia were precluded from supplying products to ZTE.  Indeed, Acacia's quarterly SEC filings also contained similar, if not identical, disclosure.  Such disclosure was materially misleading, however, in the absence of disclosure of then-prevailing constraints on demand for ZTE's products, which was also reasonably likely to adversely affect Acacia's business and revenues.

216.     Finally, the 2016 Form 10-K failed to disclose known trends, events and uncertainties under Item 303, which also rendered it false and materially misleading.  Specifically, the 2016 Form 10-K did not disclose that demand in China for Acacia's products and those of its largest customer, ZTE, was trending downward, much less the uncertainties associated with the award of business in China, particularly the provincial aspect of the buildout in China.  Nor did the 2016 Form 10-K disclose the downward trend of business from ADVA or the uncertainties that the issue presented for Acacia's business.  In fact, the 2016 Form 10-K did not even disclose the uncertainties associated with the timing and amount of business from the provincial buildout in China – a material issue for the Company, given the completion (and exhaustion) of work from the national backbone expansion in China.

217.     Later, also on February 23, 2017, Acacia conducted a conference call with analysts and investors and provided further commentary about the Company's business metrics and financial prospects.  Among those participating in the call on behalf of Acacia were President and CEO Shanmugaraj and CFO Gavin, who each discussed Acacia's products and financial performance.

Analysts from Deutsche Bank, Cowen, William Blair, Goldman Sachs, BofA Merrill Lynch, Needham, Northland and Morgan Stanley also participated.

218.    In his opening remarks, Shanmugaraj again attributed the Company's financial results for 4Q16 substantially to strong demand from China, representing, in pertinent part, as follows:

> "Turning to China, broadband investments in this market are being driven by the China Broadband Initiative. *We see continued demand for our products in this market, as network build-outs have transitioned from long-haul backbone to provincial backbone and provincial metro networks*."

219.    He also spoke of an increase in demand during 2016 from Acacia's core customer group – which included ADVA and ZTE – and assured investors and analysts that demand would grow in 2017:

> "Over the course of 2016, we continued to see *demand increase* for our products in the DCI market, both *from our original group of eight customers*, and from our newer customers. *We expect that this demand will continue to grow in 2017*."

220.    Notwithstanding a marked *decrease* in demand from one of its largest customers – later revealed as ADVA – Shanmugaraj nevertheless continued to represent that the Company would benefit from an *increase* in demand virtually across-the-board, in all markets, including China:

> "*Turning to our outlook for 2017, we believe that key growth markets for Acacia will continue to be in the DCI, China and metro markets*. 2017 is also the year in which we believe we will continue to grow business with our newer customers and further diversify our revenue base, building on the excellent progress we made in 2016."

> "*During the first quarter of 2017, we are seeing a lower-than-anticipated order rate from one of our larger customers* with exposure to the DCI market. This customer has recently indicated that demand from their cloud and content provider customers is hard to predict, given the smaller teams at those providers and their changing priorities."

> "*This customer's lower order rate is a major factor in how we formulated our first-quarter guidance*. However, some of the seasonality that we anticipated in the fourth quarter of 2016 was offset by stronger-than-anticipated demand from hyper-scale providers. *And in 2017, we anticipate capital expenditures in the DCI market from the hyper-scale providers to grow in line with industry analysts' projections*. And

specifically, we believe our CFP-DCO, and CFP2-ACO and flex-400G products are *well positioned to benefit from anticipated growth in this market in 2017*."

"As for the China markets, based on the drivers I previously mentioned, we believe that our CFP-DCO and flex-400G products are *well positioned to benefit from the anticipated growth in these markets*. We believe our industry-first CFP2-DCO will provide an *additional growth opportunity in the China market*."

221.    In his opening remarks, Gavin reiterated the representations that Shanmugaraj made regarding demand despite "lower-than-anticipated" orders from one of its largest customers, stating in pertinent part, as follows:

"As Raj discussed earlier in his remarks, during the first quarter of 2017, we are seeing a lower-than-anticipated order rate from one of our larger customers with exposure to the DCI market. This customer's lower order rate is a major factor in how we formulated our first-quarter guidance."

"We continue to see 2017 as a growth year for Acacia based on three growth drivers, namely, DCI, metro and the ongoing China broadband infrastructure program."

222.    Given this admission of weakened demand from one of Acacia's largest customers, analysts were understandably concerned – and spent nearly the entire call trying to drill down on it, only to receive the same assurances that Shanmugaraj and Gavin had provided time and time again.

223.    For example, Deutsche Bank analyst Vijay Bhagavath asked: "do you see any shared loss or potential shared loss to any of your peers?"  Despite the decrease in demand, which troubled the analysts, Shanmugaraj responded:

"[A]s we said, the major factors with impact here is the lower order rate from a larger customer of ours who has DCI exposure. They have indicated the demand from their cloud and content providers is harder to predict and they change [priorities] often. It is pretty much, that's the major contributing factor."

"*As we said earlier, we believe 2017 is a healthy growth year for us*. We participated in the highest growth market here. And we expect to grow share in our coherent market, so we're not losing share to any of our peers. *This is purely a[n] issue of demand being a little slower in the first quarter*."

224.     The news also prompted Needham analyst Alex Henderson to inquire about whether "that's business that's lost and we should now be trimming our estimates to relate to the lower start of the year, and therefore, assume a lower trajectory," to which Shanmugaraj responded, in part:

> "I think John has said *our financial model is still good*. But Alex, from what we are seeing, the hyper-scale forecast from whether we hear from the customer and the analysts, *is going to be a growth year for them, as well*."

> "We don't see any -- *for the year, it looks pretty strong. China looks like it's pretty strong*. Overall, from our perspective, we are looking at -- we are optimistic about 2017 and *we believe this will be a healthy growth year*."

225.     Likewise, Cowen analyst Paul Silverstein inquired whether all of "the first-quarter shortfall" was attributable "to only one customer, or was there any weakness from other customers"; Shanmugaraj confirmed "the major factor is from the single customer."

226.     For his part, William Blair analyst Dmitry Netis was perplexed that the customer accounted for such a significant shortfall in 1Q17 projected revenue – as he observed, "given the $20 million shortfall here in Q1, that is a sizable customer" – yet itself "reported this morning . . . [guidance] for Q1 [that] was actually relatively strong." That dynamic caused Netis to ask whether the customer was experiencing a "timing issue," prompting Shanmugaraj to claim that the issue was isolated and not connected to Acacia's products: "the customer has other business outside of the cloud and content providers . . . [t]hat are not using our product."

227.     Goldman Sachs analyst Doug Clark was also confused, noting: "Your large customer outside of ZT[E] is $30 million and the sequential guide down is for $30 million. So either that customer is going to zero, or there is something else that is coming down sequentially." Although Shanmugaraj claimed that "the major contributing factor is the large customer going down" – adding "the order rate has been a little slower and that's what's causing this shortfall" – he also blamed the decline on "typical seasonality on the telecom side."

228.    Analysts also tried to ascertain whether Acacia faced declining demand in China, with Needham analyst Quinn Bolton asking for "comment on what you're seeing in China" and noting: "There have been some very recent concerns about potential inventory build in China." In response, Shanmugaraj denied any such issues, instead stating: "*we don't see any inventory buildup there*. I think we see product demand quite strong. And we have indications when we ship to them, it's not staying there very long. So *we believe 2017 will be strong China growth for us*."

229.    Gavin later echoed Shanmugaraj's response on China, assuring Northland analyst Tim Savageaux: "we see the market growth for both DCI and metro from *geographically from China, still being strong from an expected 2017 perspective*." In addition, in response to a different question, Shanmugaraj added: "as I said before, the China broadband initiative, we're definitely getting a lot clearer in terms of the demand. *It appears very strong*."

230.    Nevertheless, BofA Merrill Lynch analyst Dan Bartus felt compelled to request further detail on demand from China, asking if revenue from Acacia's "key Chinese customer" – that is, ZTE – was "down meaningfully quarter over quarter in 4Q." Gavin denied any issues, stating: "They [ZTE] were very consistent through all four quarters of 2016. And I think as Raj had said earlier, *as we start to look into 2017, in Q1 specifically, we don't see any concerns there or any issues from a growth rate from a China perspective in ZT[E] as well. We have not seen that*."

231.    Reaction to news of the key customer's shortfall was swift, as the market began to understand Acacia faced declining demand – the extent of which remained unclear, and departed from previous assurances by Shanmugaraj and Gavin.

232.    As a February 24, 2017 *Boston Business Journal* article, entitled "Customer concerns shave $300M from Acacia's market value," reported: "Acacia issued a modest guidance for the first quarter of 2017 due to decreased demand from one of those major customers. Acacia expects to earn

between $108 million and $114 million in the first quarter of 2017, compared to $142.4 million in the last quarter of 2016."  As the article further reported: "*That guidance caused Acacia's stock price to drop precipitously Friday morning*, shaving approximately $300 million from a market valuation that had been $2.4 billion as of Thursday afternoon."

233.    Specifically, Acacia's common stock price declined by 14.8% on February 24, 2017, to close at $54.04 per share – from a closing price of $63.43 per share on February 23, 2017 – on extraordinarily high volume of 5.18 million shares trading.  Moreover, the stock price declined on two subsequent trading days – February 27, 2017 and February 28, 2017 – as the market continued to digest the news, and the further revelation of the truth, regarding Acacia's business and exposure to slowing demand not only from its top two customers, but also from the Chinese market in general.

234.    And yet the full truth regarding Acacia's business remained concealed.  Indeed, both Shanmugaraj and Gavin continued to represent that demand remained strong in China and was even *growing*, as the following statements reflect:

(a)    Shanmugaraj: "*[w]e see continued demand for our products* in this market [China], as network build-outs have transitioned from long-haul backbone to provincial backbone and provincial metro networks"; "[o]ver the course of 2016, we continued to see demand increase for our products"; "*China looks like it's pretty strong*."

(b)    Gavin: "we see the market growth for both DCI and metro [] geographically from China, *still being strong* from an expected 2017 perspective."

235.    Accordingly, the fraud remained concealed.

### H.    The March 1, 2017 Statements

236.    On March 1, 2017, Acacia participated in the Morgan Stanley Technology, Media & Telecom Conference, in which Shanmugaraj and Gavin presented on the Company and discussed its business.  Morgan Stanley analyst Meta Marshall hosted the conference.

237.   Immediately, Marshall inquired about Acacia's "significant shortfall in guidance," based on reduced orders – and demand – from a key customer.  Describing the lower-than-expected guidance as a "shortfall from what the consensus was" (referring to consensus estimates of analysts), Shanmugaraj admitted that the Company had identified the shortfall in demand no less than a month before announcing guidance, stating: "We had one customer who we saw lower order flow from that customer and really we have not seen it, *we saw in the past four weeks before we made the guidance announcement*."

238.   Further, although Shanmugaraj claimed the reduction in orders was not ascertainable earlier, he described Acacia's extensive access to information regarding its customers and industry trends, representing as follows:

> "And so it was not something that was visible earlier and -- reality is we do triangulate. *We do go to the service providers, talk to them, we talk to our customers* and it is hard to predict each markets and they have small staff with these hyper-scale cloud content providers and moving out from one quarter to another in terms of deployment is not that uncommon. So that was what we perceive from our customers. But the reason we gave a lower guidance and consensus was we saw lower order flow, we look at what the backlog is and we look at what we can do, and we made our guidance based on that."

239.   In fact, consistent with Acacia's contracts with ZTE and ADVA (described above), Shanmugaraj acknowledged – in response to a question from Marshall about whether Acacia speaks to its key customers, given the concentration of its sales and revenue – that the Company regularly receives information from "periodic operations, forecast, sales level discussions" with customers:

> "*So it is very strong as you know is a handful of customers and then their customers especially the larger ones. With our all customers there is multiple levels of discussions with them. There is a periodic operations, forecast, sales level discussions* which is more tactical saying what the quarter looks like and what the order flow. It is a little bit more along also, what does the yearly forecast look like? *They have a very good view of this is what the year turns out to be and even with our own customers we have technology sharing strategy sessions with them*. So because we are engaged in multiple generations of products with our customers because nobody wants to see this is the only product we have do, we have to see

what the roadmap is and we are engaged with current product, next-generation products, pretty much all our customers and *so that level of visibility with our customers is happens on a very regular basis so we have a good line of sight*. But we're also talk to all these service providers of the world of horizons and the content providers and you know where they are driving their network. So, and that happens on a quarterly basis it happens in the US, it happens in China, it happens in Europe. And so we have a good idea of what features they're looking for a lot of time these are aligned and we [tap] to our next-generation platforms based on what the -- that the direction the service providers and the cloud and content providers will."

240.    Additionally, Shanmugaraj provided assurances that Acacia had not lost market share as a result of its customer's reduction in orders, again refereeing its close working relationships with customers and long development cycles that require close customer interaction over lengthy periods, as follows:

"We check-in with the customers. These are deployment cycles and qualification cycles take 6 months to 12 months for customers to integrate our products and get out there and *these things don't happen suddenly* they are -- the deployment push out happen suddenly, but it's not the actual share loss happens. *We are engaged as I said with our pretty much all our customers on multiple generations of products*. The CFP which is our cash generation, we have the AC400 technology, which is the current generation and then we are working on we talked about the DCO CFP2 technology and its high performance version. And so, *these are multiple generations of technology that we work with our customers on and we are aware of what they're working in their site* because it's a collaborative effort in terms of they have to do changes to their system to incorporate our product. *So we have pretty good line of sight to where that is happening*."

241.    Building on these assurances, Gavin also represented that Acacia's frequent contact with its customer base – both established and new – afforded significant visibility into its business, and even provided the foundation for its forecasts, as the following statements reflect:

"[I]f you look at our engagement with the customers as Raj was saying. *We do work with them very closely, we have long-standing relationships* with especially the original eight customers they go back to 2011. I think you mentioned concentration earlier, I think that's helping us to look at the new customer base to develop. So if you look at Q4 where we had talked about 35% of our revenue coming from the new customer base that was up from 25% in Q3, at the very beginning part of the year was only 14%. So that engagement with these customers and being able to look at the new customer business and how that works with our overall business and the book of business that we look at *is really helping us to refine those forecasts* to be able to

work with those customers and to know by seeing additional customers and how they're buying things and their buying patterns, how that may affect our overall business. So, which is ***definitely helped us to gain those insights and to refine the way we forecast and work with customers on our forecast***."

242.    In response to Marshall's comment that "[y]ou've mentioned that you see kind of a strong market coming from [China] this year," Shanmugaraj also assured that demand from China was "very strong," representing that the transition to provincial upgrades in China fueled demand. Shanmugaraj also represented that customers had provided a sufficient level of visibility into their needs for Acacia's management to feel confident that the Company's long-term projections were accurate.  These representations are reflected in the following portion of Shanmugaraj response:

> "***We are very strong in China growth for the year and it's from multiple factors*** the national backbone build out some of them are still completing, they are not completed, they still buying products for that. And of course as it transitions to provincial, the provincial, some of this market share, the individual OEM vendors know what their share is going to be, so they have -- ***they've started forecasting*** what those numbers are going to be. And so for the year, if you look at China itself, growth for Acacia would come from not just our customer growing, our kind of customers which is -- but also we have diversified those well outside of our existing customers and with the two additional customers. ***And so looking at, when we engage with customers we had long-term projections, this is for the year, what it looks like***, so that they can get the right level of mix from us, but also purchase orders that go through the lead-time and ***both of them look very strong for us from these customers***."

243.    Adding to this representation, Gavin assured that "our product positioning is very strong in China too," stating "we're well positioned in that market."  Shanmugaraj agreed, further stating: "There's a lot of synergies that we see, we feel confidence in China work."

244.    The above representations regarding sustained demand from China were false and misleading, given the continued unpredictability associated with the provincial part of the buildout – unpredictability and uncertainty that Shanmugaraj tried to undermine, by representing that "OEM vendors know what their share is going to be, so they have – they've started forecasting what those numbers are going to be."

### I.   Acacia Continues to Make Assurances About its Business

245.   Acacia continued to make assurances about its business even as other participants in the industry, which dealt with the same market dynamic and some of the same customers, grappled with weakening demand in China.

246.   On March 14, 2017, for example, NeoPhotonics Corporation ("NeoPhotonics") issued a press release announcing financial results for its fiscal fourth quarter and full-year ended December 31, 2016.  In it, NeoPhotonics' Chairman and CEO Tim Jenks referenced the "near-term volatility in our largest served market" – an evident reference to China.  Indeed, the overwhelming majority of NeoPhotonics' 2016 revenue was derived from two customers that did substantial business in China: Huawei and Ciena Corporation, which accounted for 50% and 15% of its total revenue, respectively.

247.   As Jenks explained during NeoPhotonics' March 14, 2017 earnings conference call, which followed the issuance of its earnings press release: "we've seen meaningful changes in near-term demand especially in recent weeks in China where we have major customers."  As he further explained: "we are unaware of any large tenders for phases" after the national backbone expansion in China, such as the provincial buildout; and "[i]n the last month or more we have seen declines in planned pulls from leading Chinese customers."  As he noted, this weak demand in China resulted in NeoPhotonics' issuance of "an outlook for Q1[2017] with revenue that is well below our Q4[2016] results."  Soft demand in China later required NeoPhotonics to restructure its business, in May 2017.

248.   Nevertheless, on March 17, 2017, William Blair analysts, including Dmitry Netis, issued a research report entitled: "Trip to Headquarters Reaffirms Our Thesis; Incrementally More Bullish on Second-Half Demand for CFP2 Pluggable Modules."  In the report, William Blair remained optimistic on Acacia after a visit to the Company's headquarters in Massachusetts with a group of investors, even as questions persisted about demand in China and the impact of ADVA's declining orders on the business.

249.     Specifically, with regard to China, William Blair reported: "Management sounded incrementally more bullish on China, noting it is seeing backbone expansions with no slowdown in sight and pull-ins for new demand."  Likewise, with respect to ZTE, William Blair recounted that management had represented that "ZTE continues to be 'pretty strong' with 'good demand outside of ZTE' and no inventory buildup."

250.     By contrast, William Blair noted that "[t]he 'ADVA issue' remains unexplained," indicating that questions remained notwithstanding management's repeated assurances: "While management noted it expects the top DCI customer to come back with improved order flow this year, it is not clear whether it will come back to the same revenue level or not."

**J.     Fallout from MACOM's April 25, 2017 Announcement**

251.     On April 25, 2017, after the close of trading, MACOM – on whose board of directors Chung also sits – issued a press release announcing financial results for its second fiscal quarter ended March 31, 2017 and dour financial guidance for its third fiscal quarter ending June 30, 2017, citing near-term slowdown in demand in China.  In the press release, MACOM President/CEO John Croteau indicated that MACOM endured "cyclical weakness in our carrier-based optical businesses" – substantially exposed to China – during its second fiscal quarter.

252.     In the conference call following the issuance of the press release, Croteau was even more explicit, noting in his opening remarks that MACOM's second quarter results were adversely impacted by "very strong headwinds in Chinese carrier-based deployments in PON [passive optical networks] and provincial networks."  He also cited China as a "great example" of a geographic region in which "carrier budgets . . . are governed by public policy, which has proven time and again to be unpredictable."

253.     Additionally, Croteau indicated that "PON remained weak during the quarter, and market demand and inventory challenges persist as we enter Q3 with poor visibility."  Claiming that

MACOM's other operations could nevertheless "offset any weakness" and "decline in China," he stated: "Looking back, there was clearly an inventory build *in the December quarter* in anticipation of Chinese provincial deployments that have now pushed out."

254.    In response to an analyst's question, Croteau was "emphatic" that "there's no question that there is a cyclical weakness on the carrier base side of the business," that "visibility is low," that problems persisted in terms of the timing of "provincial deployments" in China, and that "there [are] some headwinds in demand," explaining:

> "So I would say the one thing that we want to be very clear about, and I think I was emphatic, is there's no question that there is a cyclical weakness on the carrier base side of the business. PON remains weak, visibility is low, and you've got the China correction happening with the Metro/Long-haul provincial deployments, so there's no question that there is some headwinds in demand. At the same time, we're more than offsetting those with the cloud growth and great backlog, great order intake. And so it's really a mixed bag. So if we didn't have those headwinds in China, I think things would be materially stronger."

255.    In response to these comments, the price of MACOM's common stock declined by more than $6.00 per share on April 26, 2017, pulling down the stock prices of other publicly traded companies in the industry, including Acacia, Oclaro, Inc. ("Oclaro"), Inphi Corporation ("Inphi"), NeoPhotonics, and Lumentum Holdings Inc. ("Lumentum").  This disclosure of further declining demand in China – and persistent headwinds – caused the price of Acacia stock to drop by more than 11% on April 26, 2017 to close at $48.08 per share (as compared to $54.13 per share on April 25, 2017), on unusually high volume of more than 3.5 million shares trading, or more than three times the average daily volume over the preceding ten trading days.

256.    Moreover, the trading price of Acacia stock continued to decline – closing at $46.60 (down 3.08%) on April 27, 2017 and $45.84 (down 1.63%) on April 28, 2017 – as investors digested the news and its ramifications for the Company.

257.    On May 8, 2017, the day before Acacia was scheduled to announce its 1Q17 results,

analysts from William Blair, including Dmitry Netis, issued a research report on Acacia entitled

"Revising Estimates Lower Amid China Fears; Remain Patient on Near-Term Correction."  Noting

expressly that "Acacia reports first-quarter results on May 9 after the markets close," William Blair

cut its estimates on Acacia given "underwhelming outlooks for the June quarter" reported variously

by optical vendors Oclaro, Inphi, MACOM, NeoPhotonics and Lumentum.  Specifically, the report

provided, in part, as follows:

> **Lowering expectations on China demand slowdown and inventory correction.**
> Acacia reports first-quarter results on May 9 after the markets close. We are
> revisiting our model following first-quarter earnings commentary *from a number of*
> *optical vendors*, including Oclaro (OCLR $8.39), Inphi (IPHI $36.61), Macom
> (MTSI $45.97), NeoPhotonics (NPTN $7.49), and Lumentum (LITE $49.45), *who*
> *reported underwhelming outlooks for the June quarter, citing near-term demand*
> *slowdown in China and inventory correction issues*. This weakness in most cases
> was attributed to Huawei; however, *Oclaro noted its business at ZTE has been*
> *affected as well. We note Acacia derived 41% of revenue from China in 2016 and*
> *ZTE represented 32% of total revenue*. Amid fears that this inventory correction
> issue could continue throughout the later part of the second half 2017 *and the new*
> *Phase 12 and 13 China tenders awards will not affect results meaningfully until*
> *the fourth quarter*—e.g., Oclaro management noted it has no visibility on the June
> or September time frame—*we are lowering our estimates to derisk the model*. In
> addition, *our conversations with ADVA*—Acacia's second-largest customer, which
> accounted for 21% of revenue last quarter—*highlight an ongoing inventory*
> *correction issue* as the company is transitioning customers to new platforms.

258.    By contrast, Shanmugaraj and Gavin previously represented that demand in China

was "strong," that the decline in orders from ADVA was isolated and not of concern, and that ZTE's

business remained consistent.  The issues addressed in William Blair's May 8, 2017 report, however,

suggested otherwise, prompting a severe "[r]atcheting down" by William Blair of "both fiscal 2017

and 2018 estimates" for Acacia, as follows:

> Our fiscal 2017 revenue estimate goes down to $511 million from $574 million (by
> 11%), relative to the Street at $569 million; EPS moves down to $2.89 from $3.41
> (by 15%), relative to the Street at $3.31. Our fiscal 2018 revenue estimate is lowered
> by $75 million, to $620 million (implies 21% growth), relative to the Street at $684

million; EPS are taken down $0.55, to $3.35, relative to the Street at $3.78. We are leaving our first quarter 2017 revenue and EPS estimates unchanged at $111 million (implies 31% growth) and $0.66, respectively; the Street is at $112.5 million and EPS of $0.66.

259.     As a result, William Blair reduced its fiscal 2017 revenue estimate for Acacia by $63 million and its fiscal 2018 estimate revenue by an even larger $75 million, with corresponding reductions in earnings per share.  These reductions stood in stark contrast to the optimistic outlook expressed in William Blair's March 17, 2017 research report (described above), which was based on a visit to Acacia's headquarters on March 16, 2017 with a group of investors.

### K.     The May 9, 2017 Statements

260.     On May 9, 2017, Acacia issued a press release, which it filed with the SEC as an exhibit to Form 8-K after the market closed, announcing its 1Q17 results for the period ended March 31, 2017 and providing financial guidance for the forthcoming second quarter ending June 30, 2017 ("2Q17").  Specifically, the Company reported revenue of $114.7 million – up 36%, year-over-year – and an increase in GAAP net income of 145% year-over-year.  Shanmugaraj and Gavin favorably commented on the results.

261.     Additionally, with respect to 2Q17 guidance, the Company disclosed the following information in the press release:

| Quarter Ending June 30, 2017 | | | | |
|---|---|---|---|---|
| Revenue (millions) | $ | 85.0 | to $ | 95.0 |
| Non-GAAP Net Income* (millions) | $ | 10.0 | to $ | 15.0 |
| Non-GAAP Diluted EPS* | $ | 0.22 | to $ | 0.35 |

262.     Also on May 9, 2017, Acacia filed with the SEC its Form 10-Q for 1Q17 (the "1Q17 Form 10-Q"), which repeated the 1Q17 financial results disclosed in the press release and provided additional information regarding the Company's financial condition and prospects.  The 1Q17 Form 10-Q also contained substantially similar, if not identical, risk disclosures to those in the Offering Documents and quarterly/yearly Class Period filings.  The 1Q17 Form 10-Q was signed by

Shanmugaraj and included Certifications, signed by Shanmugaraj and Gavin and dated May 9, 2017, pursuant to SOX Sections 302 and 906.  The Certifications were identical in all material respects to those filed with the 2016 Form 10-K and earlier Forms 10-Q, described above, and were materially false and misleading for the same reasons.

263.   Later that day, Acacia conducted a conference call with analysts and investors and provided commentary about the Company's business metrics and financial prospects.  Among those participating in the call on behalf of Acacia were President and CEO Shanmugaraj and CFO Gavin, both of whom discussed Acacia's products and financial performance.  Analysts from Goldman Sachs, Morgan Stanley, Needham, William Blair, Cowen and Northland also participated.

264.   In his opening remarks, Shanmugaraj acknowledged that reduced demand in China required a reduction in guidance, but tried to soften the blow by claiming the problem was temporary and short-term, as follows:

> "I would now like to comment on our outlook for the second quarter of 2017. At the midpoint of our guidance range, *we expect revenue to be sequentially down 21.7% from the first quarter* due to a couple of factors. *The primary factor is softening demand from the China market that started in April*. As you may have heard from others in our industry, *we are seeing what we believe to be a temporary slowdown in the deployments from carriers in China*, causing our larger China customers to slow down their order rates in the second quarter. The secondary factor is the variability that we are seeing in the quarterly order rate from one of our direct hyperscale customers."

265.   Nevertheless, and notwithstanding the limited visibility experienced by other industry participants, Shanmugaraj continued to represent that Acacia expected growth in the China market during the second half of 2017, basing the representation on (unidentified) customers and a claimed belief that the "slowdown in China is not a reflection of any weakening in the long-term demand":

> "We anticipate growth both in China and DCI markets, during the second half of 2017 compared to the first half of 2017. Our China customers tell us they anticipate conditions to improve in the third quarter of 2017. However, we believe the timing of a second half 2017 improvement will become clearer over the next few months. We

believe the current slowdown in China is not a reflection of any weakening in the long-term demand for 100G and above, rather a delayed deployment."

266.    Indeed, Shanmugaraj assured investors that the problems Acacia was experiencing in China, and the reduced orders it had received from a key customer (widely believed to be ADVA), would be resolved in short order, but that "quarterly order rate variability" might persist:

> "***Once China demand improves and our China customers work through their short-term inventory position of our products, we anticipate revenue growth in China*** to come from our CO pluggables and flex-rate AC400G products ***in the second half of 2017***. In the DCI segment, we believe, we'll see growth, as our direct hyperscale customers ramp deployments of Acacia products and ***as the order rate from our large OEM customer, with exposure to this segment that we discussed during our last earnings call, continues to improve***. However, in this segment, we expect to see some quarterly order rate variability depending on priorities and workloads of hyperscale providers, smaller staff and the timing of their new product introductions."

267.    As a means of shoring up favorable expectations about the business, Shanmugaraj also referenced capitalizing on existing and new business, stating: "In addition to China and DCI, we also believe that second half growth will come from ***expanded business with our original and newer customers*** as they ramp deployments of our current and newer products." And he made this representation despite ADVA's reduced order rate and the expectation of "some quarterly order rate variability" he had mentioned only moments earlier.

268.    In closing, Shanmugaraj remarked: "while we are having some headwinds in the second quarter, we are excited about Acacia's future growth opportunities."

269.    In his opening remarks, Gavin attempted to avoid addressing the reasons for Acacia's less-than-favorable guidance, instead largely restricting his comments to hard financial information. And yet when he addressed the issues facing Acacia, he did so only briefly and in a positive light, stating: "While the second quarter is off to a slower start due to the impact of the China market

slowdown and variability of DCI order rates, we are optimistic about our future growth opportunities as we continue to ramp our newer products."

270.    During the question-and-answer session, Needham analyst Alex Henderson attempted to obtain further detail on "the China situation," noting "clearly China inventory build is a problem for a lot of companies that have reported already" – evidently referring to Acacia's peers.  Focusing on the national backbone expansion in China, Gavin was forced to admit that the project was delayed and complicated by transitioning to the next phase of the expansion, involving provincial buildouts:

> "For more of a backbone, national backbone expansion application, which was expected to happen early part of Q2 and that's what it was done in preparation for and what we hear on that, on the backbone expansion, which was part of the phase 12 approval, that is -- although its [sic] been approved, there was a delay going to the second part of -- second half of Q2, so part of the backbone expansion we anticipate will be more related to. ***The provincial network expansion is part of the phase 13 as you would have heard, that is going to come in smaller pieces and that gets approved what we hear is in the next 30 to 60 days*** and that's what we say, ***we need a few months to get clarity on the provincial piece of and that will also come as not as one big deal as multiple deals*** but what our customers are telling us is that they see Q3 -- second half demand being strong starting with Q3, but based on this information that we are seeing and the detail, ***I think, you are going to see the national backbone continue sooner but the provincial -- we need a little bit more time happened before we can call exactly when the timing of the provincial bills happen*** and also when the volume picks up, but we do believe China for the industry would be a growth -- for us would be a growth second half compared to the first half."

271.    As Gavin noted, the provincial buildout portion of the expansion of China's wireless infrastructure would involve "smaller pieces" – a reference to the 23 provinces in China to which the buildout related, each of which could have its own requirements and needs, as well as the multiple carriers in China involved.  But the risks and uncertainties associated with the provincial piece of the buildout were known to industry participants, including Acacia.  And yet Shanmugaraj confirmed during the conference that "the provincial network tenders have to happen for the pickup to happen

in the second half [of 2017]" – something that Acacia knew, but failed to disclose to investors at any point previously.

272.    Additionally, as the call continued, Shanmugaraj confirmed that the slowdown in China accounted for approximately 90% of Acacia's reduced guidance, with the remaining 10% tied to the supposed "variability" in DCI orders from ADVA.

273.    In response to this adverse news – including disappointing 2Q17 guidance based on the vagaries associated with the provincial buildout and declining demand from customers – the price of Acacia's common stock declined by 8.12% on May 10, 2017 to close at $44.48 per share, from a closing price of $48.41 on May 9, 2017, on extraordinarily high volume of 5.05 million shares trading.  And yet the full extent of the fraud remained hidden, as Acacia had not yet revealed – but would soon disclose – product quality issues occurring over at least four months.

### L.    Acacia's May 31, 2017 Announcement

274.    On May 31, 2017, before the market opened, Acacia issued an unusual press release, filed with the SEC as an exhibit to Form 8-K, announcing a "quality issue" affecting a portion of its products "over an approximate four month period."  Specifically, the press release provided, in full:

> Acacia Communications, Inc. (NASDAQ: ACIA), a leading provider of high-speed coherent optical interconnect products, today announced that the Company has identified a quality issue that it currently believes affects a portion of the approximate 1,300 AC400 units and 5,000 CFP units manufactured by one of its three contract manufacturers *over an approximate four month period*. The Company believes *the root cause of this quality issue has been identified as a circuit board cleaning process that has since been eliminated*, and manufacturing at this contract manufacturer has resumed. The Company does not believe that products currently being shipped are affected by this quality issue. The Company is actively working with affected customers to remediate this issue. The Company is also working to estimate the cost of these remediation efforts and assess the impact of this issue on its near-term manufacturing capacity.

275.    This news caused a 4% drop in the stock price in premarket trading on May 31, 2017, as *MarketWatch* reported.  Although the stock price ultimately recovered, investors were kept in the

dark about the risks and uncertainties surrounding this quality issue – and the timing of its discovery and disclosure – which called into question the truth of management's representations to the market concerning other matters related to Acacia's business.  Indeed, the onset of the issue was particularly troubling, given that the substandard circuit-board cleaning process had occurred for approximately four months, spoiling a substantial number of units.  As an analyst revealed after the Class Period, the substandard cleaning process resulted in rust formation on some of the circuit boards, which led to customer returns and other complications.

276.    Moreover, the Company's failure to provide a range of estimable loss associated with the quality issue rendered the statements in the May 31, 2017 press release materially misleading, because investors were unable to gauge the financial significance of the issue or the Company's exposure to it.  Given that the issue occurred over a four-month period and yet Acacia disclosed it on May 31, 2017, the affected products roughly stretched back to February 2017, in 1Q17, at the latest – and it quite possibly extended back further, considering that Acacia could have disclosed the issue only after identifying it and initially considering its implications on the business.  And yet Acacia provided no guidance on the potential costs associated with remediating or replacing the products.

### M.    The June 7, 2017 Statements

277.    On June 7, 2017, Acacia participated in the BofA Merrill Lynch Global Technology Conference, in which Shanmugaraj and Gavin presented on the Company and discussed its business. BofA Merrill Lynch analyst Tal Liani hosted the conference.

278.    In his opening remarks, Shanmugaraj emphasized that the slowdown in demand in the China market derived from the buildout of provincial networks, referencing a page from a written presentation it distributed that depicted demand in China previously and prospectively.  The relevant page from the presentation, which shows business in China decreasing in 2017 (reflected by the red band in the middle of each bar), follows:



Sales of Optics Components and Modules[1]

279.    Attributing the data (in footnote 1 of the chart) to LightCounting Market Research, a firm focused on the study of high speed interconnects for the datacom, telecom, and consumer communications markets, Shanmugaraj extensively detailed the difference between the completed "backbone expansion" in China and the forthcoming provincial buildouts, as the following passages from his opening remarks reflect:

> "[L]ast year, we had the backbone network – China backbone – China Mobile . . . backbone expansion, that was a pretty significant build-out, and this year is the provincial networks, and some of the deployments has been delayed. So there is many provinces, over 20 provinces, so these are all going to be multiple POs [Purchase Orders] coming, rather than one big backbone PO."

> "But the thing to notice, that some of all these provinces is as big or bigger than the national backbone, so *it is a substantial build-out happening, spread out over multiple POs rather than over a single PO* and for us from where we sit, the question is not whether this is – if it is coming back, it's when it is coming back. So, people are talking about this coming in July, August versus October, November. What we see is happening, we are seeing some – people would have seen some positive news coming out of that that's all good. But we said we needed some additional time to really call it when it's happening, but for us, we see the second half being stronger than the first half and *although there will be lumpiness, it may not all happen in June, July, it's hard to predict exactly*, but we do see second half, the China market better than the first half and continuing to improve just because the provincial build-outs are a substantial piece of the China market."

280.     Given that the provincial buildout involved a series of smaller purchase orders related to numerous provinces in China, however, it presented numerous uncertainties for Acacia's business – uncertainties that Acacia failed to earlier disclose to investors, but which impacted the manner in which new and continuing business could flow into the Company.

281.     In light of Shanmugaraj's discussion of demand in China, BofA Merrill Lynch analyst Liani asked during the question-and-answer session about "other factors that drove some slowdown in [Acacia's] revenues more recently," referencing ADVA as a "customer slowing down as well."  In response, Shanmugaraj claimed ADVA had "two to three sources, suppliers, and there is always some variations on the allocations that they see."

282.     As Liani recounted, however, ADVA implied in public statements – albeit without specifically referencing Acacia – that it reduced its purchases because of the lower price associated with "buying discrete components for optics [than] buying [Acacia's] chip . . . ."  Yet, as he noted: "[w]hen [Shanmugaraj] described it, it was more about their market share within customers" – which is precisely how Acacia had explained ADVA's reduction in purchases during the Class Period.

**N.     The June 13, 2017 Statements**

283.     On June 13, 2017, Acacia participated in the William Blair Growth Stock Conference, in which Shanmugaraj and Gavin presented on the Company and discussed its business.  William Blair analyst Dmitry Netis hosted the conference.

284.     In addressing the decline in demand that Acacia had experienced with respect to its top eight customers, Gavin referenced not only "the general slowdown in China" – as management had before – but also "exposure with one of our largest customers in China," which "added to some level of decline."  In this manner, Gavin confirmed that ZTE was experiencing a decline in demand, which adversely affected Acacia.

285.     Shanmugaraj also acknowledged that the slowdown in demand from China originated from ZTE, as opposed to others Acacia does business with in China – an admission he made when claiming that Acacia believed it would experience a surge in demand from China in the foreseeable future:

> "And then the surges, there is couple of aspects to it. One is this run rate expansions of their backbone network for China Mobile. And, that was one of the factors that caused the delay in our customer, and so we see some of that signals improving. But, we've said, we need another month or two to make a call to say what the timing of that is."

286.     Likewise, Shanmugaraj again acknowledged that the provincial buildout in China was a significant source of uncertainty for Acacia's business and a key factor in the China slowdown, stating:

> "***And the provincial build*** – the signal, we're going to reveal . . . what we hear from our customers, and they are predicting that the second half is better than the first half, but ***the exact timing is still not being – is not clear***, is it happening – because of whether it's happening in July or in September or in November, it's hard to tell. But, their message to us is, their second half is going to be higher because of ***some of the provincials coming in the second half of the year***."

287.     Separately, Gavin acknowledged the decline resulting from the reduction in ADVA's orders, although he did not mention that customer by name.  Nevertheless, he referenced "our other customer's exposure to the DCI," noting: "it's lumpy and there was some share allocation that they had to go through in the first quarter."

288.     Finally, William Blair analyst Netis asked for insight into the scope of the Company's financial exposure to the quality issue identified on May 31, 2017, estimating a range of between $25 million and $50 million in revenue, explaining:

> "If I do a quick math, just kind of use your run rate ASP of $8,000 a part . . . it comes out to about $50 million sort of revenue opportunity. At a 50% margin, you have about $25 million of cost impact sort of associated with that."

289.     Notably, Acacia's 1Q17 revenue, reported on May 9, 2017, was $114.7 million, while "GAAP net income" was $35.7 million and "GAAP income from operations" was $29.9 million. Moreover, the Company forecast between $85 million and $95 million in revenue for all of 2Q17. And yet Netis's proposed range did not consider warranty, remediation or other costs and expenses.

290.     Nevertheless, Shanmugaraj rejected Netis's back-of-the-envelope range of possible exposure and confirmed that Acacia's exposure to the quality issue is "just purely supply based," rhetorically asking: "How many can we build and can we take care of new orders, as well as some retrofits that we need to do, a portion of the retrofits that we need to do." As he represented, Acacia was "scaling operations with all our CMs [contract manufacturers] to be able to meet the demand." Furthermore, he claimed that much of the blame, liability and expense could rest with the contract manufacturers, presumably implicating only minor warranty expenses, if at all, for Acacia:

> "[A] lot of it was done at one CM. It wasn't a product design to show . . . . And so, there's going to be some level of assessment we have to share with them *in terms of what their contribution is going to be*. We're still working through that."

291.     Gavin responded: "I'll agree with that." And the conference concluded.

292.     Accordingly, even when directly confronted with the question and a range of potential exposure, Acacia failed to provide an estimate of its potential financial exposure to the quality issue. Nevertheless, the Company's stock price declined slightly on June 14, 2017 (by nearly 1%) and on June 15, 2017 (by nearly 2%) as the market digested additional information regarding the reasons for the dramatic slowdown in China.

### O.     The July 14, 2017 Statements and End of the Class Period

293.     On July 14, 2017, before the market opened, Acacia issued a press release, filed with the SEC as an exhibit to Form 8-K, announcing 2Q17 disappointing preliminary financial results for the period ended June 30, 2017 and providing financial guidance for the forthcoming quarter ending September 30, 2017 ("3Q17"). Specifically, Acacia reported revenue of $77 million to $79 million –

far below its 2Q17 forecast, issued May 9, 2017, of $85 million to $95 million – a GAAP net loss of between $5.5 million and $7.5 million, and a GAAP diluted net loss per share of $0.14 to $0.19.

294.     In the press release, Shanmugaraj attributed Acacia's dismal preliminary financial results to the quality issue he downplayed only a month earlier, as the following reflects:

> "***Our second quarter results were adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31***. As we previously announced, we identified a circuit board cleaning process as the likely root cause of the quality issue. This cleaning process was eliminated and manufacturing at the impacted contract manufacturer resumed. Although we began to ramp manufacturing capacity with our contract manufacturers during the quarter, ***we experienced supply constraints as capacity was used to both build replacement units and to meet new demand*** from customers for our AC400 and CFP units," said Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "We anticipate completing our remediation efforts with respect to the remaining impacted units during the third quarter of 2017."

295.     Additionally, in a "Schedule A" attached to the press release (in which it provided a reconciliation of GAAP measures to non-GAAP measures), Acacia estimated "[w]arranty charges due to manufacturing process quality issue" as between $15 million and $16 million for 3Q17 and, thus, the period ended June 30, 2017.  Neither Shanmugaraj nor Gavin commented on this potential range of exposure in the press release.

296.     These disclosures allowed investors to finally appreciate the extent and severity of the potential implications of the quality issue on the Company's business and operations.

297.     On the news, the price of Acacia common stock declined 6.3% from its close of $41.62 per share on July 13, 2017 to close at $39 per share on July 14, 2017, on unusually high volume of more than 3.5 million shares traded.

298.     Given the significance of this adverse news, multiple media outlets reported on it. For example, in a July 14, 2017 article entitled "Acacia Communications Sandbags Investors Again Using The Same Company-Specific Quality Control Issue," *Forbes* contributor Jay Somaney wrote:

"The drama and pain continues for Acacia Communications and its beleaguered investors. Once again, this morning, the company is pre-announcing lower numbers for the June quarter and taking down guidance for the current quarter ending in September."  Noting Acacia has "struggl[ed]" with the quality issue "for the last couple of quarters now," he observed: "Acacia has been sandbagging investors for a while now."

### P.    Acacia Continues to Experience Difficulties After the Class Period

299.    After the Class Period, Acacia continued to experience difficulties associated with the problems it experienced during the Class Period, underscoring the importance of these issues and their impact on the Company's business and operations.

300.    On August 3, 2017, Acacia issued a press release, filed with the SEC as an exhibit to Form 8-K, announcing its 2Q17 financial results and 3Q17 financial guidance.  For the quarter ended June 30, 2017, Acacia reported: revenue of $78.9 million – a 32% decrease, year-over-year – and GAAP loss from operations of $6.7 million.  Commenting on the results, Shanmugaraj attributed the Company's poor performance to the quality issue, stating: "As we previously announced, our second quarter results were adversely affected by the quality issue identified at one of our three contract manufacturers . . . ."

301.    Later that day, Acacia conducted a conference call with analysts and investors and provided commentary about the Company's business metrics and financial prospects.  Among those participating in the call on behalf of Acacia were President and CEO Shanmugaraj and CFO Gavin, both of whom discussed Acacia's products and financial performance.  Analysts from Morgan Stanley, Needham, William Blair, Cowen, BofA Merrill Lynch, Deutsche Bank, Northland and D.A. Davidson & Co. also participated.

302.    In his opening remarks, Shanmugaraj admitted that Acacia was supply constrained due to the quality issue, because the contract manufacturer was required to cease production – only

resuming sometime during 2Q17, after the issue was resolved – and the Company had to not only

replace affected units but continue supplying new units to customers.  He also indicated that Acacia

had implemented "enhanced quality issues" and laid out a comparison of the prior year financial

results, as follows:

> "As previously announced, our second quarter results were adversely affected by a quality issue identified at one of our contract manufacturers. The circuit board cleaning process that we identified as the root cause of the quality issue was eliminated and manufacturing at the impacted contract manufacturer resumed in the second quarter. Although we began to ramp manufacturing capacity during the second quarter at all our contract manufacturers, we experienced a supply constraint in the quarter as capacity was used to build both replacement units as well as units to meet new demand from customers. This quality issue, in addition to the lower order rate from some of our China and DCI customers that we discussed on our first quarter earnings call, resulted in a decrease in our revenue from $116.2 million in the second quarter of 2016 to $78.9 million in the second quarter of 2017. Our non-GAAP net income declined from $28.9 million to $10.8 million. And our non-GAAP diluted EPS decreased from $0.77 to $0.26."

> "Delivering products to our customers that meet high-quality standards is a key objective at Acacia. In response to the recent quality issue, we are in the process of implementing enhanced quality initiatives, internally and with our suppliers and contract manufacturers. As we continue to scale rapidly with new products, we believe these enhanced quality initiatives will help prevent this type of a quality issue in the future. Since this quality issue has surfaced, we have worked hard to help our customers get back on track quickly and minimize any resulting business impact. We have ramped our manufacturing capacity and believe we have sufficient capacity in the third quarter to complete our remediation efforts on the remaining units impacted by the quality issue as well as to meet new demand from our customers."

303.    In his own remarks, Gavin stated that the financial impact of the quality issue caused

a 14.2% year-over-year reduction in gross margin, representing: "our GAAP gross margins were

32.2% in the second quarter [of 2017], which compared to 46.4% in the second quarter of 2016."

304.    Additionally, Acacia's lack of visibility on the provincial buildouts persisted after the

Class Period.  On September 8, 2017, Acacia participated in the Citi Global Technology Conference.

There, Shanmugaraj acknowledged that the timing of business related to the provincial buildout is

"hard to predict" because "[the] budgets are managed by the provinces, and so you're going to be

seeing it more spread out over multiple quarters than happening in a 3 quarter time frame" – which largely occurred for the backbone expansion.  Thus, he represented:

> "[T]he visibility in terms of exactly is going to happen this quarter or not is going to be much more tricky. And most recent tender you have heard of is not all -- it's not going to be all deployed in Q4. It's going to be spread out over a couple of quarters itself."

305.    The message was the same at the September 13, 2017 Deutsche Bank Technology Conference, where Shanmugaraj candidly admitted that, since the IPO, "a lot of things that happened were not in our control."  Elaborating, he juxtaposed the explosive growth experienced during the backbone expansion with the gradual business he expected Acacia to receive, over several quarters, from the forthcoming provincial buildouts:

> "2016 was a very good year because a lot of the backbone got built out in a matter of 2 to 3 quarters. ***The provincial market***, which will be as big or bigger, if you accumulate all the 20-plus provinces they have, will be even bigger than the backbone, but it ***is going to be spread out over multiple quarters. So it is going to be more of a gradual slope*** . . . ."

306.    Finally, during the November 2, 2017 earnings conference call, Shanmugaraj was forced to concede that Acacia had no better visibility into the timing of the provincial buildout than it had in earlier quarters, explaining:

> "In 2016, there was a significant year-over-year growth in the China market driven by the China Mobile backbone expansion. However, in 2017, the transition to provincial buildouts have been slower than anticipated. As you may recall, during our second quarter earnings call earlier this year, we stated that we were seeing some improved order rates in the third quarter due to one specific China Mobile backbone expansion, which has since been completed. At that time, we had indicated that we did not have any near-term visibility into the timing of the provincial buildouts. ***While there have been several planning discussions around the provincial buildouts, we are not seeing any improvements in our order flow due to these buildouts, and our near-term visibility in China remains challenging***."

307.    Accordingly, nearly four months after the Class Period, Acacia still had little to no insight on the timing and magnitude of business related to the provincial buildout in China.  And yet

it was not until after the Class Period that Acacia acknowledged the inherently unpredictable timing

of business associated with that portion of the broadband expansion in China – disclosures owed to

public investors during the Class Period to allow them to adequately assess the risks of investing in

the Company.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

308.   As alleged herein, Acacia and the Individual Defendants acted with scienter in that

they knew that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading; knew that such statements or documents would be

issued or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of

the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by

virtue of their receipt of information reflecting the true facts regarding Acacia, their control over,

and/or receipt and/or modification of Acacia's allegedly materially misleading statements and/or

their associations with the Company which made them privy to confidential proprietary information

concerning Acacia, participated in the fraudulent scheme alleged herein.

309.   The Individual Defendants were further motivated to misrepresent Acacia's business

metrics and financial prospects in order to profit from selling its common stock.  Indeed, during the

Class Period, Acacia senior executives and directors sold millions of their personally-held Acacia

shares, reaping more than $188.6 million in gross proceeds, as follows:

| Name/Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **Chung, Peter** | 10/13/16 | 346,202 | $96.50 | $33,408,493 |
| (Director) | 03/09/17 | 1,250,000 | $50.25 | $62,812,500 |
| | | 1,596,202 | | $96,220,993 |
| | | | | |
| **Gavin** | 10/13/16 | 25,501 | $96.50 | $2,460,847 |
| (CFO) | 02/14/17 | 678 | $62.24 | $42,199 |
| | 04/17/17 | 17,416 | $54.51 | $949,346 |
| | 04/17/17 | 401 | $55.08 | $22,087 |

- 97 -

| Name/Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 05/15/17 | 4,634 | $48.54 | $224,934 |
| | | 48,630 | | $3,699,413 |
| | | | | |
| **Givehchi, Mehrdad** | 10/13/16 | 98,846 | $96.50 | $9,538,639 |
| (Co-Founder; | 01/05/17 | 26,500 | $60.96 | $1,615,440 |
| VP of Hardware | 01/05/17 | 8,600 | $61.96 | $532,856 |
| and Software) | 01/05/17 | 35,598 | $60.95 | $2,169,698 |
| | 01/05/17 | 500 | $63.14 | $31,570 |
| | 01/05/17 | 6,400 | $61.90 | $396,160 |
| | 02/01/17 | 1,200 | $58.42 | $70,104 |
| | 02/01/17 | 800 | $58.81 | $47,048 |
| | 02/01/17 | 2,600 | $55.92 | $145,392 |
| | 02/01/17 | 8,330 | $55.01 | $458,233 |
| | 02/01/17 | 1,800 | $55.87 | $100,566 |
| | 02/01/17 | 1,500 | $58.17 | $87,255 |
| | 02/01/17 | 1,500 | $56.97 | $85,455 |
| | 02/01/17 | 100 | $59.61 | $5,961 |
| | 02/01/17 | 6,400 | $54.95 | $351,680 |
| | 02/01/17 | 1,600 | $57.19 | $91,504 |
| | 02/14/17 | 2,039 | $62.24 | $126,907 |
| | 03/01/17 | 11,530 | $52.21 | $601,981 |
| | 03/01/17 | 300 | $52.70 | $15,810 |
| | 03/01/17 | 2,900 | $51.10 | $148,190 |
| | 03/01/17 | 8,900 | $52.23 | $464,847 |
| | 03/01/17 | 2,200 | $51.14 | $112,508 |
| | 04/03/17 | 800 | $60.34 | $48,272 |
| | 04/03/17 | 3,660 | $58.40 | $213,744 |
| | 04/03/17 | 4,969 | $58.44 | $290,388 |
| | 04/03/17 | 6,740 | $59.39 | $400,289 |
| | 04/03/17 | 8,961 | $59.38 | $532,104 |
| | 04/03/17 | 700 | $60.11 | $42,077 |
| | 05/01/17 | 9,949 | $46.36 | $461,236 |
| | 05/01/17 | 4,781 | $46.91 | $224,277 |
| | 05/01/17 | 8,325 | $46.40 | $386,280 |
| | 05/01/17 | 2,775 | $46.96 | $130,314 |
| | 05/15/17 | 7,390 | $48.51 | $358,489 |
| | | 289,193 | | $20,285,274 |
| | | | | |
| **Mikkelsen, Benny** | 10/13/16 | 98,846 | $96.50 | $9,538,639 |
| (CTO) | 01/05/17 | 400 | $62.75 | $25,100 |
| Officer | 01/05/17 | 300 | $63.50 | $19,050 |
| | 01/05/17 | 14,162 | $61.97 | $877,619 |
| | 01/05/17 | 62,664 | $60.94 | $3,818,744 |
| | 02/01/17 | 1,600 | $58.65 | $93,840 |
| | 02/01/17 | 14,642 | $54.98 | $805,017 |
| | 02/01/17 | 4,500 | $55.92 | $251,640 |
| | 02/01/17 | 1,900 | $56.88 | $108,072 |
| | 02/01/17 | 200 | $59.61 | $11,922 |

| Name/Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 02/01/17 | 3,000 | $57.97 | $173,910 |
| | 02/14/17 | 2,032 | $62.24 | $126,472 |
| | 03/01/17 | 21,149 | $51.11 | $1,080,925 |
| | 03/01/17 | 4,693 | $52.08 | $244,411 |
| | 04/03/17 | 8,105 | $58.46 | $473,818 |
| | 04/03/17 | 16,537 | $59.40 | $982,298 |
| | 04/03/17 | 1,200 | $60.50 | $72,600 |
| | 05/01/17 | 7,068 | $46.95 | $331,843 |
| | 05/01/17 | 18,774 | $46.38 | $870,738 |
| | 05/15/17 | 7,475 | $48.52 | $362,687 |
| | | 289,247 | | $20,269,346 |
| **Murphy, Francis** | 11/15/16 | 1,582 | $69.19 | $109,459 |
| (Controller) | 12/15/16 | 3,785 | $66.79 | $252,800 |
| | 01/03/17 | 6,752 | $62.15 | $419,637 |
| | 01/09/17 | 17,157 | $60.43 | $1,036,798 |
| | 01/30/17 | 1,608 | $60.67 | $97,557 |
| | 03/31/17 | 1,668 | $60.67 | $101,198 |
| | 04/03/17 | 1,201 | $59.46 | $71,411 |
| | 04/24/17 | 400 | $52.91 | $21,164 |
| | 07/03/17 | 305 | $41.53 | $12,667 |
| | 07/24/17 | 410 | $43.47 | $17,823 |
| | 08/08/17 | 8,380 | $48.00 | $402,240 |
| | | 43,248 | | $2,542,753 |
| **Rasmussen, Christian** | 10/13/16 | 98,846 | $96.50 | $9,538,639 |
| (Co-Founder; | 01/05/17 | 400 | $62.78 | $25,112 |
| VP of Digital Signal | 01/05/17 | 14,898 | $61.94 | $922,782 |
| Processing & Optics) | 01/05/17 | 300 | $63.50 | $19,050 |
| | 01/05/17 | 61,928 | $60.95 | $3,774,512 |
| | 02/01/17 | 800 | $58.66 | $46,928 |
| | 02/01/17 | 3,200 | $58.21 | $186,272 |
| | 02/01/17 | 14,992 | $54.99 | $824,410 |
| | 02/01/17 | 2,300 | $57.03 | $131,169 |
| | 02/01/17 | 4,350 | $56.01 | $243,644 |
| | 02/01/17 | 200 | $59.61 | $11,922 |
| | 02/14/17 | 3,321 | $62.24 | $206,699 |
| | 03/01/17 | 20,882 | $51.12 | $1,067,488 |
| | 03/01/17 | 4,960 | $52.10 | $258,416 |
| | 04/03/17 | 1,600 | $60.43 | $96,688 |
| | 04/03/17 | 7,625 | $58.47 | $445,834 |
| | 04/03/17 | 16,617 | $59.37 | $986,551 |
| | 05/01/17 | 9,238 | $46.91 | $433,355 |
| | 05/01/17 | 16,604 | $46.35 | $769,595 |
| | 05/15/17 | 10,060 | $48.52 | $488,111 |
| | | 293,121 | | $20,477,176 |
| **Ritchie, John** | 10/13/16 | 2,640 | $96.50 | $254,760 |

| Name/Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| (Director) | 05/09/17 | 2,640 | $47.20 | $124,608 |
| | | 5,280 | | $379,368 |
| | | | | |
| **Bhupendra C. Shah** | 10/13/16 | 47,917 | $96.50 | $4,623,991 |
| (VP of Engineering) | 01/05/17 | 23,800 | $60.96 | $1,450,848 |
| | 01/05/17 | 500 | $63.14 | $31,570 |
| | 01/05/17 | 1,500 | $62.06 | $93,090 |
| | 01/05/17 | 5,100 | $61.93 | $315,843 |
| | 01/05/17 | 8,280 | $60.96 | $504,749 |
| | 02/01/17 | 800 | $57.47 | $45,976 |
| | 02/01/17 | 300 | $57.19 | $17,157 |
| | 02/01/17 | 5,800 | $55.02 | $319,116 |
| | 02/01/17 | 1,960 | $55.03 | $107,859 |
| | 02/01/17 | 500 | $56.11 | $28,055 |
| | 02/01/17 | 100 | $59.61 | $5,961 |
| | 02/01/17 | 1,900 | $56.16 | $106,704 |
| | 02/01/17 | 500 | $58.31 | $29,155 |
| | 02/01/17 | 1,200 | $58.52 | $70,224 |
| | 02/14/17 | 909 | $62.24 | $56,576 |
| | 03/01/17 | 7,600 | $52.23 | $396,948 |
| | 03/01/17 | 2,658 | $52.24 | $138,854 |
| | 03/01/17 | 200 | $52.81 | $10,562 |
| | 03/01/17 | 602 | $51.11 | $30,768 |
| | 03/01/17 | 2,000 | $51.20 | $102,400 |
| | 04/03/17 | 1,363 | $58.52 | $79,763 |
| | 04/03/17 | 400 | $60.52 | $24,208 |
| | 04/03/17 | 3,800 | $58.51 | $222,338 |
| | 04/03/17 | 5,600 | $59.43 | $332,808 |
| | 04/03/17 | 1,797 | $59.45 | $106,832 |
| | 04/03/17 | 100 | $60.51 | $6,051 |
| | 05/15/17 | 5,112 | $48.53 | $248,085 |
| | | 132,298 | | $9,506,490 |
| | | | | |
| **Shanmugaraj, Raj** | 10/13/16 | 93,500 | $96.50 | $9,022,750 |
| (President, CEO) | 10/13/16 | 14,663 | $96.50 | $1,414,980 |
| | 01/05/17 | 2,688 | $60.93 | $163,780 |
| | 01/05/17 | 21 | $62.72 | $1,317 |
| | 01/05/17 | 491 | $61.93 | $30,408 |
| | 01/05/17 | 7,224 | $60.93 | $440,158 |
| | 01/05/17 | 2,688 | $60.93 | $163,780 |
| | 01/05/17 | 491 | $61.93 | $30,408 |
| | 01/05/17 | 21 | $62.72 | $1,317 |
| | 01/05/17 | 1,318 | $61.93 | $81,624 |
| | 01/05/17 | 58 | $62.72 | $3,638 |
| | 01/06/17 | 2,924 | $61.28 | $179,183 |
| | 01/06/17 | 1,088 | $61.28 | $66,673 |
| | 01/06/17 | 1,088 | $61.28 | $66,673 |
| | 01/06/17 | 5,676 | $60.70 | $344,533 |

| Name/Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 01/06/17 | 2,112 | $60.70 | $128,198 |
| | 01/06/17 | 2,112 | $60.70 | $128,198 |
| | 02/02/17 | 1,811 | $57.82 | $104,712 |
| | 02/02/17 | 1,283 | $57.08 | $73,234 |
| | 02/02/17 | 1,811 | $57.82 | $104,712 |
| | 02/02/17 | 288 | $58.52 | $16,854 |
| | 02/02/17 | 3,446 | $57.08 | $196,698 |
| | 02/02/17 | 4,866 | $57.82 | $281,352 |
| | 02/02/17 | 106 | $58.52 | $6,203 |
| | 02/02/17 | 106 | $58.52 | $6,203 |
| | 02/02/17 | 1,283 | $57.08 | $73,234 |
| | 02/03/17 | 1,591 | $56.28 | $89,541 |
| | 02/03/17 | 2,082 | $57.08 | $118,841 |
| | 02/03/17 | 809 | $57.08 | $46,178 |
| | 02/03/17 | 809 | $57.08 | $46,178 |
| | 02/03/17 | 4,118 | $56.28 | $231,761 |
| | 02/03/17 | 1,591 | $56.28 | $89,541 |
| | 02/14/17 | 2,029 | $62.24 | $126,285 |
| | 03/01/17 | 286 | $50.97 | $14,577 |
| | 03/01/17 | 3,714 | $52.30 | $194,242 |
| | 03/01/17 | 1,393 | $52.30 | $72,854 |
| | 03/01/17 | 107 | $50.97 | $5,454 |
| | 03/01/17 | 1,393 | $52.30 | $72,854 |
| | 03/01/17 | 107 | $50.97 | $5,454 |
| | 03/02/17 | 1,500 | $51.21 | $76,815 |
| | 03/02/17 | 1,500 | $51.21 | $76,815 |
| | 03/02/17 | 4,000 | $51.21 | $204,840 |
| | 05/15/17 | 8,983 | $48.52 | $435,855 |
| | | 189,175 | | $15,038,903 |
| Swanson, Eric (Director) | 10/13/16 | 2,640 | $96.50 | $254,760 |
| **TOTAL:** | | **2,880,244** | | **$188,254,413** |

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

310.    During the Class Period, Acacia's stock price was artificially inflated by the issuance

of false and misleading statements, which conduct operated as a fraud or deceit on Class Period

purchasers.  When the misrepresentations and fraudulent conduct were exposed to the market, the

price of Acacia common stock declined as the artificial inflation came out, causing economic loss to

investors who bought stock during the Class Period.  Accordingly, as a result of their purchases of

Acacia stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

311.   The decline in the price of Acacia's common stock after the corrective disclosures came to light was a direct result of the nature and extent of the fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price declines in the stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the fraudulent conduct.   The economic loss suffered by Plaintiffs and the other Class members was a direct result of the fraudulent scheme to artificially inflate the price of Acacia common stock and the subsequent decline in the value of the stock when the prior misrepresentations and other fraudulent conduct were revealed.

312.   Specifically, the following corrective disclosures resulted in significant declines in the Acacia's stock price, harming its investors:

(a)   On October 27, 2016, only two weeks after Acacia's Secondary Offering, two of Acacia's largest customers, ZTE and ADVA, which together accounted for more than half of the Company's sales, announced disappointing financial guidance.   ZTE disclosed that demand for its products was slowing, while ADVA disclosed that it was months behind schedule in launching its new technology.   Both disclosures meant that ZTE's and ADVA's demand for Acacia's products would suffer as well.   In response to this news, on October 27, 2016, Acacia's stock price declined approximately 14%, closing at $73.66 per share.

(b)   On January 10, 2017, while attending the Needham Growth Conference, Acacia's President/CEO Shanmugaraj and CFO Gavin attempted to present an optimistic outlook for the Company's business.   Nonetheless, their remarks partially disclosed previously unknown facts

about the uncertainty and unpredictability of the provincial buildout phase of China's broadband expansion and thus Acacia's future sales, the substantial majority of which Acacia had historically made in China.  As a result, Acacia's stock price sank approximately 9.6% to close at $57.54 per share on January 10, 2017, as the market digested the partial disclosure of the truth.

(c)     On February 23, 2017, Acacia, through  Shanmugaraj and Gavin, disclosed that it was experiencing "a lower-than-anticipated order rate from one of [its] larger customers," but refused to provide details such as which customer and the extent of the decline.  Having received a vague indication that declining demand was adversely affecting Acacia's sales, investors drove down the price of Acacia's stock.  The price fell approximately 14.8% on February 24, 2017, to close at $54.04 per share.

(d)     On April 25, 2017, MACOM – for which Acacia director Chung also served as a director – announced gloomy financial guidance in part due to a "China correction happening." This additional evidence of declining demand in China caused Acacia's stock price to drop another approximately 11% on April 26, 2017, closing at $48.08 per share.

(e)     On May 9, 2017, Acacia itself announced gloomy financial guidance for 2Q17, stating that 90% of the reduced guidance was based on slowing demand in China.  In response to this guidance, the Company's stock price declined approximately 8.1% on May 10, 2017, to close at $44.48 per share.

(f)     On June 13, 2017, while attending the William Blair Growth Stock Conference, Shanmugaraj and Gavin discussed "the general slowdown in China" and revealed for the first time that the customer having "a lower-than-anticipated order rate" was ZTE, Acacia's largest customer.  They also acknowledged the uncertainty and unpredictability surrounding China's provincial buildout and a lower order rate from another major customer, later revealed to be ADVA.

- 103 -

This news resulted in a decline in Acacia's stock price of nearly 2% on June 14, 2017 and 1% on June 15, 2017.

(g)     On July 14, 2017, before the market opened, Acacia reported disappointing financial results and revealed for the first time that its manufacturing quality problem, which was initially disclosed on May 31, 2017 without any detail on financial impact, had a materially adverse effect on sales and revenues and resulted in significant warranty charges.  On this news, the market drove down Acacia's stock price by nearly 6.3% on July 14, 2017, to close at $39 per share.

313.    Accordingly, as these allegations illustrate, Acacia's stock price declined along with the emergence of news regarding previously-concealed adverse developments and business trends facing the Company, resulting in a decline in the stock price from the October 2016 Secondary Offering price of $100 per share to $39 per share at the end of the Class Period, on July 14, 2017.

## IX.     PRESUMPTION OF RELIANCE

314.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims against Acacia are predicated upon omissions of material fact for which there was a duty to disclose.

315.    In the alternative, or in addition, Plaintiffs are entitled to a presumption of reliance on Acacia's material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because its common stock traded in an efficient market during the Class Period for at least the following reasons:

(a)     Acacia's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     as a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ;

(c)     Acacia regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Acacia was followed by securities analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

316.    As a result of the foregoing, the market for Acacia common stock promptly digested current information regarding it from publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of such stock during the Class Period suffered similar injury through their purchases at artificially inflated prices and a presumption of reliance applies.

## X.     NO SAFE HARBOR

317.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  Many of the statements alleged herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

318.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Acacia is liable for those statements because at the time each was made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Acacia who knew that they were false when made.

## XI.    CLASS ACTION ALLEGATIONS

319.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of the following classes: (i) all persons and entities who purchased or otherwise acquired the common stock of Acacia during the Class Period and were damaged thereby (the "1934 Act Class"); and (ii) all persons and entities who purchased Acacia common stock pursuant or traceable to the Secondary Offering and were damaged thereby (the "1933 Act Class") (collectively, the "Classes").   Excluded from the Classes are defendants and their families, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

320.    The members of the Classes are so numerous that joinder of all members is impracticable.  Acacia securities were actively traded.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds, if not thousands, of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Acacia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

321.    Plaintiffs' claims are typical of the claims of the members of the Classes, as all members of the Classes are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

322.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

323.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

(a)     whether the 1933 Act and/or the 1934 Act were violated by the conduct alleged herein;

(b)     whether statements made by or on behalf of Acacia to the investing public during the Class Period misrepresented material facts about the business, operations or management of Acacia; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

324.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Because the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS AGAINST DEFENDANTS

### COUNT I

### For Violation of Section 11 of the Securities Act
### Against All Defendants

325.     For the purposes of this Count, Plaintiffs incorporate by reference those allegations concerning the parties, the Offering Documents, the 1933 Act claims and the 1933 Act Class, and the revelation of the truth, and expressly disclaim any allegations of fraud, which are not incorporated by reference in this Count.

326.     This Count is brought against all Defendants by plaintiff Rollhaus on behalf of the 1933 Act Class, seeking to recover for violations of Section 11 of the 1933 Act [15 U.S.C. §77k]. For the purposes of this Count, none of the Defendants named in this Count are alleged to have acted with scienter, which is not an element of a Section 11 claim.

327.    As alleged in the "1933 Act Claims" section above, the Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

328.    Acacia is the registrant for the Secondary Offering.  The Defendants named in this Count were responsible for the contents and dissemination of the Offering Documents; signed the Offering Documents; and/or were directors, underwriters or selling stockholders who are appropriate defendants in this Count.  By reason of this conduct, Defendants controlled a person who violated, and/or directed a person to engage in conduct that violated, Section 11 of the 1933 Act.

329.    As issuer of the shares, Acacia is strictly liable to plaintiff Rollhaus and the 1933 Act Class for any misstatements and omissions, while certain other Defendants are liable in negligence. None of Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, devoid of the omission of any material facts, and were not misleading.

330.    Plaintiff Rollhaus and the other members of the 1933 Act Class acquired Acacia common stock pursuant or traceable to the Offering Documents and otherwise in the Secondary Offering and, at the time of their purchases, they were unaware of the true facts concerning the wrongful conduct alleged herein.

331.    As a result of the conduct alleged in this Count, plaintiff Rollhaus and the other members of the 1933 Act Class have sustained damages for which Defendants are liable.  The value of Acacia common stock has declined substantially subsequent to and due to the 1933 Act violations described herein.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

332.    For the purposes of this Count, Plaintiffs incorporate by reference those allegations concerning the parties, the Offering Documents, the 1933 Act claims and the 1933 Act Class, and the revelation of the truth, as well as those contained in Count I above, and expressly disclaim any allegations of fraud, which are not incorporated by reference in this Count.

333.    This Count is brought against all Defendants by plaintiff Rollhaus on behalf of the 1933 Act Class, seeking to recover for violations of Section 12(a)(2) of the 1933 Act [15 U.S.C. §77l].  For the purposes of this Count, none of the Defendants named in this Count are alleged to have acted with scienter, which is not an element of a Section 11 claim.

334.    Defendants actively solicited purchasers of stock for the Secondary Offering by, among other things, preparing, disseminating and presenting to potential investors and otherwise eliciting investor participation in the Secondary Offering.  As a result, Defendants were "statutory sellers" for the purposes of Section 12(a)(2) of the 1933 Act.

335.    Additionally, Acacia was a statutory seller under SEC Rule 159A, which provides that an issuer is a statutory seller for the purposes of Section 12(a)(2) regardless of the form of underwriting.  Specifically, SEC Rule 159A(a), codified as 17 C.F.R. §230.159A(a)(1)-(4), provides, in part, the following "[d]efinition of seller for the purposes of section 12(a)(2) of the [Securities] Act":

> For purposes of section 12(a)(2) of the Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any [prospectus] . . . or other communication that is an offer in the offering by the issuer to such person.

336.     Furthermore, for the purposes of SEC Rule 159A(a), "information is provided or a communication is made by or on behalf of an issuer if an issuer or an agent or representative of the issuer authorizes or approves the information or communication before its provision or use." Note 1, 17 C.F.R. §230.159A(a); see also 70 Fed. Reg. 44722 at 44769 (Aug. 3, 2005).

337.     Moreover, by means of the defective Prospectuses, which were part of the Offering Documents, and oral communications, Defendants promoted and sold Acacia common stock to plaintiff Rollhaus and other members of the 1933 Act Class.

338.     The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed plaintiff Rollhaus and other members of the 1933 Act Class who purchased Acacia common stock pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained therein to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known about the misstatements and omissions contained in the Prospectuses, as set forth above.

339.     Neither plaintiff Rollhaus nor the other members of the 1933 Act Class knew, or in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time they acquired Acacia common stock in the Secondary Offering.

340.     By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff Rollhaus and other members of the 1933 Act Class who purchased Acacia common stock in the Secondary Offering pursuant to the Prospectuses sustained substantial damages in connection with their purchases.

341.     Accordingly, members of the 1933 Act Class who hold the common stock issued pursuant to the Prospectuses have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to Defendants sued in this Count.  Moreover, 1933 Act Class members who have sold their common stock seek damages to the extent permitted by law.

## COUNT III

### For Violation of Section 15 of the 1933 Act
### Against the Individual Defendants and the Selling Defendants

342.     Plaintiffs incorporate by reference the allegations concerning the background of the Defendants named in this Count, as well as the additional control allegations, allegations concerning the preparation, signing and dissemination of the Offering Documents, and the allegations set forth in Counts I and II, above.

343.     This Count is brought against all Defendants by plaintiff Rollhaus on behalf of the 1933 Act Class, seeking to recover for violations of Section 15 of the 1933 Act [15 U.S.C. §77o].

344.     As alleged herein, a primary violation of the 1933 Act occurred, in that the Offering Documents contained misleading statements and omissions and certain of Defendants engaged in conduct in violation of Section 11 of the 1933 Act.

345.     The Individual Defendants and Selling Defendants were control persons of Acacia by virtue of their positions as directors and/or senior officers of the Company, as well as their status as stockholders and their ability to cause the Company to arrange and execute the Secondary Offering and disseminate the Offering Documents in connection therewith.

346.     To the extent necessary, Defendants named in this Count were culpable participants in violating Section 11 of the 1933 Act, based on having signed, authorized or directed the signing of the Registration Statement, which otherwise formed part of the Offering Documents, and otherwise participating in the process which allowed the Secondary Offering to be successfully completed.

- 111 -

347.     Accordingly, Plaintiffs and the 1933 Act Class have sustained damages.  The value of Acacia common stock has declined substantially subsequent to and due to the 1933 Act violations alleged herein.

## COUNT IV

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against Acacia and the Individual Defendants

348.     Plaintiffs incorporate by reference all of the allegations set forth above, except those that disclaim the intentional or fraudulent nature of the conduct alleged herein.

349.     This Count is brought against Acacia and the Individual Defendants by all Plaintiffs on behalf of the 1934 Act Class, seeking to recover for violations of Section 10(b) and Rule 10b-5 of the 1934 Act.

350.     During the Class Period, Acacia and the Individual Defendants disseminated or approved the issuance of the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

351.     The defendants named in this Count violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(d)     employed devices, schemes and artifices to defraud;

(e)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(f)        engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Acacia common stock during the Class Period.

352.    Accordingly, Plaintiffs and the 1934 Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Acacia common stock. Plaintiffs and the 1934 Act Class would not have purchased Acacia common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' false and misleading statements and omissions.

## COUNT V

### Violations of §20(a) of the 1934 Act
### Against the Individual Defendants

353.    Plaintiffs incorporate by reference all of the allegations set forth above, including those that would establish the culpable participation, in any primary violation of the 1934 Act, of the Individual Defendants named in this Count.

354.    This Count is brought against the Individual Defendants by all Plaintiffs on behalf of the 1934 Act Class, seeking to recover for violations of Section 20(a) of the 1934 Act.

355.    The Individual Defendants acted as controlling persons of Acacia within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Acacia stock, the Individual Defendants had the power and authority to cause Acacia to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Acacia and all of its employees.

356.    Accordingly, by reason of such conduct, the Individual Defendants are liable to Plaintiffs and the 1934 Act Class pursuant to Section 20(a) of the 1934 Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as Class representatives, as appropriate, under Rule 23 of the Federal Rules of Civil Procedure, and Co-Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Classes against Defendants, jointly and severally, for all damages caused as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding rescission or a rescissory measure of damages to the members of the 1933 Act Class and/or otherwise as appropriate;

D.      Awarding Plaintiffs and the Classes the reasonable costs and expenses they incurred in this action, including counsel fees and expert fees; and

E.      Such other and further relief as the Court may deem just and proper.

## XIII.   JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  January 8, 2018                    BLOCK & LEVITON LLP
                                           JEFFREY C. BLOCK (BBO #600747)
                                           JASON M. LEVITON (BBO #678331)
                                           BRADLEY J. VETTRAINO (BBO #691834)


                                           _____
                                                    /s/ *Jason M. Leviton*
                                                 JASON M. LEVITON

                                           155 Federal Street, Suite 400
                                           Boston, MA  02110
                                           Telephone:  617/398-5600
                                           617/507-6020 (fax)
                                           jeff@blockesq.com
                                           jason@blockesq.com
                                           bradley@blockesq.com

                                           *Liaison Counsel for Plaintiffs and the Classes*

- 114 -

ROBBINS GELLER RUDMAN
    & DOWD LLP
SAMUEL H. RUDMAN
JOSEPH RUSSELLO (admitted *pro hac vice*)
VINCENT M. SERRA (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
vserra@rgrdlaw.com

GLANCY PRONGAY & MURRAY LLP
LIONEL Z. GLANCY
ROBERT V. PRONGAY
JOSHUA L. CROWELL (admitted *pro hac vice*)
GARTH SPENCER
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone: 310/201-9150
310/201-9160 (fax)
lglancy@glancylaw.com
rprongay@glancylaw.com
jcrowell@glancylaw.com
gspencer@glancylaw.com

*Co-Lead Counsel for Plaintiffs and the Classes*

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
frankj@johnsonfistel.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, Georgia 30064
Telephone: 770/200-3104
770/200-3101 (fax)
michaelf@johnsonfistel.com

*Additional Counsel for Plaintiffs*

ABRAHAM, FRUCHTER & TWERSKY, LLP
JACK G. FRUCHTER
LAWRENCE D. LEVIT
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: 212/ 279-5050
212/279-3655 (fax)
jfruchter@aftlaw.com
llevit@aftlaw.com

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jason M. Leviton, hereby certify that a copy of the foregoing Consolidated Amended Class

Action Complaint, filed through the CM/ECF system, will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF) on January 8, 2018.

/s/ Jason M. Leviton
Jason M. Leviton