**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STEVEN THARP, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAJ, and JOHN F. GAVIN,<br><br>Defendants. | No. 17-cv-11504-WGY<br>(LEAD DOCKET) |

**CONSOLIDATED AMENDED VERIFIED
<u>SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Lead Plaintiffs Karen Colgan, Sandra Farah-Franco, and Russell Gourley (collectively, "Plaintiffs" or "Lead Plaintiffs") bring this action derivatively for the benefit of Nominal Defendant Acacia Communications, Inc. ("Acacia" or the "Company").  Plaintiffs base their allegations on personal knowledge, as to themselves, and upon information and belief, as to all other matters.  Plaintiffs' information and belief are based upon, among other things, the investigation of counsel, which included: the review and analysis of certain of the Company's Board of Directors (the "Board") minutes and other materials obtained through a request for books and records and memorandums pursuant to 8 *Del. C.* §220 (the "§220 Request");[1] review of public filings with the United States Securities and Exchange Commission ("SEC"); review of public filings in federal courts, including lawsuits filed by court-appointed lead plaintiffs in federal securities fraud litigation; and review of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain.  Based on the allegations set forth in this complaint, Plaintiffs assert shareholder derivative claims for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of federal securities laws against members of Acacia's Board and certain Acacia executives.

## I.   INTRODUCTION

1.   This shareholder derivative action arises from the Acacia Board consciously causing and allowing the Company to mislead the investing public regarding: (1) the demand for its networking products; (2) its manufacturing quality; and (3) the adequacy of the Company's internal controls to assure that the Company's financial statements were reliable and free of

---

[1]     The parties agreed in their confidentiality agreement that all of the books and records that Acacia produced pursuant to Plaintiffs' §220 Request shall be deemed incorporated into Plaintiffs' shareholder derivative complaint. Accordingly, all of the documents that Acacia produced to Plaintiffs pursuant to the §220 Request are hereby incorporated into this complaint as if fully set forth herein.

material misstatements in an effort to artificially buoy the Company's share price in violation of federal securities laws, while the Insider Selling Defendants (defined below) reaped millions of dollars in profit from a secondary public offering engineered at the stock's apex, all in breach of their fiduciary duties to the Company and its shareholders.

2.     While the Individual Defendants (defined below) repeatedly caused the Company to represent to the market that Acacia was seeing solid growth in demand for its products in China, in reality, such growth was dependent on continued broadband buildout into China's provinces, the pace and scope of which was unpredictable, thus rendering the Company's growth unsustainable.  By late 2016, Acacia's largest customer – China-based ZTE Kangxun Telecom Co. Ltd. ("ZTE"), which accounted for 32% of the Company's total 2016 revenue – was already seeing lowered demand, resulting in reduced orders for the Company's products.  Likewise, Acacia's second-largest customer – ADVA Optical Networking North America, Inc. ("ADVA"), which accounted for 26% of the Company's total 2016 revenue – was carrying too much inventory, which significantly reduced its demand, and thus its orders, for Acacia's products.

3.     In addition, Acacia failed to timely or completely disclose material information about a serious manufacturing quality issue, occurring over at least a four-month period, that affected a substantial portion of the Company's products – a problem first revealed in a press release dedicated to the issue, filed with the SEC as an exhibit to Form 8-K, which underscored its materiality.  In the press release, Acacia failed to disclose a reasonable range of potential losses, notwithstanding its understanding of the outermost warranty and expense costs then associated with the problem.  Moreover, prior to the revelation of the issue, Acacia misled investors into believing that its robust manufacturing protocols and quality controls – including its oversight of, and close interaction with, its three third-party contract manufacturers – were

adequate to prevent this type of issue from occurring.  Due to this manufacturing quality problem, Acacia experienced significant supply constraints, rendering it unable to fully satisfy then-existing customer orders for its products and materially impacting the Company's financial results.

4.    The Individual Defendants, as the Company's directors and top officers, were acutely aware of the precarious demand levels from its top customers and the manufacturing quality issue.  Acacia's contracts with both ZTE and ADVA required them to provide Acacia with regular, rolling forecasts of their product demands.  In addition, Acacia's strategic partnerships with these customers – and presumably others – made the Company privy to changes in their business that would materially impact their orders.  Thus, Acacia had open access to reports and other information that would have informed it of ZTE's and ADVA's declining demand for its products, as well as negative trends in the industry and geographic region in which Acacia and its customers primarily operate.

5.    Furthermore, according to documents produced in response to the §220 Request, the Director Defendants (defined below) were made aware, as early as July 2016, that there were customer-specific demand issues and were apprised of customer issues on a regular basis.  Thus, the Individual Defendants cannot claim that the Board was unaware of the customer-specific demand issues.

6.    The Individual Defendants only caused the Company to reveal these issues after they brought about a secondary public offering of the Company's common stock, on or about October 7, 2016, at $100 per share (the "Secondary Offering").  The Secondary Offering permitted certain large stockholders – including six of seven Director Defendants – to reap hundreds of millions of dollars in net proceeds by selling the stock at artificially inflated prices.

7.     Less than three weeks after the Secondary Offering, ZTE announced disappointing sales results for the third quarter of 2016 and provided lower than expected sales guidance for the full 2016 fiscal year.  On the same day, ADVA also announced disappointing earnings guidance for 2016.  This caused the Company's stock to drop over 15% on October 27, 2016, closing at $73.66, which eliminated nearly $500 million in market capitalization in a single day.

8.     Further negative news about the Company's operations and prospects came out over the following nine months, causing the Company's stock price to fall further, reaching $39 by the middle of July 2017.  Meanwhile, the Individual Defendants continued to issue misleading statements about the Company in an effort to keep the stock price artificially elevated, while selling tens of millions of dollars' worth of Company stock.  From the Secondary Offering through July 14, 2017, the Insider Selling Defendants sold 4,326,348 artificially inflated shares for proceeds of just under $328 million.

9.     As set forth herein, the Individual Defendants breached their fiduciary duties owed to Acacia and its shareholders by consciously allowing and causing the Company to disseminate false and misleading statements about core aspects of the Company's health to the public.  The Individual Defendants knew and/or recklessly disregarded that Acacia was violating the law.  The discrepancy between Acacia's public SEC filings, and the significant deficiencies actually known to the Board, is a clear breach of the fiduciary duties of candor, good faith, and loyalty under Delaware law.

10.    As a consequence of the Individual Defendants' self-serving and derelict breaches of duty, Acacia, among other things, has been forced to defend itself in a consolidated securities fraud class action.  The securities action makes detailed allegations regarding Acacia's unlawful

misleading of the investing public.  Acacia and its shareholders are being required to expend significant sums of money to defend the suit and face liability well into the millions of dollars to settle or satisfy a judgment of that suit.  Acacia's illegal practices have caused, and will continue to cause, significant harm and expense to the Company and have damaged Acacia's reputation with the investor community.

11.     Along the same lines, on April 6, 2017, the Individual Defendants caused the Company to issue a proxy statement with the SEC on Schedule 14A (the "Proxy").  The Proxy requested that stockholders reelect two directors, Defendants Murugesan "Raj" Shanmugaraj ("Shanmugaraj") and Benny P. Mikkelsen ("Mikkelsen"), to the Board.  The Proxy also stated that the Board adequately oversaw Acacia's risks and had put in place adequate internal controls.  Further, although the Proxy notes that Defendants Shanmugaraj and Mikkelsen collectively sold approximately $20 million worth of stock during the Secondary Offering, the Proxy failed to disclose that the stock price was artificially inflated at the time and that such sales were improperly made while each of these Defendants were in possession of material, nonpublic information.  As a result, the information in the Proxy was not full, fair, or accurate and contained omissions that rendered it materially misleading in violation of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder.

12.     Absent the relief sought herein, the Individual Defendants will continue to cause injury to Acacia by, among other things, violating federal law, exceeding their powers as directors of a Delaware corporation by engaging in unlawful activities, violating their fiduciary duties, and otherwise wasting assets to the detriment of the Company and its shareholders.

13.     As directors and/or officers of Acacia, each of the Individual Defendants owed and/or owes the Company and its shareholders the fiduciary duties of good faith, loyalty, due

care, and candor in the management and administration of the Company.   The Individual

Defendants have breached these obligations, however, by approving, authorizing, acquiescing in,

and/or willfully turning a blind eye to Acacia's substantial violations of federal securities law.

They have likewise failed to discharge their fiduciary duty of candor during the relevant time

period.   This misconduct subjects the Company to significant civil liability.

## II.   JURISDICTION AND VENUE

14.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1331.   The Court also has jurisdiction pursuant to 28 U.S.C. §1367, as to the state law claims

alleged as they arise out of the same transactions and occurrences as the federal claims.   This

Court has personal jurisdiction over each of the Defendants (defined below) because each

defendant is either a corporation conducting business and maintaining operations in this District

or is an individual who is either present in this District for jurisdictional purposes or has

sufficient minimum contacts with this District, so as to render the exercise of jurisdiction by this

Court permissible under traditional notions of fair play and substantial justice.

15.   Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(b) because the

Nominal Defendant, Acacia, is headquartered in, and therefore is a resident of, the State of

Massachusetts.

## III.   PARTIES

16.   Plaintiff Karen Colgan ("Colgan") is a current owner of Acacia common stock

and has continuously owned such shares since September 9, 2016.   Plaintiff Colgan will hold

Acacia shares continuously throughout the pendency of this action.   Plaintiff Colgan brings this

action derivatively in the right of and for the benefit of Acacia.   Plaintiff Colgan will fairly and

adequately represent the interests of Acacia and its shareholders in enforcing the rights of the

Company.

17.     Plaintiff Sandra Farah-Franco ("Farah-Franco") is a current owner of Acacia common stock and has continuously owned such shares since September 6, 2016.  Plaintiff Farah-Franco will hold Acacia shares continuously throughout the pendency of this action. Plaintiff Farah-Franco brings this action derivatively in the right of and for the benefit of Acacia. Plaintiff Farah-Franco will fairly and adequately represent the interests of Acacia and its shareholders in enforcing the rights of the Company.

18.     Plaintiff Russell Gourley ("Gourley") is a current owner of Acacia common stock and has continuously owned such shares since October 25, 2016.  Plaintiff Gourley also owned Acacia common stock from July 29, 2016 to October 3, 2016.  Plaintiff Gourley will hold Acacia shares continuously throughout the pendency of this action.  Plaintiff Gourley brings this action derivatively in the right of and for the benefit of Acacia.  Plaintiff Gourley will fairly and adequately represent the interests of Acacia and its shareholders in enforcing the rights of the Company.

19.     Nominal Defendant Acacia is a corporation duly organized and existing under the laws of the State of Delaware.  Acacia maintains its principal place of business and executive offices at Three Mill and Main Place, Suite 400, Maynard, MA 01754.  Acacia designs, develops, manufactures, and markets communications equipment.  The Company offers high-speed, coherent optical interconnect products for cloud infrastructure operators and content and communication service providers worldwide.  Acacia claims its products enable "industry-leading speed, density, and power efficiency."  Acacia's stock trades on the NASDAQ Stock Exchange under the ticker symbol "ACIA."   Acacia's Board maintains three standing committees on which the Company's directors serve: the Audit Committee; the Compensation Committee; and the Nominating and Corporate Governance Committee.

20.     Defendant Shanmugaraj is, and was at all relevant times, Acacia's President, Chief Executive Office ("CEO"), and a member of the Board.   He began serving in those positions when he joined Acacia in April 2010.   Acacia considers Defendant Shanmugaraj an inside director.   While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Shanmugaraj sold 189,175 shares of his stock for $15,038,839.56 in proceeds.

21.     Defendant Mikkelsen is, and was at all relevant times, Acacia's Chief Technology Officer ("CTO") and a member of its Board since August 2009.   He is a co-founder of the Company.   Acacia considers Defendant Mikkelsen an inside director.   While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Mikkelsen sold 289,247 shares of his stock for $20,269,536.59 in proceeds.

22.     Defendant Peter Y. Chung ("Chung") is, and was at all relevant times, a member of the Board, Chair of the Nominating and Corporate Governance Committee, and a member of the Audit Committee and Compensation Committee, a position he has held since April 2013.   He is a managing director and CEO of Summit Partners, L.P. ("Summit Partners"), a venture capital firm, with offices in Massachusetts, California, and London, which he joined in August 1994. Since December 2010, Defendant Chung has also served on the board of directors of A10 Networks and MACOM Technology Solutions Holdings, Inc. ("MACOM"), which, through its subsidiaries, supplies products to Acacia through the Company's contract manufacturers.   In fact, during the three and nine months ended September 30, 2016, MACOM made sales to these contract manufacturers of approximately $0.5 million and $1.4 million, respectively.   Several investment vehicles associated with Summit Partners invested in Acacia, and those entities (described further below) sold stock in the Secondary Offering.   While in possession of material,

nonpublic information concerning Acacia's true business health, Defendant Chung sold 1,596,202 shares of his stock for $96,220,993 in proceeds.

23.     Defendant Stan J. Reiss ("Reiss') is, and was at all relevant times, a member of the Board, Chair of the Compensation Committee, and a member of the Audit Committee.  He is a general partner of Matrix Partners, a venture capital firm specializing in technology companies, with offices in Massachusetts and California, where he has worked since July 2000.   An investment vehicle associated with Matrix Partners invested in Acacia and that entity (described further below) sold stock in the Secondary Offering.  While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Reiss sold 1,446,104 shares of his stock for $139,549,036 in proceeds.

24.     Defendant John Ritchie ("Ritchie') is, and was at all relevant times, a member of the Board and Chair of the Audit Committee, a position he has held since April 2015.  According to its website, Summit Partners recruited Ritchie to serve on the Board and as Chairman of the Audit Committee.  While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Ritchie sold 5,280 shares of his stock for $379,368 in proceeds.

25.     Defendant Vincent T. Roche ("Roche") is, and was at all relevant times, a member of the Board, a position he has held since June 2016.  He has been Chairman of the Board since at least September 2017.  He was, at all relevant times, President, CEO, and a member of the board of directors of Analog Devices, Inc. ("ADI"), which supplies products to Acacia through the Company's contract manufacturers.  In fact, during the three and nine months ended September 30, 2016, ADI made sales to these contract manufacturers of approximately $1.5 million and $3.3 million, respectively.  Additionally, Bruce Evans, a managing director of

Summit Partners and Chairman of Summit Partners' Board of Managers, is also a director of ADI.

26.     Defendant Eric A. Swanson ("Swanson") is, and was at all relevant times, a member of the Board, a position he has held since August 2009.  Defendant Swanson was Acacia's Chairman of the Board from August 2009 until 2016.  While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Swanson sold 2,640 shares of his stock for $254,760 in proceeds.

27.     Defendant John F. Gavin ("Gavin") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Acacia.  While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Gavin sold 48,630 shares of his stock for $3,699,330.42 in proceeds.

28.     Defendant Mehrdad Givehchi ("Givehchi") is, and was at all relevant times, Acacia's co-founder and Vice President of Hardware and Software.  Defendant Givehchi was also Acacia's Director of Hardware and Software from June 2009 to June 2015.  While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Givehchi sold 289,193 shares of his stock for $20,285,090.81 in proceeds.

29.     Defendant Francis J. Murphy ("Murphy") is, and was at all relevant times, Acacia's Corporate Controller and Principal Accounting Officer.  While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Murphy sold 34,458 shares of his stock for $2,122,673.53 in proceeds.

30.     Defendant Christian J. Rasmussen ("Rasmussen") is, and was at all relevant times, Acacia's co-founder and Vice President of Digital Signal Processing and Optics.  Defendant Rasmussen was also Acacia's Director of Digital Signal Processing and Optics from

June 2009 to June 2015.  While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Rasmussen sold 293,121 shares of his stock for $20,476,861.42 in proceeds.

31.     Defendant Bhupendra C. Shah ("Shah") is, and was at all relevant times, Acacia's Vice President of Engineering.  While in possession of material, nonpublic information concerning Acacia's true business health, Defendant Shah sold 132,298 shares of his stock for $9,506,575.33 in proceeds.

32.     The Defendants identified in ¶¶20-21, 27-31 are collectively referred to herein as the "Officer Defendants."  The Defendants identified in ¶¶20-26 are collectively referred to herein as the "Director Defendants."[2]  The Defendants identified in ¶¶20-31 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, other than Defendant Roche, are referred to herein as the "Insider Selling Defendants."  Acacia and the Individual Defendants are collectively referred to herein as the "Defendants."

IV.     **THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

        A.      **The Fiduciary Duties of the Individual Defendants**

33.     By reason of their positions as present or past officers and/or directors of Acacia and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its shareholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner. Each Individual Defendant owed, and owes, the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

---

[2]     Director David J. Aldrich joined the Board in September 2017 and is not named as a defendant in this suit.

34.     To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Acacia and its most significant subsidiaries.  By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

    a.    manage, conduct, supervise, and direct the business affairs of Acacia (and those subsidiaries) in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and By-Laws);

    b.    neither violate nor knowingly permit any officer, director, or employee of Acacia (or those subsidiaries) to violate any applicable laws, rules, or regulations;

    c.    remain informed as to the status of Acacia's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto, and to take steps to correct such conditions or practices;

    d.    establish and maintain systematic and accurate records and reports of the business and affairs of Acacia and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records; and

    e.    maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Acacia (and those subsidiaries) are conducted in accordance with all applicable laws, rules, and regulations.

**B.      Acacia's Corporate Governance Guidelines Describe Additional Responsibilities of the Board**

35.     The Board adopted Corporate Governance Guidelines "to assist the Board in the exercise of its duties and responsibilities and to serve the best interests of the Company and its stockholders."  The Corporate Governance Guidelines provide that they "should be applied in a manner consistent with all applicable laws and stock exchange rules and the Company's charter and bylaws, each as amended and in effect from time to time."  The Corporate Governance

Guidelines also state that it is the Board's principal responsibility to "oversee the management of the Company and, in so doing, serve the best interests of the Company and its stockholders."[3]

36.     The Individual Defendants are also expected to adhere to the Company's Code of Business Conduct and Ethics that govern the conduct of its directors, officers, and associates. The policies contain guidelines on: (i) compliance with laws, rules, and regulations; (ii) conflicts of interest; (iii) insider trading; (iv) confidentiality; (v) honest and ethical conduct and fair dealing; (vi) protection and proper use of corporate assets; (vii) gifts and gratuities; (viii) accuracy of books and records and public reports; (ix) concerns regarding accounting or auditing matters; (x) dealings with independent auditors; (xi) workplace matters; (xii) waivers; and (xiii) reporting and compliance procedures.

### C.     Additional Fiduciary Duties of the Audit Committee Members

37.     In addition to the fiduciary duties discussed above, the Board's Audit Committee is responsible for assisting "the Board's oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements."  During the relevant period, Defendants Chung, Reiss, and Ritchie sat on the Audit Committee.

38.     The Audit Committee Charter provides that the "Audit Committee is appointed by the Board to assist the Board in monitoring . . . the compliance by the Company with legal and regulatory requirements[.]"  The Charter further provides that the Audit Committee shall, among other things:

> • "review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters required to be discussed by [Auditing Standard No. 16]";

---

[3]     Links to Acacia's corporate governance documents and committee charters are available at http://ir.acacia-inc.com/phoenix.zhtml?c=254242&p=irol-govHighlights.

- "consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K";

- "discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others";

- "discuss with the Company's management and independent auditor the Company's quarterly financial statements, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations'";

- "coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 under the Exchange Act";

- "discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled";

- "periodically discuss with the General Counsel (i) any legal matters that may have a material impact on the Company's financial statements, accounting policies, compliance with applicable laws and regulations and (ii) any material reports, notices or inquiries received from regulators or governmental agencies.  The Audit Committee shall have direct communication with the General Counsel, as needed"; and

- "report regularly to the Board."

## V.    FACTUAL ALLEGATIONS

### A.    The Defendants' Wrongful Conduct

#### 1.    Acacia's Business and Operations

39.    Acacia develops, manufactures, and sells high-speed coherent optical interconnect products in the Americas, Europe, Middle East, Africa, and Asia-Pacific region.  The Company's product offerings include a series of low-power coherent digital signal processor application-specific integrated circuits (or DSP ASICs) and silicon photonic integrated circuits (or silicon PICs), which it has integrated into families of optical interconnect modules with transmission

speeds ranging from 40 to 400 gigabits per second (or Gbps) for use in long-haul, metro, and interdata center markets. These products facilitate high-speed networking by converting electrical signals from devices (such as routers) into optics, enabling increased transmission speeds. During the relevant period, Acacia derived substantially all of its revenue from the sale of its products within its 100 and 400 Gbps product families.

40.    Network equipment manufacturers are Acacia's principal customers. These manufactures take Acacia's products to sell to communications and content service providers and data center and cloud infrastructure operators, which Acacia refers to as cloud and service providers. Acacia has stated that at least for the foreseeable future, it expects network equipment manufacturer customers to remain the main customer base for its products.

41.    According to Acacia, "[c]ustomer orders are complex and difficult to complete because prospective customers generally consider a number of factors over an extended period of time before committing to purchase the products [it] sell[s]" and those "[c]ustomers often view the purchase of [its] products as a significant and strategic decision and require considerable time to evaluate, test and qualify [its] products prior to making a purchase decision and placing an order." Customers are often slow to make decisions to buy Acacia's products because Acacia's negotiated terms and conditions of sale do not allow for returns.

42.    Acacia also states that its "product revenue is typically characterized by a life cycle that begins with sales of pre-production samples and prototypes followed by the sale of early production models with higher average selling prices and lower volumes, followed by broader market adoption, higher volumes, and average selling prices that are lower than initial levels." In addition, its "product revenue may be affected by contractual commitments to

significant customers that obligate [the Company] to reduce the selling price of [its] products on an annual or semi-annual basis."

43.     Acacia's products are meant to be completely functional when shipped without further production, modification, or customization.  Acacia recognizes revenue from product sales only after persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collection is reasonably assured.  According to the Company, its "fee is considered fixed or determinable at the execution of an agreement, based on specific products and quantities to be delivered at specified prices, which is evidenced by a customer purchase order or other persuasive evidence of an arrangement."

44.     In or about 2015, China announced a five-year plan known as the China "buildout" or "expansion," with the goal of upgrading its wireless and telecommunications infrastructure.  By the completion of the buildout in 2020, China hoped to provide broadband access throughout the entire country.

45.     The plan was designed to be completed in phases, beginning with a national "backbone" phase designed to enhance China's wireless infrastructure by, among other things, increasing the number of national "nodes" that enabled internet access in China.  The national backbone phase would be followed by a provincial, or regional, phase and end with a metro phase, extending the buildout into the urban centers.

46.      Each phase would include orders for services and equipment from vendors chosen as principal suppliers by, or on behalf of, China's three main wireless carriers: China Mobile; China Telecom; and China Unicom.

47.     Two of the principal suppliers were China-based telecommunications equipment and systems companies ZTE and Huawei Technologies, Inc. ("Huawei").  ZTE and Huawei

would then place orders with component part manufacturers, such as Acacia.  Throughout this period, ZTE was Acacia's largest customer, which meant that Acacia was particularly vulnerable to fluctuations in ZTE's business and, more broadly, the Chinese market as a whole.

48.     By 2016, Acacia was supplying products to ZTE in connection with the national backbone expansion phase of the China buildout.  During this phase of the buildout, China Mobile, China Telecom, and China Unicom placed large and valuable orders for products and services, which ZTE and Huawei were largely responsible for fulfilling.  The size of these orders meant that manufacturers for these suppliers, such as Acacia, saw a sharp spike in demand from Chinese suppliers during this phase, especially in early to mid-2016.

49.     In October 2016, only five months after the Company's initial public offering ("IPO"), Acacia held the Secondary Offering.  By that time, however, the industry – including Acacia – knew that demand in China was about to slacken sharply.

50.     Early signs of a slowdown in China began to emerge to the industry well before the Secondary Offering took place.  In connection with the issuance of an April 20, 2015 research report, entitled "China Wireless Infrastructure Industry 2015 Outlook," Earl Lum, the principal of industry analyst EJL Wireless Research, warned that "[w]ireless equipment demand has sharply declined since the middle of Q1 2015 and our current outlook for Q2 and the second half of 2015 is cautious with an extremely negative bias[.]"  As he explained, ZTE was already open to the "slowdown in China," which was likely to ramp up further:

> The wireless infrastructure equipment ecosystem has suffered through a feast and famine situation since early 2014 due to the roll out of 4G TDD-LTE by China Mobile. This has severely strained the supply chain within the industry as double and triple bookings and expedited orders have been replaced with order push outs and cancellations. Our analysis reveals that three base station equipment OEMs have the greatest exposure from the slowdown in China. They are Alcatel-Lucent, Huawei Technologies, and ZTE.

51.     Similarly, a November 19, 2015 article in the *Nikkei Asian Review*, entitled "Industry shivers as Chinese 4G investment cools," cautioned that "[t]elecommunications equipment manufacturers are bracing for a dry spell in Chinese wireless infrastructure investment."  As the article reported: "After spending heavily on fourth-generation, or 4G, technology, China's mobile carriers are beginning to shift their resources toward winning subscribers. Demand is expected to be sluggish until fifth-generation technology hits the mainstream in 2020."  The article indicated that while ZTE and other Chinese equipment makers had benefited from the national backbone phase in developing China's 4G network infrastructure, that benefit was expected to stop until the 2020 rollout and mainstream adoption of 5G technology, as China Mobile, China Telecom, and China Unicom looked in the interim to increase mobile customers.

52.     Moreover, ZTE itself announced in this timeframe that it would be moving its attention to the upcoming rollout of 5G.  In a May 18, 2016 statement published on its website, entitled "At ZTE 5G Is Now – Ubiquitous Connectivity and the Internet of Things," ZTE explained that "unlike the cases of 3G and 4G, there is now a business demand driven by end-users for the deployment of 5G."  Stating that "[a]t ZTE 5G is now," ZTE further represented that "ZTE sees 5G as an enabler for new services in multiple industries, and hence also an enabler for new businesses."

53.     Similarly, a July 18, 2016 article published by the *South China Morning Post*, entitled "China nears full mobile broadband coverage on back of increased 4G adoption," reported that ZTE spokesperson David Dai Shu commented that "expectations are rife that 'China could accelerate the roll-out of 5G mobile services' to support high-bandwidth applications like augmented reality and virtual reality, which 4G networks would be hard-

pressed to handle as demand grows." The article reinforced ZTE's statement that demand for 4G equipment in China would continue to decrease in anticipation of the full-scale implementation of 5G technologies, infrastructure, and mobile users.

54.    By the time of the Secondary Offering in October 2016, the national backbone expansion of China's broadband plan was nearly finished. Neither the provincial buildout nor the metro buildouts had started yet.

55.    The contours of the provincial buildout were much more unpredictable than the national backbone phase because unlike the national buildout, the provincial phase would be a series of smaller projects, characterized by offers for products and services on a province-by-province basis, which reduced the ability to anticipate the timing and amount of the business. Each of China's 23 provinces would be responsible for its own specifications, requirements, and timing for the second-phase buildout.

56.    By contrast, the dimensions of the national backbone expansion were much more predictable, as the process was centralized and involved relatively few orders that were largely directed by China Mobile, China Telecom, and China Unicom enhancing the ability to see into the timing and amount of the business associated with that phase of the buildout.

### 2.    Acacia Had Deep Insight into Its Concentrated Customer Base

57.    Acacia's business was deeply concentrated, with just a few customers accounting for the vast majority of Acacia's revenues. Acacia's top customers included: ZTE; ADVA, a subsidiary of Germany-based ADVA Optical Networking SE ("ADVA SE"); and Coriant, Inc. ("Coriant"), a company based in Munich, Germany. As the Company stated in the May 13, 2016 prospectus associated with its IPO (the "IPO Prospectus"):

> We have historically generated most of our revenue from a limited number of customers. In 2013, 2014, 2015 and the three months ended March 31, 2015 and 2016, our five largest customers in each period (which differed by period)

collectively accounted for 79.5%, 77.7%, 72.6%, 82.9% and 82.2% of our revenue, respectively. In 2013, 2014, 2015 and the three months ended March 31, 2015 and 2016, ADVA Optical Networking North America, Inc. accounted for 13.6%, 23.4%, 22.2%, 32.5% and 18.2% of our revenue, respectively, and ZTE Kangxun Telecom Co. Ltd., or ZTE, accounted for 32.1%, 35.4%, 27.6%, 25.8% and 46.3% of our revenue, respectively. In addition, during 2015 and the three months ended March 31, 2015 and 2016, Coriant, Inc. accounted for 13.1%, 13.2% and 11.5% of our revenue, respectively, and during 2013, Alcatel-Lucent accounted for 19.2% of our revenue.

58.     The IPO Prospectus also stated that Acacia had deep visibility into its customers' business due to close collaboration:

Customer collaboration provides deep understanding of market needs. We collaborate closely with our customers, as well as directly with many cloud and service providers, and solicit their input as they design their network equipment and as we design our next-generation products. This provides us with deep insights into the current and future needs of our customers and the market, which in turn enables us to develop and deliver products that meet customer demands and anticipate market developments.

59.     As detailed below, Acacia repeated these statements in the documents associated with the Secondary Offering, giving the market reason to believe that the Company had visibility in to both its customers' business requirements and market demand for its products.

60.     As described above, an impending and increasing slowdown in Chinese demand was known to the industry in which Acacia worked, coming out of the winding down of the national backbone telecom buildout and heading into the unpredictable provincial and metro phases.

61.     More saliently, Acacia had access to non-public information about its customers' needs, which also gave insight into market demand.  Acacia indicated as much in certain of its SEC filings: "some of our customers have committed to purchase a specified share of their required volume for a particular product from us"; and "[s]ome customers provide us with their expected forecasts for our products several months in advance[.]"

62.     Acacia, thus, received nonpublic information from its customers regarding their product forecasts and demand, giving Acacia insight into the overall market for Acacia's products and those of its customers.  In fact, Acacia's two largest customers – ZTE and ADVA, which together consistently accounted for nearly 60% of Acacia's sales and revenue – were contractually obligated to provide this information to the Company on a rolling basis.  These customers were also required to inform Acacia of business developments that could materially affect their orders.

63.     For example, ZTE's General Conditions of Purchase, which, together with the Framework Contract or Purchase Contract and Purchase Order (collectively defined therein as the "Contract"), governed its product purchases from Acacia, required ZTE to provide and update a "rolling forecast" of its product needs and obligated ZTE to notify Acacia "in writing" when an event might "impact significantly the implementation of the Contract[.]"  Filed publicly (with confidential information redacted) as Exhibit 10.17 to Acacia's December 21, 2015 Form S-1, the General Conditions of Purchase were entered into in October 2010 for a one-year period and, pursuant to subpart (a) of Section 34 (entitled "Effective Period, Modification and Termination"), were subject to automatic renewal on a yearly basis thereafter.  Importantly, Section 7 (entitled "Lead Time") contemplated that ZTE, as the buyer, would "place PO [purchase orders] in advance according to the lead time agreed upon mutually between the parties," while subpart (a) of Section 11 (entitled "Forecast and Inventory") required ZTE to provide Acacia, the supplier, with a "rolling forecast," updated regularly.  Specifically, Section 11(a) provides as follows (with redacted information represented by a double asterisk): "(a) Buyer provides Supplier with a [**] weeks' rolling forecast which is updated [**].  The forecast

information Buyer provides to Supplier is only for reference usage and shall in no event be construed as an obligation of purchase."

64.     Additionally, Section 19 of the General Conditions of Purchase (entitled "Important Information Exchange") required ZTE and Acacia to immediately advise each other of any event that could significantly impact the Contract – which includes, as noted above, the performance of any purchase orders.   Specifically, Section 19 provides as follows: "Both Supplier [Acacia] and Buyer [ZTE] will notify each other in writing immediately when event occurs which may impact significantly the implementation of the Contract hereunder. Both parties shall make efforts to reduce any losses to each other."

65.     Moreover, to facilitate their business relationship and enable sharing of non-public information regarding their respective operations, ZTE and Acacia entered into a Non-Disclosure Agreement in October 2010.   Attached as Appendix 2 to the General Conditions of Purchase and filed publicly (with confidential information redacted) with Acacia's December 21, 2015 Form S-1, the Non-Disclosure Agreement, referenced in Section 30 (entitled "Confidentiality") of the General Conditions of Purchase, contemplated that ZTE and Acacia might share "information relating to business plans, financial or technical matters, trade secrets, designs, know-how, inventions, test results, operations and any other information" exchanged in developing their business relationship – all of which was defined as "confidential" thereunder.

66.     Thus, Acacia had a contractual right to receive information about ZTE's product demands and forecasts, as well as information on any "event" that might "impact significantly" the performance of the Contract, including any purchase orders forming part of the Contract. Further, ZTE and Acacia contemplated sharing non-public information regarding their operations.   These provisions provided Acacia with deep insight into ZTE's business and,

therefore, into the demand for ZTE's products – particularly the "Forecast and Inventory" provision of the General Conditions of Purchase, which inherently also provided insight into ZTE's demand for Acacia's products.

67.     Similarly, Acacia entered into a Strategic Partnering Agreement with ADVA on March 8, 2011, which, pursuant to Section 9.1 thereof (entitled "Term"), had an initial term of five years and was automatically renewable for one-year periods thereafter.  Filed publicly (with certain confidential information redacted) as Exhibit 10.16 to Acacia's December 21, 2015 Form S-1, the Strategic Partnering Agreement, as amended (several times), governed Acacia's "design and development" of products for ADVA, purchase orders, and the sharing of confidential information during the course of their relationship.   As defined therein, "confidential information" included "all financial, business and technical information of the disclosing party or any of its affiliates, suppliers, customers and employees."

68.     Moreover, the Strategic Partnering Agreement, like ZTE's General Conditions of Purchase, contained a provision requiring ADVA to furnish Acacia with a "rolling forecast" of product requirements.   Specifically, Section 4.3.9 (entitled "Forecasts") provides as follows (with redacted information represented by a double asterisk):

> Forecasts.  ADVA shall provide Acacia with a non-binding [**] rolling forecast of its requirements of Products for the following [**] period, provided Acacia will offer ADVA significantly shorter Product Lead Times for forecasted quantities as set forth in Section 4.3.6. Within [**] of receiving ADVA's forecast, Acacia shall acknowledge the receipt of the forecast and confirm to ADVA in writing that it can deliver all forecasted Products. If Acacia foresees any problems (*i.e.*, manufacturing capacity, material availability etc.) to meet the forecasted requirements, Acacia must advise ADVA before the end of the [**] period.

69.     Additionally, Section 4.4.2 (entitled "Lead Times") governs "Lead Times," defined in the Strategic Partnering Agreement as "the time between the date of issuance of the Purchase Order by ADVA and the Delivery Date."  Specifically, Section 4.4.2 provides, in part,

that "Lead Times for forecasted Products shall be a maximum of [**] weeks and the Lead Times for non-forecasted Products shall be a maximum of [**] weeks."

70.     Notably, Section 11.1 (entitled "Amendments/Notices") required all notices under the Strategic Partnering Agreement to "be in writing, in English" and sent to ADVA's parent company, ADVA AG Optical Networking, in Germany.

71.     Thus, Acacia had a contractual right under the Strategic Partnering Agreement to receive information about ADVA's product demands and forecasts.  Further, ADVA and Acacia contemplated sharing non-public information regarding their operations; and Acacia had a line of communication directly to ADVA's parent company, given the manner in which notice was prescribed under the Strategic Partnering Agreement.  All of these provisions provided Acacia with insight into ADVA's business and operations and the demand for ADVA's products that utilized parts sourced from Acacia.

72.     Furthermore, at least two members of the Board – Defendants Chung and Roche – were directors and/or officers in entities that supplied products to the Company's contract manufacturers and otherwise participated in the same industry as Acacia.  Their longstanding involvement in the industry in which Acacia operates gave the Company further visibility into some of the same industry trends facing MACOM and ADI.

73.     Defendant Chung, a member of the Acacia Board since April 2013, has served on MACOM's board of directors since December 2010.  Headquartered in Lowell, Massachusetts, MACOM sells devices, including integrated circuits, that facilitate high-speed networking.  For MACOM's 2016 fiscal year ended September 30, 2016, China was the largest single contributor of revenue, dropping to second-largest for its 2017 fiscal year.  Huawei accounted for 15% of MACOM's revenue for fiscal year 2016 and 10% for fiscal year 2017.  Thus, MACOM – like

Acacia – was vulnerable to movement in the Chinese market.  For example, in its August 2, 2017 Form 10-Q for the fiscal quarter ended June 30, 2017, MACOM disclosed the following: "[I]n fiscal 2017 we experienced decreased demand in China for our products targeting 2.5 Gigabit passive optical networks (PON), metro/long-haul optical network deployments and other carrier-side applications, as carriers began migrating from 2.5 Gigabit to 10 Gigabit PON and the pace of provincial network deployments in China slowed."

74.     Defendant Roche, a member of the Acacia Board since June 2016, joined ADI in 1988 and has served as ADI's President since 2012 and as its CEO and a member of its board of directors since 2013.  Headquartered in Norwood, Massachusetts, ADI designs, manufactures, and sells products, including integrated circuits, that leverage high-performance technology to facilitate networking.  China accounted for 17% of ADI's revenues for fiscal year 2016 (the year ended October 29, 2016), and 16% of its revenues for fiscal year 2017 (the year ended October 28, 2017).  In its August 30, 2017 Form 10-Q for the fiscal quarter ended July 29, 2017, ADI disclosed that an increase in sales in China primarily resulted from a corporate acquisition and demand in the industrial and automotive end markets, partially offset by a decline in the communications end market, as follows:

> The sales increase in China in the three- and nine-month periods ended July 29, 2017 , [sic] as compared to the same periods of the prior fiscal year, was primarily a result of the Acquisition and an increase in demand of our products sold into the industrial and automotive end markets, partially offset by a decrease in demand in products sold into the communications end market.

75.     As a result, in addition to its own experience in China, Acacia had great insight into the negative regional business trajectories in China stemming from forecasts and non-public information shared by its largest customers, other market participants, and Board members, such as Defendants Chung and Roche.

### 3.    Acacia Misrepresented Demand in China

76.    Given the built-in complications and delay, significant sustained work had not yet begun in earnest on the provincial buildout even as of March 2017.  Indeed, certain of Acacia's competitors had explicitly noted by then the poor visibility into the timing of business generated by that phase and that suppliers for the buildout, such as ZTE and Huawei, had a resulting buildup of inventory.

77.    Acacia was aware that the national backbone phase in China would wrap up shortly, ending Acacia's associated product opportunity.  The Company was also aware of the uncertain opportunity represented by the provincial buildout.  Nevertheless, Acacia continued to represent that demand was strong and sustainable – and even increasing – in China.

78.    For example, as detailed further below, Defendant Shanmugaraj stated during the Company's August 12, 2016 earnings conference call that "ZTE . . . in Q1 was pretty large, 46% revenue.  And that was because of the backbone build-outs.  And then in Q2 they've dropped down to 31%."  Yet he represented that "we see continued strong backlog as well from ZTE going into the rest of the year. We don't see a whole lot of slowdown . . . in terms of backlog coming from ZTE or growth prospects for them in terms of expansion."

79.    Then, at the January 10, 2017 Needham Growth Conference, Defendant Shanmugaraj discussed the provincial portion of the buildout as a catalyst for demand in China, as follows: "we still see very strong demand from China, going first in the provincial backbone, provincial metro and getting into the metro access networks."   Moreover, while he acknowledged "some quarter-to-quarter variation," Defendant Shanmugaraj nevertheless stated unequivocally: "if you look at the demand as well as the projection for the next few years, we see very continued strong demand in China. We don't see a subsiding any of the demand that we've seen earlier."

80.     In May 2017, however, Acacia acknowledged that the provincial buildout involved multiple parts/deals and was not yet approved, and that visibility would be limited for a few months.  As Defendant Gavin represented during the May 9, 2017 earnings conference call, "[t]he provincial network expansion . . . is going to come in smaller pieces" and could receive approval within "30 to 60 days," which meant Acacia "need[ed] a few months to get clarity on the provincial piece[.]"  Despite the importance of this information, Acacia's SEC filings failed to disclose it – before or after that date.

81.     Nevertheless, by June 7, 2017, Acacia's "clarity" was no better.  On that date, Acacia took part in the Bank of America Merrill Lynch Global Technology Conference, at which Defendant Shanmugaraj stated: "this year is the provincial networks, and some of the deployments ha[ve] been delayed," noting there are "over 20 provinces, so these are all going to be multiple [purchase orders]" with the timing of the business "hard to predict[.]"

82.     Similarly, a week later, on June 13, 2017, Defendant Shanmugaraj was forced to admit that the timing of the provincial buildout was "not clear," ominously stating that business awards could occur "in July or in September or in November, it's hard to tell."

83.     Thus, uncertainty associated with the timing of provincial business in China persisted, which Acacia was forced to admit even as of November 2, 2017.

### 4.     ADVA Was Experiencing Delays Rolling Out Its Product

84.     As ZTE was experiencing waning demand associated with the China buildout, ADVA was experiencing delays in rolling out its CloudConnect product – delays that decreased ADVA's demand for Acacia's products.

85.     In its third quarter 2016 earnings conference call on October 27, 2016, Ulrich Dopfer ("Dopfer"), the CFO of ADVA SE, ADVA's parent company, acknowledged that the "FSP 3000 CloudConnect is slightly behind schedule, but it's starting to ramp up."  Elaborating

on the delay, Brian Protiva ("Protiva"), CEO of ADVA SE, stated "[w]e're about three months

behind," further explaining:

> We had set initial shipment in Q2, low single digit millions in Q3 and then
> moving to double digit millions in Q4. And we shipped first products. We got a
> handful of customers in Q3, small volumes, first shipments. This quarter in Q4,
> we'll do low millions and then we'll move to double digit starting early next year.
> So, we're about three months behind the curve on the CloudConnect. . . . And the
> reasons were a number of issues from just yields, scaling output, software and
> hardware challenges, but we have them all under control and we're moving
> forward at this point. But we lost some time.

86.     Given the approximately three-month delay described during the October 27,

2016 call, ADVA evidently began experiencing difficulties rolling out its CloudConnect product

no later than the end of July 2016 (three months before late October 2016) and possibly earlier.

87.     The situation was still dire, however, when ADVA SE held its fourth quarter 2016

earnings conference call on February 23, 2017.  On that date, Protiva indicated that ADVA was

still experiencing difficulties in ramping up CloudConnect, stating, in part, as follows:

> [W]e are now starting to ramp our FSP 3000 CloudConnect solutions, as seen by
> the bookings of double digit millions of orders in Q4, 2016. We are still
> challenged with the ramp up of manufacturing, but this is within the standard
> challenges of bringing on cutting edge technologies and ramping growth with
> these new technologies within a very short period of time.

88.     Moreover, as he further explained, ADVA generated "seasonably less business"

in the fourth quarter of 2016, which harmed the rollout and adoption of CloudConnect

technology.  In fact, Protiva noted that ADVA had experienced engineering and supplier-related

delays, stating: "Some of the things took longer than expected from both our own engineering,

but also specifically some of our suppliers there."

89.     In turn, Dopfer said that long "lead times" for "certain components" required

ADVA to increase inventory levels, as follows: "I would add that for certain components, maybe

the lead times are a little longer than we're used to and that's why we just have to account for

that in order to make payment flexibility and to fulfill orders quickly. And that's why we increased some -- for some components the inventory levels as well."

90.     During its second-quarter earnings conference call on July 20, 2017, however, ADVA SE indicated that it was continuing to experience complications rolling out CloudConnect and also a slowdown in business. In his opening remarks, for example, Protiva commented: "Our results are strong but our forecast demonstrates a slowing of our business while we consolidate our margins and focus on introducing our new product architectures to market." With respect to CloudConnect, he further stated: "From a product perspective we saw our FSP 3000 CloudConnect ramping in the first half but the growth projection seems to be slowing in Q3."

91.     Moreover, when asked about "relatively weak Q3 guidance" and "why the margin guidance is also pretty low," Protiva blamed the "CloudConnect product" as one of two contributing issues. Indeed, as he later explained, when noting ADVA was experiencing delays in converting some customers to CloudConnect technology: "it is taking us longer than we had anticipated to get into some of our key customers." In fact, Protiva admitted: "CloudConnect is not ramping as fast as we had hoped or anticipated"; "[a]nd in Q3 as indicated, CloudConnect doesn't look like it is growing quickly."

92.     On October 26, 2017, ADVA SE issued a press release announcing disappointing third quarter financial results, reporting that "[q]uarterly revenues decreased to EUR 111.2 million from EUR 144.2 in Q2 2017," which "marks a decrease of 30.3% year-on- year (YoY) (Q3 2016: EUR 159.5 million)." In his comments, Protiva characterized the third quarter of 2017 as "one of the most challenging quarters in our company's history," adding: "[w]e had to lower our guidance within a financial quarterly period for the first time since Q2, 2008."

93.    Accordingly, ADVA was experiencing significant setbacks and delays in rolling out the CloudConnect product to its customers, as well as rising inventory levels and disappointing financial results.  But neither the Secondary Offering documents nor Acacia's other SEC filings or public statements adequately apprised investors of these problems, nor the impact that these issues could have on Acacia's own financial condition and prospects.

### 5.    Acacia's Insufficient Manufacturing Disclosure

94.    On May 31, 2017, before the market opened, Acacia issued an unusual press release, filed with the SEC as an exhibit to Form 8-K, announcing a "quality issue" affecting a portion of its products "over an approximate four month period."  Specifically, the press release provided, in full:

> Acacia Communications, Inc. (NASDAQ: ACIA), a leading provider of high-speed coherent optical interconnect products, today announced that the Company has identified a quality issue that it currently believes affects a portion of the approximate 1,300 AC400 units and 5,000 CFP units manufactured by one of its three contract manufacturers over an approximate four month period. The Company believes the root cause of this quality issue has been identified as a circuit board cleaning process that has since been eliminated, and manufacturing at this contract manufacturer has resumed. The Company does not believe that products currently being shipped are affected by this quality issue. The Company is actively working with affected customers to remediate this issue. The Company is also working to estimate the cost of these remediation efforts and assess the impact of this issue on its near-term manufacturing capacity.

95.    This news caused a 4% drop in the stock price in premarket trading on May 31, 2017, as MarketWatch reported.  Although the stock price ultimately recovered, investors were kept in the dark about the risks and uncertainties surrounding this quality issue – and the timing of its discovery and disclosure – which called into question the truth of management's representations to the market concerning other matters related to Acacia's business.  Indeed, the onset of the issue was particularly troubling, given that the substandard circuit-board cleaning process had occurred for approximately four months, spoiling a substantial number of units.  As

an analyst revealed, the substandard cleaning process resulted in rust formation on some of the circuit boards, which led to customer returns and other complications.

96.     Moreover, the Company's failure to provide a range of estimable loss associated with the quality issue rendered the statements in the May 31, 2017 press release materially misleading because investors were unable to gauge the financial significance of the issue or the Company's exposure to it.  Given that the issue occurred over a four-month period, and yet Acacia disclosed it on May 31, 2017, the problem roughly stretched back to February 2017, in the first quarter of 2017, at the latest – and it quite possibly extended back further, considering that Acacia could have disclosed the issue only after identifying it and initially considering its implications on the business.  And yet, Acacia provided no guidance on the potential costs associated with remediating or replacing the products.

97.     On July 14, 2017, before the market opened, Acacia issued a press release, filed with the SEC as an exhibit to Form 8-K, announcing disappointing preliminary second quarter financial results for the period ended June 30, 2017 and providing financial guidance for the forthcoming quarter ending September 30, 2017.  Specifically, Acacia reported revenue of $77 million to $79 million – far below its second quarter 2017 forecast, issued May 9, 2017, of $85 million to $95 million – a generally accepted accounting principles ("GAAP") net loss of between $5.5 million and $7.5 million, and a GAAP diluted net loss per share of $0.14 to $0.19.

98.     In the press release, Defendant Shanmugaraj attributed Acacia's dismal preliminary financial results to the quality issue he downplayed only a month earlier, as the following reflects:

> "Our second quarter results were adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31. As we previously announced, we identified a circuit board cleaning process as the likely root cause of the quality issue. This cleaning process was eliminated and

manufacturing at the impacted contract manufacturer resumed. Although we began to ramp manufacturing capacity with our contract manufacturers during the quarter, we experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers for our AC400 and CFP units," said [Defendant] Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "We anticipate completing our remediation efforts with respect to the remaining impacted units during the third quarter of 2017."

99.     Additionally, in a "Schedule A" attached to the press release (in which it provided a reconciliation of GAAP measures to non-GAAP measures), Acacia estimated "[w]arranty charges due to manufacturing process quality issue" as between $15 million and $16 million for 3Q17 and, thus, the period ended June 30, 2017.  Neither Defendant Shanmugaraj nor Defendant Gavin commented on this potential range of exposure in the press release.

100.     These disclosures allowed investors to finally appreciate the extent and severity of the potential implications of the quality issue on the Company's business and operations.

101.     On the news, the price of Acacia common stock declined 6.3% from its close of $41.62 per share on July 13, 2017 to close at $39 per share on July 14, 2017, on unusually high volume of more than 3.5 million shares traded.

102.     Given the significance of this adverse news, multiple media outlets reported on it. For example, in a July 14, 2017 article, entitled "Acacia Communications Sandbags Investors Again Using The Same Company-Specific Quality Control Issue," *Forbes* contributor Jay Somaney wrote: "The drama and pain continues for Acacia Communications and its beleaguered investors. Once again, this morning, the company is pre-announcing lower numbers for the June quarter and taking down guidance for the current quarter ending in September."  Noting that Acacia has "struggl[ed]" with the quality issue "for the last couple of quarters now," he further observed that "Acacia has been sandbagging investors for a while now."

103.     On August 3, 2017, Acacia issued a press release, filed with the SEC as an exhibit to Form 8-K, announcing its second quarter 2017 financial results and third quarter 2017

financial guidance.  For the quarter ended June 30, 2017, Acacia reported revenue of $78.9

million – a 32% decrease, year-over-year – and GAAP loss from operations of $6.7 million.

Commenting on the results, Defendant Shanmugaraj attributed the Company's poor performance

to the quality issue, stating: "As we previously announced, our second quarter results were

adversely affected by the quality issue identified at one of our three contract manufacturers[.]"

104.    Later that day, Acacia conducted a conference call with analysts and investors and

provided commentary about the Company's business metrics and financial prospects.  Among

those participating in the call on behalf of Acacia were Defendants Shanmugaraj and Gavin, both

of whom discussed Acacia's products and financial performance.  Analysts from Morgan

Stanley, Needham, William Blair, Cowen, Bank of America Merrill Lynch, Deutsche Bank,

Northland, and D.A. Davidson & Co. also participated.

105.    In his opening remarks, Defendant Shanmugaraj admitted that Acacia was supply

constrained due to the quality issue because the contract manufacturer was required to cease

production – only resuming sometime during the second quarter of 2017, after the issue was

resolved – and the Company had to not only replace affected units, but continue supplying new

units to customers.  He also indicated that Acacia had implemented "enhanced quality issues"

and laid out a comparison of the prior year financial results, as follows:

> As previously announced, our second quarter results were adversely affected by a
> quality issue identified at one of our contract manufacturers. The circuit board
> cleaning process that we identified as the root cause of the quality issue was
> eliminated and manufacturing at the impacted contract manufacturer resumed in
> the second quarter. Although we began to ramp manufacturing capacity during the
> second quarter at all our contract manufacturers, we experienced a supply
> constraint in the quarter as capacity was used to build both replacement units as
> well as units to meet new demand from customers. This quality issue, in addition
> to the lower order rate from some of our China and DCI customers that we
> discussed on our first quarter earnings call, resulted in a decrease in our revenue
> from $116.2 million in the second quarter of 2016 to $78.9 million in the second

quarter of 2017. Our non-GAAP net income declined from $28.9 million to $10.8 million. And our non-GAAP diluted EPS decreased from $0.77 to $0.26.

Delivering products to our customers that meet high-quality standards is a key objective at Acacia. In response to the recent quality issue, we are in the process of implementing enhanced quality initiatives, internally and with our suppliers and contract manufacturers. As we continue to scale rapidly with new products, we believe these enhanced quality initiatives will help prevent this type of a quality issue in the future. Since this quality issue has surfaced, we have worked hard to help our customers get back on track quickly and minimize any resulting business impact. We have ramped our manufacturing capacity and believe we have sufficient capacity in the third quarter to complete our remediation efforts on the remaining units impacted by the quality issue as well as to meet new demand from our customers.

106.    In his own remarks, Defendant Gavin stated that the financial impact of the quality issue caused a 14.2% year-over-year reduction in gross margin, representing: "our GAAP gross margins were 32.2% in the second quarter [of 2017], which compared to 46.4% in the second quarter of 2016."

### 6.    Materially False and Misleading Statements and Omissions in Financial Statements During the Relevant Period

107.    On August 11, 2016, Acacia issued a press release announcing its second quarter 2016 financial results and providing glowing guidance for the third quarter.  According to the press release, Acacia achieved impressive revenue of $116.2 million, up 101%, and a staggering increase to net income up 247% year-over-year.  Ignoring the fact that the Company's top two customers were experiencing operational and sales problems that were limiting demand for Acacia's products, for the third quarter of 2016, the press release touted guidance of $120 million to $128 million in revenue, non- GAAP net income of $26 million to $31 million, and non-GAAP diluted earnings per share ("EPS") of $0.64 to $0.76.  Defendant Shanmugaraj boasted that the "second quarter results exceeded [Acacia's] expectations across the board and reflect the success of [the Company's] disruptive technology in transforming cloud, content and communications network"s.  Defendant Shanmugaraj further proclaimed that the impressive

results were "a testament to [Acacia's] strategy and demonstrate [the Company's] leadership position in the high-growth 100G plus optical networking market," and that "[Acacia] continue[d] to see strong global demand for [its] products, driven by metro and inter-data center network infrastructure buildouts."  Defendant Gavin added that the "IPO enabled [Acacia] to strengthen [the Company's] balance sheet while providing substantial capacity to further grow the business."

108.    Later the same day, Acacia conducted an earnings conference call with analysts and investors.  During the call, Defendants Shanmugaraj and Gavin continued to boast about Acacia's current and future growth.  Further, although the Company's two largest customers were beginning to reduce purchases from the Company, and demand was also waning in China because its 4G infrastructure buildout was nearing completion, Defendants Shanmugaraj and Gavin touted purported increased demand for the Company's products across all regions, particularly China.  Defendants Shanmugaraj and Gavin stated:

[Defendant Shanmugaraj]

***The market opportunity we are targeting is large and growing***. The growth in bandwidth demand has caused an increase in investments across long-haul, metro and inter-data center networks with most of that investment focused on speeds up 100G and higher. With the growth of large data centers and content moving closer to the consumer, we are seeing strong demand for our products across metro and inter-data center networks.

Geographically, we are seeing demand across all regions while ***demand from China is particularly strong***. Our customer base has grown from eight customers in 2011 to more than 25 customers in the first half of 2016. We have seen substantial increases in customer revenue in the past four years from our original eight customers. They have increased both the volume and the number of products they purchased from us. And we believe, we will see similar increases from our newer customers going forward.

***Our growth is being driven by strong global demand*** from metro and inter-data center network buildouts. We believe that the industry is in the early stages of a multi-year buildout cycle of 100G, 200G and 400G technology. These buildouts

are happening in long-haul including submarine and in metro and inter-data center networks.

In the second quarter, we saw a step function increase in demand driven by deployments in all of our growth markets. We started to see this demand increase beginning late in the first quarter and continuing into the second quarter which enabled us to achieve a revenue growth rate of 91% year-over-year in the first half of 2016. *We expect similar growth to continue into the second half of 2016*.

During the second quarter, total revenues grew to $116.2 million, an increase of 101% year-over-year driven primarily by an increase in sales of our 100G CFP digital coherent optics or CFP-DCO products as well as the ramp of our new 400G product family. At the same time, we recorded non-GAAP net income in the second quarter of $28.9 million compared to $6.1 million in the second quarter of 2015.

\* \* \*

[Defendant Gavin]

Total revenue of $116.2 million for the second quarter of 2016 rose 101% from revenue of $57.9 million in the second quarter of 2015. *This growth was driven by continued strong global demand for metro and inter-data center network buildouts with particularly strong demand from the China market*.

[Emphasis added.]

109.    The following day, on August 12, 2016, Acacia's stock price skyrocketed in light of the Individual Defendants' misstatements, increasing approximately 40% to close at $95.67 per share.

110.    On September 26, 2016, in anticipation of the Secondary Offering, Acacia filed a Form S-1 Registration Statement with the SEC.  The Form S-1 revealed that the Company intended to issue and sell up to $125 million worth of its common stock, and that certain of the Company's stockholders – including its CEO and the private equity firms and their representatives on the Board – would sell up to an additional $325 million worth of their personally held shares.  The same day, the Company filed a Current Report on Form 8-K with the SEC disclosing Acacia's "Financial Outlook for the Third Quarter of 2016."  According to

the Form 8-K, Acacia had raised its revenue guidance for the third quarter of 2016 and "the Company [now] expect[ed] revenue of $127 million to $131 million," compared to previous guidance of $120 million to $128 million.

111.  On October 4, 2016, the Company filed with the SEC an Amended Registration Statement on Form S-1/A (the "Registration Statement").  The Registration Statement was signed by Officer Defendants Shanmugaraj, Gavin, Mikkelsen, and Murphy and Director Defendants Swanson, Chung, Reiss, Ritchie, and Roche.  The Registration Statement touted that Acacia had "experienced rapid revenue growth over the last several years" and that the Company "expect[ed] to generate additional revenue through sales to [its existing] customers" and as a result of "increased demand for [its] products," but failed to disclose that sales demands from some of the Company's largest customers were in the process of winding down.  The Registration Statement stated:

> We sell our products through a direct sales force to leading network equipment manufacturers. The number of customers who have purchased and deployed our products has increased from eight in 2011 to more than 25 during the twelve months ended June 30, 2016. *We have experienced rapid revenue growth over the last several years*. Our revenue for 2015 was $239.1 million, a 63.5% increase from $146.2 million of revenue in 2014. Our revenue for the six months ended June 30, 2016 was $200.7 million, a 91.0% increase from $105.1 million of revenue in the six months ended June 30, 2015. In 2015, we generated net income of $40.5 million and our adjusted [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] was $47.5 million, compared to net income of $13.5 million and adjusted EBITDA of $20.4 million in 2014. For the six months ended June 30, 2016, we generated net income of $32.2 million and our adjusted EBITDA was $52.6 million, compared to net income of $9.0 million and adjusted EBITDA of $17.7 million for the six months ended June 30, 2015. See "Selected Consolidated Financial Data—Non-GAAP Financial Measures" for more information regarding our use of adjusted EBITDA and other non-GAAP financial measures and a reconciliation of adjusted EBITDA to net income.

*  *  *

**Our Growth Strategy**

> Our goal is to become the leading provider of high-speed optical interconnect technology that underpins the world's data and communication networks. To grow our business and achieve our vision, we are pursuing the following strategies:
>
> \* \* \*
>
> ***Increase penetration within our existing customer base***. As we continue to enhance and expand our product families, and as our existing customers seek to expand and improve their network equipment technology, ***we expect to generate additional revenue through sales to these customers***.
>
> \* \* \*
>
> Our revenue has generally increased over the periods presented due to ***increased demand for products*** in our 100 Gbps product family, as well as the introduction of new products in our 400 Gbps product family. In 2014, we experienced a decline in revenue in the fourth quarter compared to the third quarter due to our customers' ability to delay or reschedule shipments under the terms of their contracts with us, resulting in $4.0 million of anticipated purchases by two customers being delayed to the first quarter of 2015.

[Emphasis added in bold and italics.]

112.    The Registration Statement also boasted that Acacia had "broad expertise" in design and manufacturing, and further assured investors that the Company "continuously engage[d] with [its] customers" and had "deep insights into current and future market needs." The Registration Statement stated:

> Our engineering and management teams have extensive experience in optical systems and networking, digital signal processing, large-scale ASIC design and verification, silicon photonic integration, system software development, hardware design and high-speed electronics design. This ***broad expertise*** in a range of advanced technologies, methodologies and processes enhances our innovation, design and development capabilities and has enabled us to develop and introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009. Our sixth coherent DSP ASIC is currently under development and anticipated to be introduced in the fourth quarter of 2016. In the course of our product development cycles, ***we continuously engage with our customers*** as they design their current and next-generation network equipment, which provides us with ***deep insights into the current and future market needs***.
>
> \* \* \*

38

>	***Customer collaboration provides deep understanding of market needs.*** We collaborate closely with our customers, as well as directly with many cloud and service providers, which allows us to better understand their needs and anticipate next generation product and service requirements.

[Emphasis added.]

113.	With respect to manufacturing, the Registration Statement stated that the Company contracts and works closely with certain third-party contract manufacturers, and that the Company requires these third parties to meet high quality and reliability standards, stating:

>	***We contract with third parties to manufacture, assemble and test our products.*** We utilize a range of [complementary metal oxide semiconductor ("CMOS")] and CMOS-compatible processes to develop and manufacture the coherent DSP ASICs and silicon PICs that are designed into our modules. We select the semiconductor process and foundry that provides the best combination of performance, cost and feature attributes necessary for our products. For several of our products, a single foundry fab is selected for semiconductor wafer production.

>	***We contract with three third-party contract manufacturers to test, build and inspect modules incorporating our coherent DSP ASICs and silicon PICs for high-volume production of our modules.*** Our contract manufacturers also implement many customer-specific configurations and packaging before customer shipments. ***We build the test systems used by our contract manufacturers.*** We also directly manufacture prototype products and limited production quantities during initial new product introduction.

>	We believe our outsourced manufacturing model enables us to focus our resources and expertise on the design, sale, support and marketing of our products to best meet customer requirements. We also believe that ***this manufacturing model provides us with the flexibility required to respond to new market opportunities and changes in customer demand, simplifies the scope of our operations and administrative processes and significantly reduces our working capital requirements, while providing the ability to scale production rapidly***.

>	***We subject our third-party manufacturing contractors and foundries to qualification requirements in order to meet the high quality and reliability standards required of our products. Our engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that component sourcing strategies are in place to support our manufacturing needs.***

[Emphasis added.]

114.     The Registration Statement also indicated that shares held by certain Acacia directors and officers would be partially released from lock-up provisions dating back to the Company's IPO, allowing those Defendants to massively profit prematurely in the Secondary Offering, stating:

> In addition, approximately 31,425,067 shares are subject to lock-up agreements entered into in connection with our initial public offering. These lock-up agreements were originally set to expire on November 8, 2016. However, the underwriters from our initial public offering have consented to partially release these lock-up restrictions with respect to the selling stockholders to permit them to sell up to 3,964,698 shares (including the underwriters' option to purchase additional shares) in this offering, including 2,321,881 shares beneficially owned by our directors and executive officers or entities with which they are affiliated.

115.     On October 6, 2016, Acacia issued a press release announcing the pricing of its Secondary Offering of 4.5 million shares of the Company's common stock at a price to the public of $100 per share.  The Secondary Offering consisted of 1,210,302 shares from Acacia and 3,289,698 shares "from certain existing stockholders."  In connection with the Secondary Offering, Acacia issued and sold 1,210,302 shares of stock, receiving approximately $121 million in gross proceeds.  At the same time, as detailed in the table below, the Insider Selling Defendants collectively dumped over 2.275 million shares at an average price of $96.50 per share, reaping over $219.6 million in proceeds.  Of these insider stock sales, over two million shares were sold by Defendants Chung, Mikkelsen, Reiss, Ritchie, Shanmugaraj, and Swanson, on October 13, 2016, for proceeds of more than $193.4 million.

| DEFENDANT Secondary Offering SALES | | |
|---|---|---|
| Defendant | Shares | Transaction Value |
| CHUNG – Director | 346,202 | $33,408,493.00 |
| GAVIN – CFO | 25,501 | $2,460,846.50 |
| GIVEHCHI – Vice President | 98,846 | $9,538,639.00 |
| MIKKELSEN – Director, CTO | 98,846 | $9,538,639.00 |
| REISS – Director | 1,446,104 | $139,549,036.00 |

| DEFENDANT Secondary Offering SALES | | |
|---|---|---|
| Defendant | Shares | Transaction Value |
| RITCHIE – Director | 2,640 | $254,760.00 |
| SHAH – Vice President of Engineering | 47,917 | $4,623,990.50 |
| SHANMUGARAJ – Director, President, CEO | 108,163 | $10,437,729.50 |
| RASMUSSEN – Vice President | 98,846 | $9,538,639.00 |
| SWANSON – Director | 2,640 | $254,760.00 |
| TOTAL | 2,275,705 | $219,605,760.50 |

**7.     The Truth Slowly Emerges as the Individual Defendants Continue to Misrepresent the Company's Prospects While Dumping Their Artificially Inflated Acacia Stock**

116.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge just two weeks after a majority of the Insider Selling Defendants collectively dumped over two million Acacia shares for proceeds of more than $193.4 million. On October 27, 2016, Acacia's two largest clients, ZTE and ADVA, both reported soft guidance. In particular, Acacia's largest customer, ZTE, which accounted for approximately 40% of Acacia's sales during the first half of 2016, reported revenue for the third quarter of 23.8 billion yuan, which was well below the market analysts' consensus estimate of 26.27 billion yuan for that period, noting that pressures from a weak global macroeconomy impacted the telecommunications industry in the past three quarters.  Similarly, ADVA, Acacia's second-largest customer, issued fourth-quarter revenue guidance of 125 million euros to 140 million euros, significantly below consensus estimate of 149 million euros.  ADVA also disclosed that it had fallen roughly three months behind in rolling out a project that utilized Acacia's products.

117.     The disappointing results from Acacia's two largest customers caused the Company's stock to tumble over 15% on October 27, 2016, closing at $73.66 per share.

118.     The Insider Trading Defendants thus benefitted greatly from the early release of their lock-up agreements, allowing them to reap hundreds of millions of dollars in proceeds from

the Secondary Offering – all while being in possession of rolling forecasts from the Company's

two largest customers.

119.    On November 10, 2016, Acacia issued a press release reporting its financial

results for the third quarter 2016.  The Company reported revenue of $135.3 million, up 107%,

and net income up 295% year-over year.  Defendant Shanmugaraj attributed the apparently

impressive results to "strong global demand for [Acacia] products," thus suggesting that strong

results would continue for the foreseeable future.  Unfortunately, this was not the case.

120.    During a follow-up earnings conference call the same day, Defendants

Shanmugaraj and Gavin sought to downplay the negative impact of the soft guidance provided

by Acacia's top two customers, ZTE and ADVA.   Specifically, when questions about the

"customer concentration issue" in relation to their soft guidance, Defendants Shanmugaraj and

Gavin intimated that growth from smaller customers would make up for the ZTE and ADVA

declines, stating:

> [Analyst]
>
> Thanks for taking my questions. The first one I want to touch on is actually a bit of *the customer concentration issues* as well. And the 10-Q is out, so we can get a pretty detailed look at what those customers are.
>
> And what strikes me and what *I want to get your response on is the three big customers that have been that way for the past few quarters were still 69% of sales, which is basically the same that it has been for the past two quarters during the year as well. So I'm wondering if you can give a little bit more detail onto that diversification*.
>
> And then *related to two out of those three big customers, one already guided for pretty significant sequential declines in the fourth quarter. So I'm wondering as we look in the fourth quarter, should we really see a material ramp-up in the new customer revenue contributions to offset some of those potential declines?*
>
> [Defendant Shanmugaraj]
>
> Yes, so good question. Let me take a crack at it, Doug, and maybe John can chime in. As we said, the customer concentration, while there is not an addition of

another 10% customer, we made two references. One is that ***we have added two top-tier customers into our top five***, which was not the case before. It was in Q2, but not before that. ***So we are happy with the ramp of our top-tier customers.***

Number two is these are 18- to 24-month lead time development. So in other words, it is not something that we take in and they plug in like a client side and off to market they go within a couple of months.

These are 18 to 24. We -- they have to develop their product, integrate our product, then qualify our product and take it to their customers, qualify in their customers. So it is a -- it takes time. And that is the other piece of it.

So while we don't have a new 10% customer, we have 2 of those in the top five. And also, as I said in my section, the new customers accounted for 37% sequential growth quarter over quarter. And we see that growth continuing, which is also what -- the point I made about the -- ***to offset some of the seasonality***.

So it will take time at this point, and at the right time, obviously, we will share with you as soon as the customer crosses that 10% threshold. But the way to look at it as we have several of these that are not at the 10% level, but ***we're very happy with the progress of our newer customers***.

[Defendant Gavin]

And Doug, I will just add to that. As I said in my prepared remarks, 25% of our revenue in Q3 was from that new customer set. It's the highest percent contribution of that group to date. And we expect that to grow again in Q4 and through the quarters starting in 2017. So we are seeing that start to ramp up, and we just had some customers in Q3 from the original customer group that had large quarter for them in Q3.

\* \* \*

[Defendant Shanmugaraj]

And again, the part B question was about what about the customers who guided, and I think I covered a little bit of that earlier. One is that a customer like ZTE, for example, has all the way from mobile to handset to optical.

So is very hard. ***We don't see any slowdown in the 100G and about optical segment from a customer like ZTE, for example. So just because they claim they've guided some number***, which we can't really comment on. What we can say is that ***we don't see any slowdown in that ramp. And of course, it is being offset, as we talk about, with the new customers ramping up as well.***

[Emphasis added.]

43

121.    Over the next few months, Defendant Murphy, Acacia's Corporate Controller, dumped thousands of shares of Acacia stock, priced between about $60 and $70 dollars per share, many of which were not sold pursuant to a 10b5-1 trading plan, including: 1,582 shares sold, on November 15, 2016, for proceeds of $109,458.58; 3,785 shares sold, on December 15, 2016, for proceeds of $252,758.01; 6,752 shares sold, on January 1, 2017, for proceeds of $419,636.80; and 1,608 shares sold, on January 30, 2017, for proceeds of $97,557.36.  Several other Individual Defendants soon followed suit, as detailed below.

122.    On February 14, 2017, numerous Individual Defendants collectively sold thousands of shares of their Acacia stock at an average price of $62.24 per share, and none of them were sold pursuant to a 10b5-1 trading plan.  In particular: Defendant Rasmussen sold 3,321 shares for proceeds of $206,695.72; Defendant Givehchi sold 2,039 shares for proceeds of $126,905.32; Defendant Mikkelsen sold 2,032 shares for proceeds of $126,469.65; Defendant Shanmugaraj sold 2,029 shares for proceeds of $126,282.93; Defendant Shah sold 909 shares for proceeds of $56,575.25; and Defendant Gavin sold 678 shares for proceeds of $42,198.04.

123.    On February 23, 2017, Acacia issued a press release announcing fourth quarter 2016 financial results.  Although Acacia generally achieved its forecasted results for the quarter, the Company issued 2017 revenue guidance and an earnings forecast well below what the Company had led the investing public to expect.  In particular, for the first quarter of 2017, Acacia noted that it expected revenue to be in the range of $108 million to $114 million, a dramatic slowdown from previous quarters and well below analysts' expectations of $137.4 million.  Acacia's earnings guidance was also disappointing, with the Company expecting non-GAAP EPS between $0.63 and $0.70, well below analysts' expectations of $0.78.  Although financial guidance plunged, the Individual Defendants continued to mislead the market in order

to keep the Company's stock price from an utter free-fall.  For example, Defendant Shanmugaraj continued to boast about "continued strong global demand" for Acacia's products, and further proclaimed that Acacia's "***current product offerings, roadmap products, and development pipeline, position [the Company] well to take advantage of future growth opportunities***."  [Emphasis added].  Similarly, the press release quoted defendant Gavin as follows:

> Our fourth quarter results again exceeded our guidance for revenue and non-GAAP diluted EPS ***and capped off a strong year at Acacia Communications***. During the fourth quarter, we experienced year-over-year revenue growth of 108%, further diversified our revenue base, with sales to newer customers outside our original eight 2011 customers increasing to 35% of our total revenue from 14% in the first quarter of 2016…. ***We believe our market strategy and business model are strong, and position us for further growth***.

[Emphasis added.]

124.    On February 23, 2017, Acacia also filed its Annual Report on Form 10-K for the year ended December 31, 2016 with the SEC ("2016 Form 10-K"), signed by Defendants Shanmugaraj, Gavin, Murphy, Swanson, Chung, Mikkelsen, Reiss, Ritchie, and Roche.  The 2016 Form 10-K reiterated the same financial results as the above noted press release, and further assured investors that the Company's third-party contract manufacturers and foundries were subjected to special requirements in order to meet the purported "high quality and reliability standards required of [Acacia's] products."  The 2016 Form 10-K stated:

**Manufacturing**

We contract with third parties to manufacture, assemble and test our products. We utilize a range of CMOS and CMOS-compatible processes to develop and manufacture the coherent DSP ASICs and silicon PICs that are designed into our modules. We select the semiconductor process and foundry that provides the best combination of performance, cost and feature attributes necessary for our products.

***We contract with three third-party contract manufacturers to test, build and inspect modules incorporating our coherent DSP ASICs and silicon PICs for high-volume production of our modules***. Our contract manufacturers also implement many customer-specific configurations and packaging before customer

shipments. ***We build the test systems used by our contract manufacturers.*** We also directly manufacture prototype products and limited production quantities during initial new product introduction.

We believe our outsourced manufacturing model enables us to focus our resources and expertise on the design, sale, support and marketing of our products to best meet customer requirements. We also believe that this manufacturing model provides us with the flexibility required to respond to new market opportunities and changes in customer demand, simplifies the scope of our operations and administrative processes and significantly reduces our working capital requirements, while providing the ability to scale production rapidly.

***We subject our third-party contract manufacturers and foundries to qualification requirements in order to meet the high quality and reliability standards required of our products. Our engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that component sourcing strategies are in place to support our manufacturing needs.***

[Emphasis added in bold and italics.]

125.    On February 24, 2017, Acacia's stock tumbled as a result of the disappointing financial forecast, but remained somewhat propped up as a result of the Individual Defendants' assurances of a strong business model, future growth, and high standards of quality control. Specifically, on February 24, 2017, Acacia's stock closed at $54.04 per share, a decrease of more than 14% compared to the previous day's close.

126.    With Acacia's stock price still artificially inflated, certain Individual Defendants continued to dump their shares.  For example, from March 31, 2017 to April 24, 2017, Defendant Murphy sold another 3,269 shares priced between $52.91 and $60.67 for proceeds of $193,722.54, and none of them were sold pursuant to a 10b5-1 trading plan.

127.    On April 25, 2017, news began to surface suggesting that demand was weakening in the market serviced by Acacia.  Specifically, Acacia's competitor, MACOM, reported dismal financial guidance for the following quarter, citing demand slowdown in China and various inventory correction issues.  The same day during a conference call, MACOM's CEO was

"emphatic" that "there [was] no question that there [was] a cyclical weakness on the carrier base side of the business." MACOM's CEO further explained that the market had "the China correction happening with the Metro/Long Haul provincial deployments, so there's no question that there [are] some headwinds in demand," and "if [the market] didn't have those headwinds in China, I think things would be materially stronger." On this news, Acacia's stock price declined approximately 11% the following trading day to close at $48.08 per share. MACOM's stock price declined the same day as well, as did several other competitors in the market, including Inphi Corporation, NeoPhotonics Corporation, and Lumentum Holdings Inc.

128. On May 9, 2017, Acacia issued a press release announcing its financial results for the first quarter of 2017. The press release provided bleak guidance again, this time for the second quarter of 2017. In particular, Acacia provided second quarter 2017 EPS guidance of just $0.22 to $0.35 per share on revenues of only $85 million to $95 million, significantly lower than the EPS of $0.74 per share on revenues of $131 million that the market had been led to expect. During an earnings conference call the following day, Defendant Shanmugaraj blamed the downturn on lower demand in China, admitting that Acacia's stockholders were forced to learn this information from the Company's competitors, and also blamed it on variability in the quarterly order rate from its second largest customer, ADVA. Defendant Shanmugaraj stated:

> I would now like to comment on our outlook for the second quarter of 2017. At the midpoint of our guidance range, we expect revenue to be sequentially down 21.7% from the first quarter due to a couple of factors. The primary factor is softening demand from the China market that started in April. ***As you may have heard from others in our industry, we are seeing what we believe to be a temporary slowdown in the deployments from carriers in China***, causing our larger China customers to slow down their order rates in the second quarter. The secondary factor is the variability that we are seeing in the quarterly order rate from one of our direct hyperscale customers [ADVA].

[Emphasis added.]

129.    Commensurate with the bad news, the May 9, 2017 press release quoted Defendants Shanmugaraj and Gavin in their attempts to keep Acacia's stock price afloat by continuing to tout the Company's purportedly strong competitive position, the global demand for its products, and long-term growth prospects, stating:

> "We are pleased that our first quarter results came in stronger than we expected at the start of the quarter *driven by demand for our CFP and flex-400G products around the world*," said [Defendant] Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "During the quarter, we made good progress on ramping production of our CFP2-ACO and CFP2-DCO modules with our contract manufacturers and *we continue to see strong customer interest for these products*. We believe that our continued innovation with products like our CFP2-DCO will further advance *our technology leadership position and contribute to our growth in the second half of 2017 and beyond*."

> "We believe that our strong balance sheet, which shows a significant cash position and no debt, provides us with the financial flexibility to continue to invest in product development to *further strengthen our competitive position and enable us to bring products to those markets that require a rapid pace of innovation*, like the DCI market," said [Defendant] Gavin, Chief Financial Officer of Acacia Communications. "For example, we recently announced our next generation Pico DSP ASIC which, when combined with our ball grid array PIC, will support transmission speeds of up to 1.2 Tbps with two carriers of 600 Gbps each. Pico will power our AC1200 module and is focused on DCI applications."

[Emphasis added.]

130.    On the above news, Acacia's stock price declined more than 8% on May 10, 2017, closing at $44.48 per share.

131.    On May 15, 2017, while Acacia's stock price was still artificially inflated due to the various misstatements noted above, several Individual Defendants dumped more stock at an average price of $48.54 per share.  Again, none of the Individual Defendants sold their stock pursuant to a 10b5-1 trading plan.  Specifically, Defendant Rasmussen sold 10,060 shares for proceeds of $488,109.19, Defendant Shanmugaraj sold 8,983 shares for proceeds of $435,865.94, Defendant Mikkelsen sold 7,475 shares for proceeds of $362,649.63, Defendant

Givehchi sold 7,390 shares for proceeds of $358,522.16, Defendant Shah sold 5,112 shares for proceeds of $248,087.92, and Defendant Gavin sold 4,634 shares for proceeds of $224,926.48.

132.   On May 31, 2017, Acacia issued a press release cryptically announcing for the first time that the Company had identified a quality issue that it believed "affect[ed an undisclosed] portion of the approximate 1,300 AC400 units and 5,000 CFP units manufactured by one of [the Company's] three contract manufacturers over an approximate four month period."  The press release further noted that Acacia "believ[ed] the root cause of this quality issue ha[d] been identified as a circuit board cleaning process," and that the issue "ha[d] since been eliminated."   The press release also claimed that "manufacturing at this contract manufacturer has resumed" and the "Company does not believe that products currently being shipped are affected by this quality issue."

133.   On July 14, 2017, Acacia issued a press release announcing disappointing preliminary second quarter 2017 results.   In particular, Acacia reported second quarter preliminary revenue of only $77 million to $79 million, with non-GAAP EPS of $0.17 to $0.20, far lower than the EPS of $0.31 and revenue of $91 million expected by analysts.  The Company blamed the shortfall on the above noted "quality issue" and admitted that Acacia experienced supply constraints while trying to build replacement units at the same time that it attempted to meet new demand from customers.   The press release further revealed that Acacia did not anticipate completing remediation efforts, with respect to the remaining affected units, until the third quarter of 2017, and that the Company now anticipated third quarter 2017 EPS of $0.25 to $0.40 on revenues of $95 million to $110 million.  The press release stated:

> Acacia Communications, Inc. (NASDAQ: ACIA), a leading provider of high-speed coherent optical interconnect products, today announced certain preliminary financial results for the quarter ended June 30, 2017 and provided preliminary guidance for its third quarter ending September 30, 2017.

"Our second quarter results were ***adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31***. As we previously announced, we identified a circuit board cleaning process as the likely root cause of the quality issue. This cleaning process was eliminated and manufacturing at the impacted contract manufacturer resumed. ***Although we began to ramp manufacturing capacity with our contract manufacturers during the quarter, we experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers*** for our AC400 and CFP units," said [Defendant] Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "We anticipate completing our remediation efforts with respect to the remaining impacted units during the third quarter of 2017."

"While we are disappointed with the impact that the quality issue had on second quarter results, looking ahead to the third quarter, we believe we are well positioned to meet customer demand for our products, which we believe continues to be driven by the strength of our product capabilities," said [Defendant] Gavin, Chief Financial Officer of Acacia Communications. "We remain excited about Acacia's future growth opportunities, and believe that the new products we are currently ramping up will be contributors to our anticipated growth in the second half of 2017 over the first half of 2017."

[Emphasis added.]

134.     On this news, Acacia's stock price fell 6.3%, or $2.62 per share, on July 14, 2017, to close at $39 compared to the previous trading day's closing of $41.62.

135.     In *Tharp v. Acacia Commc'ns, Inc.*, No. 1:17-cv-11504 (D. Mass.), certain Acacia stockholders, who purchased shares between August 11, 2016 and July 13, 2017, allege that the Company and/or Defendants Shanmugaraj and Gavin violated §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act") and §§10(b) and 20(a) of the Exchange Act by making false statements, with scienter as to the Exchange Act claims, regarding demand for the Company's products and the quality of its manufacturing.   The amended consolidated class action complaint filed on January 8, 2018 sets out the particular statements that violated the 1933 Act and Exchange Act.   *See* ECF No. 79.   The Company's potential liability stemming from the allegations within the Complaint, as well as expenses and attorneys' fees expended to date, is directly caused by the Individual Defendants' breach of their fiduciary duties as described in the

securities complaint and herein.  Plaintiffs here seek indemnification on behalf of the Company for those wrongs.

**B.    The Board Had Knowledge of the Underlying Wrongdoing and Caused the Company to Issue False and Misleading Statements**

136.    Board minutes and other materials obtained from the §220 Request show that, despite the Board's knowledge of pertinent customer-specific demand information, the Director Defendants consciously failed to prevent the Company from repeatedly issuing false and misleading public statements to investors.[4]  The Company also failed to establish internal controls that would have detected, and likely prevented, the manufacturing quality issue. Alternatively, assuming such controls were in place, the Director Defendants had many red flags that alerted them to the misconduct, and yet, they deliberately ignored the warning signs and allowed the wrongdoing to continue.

137.    For example, at the July 19, 2016 Board meeting, attended by all Director Defendants, Defendant Shanmugaraj provided the Board with "a general update regarding the Company's operations and recent developments, including a summary of major milestones in the Company's evolution, first half 20l6 performance, 2017 forecast, ***customer demand***, scaling of production volume, competitive/pricing pressure issues and the impact on margins, product development, staffing increases, and HR initiatives."  [Emphasis added].  John J. LoMedico ("LoMedico"), Acacia's Vice President of Sales and Business Development, presented the Board with a report on the Company's 2016 YTD sales, full-year 2016 sales forecast and 2017 sales forecast.  He then reviewed the sales activities needed to achieve the 2017 forecast, ***by product and customer***, and discussed upside potential.  Defendant Gavin next presented the Board with a

---

[4]      As previously stated herein (*supra* n.1), all of the documents that Acacia produced to Plaintiffs pursuant to the §220 Request are hereby incorporated into this complaint.

report on finance matters, including the Company's preliminary second quarter and first half 2016 results compared to budget, on both a GAAP and non-GAAP basis, unit shipments, gross margins, **customer growth and concentration**, selected balance sheet items, capital expenditures, inventory, an update on the Company's cash management strategies, and other updates.  He then reviewed an updated forecast for full-year 2016 and critical assumptions underlying the forecasted customer-specific shipment information.  In addition, the Board discussed the nature and timing of the Company's upcoming guidance.

138.   A presentation prepared for the July 19, 2016 Board meeting included customer-specific issues affecting forecast and margin pressures.  The presentation also included a 2016 and 2017 sales forecast showing customer-specific revenue impacts.  The financial forecast included a slide showing backlog visibility with customer-specific forecasts.  The presentation showed customer concentration figures with fiscal year 2016 numbers showing expected revenue for certain customers.

139.   At the August 9, 2016 Board meeting, attended by all Director Defendants, Defendant Shanmugaraj led the Board in a discussion regarding the Company's second quarter of 2016 results and financial statements and the draft Form 10-Q for the period ending June 30, 2016 and related earnings release, copies of which were distributed to the Board in advance of the meeting.  Defendant Ritchie, Chairman of the Audit Committee, notified the Board that the Audit Committee had approved the financial statements, Form 10-Q, and earnings release and that the Audit Committee recommended the approval thereof by the Board.  Following this discussion, the Board approved: (i) the inclusion of the financial statements in the Form 10-Q for filing with the SEC; (ii) the filing of the Form 10-Q with the SEC; and (iii) the dissemination of the earnings release.

140.    At the September 23, 2016 Board meeting, attended by all Director Defendants, Defendant Gavin led the Board in a discussion regarding the Company's updated third quarter guidance to be included in the Company's Form S-1 filing in connection with its planned follow-on offering.   During this review, Defendant Gavin provided an update on the Company's third quarter shipments and backlog to date and management's assessment of anticipated third quarter profits and loss and earnings per share.   Defendant Gavin also provided the Board with an update on the Company's fourth quarter backlog.

141.    A presentation prepared for the September 23, 2016 Board meeting had a guidance update for the third quarter of 2016, including shipment and backlog status.   Variability factors included customer-specific issues.

142.    At the November 8, 2016 Board meeting, attended by all Director Defendants, Defendant Shanmugaraj opened the meeting by reviewing the agenda and providing an executive overview of the Company's third quarter performance, operations, and recent developments, including a summary of recent milestones, the shifting competitive landscape, continued efforts to scale product production volume, and ongoing HR initiatives.   LoMedico presented the Board with a report on the Company's 2016 third quarter sales, 2016 fourth quarter sales forecast, and 2017 sales forecast.   He then reviewed ongoing sales initiatives geared toward achieving the 2017 forecast and discussed opportunities for additional upside with respect to the 2017 forecast. LoMedico then provided an operations report, during which he reviewed ongoing volume production ramp, RMA process improvement, and quality control initiatives.   Management also provided an update on key operations focus areas in the fourth quarter of 2016.   Defendant Gavin next presented the Board with a report on finance matters, including the Company's preliminary third quarter and nine months ended September 30, 2016 results compared to budget, previously

provided guidance and market consensus, on both a GAAP and non-GAAP basis, unit shipments, gross margins, ***customer growth and concentration***, capital expenditures, inventory, and selected balance sheet items.  He then reviewed the updated forecast for the fourth quarter of 2016, focusing on critical assumptions underlying the forecast.  Next, Defendant Gavin provided the Board with an ***update on historical and anticipated revenue growth from the Company's key customers*** and on metrics impacting gross margins for the Company's volume production products.  Defendant Gavin then presented the Company's preliminary guidance with respect to fourth quarter 2016 revenue, non-GAAP net income, and non-GAAP diluted earnings per share.

143.   A presentation prepared for the November 8, 2016 Board meeting included potential challenges regarding customer-specific concerns and market pressures.

144.   At the December 13, 2016 Board meeting, attended by all Director Defendants except Defendant Roche, Defendant Mikkelsen led the Board in a strategy discussion.  This discussion included presentations by Defendants Mikkelsen, Rasmussen, and Shah regarding, among other topics, the Company's accomplishments since inception, including what worked well and lessons learned, current and anticipated roadmap product offerings, market and industry data, ongoing and future margin expansion efforts, ongoing and future customer diversification efforts, competition, ongoing and planned research and development efforts, opportunities for organic and inorganic growth, and key strategic takeaways.  Defendant Gavin next presented the Board with a report on finance matters, including the Company's fourth quarter performance to date and projected year-end results.  Defendant Gavin then provided an overview of the Company's updated preliminary budget for 2017, including target revenue, non-GAAP gross profit, operating expenses and net income, and headcount.  Next, Defendant Gavin provided an

overview of historical and projected 2017 customer revenues, unit volumes and growth rates, revenue by product, and GAAP and non-GAAP operating expenses.

145.    A presentation prepared for the December 13, 2016 Board meeting showed a customer-specific revenue issue.

146.    At the February 20, 2017 Board meeting, attended by all Director Defendants, LoMedico presented an update to the Company's first quarter and full year 2017 sales forecasts, including a summary of ongoing sales activities and updates to the forecasts presented to the Board in the fourth quarter of 2016.  Defendant Gavin presented the Board with a report on finance matters, including the Company's fourth quarter and year ended December 31, 2016 results compared to budget and previously provided guidance and market consensus, on both a GAAP and non-GAAP basis.  Defendant Gavin then presented the Company's preliminary guidance with respect to first quarter 2017 revenue, non-GAAP net income, and non-GAAP diluted earnings per share.

147.    At the April 18, 2017 Board meeting, attended by all Director Defendants, Defendant Shanmugaraj opened by reviewing the agenda for the open session of the meeting and providing the Board with an executive overview of the Company's year-to-date performance, new product development and quality initiatives, OFC feedback, and long-term growth strategy objectives.  LoMedico provided the Board with an update to the Company's first quarter sales activity and second quarter and full year 2017 sales forecasts, including a summary of ongoing sales activities and further updates to the forecasts presented to the Board at the last Board meeting.  Defendant Mikkelsen led the Board in a strategy discussion, which included, among other topics, a detailed discussion regarding the Company's competitive landscape, ***market trends***, ***key market segments***, and potential growth and strategic opportunities for the Company.

Defendant Gavin presented the Board with a report on finance matters, including the Company's preliminary first quarter 2017 results compared to budget and prior market guidance, ***current second quarter 2017 sales backlog***, and the Company's preliminary financial projections with respect to its second quarter 2017.

148.    A presentation for the April 18, 2017 Board meeting discussed a customer-specific concern for 2017.

149.    At the May 7, 2017 Board meeting, attended by all Director Defendants, Defendant Gavin presented the Board with an update on various finance and other business matters since the last meeting of the Board.  Defendants Shanmugaraj and Gavin also led the Board in a discussion on recent changes in demand in an important market.  Defendant Gavin then presented the Company's preliminary determination of its guidance for the second quarter of 2017.

150.    A presentation prepared for the May 7, 2017 Board meeting showed that the preliminary guidance ranges and business condition updates for the second quarter of 2017 were impacted by customer-specific issues.

C.    **The Director Defendants Present Defendants Shanmugaraj and Mikkelsen for Retention While Withholding Material Information from Shareholders**

151.    On April 6, 2017, the Director Defendants caused Acacia to issue a false and misleading Proxy in connection with the 2017 Annual Stockholders meeting that was held on May 18, 2017, at which Acacia's shareholders were to vote on the retention of Defendants Shanmugaraj and Mikkelsen as members of the Board.

152.    In violation of §14(a) of the Exchange Act, the Proxy contained false and misleading statements and omissions.

153.    The Proxy contained the following statements in urging shareholders to vote to

retain Defendants Shanmugaraj and Mikkelsen:

**Nominees**

Based on the recommendation of the Nominating and Corporate Governance Committee
of our Board of Directors ("Nominating and Corporate Governance Committee"), our
Board of Directors has nominated Murugesan Shanmugaraj and Benny P. Mikkelsen for
election as directors to serve for a three-year term ending at the 2020 annual meeting or
until their successors are elected and qualified. Each of the nominees is a current member
of our Board of Directors and has consented to serve if elected.

* * *

*Audit Committee*

Our Audit Committee's responsibilities include:

* * *

• reviewing and discussing with management and the registered public
accounting firm our annual and quarterly financial statements and related
disclosures; [and]

• monitoring our internal control over financial reporting, disclosure
controls and procedures and code of business conduct and ethics[.]

* * *

**Board Processes**

*Oversight of Risk*

Our Board of Directors oversees our risk management processes directly and through its
Committees. Our management is responsible for risk management on a day-to-day basis.
The role of our Board and its committees is to oversee the risk management activities of
our management. They fulfill this duty by discussing with management the policies and
practices utilized by management in assessing and managing risks and providing input on
those policies and practices. In general, our Board oversees risk management activities
relating to business strategy, acquisitions, capital allocation, organizational structure and
certain operational risks; our Audit Committee oversees risk management activities
related to financial controls and legal and compliance risks; our Nominating and
Corporate Governance Committee oversees risk management activities relating to the
composition of our Board; and our Compensation Committee oversees risk management
activities relating to our compensation policies and practices and management succession
planning. Each Committee reports to the full Board on a regular basis, including reports
with respect to each Committee's risk oversight activities as appropriate. In addition,

since risk issues often overlap, Committees from time to time request that the full Board discuss particular risks.

* * *

### *Participation in our Follow-On Public Offering*

On October 13, 2016, we closed our follow-on public offering in which we issued and sold 1,210,302 shares of common stock and certain selling stockholders sold an additional 3,289,698 shares. The price per share to the public was $100.00, resulting in aggregate proceeds to the company of approximately $116.8 million, net of underwriters' discounts and commissions, before deduction of offering expenses of approximately $1.2 million. The selling stockholders in our follow-on public offering included each of our executive officers, entities affiliated with Summit Partners, L.P., Commonwealth Capital Ventures and Matrix Partners and certain of our directors as set forth in the table below. We did not receive any proceeds from the sale of shares by the selling stockholders.

| Name | Nature of Relationship | Shares | | Aggregate Proceeds(1) |
|---|---|---|---|---|
| Murugesan "Raj" Shanmugaraj | Executive Officer | 108,163 | | $ 10,437,730 |
| John F. Gavin | Executive Officer | 25,501 | | $ 2,460,847 |
| Benny P. Mikkelsen | Executive Officer | 98,846 | | $ 9,538,639 |
| Christian J. Rasmussen | Executive Officer | 98,846 | | $ 9,538,639 |
| Mehrdad Givehchi | Executive Officer | 98,846 | | $ 9,538,639 |
| Bhupendra C. Shah | Executive Officer | 47,917 | | $ 4,623,991 |
| Entities Affiliated with Matrix Partners | Significant Stockholder | 1,448,493 | (2) | $ 139,779,575 |
| Commonwealth Capital Ventures IV L.P. | Significant Stockholder | 726,426 | | $ 70,100,109 |
| Entities Affiliated with Summit Partners, L.P. | Significant Stockholder | 346,202 | (3) | $ 33,408,493 |
| Eric Swanson | Director | 2,640 | | $ 254,760 |
| Stan Reiss | Director | 1,448,493 | (2) | $ 139,779,575 |
| John Ritchie | Director | 2,640 | | $ 254,760 |

(1)   Amounts are net of underwriters' discounts and commissions.

(2)   See "Security Ownership of Certain Beneficial Owners and Management" above for additional information related to the beneficial ownership of our common stock by this significant stockholder and Mr. Reiss's relationship to this entity.

(3)   See "Security Ownership of Certain Beneficial Owners and Management" above for additional information related to the beneficial ownership of our common stock by this significant stockholder and Mr. Chung's relationship to this entity.

154.   Defendants' statements misleadingly suggested that: (i) the Board maintained adequate compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; and (ii) the Audit Committee adequately reviewed the Company's financial statements and disclosures and monitored disclosure and

internal controls to ensure they were effective.  The Proxy omitted any disclosures regarding: (i) the decreasing demands for Acacia's products from the Company's largest customers; (ii) the quality control issues that were negatively affecting Acacia products; and (iii) Acacia's improperly inflated financial guidance.  In addition, while the Proxy disclosed that Defendants Shanmugaraj and Mikkelsen collectively sold approximately $20 million worth of their personally held Acacia stock in connection with the Secondary Offering, the Proxy failed to disclose that such sales were artificially inflated and improperly made while both Defendants were in possession of material, adverse information concerning Acacia's business, operations, and prospects.

155.    These false and misleading statements and omissions were an essential link in the reelection of Defendants Shanmugaraj and Mikkelsen to the Acacia Board.  This Proxy harmed Acacia by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  For example, as a result of their reelection to the Board, Defendants Shanmugaraj and Mikkelsen continued to harm Acacia by perpetuating the violations of securities laws in order to prop up the Company's stock price as the Individual Defendants continued to receive proceeds from their sale.

156.    The Proxy harmed Acacia by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the Individual Defendants' misleading statements in the Proxy, Acacia's stockholders voted to reelect Defendants Shanmugaraj and Mikkelsen to Acacia's Board.

## VI.    DERIVATIVE ALLEGATIONS

157.    Plaintiffs bring this action derivatively in their own right and for the benefit of Acacia to redress injuries suffered, and to be suffered, by Acacia as a direct result of the breaches of fiduciary duties by the Individual Defendants.

158.   Acacia is named as a Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159.   As alleged above, Plaintiffs are current shareholders of Acacia stock.  Plaintiffs also were shareholders of Acacia at the time of the breaches of fiduciary duties complained of herein.  Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in prosecuting this action.  Because the Individual Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its shareholders.

160.   The wrongful acts complained of herein subjected, and continue to subject, Acacia to harm.

## VII.   DEMAND ON THE BOARD IS EXCUSED AS FUTILE

161.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

162.   At the time this complaint was filed, the Board was comprised of eight directors. To properly allege that a demand on the Board would be a futile act, Plaintiffs need only show that *reasonable doubt exists* as to whether *demand would be futile as to at least half* of the Board.  Plaintiffs did not make a demand upon the Board prior to instituting this action because at least half of the Board either: (1) lacks independence from the Company; (2) engaged in conduct that was not a legitimate exercise of business judgment and/or was *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (3) is interested, and therefore conflicted from, and unable to fairly consider a demand because they face a substantial likelihood of liability for their role in Acacia's illegal conduct and/or because they sat idle in the

face of red flags that placed them on notice, or constructively placed them on notice, of the wrongdoing alleged herein.

### A.   Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment

163.   The challenged misconduct at the heart of this case involves the direct facilitation of illegal activity, including Director Defendants knowingly and/or consciously presiding over the Company's blatant violations of federal securities statutes.  The Director Defendants, in their capacity as corporate directors, affirmatively adopted, implemented, and/or condoned a business strategy based on Acacia's deliberate violations of law.  The Board cannot plausibly claim ignorance concerning these wide-ranging compliance failures.  Indeed, the Acacia Board was specifically and uniquely accountable and responsible for the compliance failures discussed herein given that the Board received numerous presentations during the relevant period regarding a potential impact from customer-specific issues.

164.   The Board's "do nothing' strategy in the face of information evidencing the systematic violations of applicable laws and regulations is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.

165.   In addition, the Director Defendants utterly and consciously failed to exercise proper control over Acacia with regard to the critical manufacturing issues described above, causing the Company to repeatedly misstate its results of operations in violation of federal securities laws.  The Director Defendants each sat on the Board or were otherwise involved in the management and control of the Company during the wrongdoing described throughout this complaint, and each was responsible for setting and enforcing Company policy.  The Director Defendants stood idly by while Acacia executives repeatedly and falsely claimed in financial

statements and public investor presentations that the Company had robust manufacturing protocols and quality controls.

166.    A derivative claim to recoup damages for harm caused to the Company by pervasive unlawful activity represents a challenge to conduct that is outside the scope of appropriate business judgment – conduct for which the Individual Defendants should face potential personal liability.  As such, the protections of the "business judgment rule" do not extend to such malfeasance.  Nor can such malfeasance ever involve the "good faith" exercise of directorial authority.  Accordingly, any demand on the Board to initiate this action would be futile.

**B.      Demand Is Excused Because at Least Half of the Board Members Are Either Not Independent or Not Disinterested Because They Face a Substantial Likelihood of Liability**

167.    In addition to demand futility stemming from the Director Defendants' culpable presiding over an illegal course of Company conduct, demand is also futile and excused because at least half of the members of the Board are not disinterested or independent and cannot, therefore, properly consider any demand.

168.    As an initial matter, the Board has effectively conceded, in the Company's SEC filings, that Defendants Shanmugaraj, Mikkelsen, and Reiss are not independent directors of the Company.  Indeed, in Acacia's April 6, 2017 Proxy, the Company states that "each of Messrs. Chung, Ritchie, Reiss, Roche and Swanson are independent" under "NASDAQ listing rules." By excluding Defendants Shanmugaraj and Mikkelsen, Acacia acknowledges that they are not independent.[5]  Further, the Proxy states that "each of Messrs. Chung and Ritchie, but not Mr.

---

[5]        Director Aldrich was not a member of the Board at the issuance of the Proxy.

Reiss, satisfies the independence standards for audit committee membership" under SEC and NASDAQ rules.

169.    Specifically, Defendant Shanmugaraj is not independent because his principal occupation is serving as the Company's President and CEO.  According to the Company's SEC filings, since 2015, Defendant Shanmugaraj has received in excess of $4.1 million in salary and other compensation from Acacia.    In addition, during the relevant period, Defendant Shanmugaraj sold 189,175 shares of his personally held Acacia stock for proceeds of $15,038,839.56.  Defendant Shanmugaraj's sales were timed to maximize profit from Acacia's then-artificially inflated stock price.  Defendant Shanmugaraj's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 14% of his holdings, compared to the 3.8% he sold in the year before that time.  Thus, he cannot distance himself from the misconduct alleged herein.  Defendant Shanmugaraj is therefore incapable of impartially considering a demand to commence this action.

170.    Similarly, Defendant Mikkelsen is not independent because his principal occupation is serving as the Company's CTO.  As a result of this employment relationship, Mikkelsen has received, and will receive, valuable financial benefits from the Company – benefits that would be lost if Defendant Mikkelsen's employment relationship were severed.  As such, Defendant Mikkelsen is incapable of impartially considering a demand to commence this action.

171.    Defendants Chung, Reiss, and Ritchie were all members of the Audit Committee during the relevant period and are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee.  The Board's Audit Committee is responsible for assisting "the Board's oversight of the Company's

accounting and financial reporting processes and the audits of the Company's financial statements." During the relevant period, Defendants Chung, Reiss, and Ritchie sat on the Audit Committee.

172. The Audit Committee Charter further provides that the Audit Committee shall, among other things:

- "review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters required to be discussed by [Auditing Standard No. 16]";

- "consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K";

- "discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others";

- "discuss with the Company's management and independent auditor the Company's quarterly financial statements, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations';"

- "coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 under the Exchange Act";

- "discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled";

- "periodically discuss with the General Counsel (i) any legal matters that may have a material impact on the Company's financial statements, accounting policies, compliance with applicable laws and regulations and (ii) any material reports, notices or inquiries received from regulators or governmental agencies. The Audit Committee shall have direct communication with the General Counsel, as needed"; and

- "report regularly to the Board."

173.    As members of the Audit Committee, Defendants Chung, Reiss, and Ritchie violated their fiduciary duties to act in good faith to address the pervasive legal violations that led to violations of federal securities laws and the ensuing class litigation.    Accordingly, Defendants Chung, Reiss, and Ritchie face a substantial likelihood of liability and cannot impartially consider a demand.  Therefore, demand is excused.

174.    The Director Defendants are likewise conflicted from and unable to pursue Acacia's claims against members of the Company's management.  Any effort to prosecute such claims against the Officer Defendants for their direct roles in implementing a business strategy designed to ignore or otherwise circumvent the federal securities statutes would necessarily expose the Board's own culpability for the very same conduct.  In other words, given that the Board regularly received reports from the Officer Defendants, any effort by the Director Defendants to hold those defendants liable would surely lead these executives to defend on the ground that their own conduct was consistent with Acacia's corporate policy and practice, as established by and known to the Director Defendants.

175.    As alleged above, seven of the eight current Board members – Defendants Shanmugaraj, Mikkelsen, Roche, Reiss, Swanson, Chung, and Ritchie – violated §14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the Proxy. Each of these Defendants further breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding Acacia's business, operations, and prospects.  Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

176.    As alleged herein, seven of the eight current Board members – Defendants Shanmugaraj, Mikkelsen, Roche, Reiss, Swanson, Chung, and Ritchie – violated §10(b) of the

Exchange Act by: (a) employing devices, schemes, and artifices to defraud; and (b) making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

177.   As alleged herein, seven of the eight current Board members – Defendants Shanmugaraj, Mikkelsen, Roche, Reiss, Swanson, Chung, and Ritchie – violated §11 of the Securities Act by disseminating or approving and signing a Registration Statement for the Secondary Offering that failed to fully disclose the risk that Acacia was systematically violating federal and state law.  Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

178.   Moreover, the incredible insider selling at inflated stock prices further demonstrates the Board's unwillingness to impartially consider a pre-suit demand.  In particular, the Insider Selling Defendants sold the following stock during and around the Secondary Offering:

- Defendant Reiss sold 1,446,104 shares of personally and indirectly held Acacia stock for proceeds of $139,549,036;

- Defendant Chung sold 1,596,202 shares of personally held Acacia stock for proceeds of $96,220,993;

- Defendant Rasmussen sold 293,121 shares of personally held Acacia stock for proceeds of $20,476,861.42;

- Defendant Givehchi sold 289,193 shares of personally held Acacia stock for proceeds of $20,285,090.81;

- Defendant Mikkelsen sold 289,247 shares of personally held Acacia stock for proceeds of $20,269,536.59;

- Defendant Shanmugaraj sold 189,175 shares of personally held Acacia stock for proceeds of $15,038,839.56;

- Defendant Shah sold 132,298 shares of personally held Acacia stock for proceeds of $9,506,575.33;

- Defendant Gavin sold 48,630 shares of personally held Acacia stock for proceeds of $3,699,330.42;

- Defendant Murphy sold 34,458 shares of personally held Acacia stock for proceeds of $2,122,673.53;

- Defendant Ritchie sold 5,280 shares of personally held Acacia stock for proceeds of $379,368; and

- Defendant Swanson sold 2,640 shares of personally held Acacia stock for proceeds of $254,760.

In total, the Officer Defendants and six of the seven Director Defendants sold over $327 million in Acacia stock at artificially inflated prices during the relevant period.  As alleged herein, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health – in particular, the problems with the Company's two largest customers that were required to be provided to the Company on a rolling basis and revealed to the public a mere two weeks after the Secondary Offering.  While in possession of this knowledge, the Insider Selling Defendants each made suspicious sales for their own personal benefits.  The Board's willingness to ignore shareholder concerns and to instead favor the interests of corporate insiders demonstrates the Board's utter inability and/or unwillingness to fairly consider the interests of the Company as a whole.

> **C.     The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith**

179.    Under Delaware law and Acacia's Corporate Governance Guidelines, the Board, as the Company's highest decision-making body, is charged with ensuring that processes are in place for ensuring legal and regulatory compliance.  This is particularly true when such compliance concerns a core operation of the Company.  In the case at bar, the misconduct alleged was blatant, involved the Company's core business operations and primary sources of

revenue, and facilitated hundreds of millions of dollars in proceeds to the Individual Defendants. Such violations of the law do not result from an isolated failure of oversight. At the very least, the Director Defendants consciously turned a blind eye to these pervasive violations of law, creating a substantial likelihood of liability. Accordingly, demand is excused.

180.     Each and all of the Director Defendants failed to act in the face of known duties. Indeed, as explained herein, they were presented with – but consciously ignored (and/or perpetuated) – substantial "red flag" warnings regarding customer-specific demand. They also failed to meaningfully implement internal controls that would have prevented the manufacturing issue to the detriment of the Company and its shareholders. These and other wrongful acts have caused, and will continue to cause, the Company to be subjected to significant potential fines and penalties and numerous lawsuits. They have also resulted in severe harm to the Company's business reputation. Since the wrongdoing and harm alleged in this complaint flows directly from the Director Defendants' conscious decision to permit the sustained and systemic violations of law in question and/or failure to implement meaningful controls, the Director Defendants are incapable of exercising the independent judgment required to determine whether the initiation of an action against the Individual Defendants is appropriate.

## VIII.   CLAIMS FOR RELIEF

### COUNT I
### Derivative Claim for Breach of Fiduciary Duty
### (Against the Individual Defendants)

181.     Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

182.     The Individual Defendants each owed and/or owes Acacia and its shareholders the highest fiduciary duties of good faith, loyalty, due care, and candor in managing and administering the Company's affairs.

183.    As detailed herein, the Individual Defendants committed unlawful and *ultra vires* acts.  They also consciously failed to fulfill their fiduciary obligations to the Company and its shareholders.

184.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) demand for Acacia's core products was dwindling, particularly with respect to the Company's largest customers; (ii) quality control issues were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders; and (iii) defendants' positive statements about Acacia's business, operations, and prospects were materially misleading.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

185.    The Director Defendants, as directors of the Company, owed Acacia the highest duty of loyalty.  These Defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.   The Director Defendants knew or were reckless in not knowing that: (i) demand for Acacia's core products was dwindling, particularly with respect to the Company's largest customers; (ii) quality control issues were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders; and (iii) Defendants' positive statements about Acacia's business, operations, and prospects were materially misleading.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

186.    As members of the Audit Committee, Defendants Chung, Reiss, and Ritchie breached their fiduciary duty of loyalty by approving the statements described herein, which

were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  Defendants Chung, Reiss, and Ritchie completely and utterly failed in their duty of oversight and to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

187.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of good faith, loyalty, due care, and candor, Acacia has suffered, and continues to suffer, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company in an amount to be determined at trial.

## COUNT II
### Breach of Fiduciary Duty for Insider Trading
### (Against the Insider Selling Defendants)

188.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

189.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the material non-public information described above and sold Acacia common stock on the basis of such information.

190.    The information described above was proprietary non-public information concerning the Company's operation, financial condition, and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold their Acacia common stock.

191.    At the time of their stock sales, the Insider Selling Defendants knew that Acacia was systematically violating federal and state law via material misstatements and omissions regarding: (1) the demand for its networking products; (2) its manufacturing quality; and (3) the adequacy of the Company's internal controls to assure that the Company's financial statements were reliable and free of material misstatements.  The Insider Selling Defendants' sales of

Acacia stock, while in possession and control of this material adverse non-public information, was a breach of their fiduciary duties of loyalty and good faith, and the concealment of this material non-public information allowed the Insider Selling Defendants to knowingly sell their shares at artificially inflated prices.

192.    As a direct and proximate result of the Insider Selling Defendants' insider sales and breach of fiduciary duties, Acacia has suffered damages, not only monetarily, but also to its corporate image and goodwill.  Because the Insider Selling Defendants used the Company's proprietary information for their own gain, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III
### Violations of Section 11 of the Securities Act
### (Against the Individual Defendants)

193.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

194.    During the relevant period, the Individual Defendants disseminated or approved and signed a Registration Statement for the Secondary Offering that failed to fully disclose the risk that Acacia was systematically violating federal and state law via material misstatements and omissions regarding: (1) the demand for its networking products; (2) its manufacturing quality; and (3) the adequacy of the Company's internal controls to assure that the Company's financial statements were reliable and free of material misstatements.

195.    As such, the Individual Defendants caused the Company to violate §11 of the Securities Act.

196.    As a result of the Individual Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace as a result of the violations of §11.

197.    At all relevant times to the dissemination of the materially false and/or misleading Registration Statement, Director Defendants were aware of, and/or had access to, the true facts concerning Acacia's operations.

198.    Acacia has been severely injured by this conduct and is entitled to damages and equitable relief.

**COUNT IV**
**Violations of Section 10(b) of the Exchange Act**
**(Against the Individual Defendants)**

199.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

200.    During the Relevant Period, the Individual Defendants disseminated or approved public statements that failed to fully disclose the risk that Acacia was systematically violating federal and state law via material misstatements and omissions regarding (1) the demand for its networking products; (2) its manufacturing quality; and (3) the adequacy of the Company's internal controls to assure that the Company's financial statements were reliable and free of material misstatements.

201.    As such, the Individual Defendants caused the Company to violate §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

> (a)    employed devices, schemes, and artifices to defraud; and

> (b)    made untrue statements of material fact or omitted to state material facts necessary, in order to make the statements made, in light of the circumstances under which they were made, not misleading.

202.    As a result of the Individual Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace due to violations of §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

203.    At all relevant times to the dissemination of the materially false and/or misleading Proxy and other statements, Director Defendants were aware of, and/or had access to, the true facts concerning Acacia's operations.

204.    Acacia has been severely injured by this conduct and is entitled to damages and equitable relief.

## COUNT V
### Derivative Claim for Violation of Section 14(a) of the Exchange Act
### (Against the Director Defendants)

205.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

206.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

207.    The Director Defendants exercised control over Acacia and caused Acacia to disseminate the false and misleading Proxy.  The Proxy materially misrepresented the manner in which nominees for Acacia's Board were selected, the effectiveness of the Board's oversight of internal controls at Acacia, and the Board's compliance with Acacia's corporate governance documents.

208.    As stated herein, the Proxy contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  These false

statements and omissions were essential links in the election of the Defendants Shanmugaraj and Mikkelsen to Acacia's Board and the continued illegal management of Acacia.

209.     The written communications made by the Defendants described herein constitute violations of Rule 14a-9 and Section 14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

210.     At all relevant times to the dissemination of the materially false and/or misleading Proxy, Defendants were aware of and/or had access to the true facts concerning Acacia's operation.

211.     Acacia has been severely injured by this conduct and is entitled to damages and equitable relief.

## COUNT VI
### Derivative Claim for Violation of Section 29(b) of the Exchange Act
### (Against the Individual Defendants)

212.     Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

213.     Individual Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §§10(b) and 14(a) of the Exchange Act. The Individual Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because Individual Defendants violated §§10(b) and 14(a) by issuing false and misleading reports to Acacia shareholders regarding the nature of, and responsibility for, the Company's internal controls and operations.  All of the payments Individual Defendants received are therefore voidable by Acacia.

214.     Acacia is in privity with the Individual Defendants with respect to the incentive compensation and fees provided by Acacia to Individual Defendants.  Individual Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

215.    Acacia has been severely injured by the misconduct of the Individual Defendants. Accordingly, Acacia is entitled to damages, *i.e.*, recession of the incentive and compensation and fees granted to Individual Defendants.

## COUNT VII
### Waste of Corporate Assets
### (Against the Individual Defendants)

216.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

217.    As a result of the wrongdoing detailed herein, and by failing to conduct proper supervision, the Individual Defendants have caused Acacia to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

218.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

219.    Plaintiffs, on behalf of Acacia, have no adequate remedy at law.

## COUNT VIII
### Unjust Enrichment
### (Against the Individual Defendants)

220.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

221.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense, and to the detriment, of Acacia.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Acacia.

222.    The Insider Selling Defendants sold Acacia stock while in possession of material, adverse nonpublic information that artificially inflated the price of Acacia stock.  As a result,

these Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

223.    Plaintiffs, as stockholders and representatives of Acacia, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

224.    Plaintiffs, on behalf of Acacia, have no adequate remedy at law.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    A judgment finding that a shareholder demand on the Acacia Board would have been a futile and useless act;

B.    A judgment finding that the Individual Defendants have breached their fiduciary duties to the Company and violated the federal securities laws;

C.    A judgment against each of the Individual Defendants in favor of Acacia for the amount of damages sustained by Acacia as a result of the breaches of fiduciary duties by each Individual Defendant as alleged herein, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.    A judgment requiring the Individual Defendants to return to Acacia all compensation and remuneration of whatever kind paid to them by Acacia during the time that they were in breach of the fiduciary duties they owed to Acacia;

E.    Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Acacia's directors, officers, and employees do not engage in wrongful and illegal practices;

F.      Granting appropriate equitable and/or injunctive relief to remedy the Individual

Defendants' misconduct, as permitted by law;

G.      Awarding to Plaintiffs the costs and disbursements of this consolidated action,

including reasonable attorneys' and experts' fees and expenses; and

H.      Granting such other and further relief as this Court deems just and equitable.

## X.      DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

DATED:  May 30, 2018                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                        */s/ Geoffrey M. Johnson*
                                        Geoffrey M. Johnson (*pro hac vice*)
                                        12434 Cedar Road, Suite 12
                                        Cleveland Heights, OH 44118
                                        Telephone:  (216) 229-6088
                                        Facsimile:   (860) 537-4432
                                        gjohnson@scott-scott.com

                                        David R. Scott
                                        Amanda F. Lawrence (BBO# 568737)
                                        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                        156 South Main Street
                                        P.O. Box 192
                                        Colchester, CT 06415
                                        Telephone:  (860) 537-5537
                                        Facsimile:   (860) 537-4432
                                        david.scott@scott-scott.com
                                        alawrence@scott-scott.com

                                        Joe Pettigrew
                                        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                        600 W. Broadway, Suite 3300
                                        San Diego, CA 92101
                                        Telephone:  (619) 233-4565
                                        Facsimile:   (619) 233-0508
                                        jpettigrew@scott-scott.com

                                        *Co-Lead Counsel for Lead Plaintiffs*

Brian J. Robbins
Felipe J. Arroyo
Steven R. Wedeking
**ROBBINS ARROYO LLP**
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com
swedeking@robbinsarroyo.com

*Co-Lead Counsel for Lead Plaintiffs*

Josh Baker
Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone:  (212) 686-1060
Facsimile:  (212) 202-3827
jbaker@rosenlegal.com
pkim@rosenlegal.com

Matthew H. Lee
Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone:  (516) 922-5427
Facsimile:  (516) 344-6204
mlee@thebrownlawfirm.com
tbrown@thebrownlawfirm.com

*Additional Counsel for Lead Plaintiffs*

## VERIFICATION

I, Karen Colgan, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Consolidated Amended Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: May 28, 2018

KAREN COLGAN

## VERIFICATION

I, Russell Gourley, hereby verify that I have authorized the filing of the attached Consolidated Amended Verified Shareholder Derivative Complaint, that I have reviewed the Consolidated Amended Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

Dated: _May 29 2018_____

_Russell C. Gourley_____
Russell Gourley