UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
STEVEN THARP, individually and on  )
behalf of all others similarly   )
situated,                        )
                               )
            Plaintiff,          )
                               )
      v.                        )      CIVIL ACTION
                               )      NO. 17-11504-WGY
ACACIA COMMUNICATIONS, INC.;     )
MURUGESAN SHANMUGARAJ; and        )
JOHN F. GAVIN,                   )
                               )
            Defendants.         )
_____)
```

YOUNG, D.J.                                    June 15, 2018

**MEMORANDUM & ORDER**

## I.    INTRODUCTION

This is a securities class action on behalf of persons and

entities who purchased Acacia Communications, Inc. common stock.

Lead plaintiffs WKW Partners Fund I, L.P. ("WKW Partners"), Hui

Zhang ("Zhang"), and Chris Kebler ("Kebler"), together with

plaintiff Rina Rollhaus ("Rollhaus" and collectively with WKW

Partners, Zhang, and Kebler, "Plaintiffs") purchased the stock

between August 11, 2016 and July 13, 2017 ("Class Period").  The

Plaintiffs bring this class action against Acacia

Communications, Inc. ("Acacia"); individual defendants Murugesan

"Raj" Shanmugaraj ("Shanmugaraj"), John F. Gavin ("Gavin"),

Francis J. Murphy ("Murphy"), Benny P. Mikkelsen ("Mikkelsen"),
Eric A. Swanson ("Swanson"), Peter Y. Chung ("Chung"), Stan J.
Reiss ("Reiss"), John Ritchie ("Ritchie"), Vincent T. Roche
("Roche" and collectively with Shanmugaraj, Gavin, Murphy,
Mikkelsen, Swanson, Chung, Reiss, and Ritchie, the "Individual
Defendants"); the selling defendants Matrix Partners VIII, L.P.
("Matrix"), Summit Partners Venture Capital Fund III-A ("Summit
III-A"), Summit Partners Venture Capital Fund III-B ("Summit
III-B"), Summit Investors I, LLC ("Summit Investors"), and
Summit Investors I (UK), L.P. ("Summit UK" and collectively with
Summit III-A, Summit III-B and Summit Investors, "Summit"),
Commonwealth Capital Ventures IV L.P. ("Commonwealth"), the
Malini Shanmugaraj 2016 QTIP Trust ("Shanmugaraj Trust"),
Mehrdad Givehchi ("Givehchi"), Givehchi LLC, John LoMedico
("LoMedico"), Bhupendra C. Shah ("Shah"), Bhupendra Shah 1999
Trust U/A DTD 10/06/1999 ("Shah Trust"), Christian Rasmussen
("Rasmussen"), OFS Fitel, LLC ("OFS"), Egan Managed Capital III,
L.P. ("Egan"), Weston & Co. VIII, LLC ("Weston" and collectively
with Matrix, Summit, Commonwealth, Shanmugaraj Trust, Givehchi,
Givehchi LLC, LoMedico, Shah, Shah Trust, Rasmussen, OFS, Egan,
Shanmugaraj, Gavin, Swanson, Mikkelsen, Reiss, and Ritchie, the
"Selling Defendants"); and the underwriter defendants Goldman
Sachs & Co. ("Goldman Sachs"), Merrill Lynch, Pierce, Fenner &
Smith Inc. ("Merrill Lynch"), Deutsche Bank Securities Inc.

("Deutsche Bank"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Needham & Company, LLC ("Needham"), Cowen and Company, LLC ("Cowen"), William Blair & Company, LLC ("William Blair") and Northland Securities, Inc. ("Northland" and collectively with Goldman Sachs, Merrill Lynch, Deutsche Bank, Morgan Stanley, Needham, Cowen, and William Blair, the "Underwriter Defendants").[1] The Plaintiffs allege violations of Section 11 of the Securities Act of 1933 ("Securities Act") against all of the Defendants, violations of Section 12(a)(2) of the Securities Act against Acacia, Shanmugaraj, Gavin, and the Underwriter Defendants, violations of Section 15 of the Securities Act against the Selling Defendants, violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Securities Exchange Act") against Acacia, Shanmugaraj, and Gavin, and violations of Section 20(a) of the Securities Exchange Act against the Selling Defendants. Prop. Am. Compl., Ex. 1 ("Prop. Am. Compl."), ECF No. 160-1.

The Defendants moved to dismiss all claims against them with prejudice.[2]

---

[1] "Defendants" refers collectively to Acacia, the Individual Defendants, the Selling Defendants and the Underwriter Defendants.

[2] In the Proposed Amended Complaint, the Plaintiffs removed formerly named defendants Commonwealth, Shanmugaraj Trust, Givehchi, Givehchi LLC, LoMedico, Shah, Shah Trust, Rasmussen, OFS, and Egan from their Proposed Amended Complaint. Any

**A.  Procedural History**

The Plaintiffs Steven Tharp ("Tharp") and Zhang,
individually and on behalf of all other similarly situated, each
filed a class action complaint against Acacia, Shanmugaraj, and
Gavin on August 14, 2017 and August 16, 2017, respectively,
alleging violations of the Securities Act and the Securities
Exchange Act.  Class Action Compl., 17-cv-11504, ECF No. 1;
Class Action Compl., 17-cv-11518, ECF No. 1.  Other Plaintiffs
filed similar actions against Acacia soon after.  See Docket
Nos. 17-cv-11695; 17-cv-11988; 17-cv-12350; 17-cv-12550; 17-cv-
12571; 18-cv-10465.  On October 13, 2017, class member Ronald
Sobala ("Sobala") filed a motion to consolidate any related
actions filed pursuant to Rule 42(a) of the Federal Rules of
Civil Procedure and appoint Sobala as lead counsel.  Sobala Mot.
Cons., ECF Nos. 21, 22.  That same day, WKW Partners, Zhang, and
class member David A. Klopfenstein filed similar motions to
consolidated related cases.  Mot. Cons., ECF Nos. 27, 31, 32,
35.  On November 1, 2017, the Court ordered that the related
cases be consolidated under the oldest case number, 17-cv-11504.
Electronic Clerk's Notes, ECF No. 50; Order, ECF No. 51.  The
Plaintiffs then filed a consolidated amended complaint on
January 8, 2018, alleging violations by all the Defendants of

---

motions to dismiss filed by these defendants shall be denied as
moot.

Section 11 of the Securities Act (count I) and Section 12(a)(2)
of the Securities Act (count II); violations of Section 15 of
the Securities Act by the Individual Defendants and the Selling
Defendants (count III); violations of Section 10(b) and Rule
10b-5 of the Securities Exchange Act by Acacia and the
Individual Defendants (count IV); and violations of Section
20(a) of the Securities Exchange Act by the Individual
Defendants (count V). Am. Compl. ¶¶ 325-56, ECF No. 79.

A subset of the Selling Defendants -- Commonwealth, Egan,
Matrix, Summit, and Weston (collectively, the "Shareholder
Defendants") -- moved to dismiss counts I, II, and III of the
amended complaint on February 9, 2018. Shareholder Defs.' Mot.
Dismiss ("Shareholder Defs.' Mot."), ECF No. 98; Shareholder
Defs.' Mem. Law Supp. Mot. Dismiss ("Shareholder Defs.' Mem."),
ECF No. 99. The same day, the Underwriter Defendants moved to
dismiss counts I and II of the amended complaint. Underwriter
Defs.' Mot. Dismiss ("Underwriter Defs.' Mot."), ECF No. 101;
Underwriter Defs.' Mem. Law Supp. Mot. Dismiss ("Underwriter
Defs.' Mem."), ECF No. 102. OFS also moved to dismiss all
claims asserted against it. Def. OFS Mot. Dismiss ("OFS's
Mot."), ECF No. 103; Def. OFS Mem. Law Supp. Mot. Dismiss
("OFS's Mem."), ECF No. 104. Finally, Acacia, the Individual
Defendants, Shah Trust, Givehchi, Givehchi LLC, Lomedico,
Rasmussen, Shah, and Shanmugaraj Trust (collectively, with

Acacia and the Individual Defendants, the "Acacia Defendants")
moved to dismiss all counts of the amended complaint.  Acacia
Defs.' Mot. Dismiss ("Acacia Defs.' Mot."), ECF No. 105; Acacia
Defs.' Mem. Law Supp. Mot. Dismiss ("Acacia Defs.' Mem."), ECF
No. 106.  The Plaintiffs filed their opposition to the above
motions on March 9, 2018.  Pls.' Opp'n Defs.' Mot. Dismiss
("Pls.' Opp'n"), ECF Nos. 109, 110, 111, 112.  The Shareholder
Defendants, OFS, the Underwriter Defendants, and the Acacia
Defendants filed replies to the Plaintiffs' opposition briefs on
March 23, 2018.  Defs.' Reply Pls.' Opp'n ("Defs.' Reply"), ECF
Nos. 126, 127, 128, 129.

On March 29, 2018, the Court heard oral argument on the
motions.  Electronic Clerk's Notes, ECF No. 145.  The Court took
the matter under advisement but granted the Plaintiffs 30 days
to file a motion for leave to amend the complaint.  Id.  The
Court informed the Defendants that they could file a response to
the motion for leave to amend within 14 days.  Id.  The Court
cautioned the parties that were it to decide to dismiss the
complaint on what it "understand[s] is the factual record," it
would dismiss with prejudice because it gave the Plaintiffs
"every chance" to file a proper complaint.  Tr. 3/29/18, 7:18-
8:3, ECF No. 147.

On April 30, 2018, the Plaintiffs filed a motion to amend
the consolidated amended class action complaint along with their

[6]

Proposed Amended Complaint ("Prop. Am. Compl."). Pls.' Mot. Am., ECF Nos. 160, 161. On May 14, 2018, the Defendants opposed the motion. Defs.' Opp'n Am. Compl., ECF No. 165.

## B. Factual Background as Alleged in the Proposed Amended Complaint

### 1. Acacia

Acacia is a company that designs, produces, and sells high-speed coherent optical interconnect products for cloud infrastructure operators and content and communication service providers. Prop. Am. Compl. ¶ 18. These products are designed to improve a customer's communications network. Id. Acacia is headquartered in Maynard, Massachusetts. Id. On July 28, 2017, Acacia had more than 39,200,000 shares issued and outstanding. Id. at ¶ 19.

### 2. Individual Defendants

Shanmugaraj is Acacia's President, CEO, and a member of its Board of Directors (the "Board"). Id. at ¶ 21. Gavin is the CFO of Acacia. Id. at ¶ 22. Murphy is Acacia's Corporate Controller and Principal Accounting Officer. Id. at ¶ 23. Mikkelsen is Acacia's Chief Technology Officer ("CTO") and a member of the Board. Id. at ¶ 24. Swanson is Acacia's Chairman of the Board, a position he has held since August 2009. Id. at ¶ 25. Chung is a member of the Board, a position he has held since April 2013, and a managing director and CEO of Summit

Partners, L.P. ("Summit Partners"), a venture capital firm.  Id. at ¶ 26.  Reiss is a member of the Board, a position he has held since August 2009, and a general partner at Matrix Partners, a venture capital firm.  Id. at ¶ 27.  Ritchie is a member of the Board, a position he has held since April 2015.  Id. at ¶ 28. Roche is a member of the Board, a position he has held since June 2016.  Id. at ¶ 29.  The Plaintiffs allege that each of these individual defendants either signed or authorized the signing or issuance of the registration statement in connection with Acacia's secondary public offering of common stock (the "Secondary Offering").  Id. at ¶¶ 21-29.

### 3. Selling Defendants

The following defendants sold Acacia common stock in connection with the Secondary Offering: (a) Matrix, an entity affiliated with Matrix Partners and Reiss; (b) Summit, a collection of entities affiliated with Summit Partners and Chung; (c) Weston, an entity affiliated with Matrix Partners and which shares the same address as Reiss and Matrix in Massachusetts, owned common stock in Acacia directly, and held stock as a nominee for Matrix and others; (d) Shanmugaraj; (e) Gavin; (f) Swanson; (g) Mikkelsen; (h) Reiss; and (i) Ritchie. Id. at ¶¶ 31-37.  The Plaintiffs allege that the Selling Defendants sold common stock and solicited purchasers of common stock in connection with the Secondary Offering, as well as

causing Acacia to effectuate the Initial Public Offering ("IPO")
and the Secondary Offering.  Id. at ¶ 37.

### 4.  Underwriter Defendants

Goldman Sachs, Merrill Lynch, Deutsche Bank, Morgan
Stanley, Needham, Cowen, William Blair, and Northland served as
underwriters for the Secondary Offering and did business in
connection with the Secondary Offering.  Id. at ¶ 38.

### 5.  Acacia's Business

Acacia's products are designed to assist with high-speed
networking.  Id. at ¶ 40.  Acacia sells the products to
communications and content service providers, and data center
and cloud infrastructure operators.  Id. at ¶ 41.  A couple of
Acacia's biggest customers, who account for a majority of its
revenues, include ZTE, a subsidiary of ZTE Corporation based in
Shenzhen, China; ADVA, a subsidiary of Germany-based ADVA
Optical Networking SE ("ADVA SE"); and Coriant, Inc.
("Coriant"), a company based in Munich, Germany.  Id. at ¶ 45.

As part of Acacia's contracts with these customers, Acacia
is given access to non-public information from the customers
regarding the customers' forecasts and demand for the products
by the public.  Id. at ¶¶ 52-54.  This information, the
Plaintiffs allege, aids Acacia in determining the demand for its
products from customers.  Id.  Customers are also required to

advise Acacia of any event that could have a significant impact on the contracts, and vice-versa.  Id. at ¶ 56.

### 6.  Acacia's Initial Public Offering

On May 18, 2016, Acacia completed its IPO.  Id. at ¶ 71. As part of the IPO, Acacia issued and sold 4,570,184 shares of common stock at $23 per share.  Id.  Certain stockholders sold an additional 604,816 shares to the public at the same price. Id.  Acacia received more than $105,000,000 in gross proceeds. Id.  All of the Underwriter Defendants, except for William Blair, were involved in underwriting the IPO, with Goldman Sachs, Merrill Lynch, and Deutsche Bank serving as joint bookrunners and Needham, Cowen, and Northland acting as co-managers.  Id.  The "selling stockholders" in the IPO included Shanmugaraj, who sold 50,000 shares, receiving $1,150,000 in gross proceeds; Gavin, who sold 7,500 shares and received $172,500 in gross proceeds; and three other Acacia executives, who together sold another 413,816 shares of their personally-held Acacia common stock, receiving more than $9,500,000 in gross proceeds.  Id. at ¶ 72.

### 7.  China's Market and its Connection to Acacia

In 2015, China announced a plan to upgrade its wireless and telecommunications infrastructure, hereinafter referred to as the "China Buildout."  Id. at ¶ 84.  There were two phases to

the China Buildout: first, the national backbone expansion phase[3] and second, the provincial buildout phase.[4] Id. at ¶¶ 94, 103. As part of the China Buildout, China's main wireless carriers were tasked with choosing vendors who would provide the necessary services and equipment. Id. at ¶ 92. These vendors included ZTE and Huawei Technologies, Inc. ("Huawei"), which would then place orders from component part manufacturers such as Acacia. Id. at ¶ 93. During the first phase of the China Buildout, ZTE had large and valuable orders that it needed to fulfill. Id. at ¶ 95. By August 11, 2016, Acacia was supplying products to ZTE to fulfill those orders. Id. at ¶ 94. The Plaintiffs allege that this led to Acacia's "receiv[ing] extensive business and experience[ing] explosive growth" during this phase of the China Buildout. Id. at ¶ 95.

Despite the demand for products in connection with the China Buildout, the Plaintiffs allege that China had been experiencing a decline in its wireless market. Id. at ¶ 96. The Plaintiffs claim the "warning signs of a slowdown in China were known to industry participants long before the Secondary Offering closed." Id. at ¶ 97. Starting in April 20, 2015,

---

[3] The focus of this phase was to upgrade the nation's core infrastructure by increasing the number of national "nodes" that enabled internet access in China. Id. at ¶ 94.

[4] The focus of this phase was to upgrade the infrastructure of individual provinces in China. Id. at ¶ 103.

research reports and articles warned of a slowdown in demand for wireless equipment. Id. at ¶¶ 97-99, 101. The Plaintiffs allege that Acacia knew of the market decline before the close of the Secondary Offering in October of 2016. Id. at ¶¶ 96-97.

The Plaintiffs allege that at the same time, ZTE was shifting its focus from a 4G network infrastructure to a 5G network infrastructure. Id. at ¶ 100. According to the Plaintiffs, a ZTE spokesperson had commented in an article published on July 18, 2016, entitled "China nears full mobile broadband coverage on back of increased 4G adoption," that China would be accelerating its 5G network infrastructure, decreasing demand for 4G equipment. Id. at ¶ 101.

The Plaintiffs claim that Acacia knew of the decline in demand in China because on August 12, 2016, Shanmugaraj stated that "ZTE . . . in Q1 was pretty large, 46% revenue. And that was because of the backbone build-outs. And then in Q2 they've dropped down to 31%." Id. at ¶ 108. Despite the decrease in revenue, Shanmugaraj went on to say that Acacia sees a "continual strong backlog as well from ZTE going into the rest of the year. [It doesn't] see a whole lot of slowdown . . . in terms of backlog coming from ZTE, or growth prospects for them in terms of expansion." Id. Shanmugaraj continued to predict strong demand in China on January 10, 2017. Id. at ¶ 109.

As of May 2017, the second phase of the China Buildout had
not yet been approved.  Id. at ¶ 110.  On June 7, 2017, at the
Bank of America Merrill Lynch Global Technology Conference,
Shanmugaraj stated that there was a current delay in the
provincial networks and that some of the deployments had been
delayed, and that the timing of the purchase orders would be
hard to predict.  Id. at ¶ 111.  On June 13, 2017, Shanmugaraj
stated again that the timing of the provincial phase of the
China Buildout was unclear and that business orders could occur
"in July or in September or in November, it's hard to tell."
Id.

The Plaintiffs allege that ADVA was also experiencing
delays with its CloudConnect product, which decreased demand for
Acacia's products sometime around October 27, 2016.  Id. at ¶¶
115-16.  ADVA had fallen three months behind in shipping its
product due to "yields, scaling output, software and hardware
challenges," but it "[had] them all under control and [was]
moving forward."  Id.  The Plaintiffs claim that these
difficulties must have started "no later than the end of July
2016 (three months before late-October 2016), and possibly
earlier."  Id. at ¶ 116.  On October 26, 2017 ADVA issued a
press release in which it reported that "[q]uarterly revenues
decreased to EUR 111.2 million from EUR 144.2 in Q2 2017," which
"marks a decrease of 30.3% year-on-year . . . ."  Id. at ¶ 122.

[13]

### 8. Acacia's Secondary Public Offering

At the beginning of the class period, August 11, 2016, Acacia announced that for its second quarter, ending June 30, 2016, it had a net income of $17,600,000 under Generally Accepted Accounting Principles ("GAAP") on revenue of $116,190,000.  Id. at ¶ 153.  Compared to the prior year, Acacia had an increase of 101% in revenue and 274% in net income.  Id. Acacia predicted that it would continue to see a strong growth and demand for its product in the future.  Id. at ¶¶ 154-71.

On or about October 7, 2016, after having filed an initial registration statement for the Secondary Offering with the SEC, Acacia priced the Secondary Offering at $100 per share and filed its final prospectus (collectively with the registration statement, the "Offering Documents") with the SEC.  Id. at ¶ 133.  The Secondary Offering closed on October 13, 2016 and Acacia issued and sold 1,210,302 shares of common stock, receiving more than $121,000,000 in gross proceeds; the Selling Defendants sold approximately 3,289,698 of their personally held shares, receiving approximately $328,900,000 in gross proceeds. Id.  The Plaintiffs purchased their common stock in the Secondary Offering.  Id. at ¶ 17.

The Offering Documents stated in part that Acacia had "experienced rapid revenue growth over the last several years," noting that its "revenue for 2015 was $239.1 million, a 63.5%

[14]

increase from $146.2 million of revenue in 2014," and that its "revenue for the six months end[ing] June 30, 2016 was $200.7 million, a 91.0% increase from $105.1 million of revenue in the six months ended June 30, 2015." Id. at ¶ 136. For the quarter ending September 30, 2016, the Offering Documents stated that Acacia expected "revenue of $130 million to $133 million," an increase of more than 100% over the $65.4 million reported in the third quarter of 2015. Id. The Offering Documents also stated that Acacia's "revenue ha[d] generally increased . . . due to increased demand for products in [its] 100 Gbps product family, as well as the introduction of new products in [its] 400 Gbps product family." Id. at ¶ 137. The Offering Documents further stated that Acacia's "Competitive Strengths" included "[c]ustomer collaboration provid[ing a] deep understanding of market needs." Id. Acacia further explained that it "continue[d] to enhance and expand [its] product families, and as [its] existing customers [sought] to expand and improve their network equipment technology, [Acacia] expect[ed] to generate additional revenue through sales to these customers." Id. ¶ 138. The Offering Documents also addressed the design and manufacture of the products, stating that "engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that

component sourcing strategies are in place to support our manufacturing needs." Id. at ¶¶ 139-40.

### 9. Alleged Misstatements and Omissions

The Plaintiffs allege that the Offering Documents were misleading because they failed to disclose the uncertainties in China's market and uncertainties with the second phase of the China Buildout. Id. at ¶¶ 141-43. They allege that the Offering Documents failed to "disclose the fundamental shift in the broadband expansion in China, which was transitioning from the national backbone expansion -- for which business was awarded in a handful of large orders -- to individual provincial buildouts -- which would involve a series of smaller business awards." Id. at ¶ 146. The Plaintiffs claim that because most of Acacia's revenue is generated from the Asia-Pacific region, and because of "the importance of the broadband expansion in China to [Acacia's] business, the omission of this key information rendered the Offering Documents incomplete and, therefore, materially misleading and negligently prepared." Id. at ¶¶ 145-46. The Offering Documents also failed to disclose that Acacia's manufacturing, quality control, and oversight processes were insufficient to prevent basic quality issues from occurring. Id. at ¶¶ 141-52.

The Plaintiffs acknowledge that the Offering Documents provided a disclosure under the heading "The industry in which

we operate is subject to significant cyclicality," which stated in part:

> Capital expenditures can be highly cyclical due to the importance and focus of local initiatives, such as the ongoing telecommunications build out and upgrade in China, government funding and other factors, thus resulting in wide fluctuations in product supply and demand. From time to time, these factors, together with changes in general economic conditions, have caused significant industry upturns and downturns that have had a direct impact on the financial stability of our customers, their customers and our suppliers.

Id. at ¶ 147. They also acknowledge that the Offering Documents mentioned certain risks associated with the ownership of Acacia stock "that may cause the market price" of said stock to fluctuate, including:

> **announcements by our customers** regarding significant increases or decreases in capital expenditures; [and] changes in general economic, industry and market conditions and trends, **including the economic slowdown in China** that began in 2015 and the uncertainty arising from the June 2016 referendum vote in the United Kingdom in favor of exiting from the European Union.

Id. at ¶ 150 (emphasis in original).

### 10. Demand from ZTE and ADVA

Following the Secondary Offering, on October 27, 2016, ZTE and ADVA announced weaker sales guidance than anticipated. Id. at ¶¶ 190-93. Despite weak sales from its customers, on November 10, 2016, Acacia issued a press release announcing an increase in net income for the third quarter of 2016, and

predicting an increase in revenue for the quarter ending
December 31, 2016, due in part to "strong global demand." Id.
at ¶¶ 197-98.  As part of the Needham Growth Conference, on
January 10, 2017, Acacia addressed concerns about the China
Market.  Id. at ¶¶ 220-21.  Shanmugaraj explained that despite
the slowdown in China, Acacia expected demand still to continue
from the China Market, and that Acacia would continue to
experience growth, albeit not as big a growth as it did from
2015 to 2016.  Id.

On February 23, 2017, Acacia issued a press release
announcing revenue of $142,400,000 at the end of the fourth
quarter of 2016.  Id. at ¶ 226.  On May 9, 2017, Acacia issued a
press release announcing its results for the quarter ending
March 31, 2017, reporting revenue of $114,700,000.  Id. at ¶
286.

On May 31, 2017, before the market opened, Acacia issued a
press release announcing a "quality issue" affecting a portion
of its products "over an approximate four month period." Id. at
¶ 300.  On July 14, 2017, before the market opened, Acacia
issued a press release announcing disappointing preliminary
financial results for the quarter ending on June 30, 2017 and
providing financial guidance for the forthcoming quarter ending
September 30, 2017.  Id. ¶ 319.  Acacia reported revenue of
$77,000,000 to $79,000,000 -- a GAAP net loss of between

$5,500,000 and $7,500,000, and a GAAP diluted net loss per share of $0.14 to $0.19. Id. That day, July 14, 2017, marks the end of the class period. Id. ¶ 319-24. On August 3, 2017, Acacia issued a press release, reporting for the quarter ending on June 30, 2017 revenue of $78,900,000 and a GAAP loss from operations of $6,700,000 due to the quality issues with the contract manufacturers. Id. at ¶ 326.

The Plaintiffs allege that due to Acacia's misstatements throughout the class period, its stock prices were artificially inflated. Id. at ¶ 354.

## II. ANALYSIS

The Shareholder Defendants and the Acacia Defendants argue that counts I-III ought be dismissed because the Plaintiffs fail to allege in their consolidated Proposed Amended Complaint that (1) the Shareholder Defendants or the Acacia Defendants fall into any category of permissible defendants enumerated under Section 11 of the Securities Act, (2) the Shareholder Defendants or the Acacia Defendants either sold or offered securities as statutory sellers within the meaning of Section 12(a)(2); and (3) the Shareholder Defendants and the Acacia Defendants had a level of actual control necessary to impose control-person liability under Section 15.

The Underwriter Defendants argue that counts I and II ought be dismissed because the Plaintiffs did not allege in their

Proposed Amended Complaint (1) a misrepresentation of material fact, (2) a material omission in contravention of an affirmative legal disclosure obligation, and (3) a material omission of information necessary to prevent existing disclosures from being misleading.

The Acacia Defendants in addition argue that counts IV and V ought be dismissed because the Proposed Amended Complaint fails sufficiently to allege that any challenged statement was false or misleading, and because the Proposed Amended Complaint does not raise the strong inference of scienter required by the Private Securities Litigation Reform Act ("PSLRA"). The Acacia Defendants also claim that Acacia disclosed all information required by Item 303 of Regulation S-K under the Securities Act.

Leave to amend a complaint shall be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), but a court will not grant such leave when the amendment is futile. "In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion." <u>Glassman</u> v. <u>Computervision Corp.</u>, 90 F.3d 617, 623 (1st Cir. 1996). A well pleaded complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order for the Plaintiffs to survive a motion to dismiss, their complaint must contain sufficient factual matters, accepted as true, to "state

a claim to relief that is plausible on its face." <u>Bell Atl.</u>
<u>Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007).  The Court will not
accept a mere recital of the legal elements supported only by
conclusory statements.  <u>Id.</u> at 555.

For the reasons that follow, the Court GRANTS the
Defendants' motions to dismiss.

### A.    Heightened Pleading Standard

The Defendants argue that the Plaintiffs' claims are
subject to the heightened pleading standards of Rule 9(b).  Rule
9(b) states that: "[i]n alleging fraud . . . a party must state
with particularity the circumstances constituting fraud."  Fed.
R. Civ. P. 9(b).  A plaintiff "must set forth specific facts
that make it reasonable to believe that the defendant[s] knew
that a statement was materially false or misleading.  The rule
requires that the particular times, dates, places, or other
details of the alleged fraudulent involvement of the actors be
alleged." <u>Lenartz</u> v. <u>American Superconductor Corp.</u>, 879 F.
Supp. 2d 167, 180 (D. Mass. 2012) (quoting <u>Gross</u> v. <u>Summa Four,</u>
<u>Inc.</u>, 93 F.3d 987, 991 (1st Cir. 1996)).

The Defendants argue that the Plaintiffs' claims sound in
fraud and that allegations of fraud cannot be disclaimed to
avoid the pleading standards of Rule 9(b).  The Proposed Amended
Complaint claims that the Defendants made false and misleading
statements in violation of sections 11, 12(a)(2), and 15 of the

Securities Act, and in violation of sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5. "[T]he mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent." Id. at 190 (quoting In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007)). Even though the Plaintiffs use words and phrases like "materially misleading," "inaccurate," and "materially false," these words alone do not transform the claims based on negligence into a fraud-based claim. Id. Therefore, the Plaintiffs are not required to abide by the heightened pleading standards of Rule 9(b), and need only satisfy the notice-pleading standards of Rule 8(a).

**B.   Shareholder Defendants' and Acacia Defendants' Motions to Dismiss**

The Shareholder Defendants and the Acacia Defendants[5] argue in their motions to dismiss that counts I-III ought be dismissed as to them for the variety of reasons noted above at pages 19-20. The Court explains each of these arguments and finds them wanting.

---

[5] The Acacia Defendants argue in a footnote to their memorandum that counts I, II and III ought be dismissed for the same reasons explained by the Shareholder Defendants and the Underwriter Defendants. Acacia Defs.' Mem. 2 n.2.

## 1.    Section 11 of the Securities Act

Section 11(a) states that the following persons may be sued under section 11:

> (1) every person who signed the registration statement;
> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
> (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
> (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;
> (5) every underwriter with respect to such security.

15 U.S.C. § 77k.

Count I may not be dismissed as to the Shareholder Defendants (the remaining active parties of which are Matrix, Summit, and Weston) or as to the Acacia Defendants (the remaining active parties of which are Acacia and the Individual Defendants) because the section 11 claims are properly pleaded against these defendants under section 11 and the doctrine of respondeat superior.  The Plaintiffs properly alleged that the Individual Defendants, who were associated with the Shareholder

Defendants and whom the Shareholder Defendants controlled, signed or issued the Registration Statement in connection with the Secondary Offering. Defendant Reiss is the general partner of Matrix Partners. Prop. Am. Compl. ¶ 27. He signed or authorized the signing or issuance of the Registration Statement in connection with the Secondary Offering. Id. Defendant Chung is a managing director and CEO of Summit Partners. Id. at ¶ 26. Chung signed or authorized the signing or issuance of the Registration Statement in connection with the Secondary Offering. Id. Weston is a limited partner of Matrix and shares the same address as Reiss and Matrix. Id. at ¶ 33. Both Matrix and Weston are represented by Reiss, according to Schedule A to the April 17, 2013 Amended and Restated Investors' Rights Agreement. Id. Both Reiss and Chung signed the Offering Documents in their official capacities for Matrix/Weston and Summit, respectively. Id. at ¶¶ 26-27. Defendant Shanmugaraj is Acacia's President, CEO, and a member of its Board of Directors, and signed or authorized the signing or issuance of the Registration Statement in connection with the Secondary Offering. Id. at ¶ 21. Defendants Gavin, Murphy, Mikkelsen, Swanson, Ritchie, and Roche also are all officers of Acacia or members of its Board and signed or authorized the signing or issuance of the registration statement in connection with the Secondary Offering. Id. at ¶¶ 22-29. Acacia issued the shares

that were sold during the Secondary Offering.  Id. at ¶ 19.

Therefore, the Plaintiffs have adequately alleged facts from

which a jury could infer that the Individual Defendants are

directly liable, and Acacia, Matrix, Weston, and Summit

vicariously liable, under Section 11.  See Affiliated Ute

Citizens of Utah v. United States, 406 U.S. 128, 154 (1972)

(holding bank accountable for the actions of its employees which

violated securities law); In re Musicmaker.com Sec. Litig., No.

CV00-2018 CAS(MANX), 2001 WL 34062431, at *12 (C.D. Cal. June 4,

2001) ("[I]f [signors] were acting within the course and scope

of their employment with [Defendant One] while acting as

directors of [Defendant Two], and when they signed the

registration statement, it appears that [Defendant One] would be

[a] proper defendant[] under § 11(a)(1) and (2) and the doctrine

of respondeat superior.").

**2.   Section 12(a)(2)**

Section 12(a)(2) states that any person who offers or sells

a security by means of a prospectus or oral communication that

"includes an untrue statement of a material fact" or "omits to

state a material fact necessary in order to make the statements

. . . not misleading" shall be liable under the statute.  15

U.S.C. § 77l(a)(2).

Only the Acacia Defendants[6] moved to dismiss this count for the reason that it does not meet the statutory definition of "seller" under the statute. The Acacia Defendants are incorrect. The Proposed Amended Complaint alleges that "Acacia, Shanmugaraj, Gavin and the Underwriter Defendants actively solicited purchasers of common stock for the Secondary Offering by, among other things, preparing, disseminating and presenting to potential investors and otherwise eliciting investor participation in the Secondary Offering." Prop. Am. Compl. ¶ 379. "Drawing all reasonable inferences in favor of [P]laintiffs, those allegations are sufficient to infer that [these defendants] solicited the sale of [Acacia] stock." Silverstrand Invs. v. AMAG Pharm., Inc., 12 F. Supp. 3d 241, 254 (D. Mass. 2014) (Gorton, J.); see Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 776 (1st Cir. 2011) ("But the complaint also alleged that plaintiffs 'acquired . . . [c]ertificates from defendant [] and that the '[d]efendants promoted and sold the [c]ertificates to [the p]laintiffs and other members of the [c]lass' (emphasis added); these allegations are sufficient to state a claim under section

---

[6] The Shareholder Defendants also initially moved to dismiss this count on this ground, but the Plaintiffs no longer assert this count against them. In the Proposed Amended Complaint, the Plaintiffs now assert this claim solely against Acacia, Shanmugaraj, Gavin, and the Underwriter Defendants.

12(a)(2) so long as material misstatements or misleading omissions are alleged."). Count II may not be dismissed against Acacia, Shanmugaraj, or Gavin upon this ground.[7]

### 3.  Section 15

Section 15 states a person is jointly and severally liable when he or she controls any person liable under Sections 11 or 12 of the Securities Act.  15 U.S.C. § 77o.  In order to state a claim under Section 15, the Plaintiffs must allege "1) an underlying violation by the controlled person or entity and 2) that the defendants controlled the violator." <u>Silverstrand Invs.</u>, 12 F. Supp. 3d at 248.  "The standard for 'control' under § 15 is the same as under § 20(a)."[8]  <u>In re Brooks Automation, Inc. Sec. Litig.</u>, Civil Action No. 06-11068-RWZ, 2007 WL 4754051, at *15 (D. Mass. Nov. 6, 2007) (Zobel, J.).  "In the

---

[7] Count II, however, is dismissed against them because the Plaintiffs failed to plead sufficient facts to show that any of the statements in the prospectus were in violation of Section 11.  See <u>infra</u> Section C.

[8] Section 20(a) states:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

securities context, 'control' means 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of [an entity], whether through the ownership of voting securities, by contract, or otherwise.'" Id. (quoting, 17 C.F .R. § 230.405 (2006)). The controlling person must "have general power to control the company" and "must actually exercise control over the company." Id. Matrix, Summit, and Weston argue that count III should be dismissed as to them because the Plaintiffs failed properly to allege a violation of sections 11 or 12, and because the Plaintiffs failed to allege that Matrix, Summit, or Weston controlled the people who violated sections 11 or 12.

As explained supra, the Plaintiffs sufficiently alleged that the Shareholder and Acacia Defendants were proper defendants under section 11, and that Acacia, Shanmugaraj, and Gavin were "sellers" under Section 12(a)(2). See supra Section B.2; see also Silverstrand Invs., 12 F. Supp. 3d at 254 (holding "because the Court finds sufficient allegations to deny defendants' motions to dismiss with respect to the claims under § 11 and § 12, the claims under § 15 survive as well").

As for control, the Plaintiffs sufficiently allege that the Individual Selling Defendants (Shanmugaraj, Gavin, Swanson, Mikkelsen, Reiss, and Ritchie) were control persons subject to section 15 liability because the Proposed Amended Complaint

alleges that they were Board members or senior officers of Acacia, and signed or authorized the signing or issuance of the registration statement in connection with the Secondary Offering.  See In re Brooks Automation, 2007 WL 4754051 (explaining that allegations that defendant participated in day-to-day management of company, signed some of the SEC filings at issue, and held a position as an executive officer were sufficient to allege control).  Matrix, Summit, and Weston were also control persons subject to section 15 liability because they exercised control over the violators of sections 11 and 12. The Plaintiffs claim that the Matrix, Summit, and Weston "sold common stock and solicited purchasers of common stock in connection with the Secondary Offering, and caused the Company to effectuate the Secondary Offering and presumably the IPO, before it."  Prop. Am. Compl. ¶ 37.  According to the complaint, Matrix, Summit, and Weston recruited individuals to sit on Acacia's Board to develop Acacia's business.  Id. at ¶¶ 28, 34. The Plaintiffs allege that Ritchie, who was recruited to sit on the Board, "signed or authorized the signing and/or issuance of the Registration Statement in connection with the Secondary Offering."  Id. at ¶ 28.  Due to the fact that the Plaintiffs alleged proper violators of sections 11 and 12, and that Matrix, Summit, and Weston controlled the violators, i.e. Ritchie, count

III may not be dismissed upon this ground.[9] See In re Evergreen

Ultra Short Opportunities Fund Sec. Litig., 705 F. Supp. 2d 86,

96-97 (D. Mass. 2010) (Gorton, J.) (concluding allegations that

defendants "'participated in the drafting, preparation, and/or

approval of various untrue and misleading statements' contained

in the SEC filings and that they, by virtue of their Board

memberships, 'were responsible for ensuring the truth and

accuracy' of those statements. . . . [and had] 'power and

influence to direct the management and activities of [the] Fund

and its employees [and, accordingly,] were able to, and did,

control the contents of the Offering Materials'" sufficient to

withstand a motion to dismiss a section 15 claim).

### C. Underwriter Defendants' and Acacia Defendants' Motion to Dismiss

The Underwriter Defendants and the Acacia Defendants argue

that Counts I and II ought be dismissed because there are no

fact-based allegations that the Offering Documents contained a

misrepresentation of material fact, a material omission of an

affirmative legal disclosure obligation, or a material omission

necessary to prevent existing disclosures from being misleading.

The Plaintiffs disagree and argue that the Offering Documents

failed to disclose (1) that Acacia's two most important

---

[9] Count III is dismissed because the Plaintiffs failed to
plead sufficient facts that the Defendants misstated or omitted
material statements under counts I and II. See infra Section C.

customers were experiencing a material decline in demand that would adversely impact Acacia's revenues and growth trajectory, (2) material information about the China Buildout necessary for investors to appreciate the risks and uncertainties associated with Acacia, (3) Acacia's deficient quality control for manufacturing, and (4) the existence of material trends and uncertainties in accordance with Item 303 of SEC Regulation S-K. "Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." Herman & MacLean v. Huddleston, 459 U.S. 375, 381 (1983). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." Id. at 382. Sections 11 and 12(a)(2) have "roughly parallel elements." Silverstrand Invs., 12 F. Supp. 3d at 251. For the reasons explained infra, the Court dismisses counts I and II as against all Defendants.

### 1. Slowing Demand from Acacia's Major Customers, and Deficient Quality Control for Manufacturing

In the Proposed Amended Complaint, the Plaintiffs allege that the Offering Documents stated that Acacia's revenue had increased due to demand for its products and that it collaborated with customers, which provided a deep understanding

of market needs and helped it better understand their customers'
needs and anticipate next generation product and service
requirements.  Prop. Am. Compl. ¶ 137.  The Plaintiffs allege
that the Offering Documents were negligently prepared and were
misleading because Acacia did not disclose that "Acacia's
manufacturing, quality control and oversight processes were
insufficient to prevent basic quality issues from occurring."
Id. at ¶ 142.  "Further, the Offering Documents did not disclose
that demand associated with the next phase of business in China
-- the provincial buildouts -- was unpredictable, nor did they
disclose the manner in which such unpredictability was
reasonably likely to impact [Acacia's] revenues."  Id. at ¶ 143.

"Section[] 11 . . . [is an] 'enforcement mechanism[] for
the mandatory disclosure requirements of the Securities Act."
Silverstrand Invs. v. AMAG Pharm., Inc., 707 F.3d 95, 102 (1st
Cir. 2013) (quoting Glassman, 90 F.3d at 623).  Liability
attaches under Section 11 when "any part of the registration
statement, when such part became effective, contained an untrue
statement of a material fact or omitted to state a material fact
required to be stated therein or necessary to make the
statements therein not misleading."  15 U.S.C. § 77k.  "When
applicable, it imposes strict liability on issuers of a
security, and any 'remaining [] defendants . . . may be held
liable for mere negligence.'"  Silverstrand Invs., 707 F.3d at

102 (quoting <u>In re Morgan Stanley Info. Fund Secs. Litig.</u>, 592
F.3d 347, 359 (2d Cir. 2010)).  Section 11 does not have a
scienter or reliance requirement, and the pleadings need only
satisfy the standards imposed by Federal Rule of Civil Procedure
8(a).  <u>See</u> <u>id.</u>

The Proposed Amended Complaint fails properly to allege any
misstatements of slowing demand from Acacia's customers or that
Acacia knew of the quality issues with its product.  In the
prospectus, Acacia and the Underwriter Defendants warned that
"changes in general economic, industry and market conditions and
trends, **including the economic slowdown in China** that began in
2015" could cause market price for Acacia's common stock to
vary.  Prop. Am. Compl. ¶ 150 (emphasis in original).  Contrary
to the Plaintiffs' assertions, Acacia and the Underwriter
Defendants acknowledged the economic slowdown in China that
began prior to the class period.  The Plaintiffs do not,
however, believe the language quoted above sufficiently informed
them of the "potential impact likely to result from the trends
and uncertainties facing Acacia resulting from changing market
conditions and uncertain demand for its products."  <u>Id.</u> at ¶
151.  The Plaintiffs' allegations are unsupported given the
language in the prospectus that states: "The loss of any []
large customer, which could be due to reasons beyond [Acacia's]
or their control, could materially harm our business, financial

condition, results of operations and prospects." Id. at ¶ 144.
A fair inference can be drawn that, if Acacia loses one of its
large and profitable customers, the loss could severely impact
its revenue and growth, an inference that was clearly outlined
in the prospectus for investors to see and heed.

The Plaintiffs also argue that the Underwriter Defendants
and Acacia knew of the decline in demand because of subsequent
events including lower than expected earnings from customers.
According to the Plaintiffs, this Court can infer that the
Underwriter Defendants and Acacia knew of a decline in demand at
the time the prospectus became effective because of the drop in
Acacia's stock prices. A decline in demand seven months
following the prospectus does not suggest that at the time the
prospectus became effective, the Underwriter Defendants and
Acacia knew of the decline in demand. See Glassman, 90 F.3d at
632 ("[W]hen the allegedly undisclosed information . . . is more
remote in time and causation from the ultimate events of which
it supposedly forewarns, a nondisclosure claim becomes
'indistinguishable from a claim that the issuer should have
divulged its internal predictions about what would come of the
undisclosed information.'" (quoting Shaw v. Digital Equipment
Corp., 82 F.3d 1194, 1211 (1st Cir. 1996))). Neither do
announcements nor press releases suggest knowledge of quality
control issues at the time of the prospectus. See In re Number

Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d. 1, 17 (D.
Mass. 1999) ("[T]he mere announcement, eight months later, of an
inventory markdown is not sufficient to raise an inference that
inventory was obsolete at the time of the Offering.").

Regardless whether the Defendants knew of a decline in
demand and issues with manufacturing, the prospectus also
included disclosures about the current trend in China, see
supra, as well as a disclosure of the risks associated with
Acacia's manufacturing, stating that "[q]uality control problems
in manufacturing could result in delays in product shipments to
customers or in quality problems with [Acacia's] products" as a
result of their outsourced manufacturing.  Prospectus, Ex. D to
Decl. Lavinia M. Weizel Supp. Defs.' Mot. Dismiss ("Prospectus")
at 5-6, ECF No. 100-4.  The prospectus discloses that Acacia
depends on third parties for fabrication, assembly, and testing
of its products.  Id. at 14.  As a result, Acacia "cannot
directly control [its] product delivery schedules and quality
assurance."  Id.  The disclosure contained "enough cautionary
language or risk disclosure that reasonable minds could not
disagree that the challenged statements were not misleading."
In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1409
(9th Cir. 1996) (quoting Fecht v. Price Co., 70 F.3d 1078, 1082
(9th Cir. 1995)).

## 2. Item 303 Trends and Uncertainties Relating to Demand

"[A]n actionable § 11 omission may arise when a registration statement fails to comply with Item 303 [. . .] of SEC Regulation S-K." _Silverstrand Invs._, 707 F.3d at 102. Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). To plead an Item 303 violation, "a complaint must allege (1) that a registrant knew about an uncertainty before an offering; (2) that the known uncertainty is 'reasonably likely to have material effects on the registrant's financial condition or results of operation'; and (3) that the offering documents failed to disclose the known uncertainty." _Silverstrand Invs._, 707 F.3d at 103 (quoting _Management's Discussion and Analysis Of Financial Condition and Results Of Operations; Certain Investment Company Disclosures_, 1989 WL 1092885, at *4 (May 18, 1989)).

In their Proposed Amended Complaint, the Plaintiffs alleged the following facts regarding all the Defendants' knowledge of the uncertainties surrounding the China Buildout and their effect on stock prices:

> (1) "[Acacia] and its management frequently discussed sales forecasts and customer concentration,

as well as demand." Prop. Am. Compl. ¶ 66; (2)
"Acacia had access to information regarding downward
business trends and uncertainties relating to China
not only from its own experience in the region, but
also based on the forecasts and non-public information
shared by customers, other market participants, and
Board members such as Chung and Roche." Id. at ¶ 70;
(3) "In October 2016, only five months after the IPO,
Acacia consummated the Secondary Offering.  By that
time, however, demand in China was on the precipice of
a slowdown and industry participants -- such as Acacia
-- knew it." Id. at ¶ 96; (4) "ZTE itself announced
its shifting focus to 5G.  In a May 18, 2016 'article'
published on its website, entitled 'At ZTE 5G Is Now -
- Ubiquitous Connectivity and the Internet of Things,'
ZTE explained that 'unlike the cases of 3G and 4G,
there is now a business demand driven by end-users for
the deployment of 5G.'  Stating that '[a]t ZTE 5G is
now,' ZTE further represented that 'ZTE sees 5G as an
enabler for new services in multiple industries, and
hence also an enabler for new businesses.'" Id. at ¶
100; (5) "Indeed, certain of Acacia's competitors had
openly acknowledged by then that visibility into the
timing of the business was limited, and that their
customers -- suppliers, such as ZTE and Huawei, who
contracted directly with the three mobile carriers --
had a buildup of inventory awaiting deployment as a
result." Id. at ¶ 106; (6) "Despite understanding
that the national backbone expansion in China would
soon be complete and Acacia would no longer receive
business from it, Acacia continued to represent during
the Class Period that demand was strong and
sustainable -- and even increasing -- in China.  Yet
the work associated with the provincial buildout --
which was then uncertain and far more unpredictable --
was not yet offered or awarded, and product orders
were not yet placed." Id. at ¶ 107; (7) "As ZTE was
experiencing waning demand associated with the China
buildout, ADVA was experiencing delays in rolling out
its CloudConnect product -- delays that decreased
ADVA's demand for Acacia's products." Id. at ¶ 114;
(8) "[W]aning demand in China as the broadband
expansion continued (for Acacia's products and those
of its largest customer, ZTE), coupled with the
unpredictable timing of business associated with the
provincial portion of the buildout in China and a
reduction in demand from another key customer (ADVA),

presented known trends and uncertainties that were
reasonably likely to -- and, when they came to
fruition during the Class period, did -- adversely
affect Acacia's revenues and/or results of
operations." Id. at ¶ 129.

The Plaintiffs thus properly allege that Acacia and the

Underwriter Defendants knew of the uncertainties and their

effects on the stock prices, but do not allege sufficient facts

to show "that the offering documents failed to disclose the

known uncertaint[ies]." See Silverstrand Invs., 707 F.3d at

103.  As explained above, as part of the prospectus, Acacia and

the Underwriter Defendants acknowledged that "changes in general

economic, industry and market conditions and trends, **including**

**the economic slowdown in China** that began in 2015" could affect

the market price for Acacia's common stock.  Prop. Am. Compl. ¶

150 (emphasis in original).  Neither Acacia nor the Underwriter

Defendants failed to disclose any pertinent information, as the

Plaintiffs claim, and are not liable under Item 303.  See

generally In re Parametric Tech. Corp., 300 F. Supp. 2d 206,

213-15 (D. Mass. 2001) (O'Toole, J.).

### 3. Prospectus Statements as to Future Revenue Guidance Are Protected by the Statutory Safe Harbor

The Plaintiffs argue that the Prospectus included forward

looking statements which are misleading.  The Plaintiffs allege

that:

The Offering Documents emphasized ongoing, strong demand for Acacia's products, stating in part that Acacia had "experienced rapid revenue growth over the last several years," noting that its "revenue for 2015 was $239.1 million, a 63.5% increase from $146.2 million of revenue in 2014," and that its "revenue for the six months ended June 30, 2016 was $200.7 million, a 91.0% increase from $105.1 million of revenue in the six months ended June 30, 2015." For the quarter ending September 30, 2016, the Offering Documents stated that Acacia expected "revenue of $130 million to $133 million," an increase of more than 100% over the $65.4 million reported in the third quarter of 2015.

The Offering Documents stated that Acacia's "revenue ha[d] generally increased . . . due to increased demand for products in [its] 100 Gbps product family, as well as the introduction of new products in [its] 400 Gbps product family." The Offering Documents also stated that Acacia's "Competitive Strengths" included "[c]ustomer collaboration provid[ing a] deep understanding of market needs." Acacia represented that it "collaborate[s] closely with [its] customers, as well as directly with many cloud and service providers, which allows [it] to better understand their needs and anticipate next generation product and service requirements."

The Offering Documents further stated that as Acacia "continue[d] to enhance and expand [its] product families, and as [its] existing customers [sought] to expand and improve their network equipment technology, [Acacia] expect[ed] to generate additional revenue through sales to these customers." The Offering Documents stated that Acacia's products and existing customers "will drive more network equipment manufacturers to purchase their optical interconnect products from [Acacia]."

Prop. Am. Compl. ¶¶ 136-38.

The Plaintiffs are correct that the prospectus included "forward-looking statements." In the prospectus, the Defendants caution that:

> This prospectus contains forward-looking statements
> within the meaning of Section 27A of the Securities
> Act and Section 21E of the Exchange Act.  All
> statements other than statements of historical fact
> contained in this prospectus, including statements
> regarding our future results of operations and
> financial position, business strategy and plans and
> objectives of management for future operations, are
> forward-looking statements.  These statements involve
> known and unknown risks, uncertainties and other
> important factors that may cause our actual results,
> performance or achievements to be materially different
> from any future results, performance or achievements
> expressed or implied by the forward-looking
> statements.

Prospectus at 43.  The Defendants are not liable for "forward-looking statements" because the statements are protected under the Securities Act's statutory safe harbor, which precludes liability for "forward-looking statement[s]" when they are "accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1)(A)(i).  The prospectus qualified these statements with cautionary language about the associated risk factors that could derail the expected results.  See Prospectus at 5-6, 12-43 (warning investors "[Acacia has] a history of operating losses, and [] may not maintain or increase" profits, noting "the economic slowdown in China" and "revenue growth rate in recent periods may not be indicative of [] future growth or performance"); Baron v. Smith, 380 F.3d 49, 53-54 (1st Cir. 2004) (holding forward-looking statements protected under the statutory safe harbor).

The Defendants did not include any misleading statements or omit any pertinent information from the prospectus and counts I and II are dismissed.  Count III is consequently dismissed as well.

**D.    Acacia Defendants' Motion to Dismiss Counts IV and V**

The Acacia Defendants argue that counts IV and V ought be dismissed because the amended complaint fails sufficiently to allege that any challenged statements were false or misleading, because Acacia disclosed all information required by Item 303, and because the amended complaint does not raise the strong inference of scienter required by the PSLRA.  The Court agrees with the Acacia Defendants and dismisses these counts.

**1. Section 10(b) and Rule 10b-5**

"To state a claim under Section 10(b) of the Securities [Exchange] Act, a plaintiff must allege, <u>inter alia</u>, that a defendant '(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.'"  <u>Baron</u>, 380 F.3d at 52 (quoting 15 U.S.C. § 78u-4(b)(1)(A)-(B)).  SEC Rule 10b-5 states that it is unlawful:

> (a) [t]o employ any device, scheme or artifice to
> defraud, (b) [t]o make any untrue statement of a
> material fact or to omit to state a material fact
> necessary in order to make the statements made, in the
> light of the circumstances under which they were made,

not misleading, or (c) [t]o engage in any act,
practice or course of business which operates or would
operate as a fraud or deceit upon any person, in
connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Plaintiffs argue that statements made by Acacia

describing past economic performance and its growth were

misleading. Acacia cannot be held liable "for accurate reports

of past successes, even if present circumstances are less rosy."

Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st

Cir. 1994), abrogated on other grounds by Greebel v. FTP

Software, Inc., 194 F.3d 185, 197 (1st Cir. 1999).

The Plaintiffs also argue that certain optimistic statements

about future demand were misleading because they did not

disclose the risk of decline in demand in China and with

Acacia's other customers. As explained supra, Acacia is not

liable for forward-looking statements that include cautionary

language about the associated risks. See supra Section C.3;

Baron, 380 F.3d at 53-54. Moreover, Acacia did in fact disclose

the risks to investors in its prospectus associated with its

market shares, including a decline in the China Market, and the

effects that a loss of its biggest customer, ZTE, would have on

those shares. See Prospectus at 5-6, 12-43; supra Section C;

Baron, 380 F.3d at 55 ("Plaintiffs' claim fails because [the

company] disclosed the material facts that would lead a

[42]

reasonable investor to make an informed decision regarding the purchase of stock in [the company].").

The Plaintiffs also allege that Acacia omitted information concerning the quality issues with its product and should have disclosed them sooner. As explained in Section C.1, the Prospectus contains sufficient disclosures about the possible issues associated with quality control of Acacia's products.

### 2. Scienter

The Acacia Defendants also argue that the amended complaint does not raise the strong inference of scienter required by the PSLRA. The PSLRA "imposes scienter pleading standards even more rigorous than the requirements of Rule 9(b)." Lenartz, 879 F. Supp. 2d at 180. The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2)(A).

"The Supreme Court has described scienter as 'a mental state embracing intent to deceive, manipulate, or defraud.'" In re Ariad Pharm., Inc. Sec. Litig., 842 F.3d 744, 750 (1st Cir. 2016) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)). "[C]laims of scienter are subject to the heightened pleading requirements of the [PSLRA], enacted 'to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." In re

Boston Scientific Corp. Sec. Litig., 686 F.3d 21, 29-30 (1st

Cir. 2012).

"To qualify as 'strong' . . . an inference of scienter must

be more than merely plausible or reasonable -- it must be cogent

and at least as compelling as any opposing inference of

nonfraudulent intent." In re Ariad, 842 F.3d at 751 (quoting

Tellabs, 551 U.S. at 314). This standard is satisfied when the

complaint "contains clear allegations of admissions, internal

records or witnessed discussions suggesting that at the time

they made the statements claimed to be misleading, the defendant

officers were aware that they were withholding vital information

or at least were warned by others that this was so." Id.

(quoting In re Boston Scientific Corp., 686 F.3d at 31).

As evidence that Acacia, Shanmugaraj, and Gavin acted with

scienter, the Plaintiffs claim that Shanmugaraj and Gavin were

"motivated to misrepresent Acacia's business metrics and

financial prospects in order to profit from selling its common

stock." Prop. Am. Compl. ¶ 336. Acacia's senior executives and

directors made more than $188,600,000 million from the sale of

millions of personally held Acacia shares. Id. The Plaintiffs

allege that "[t]hese insider sales were unusual and suspicious

when made because they were timed to capitalize on Acacia's

knowingly or recklessly false and misleading statements

concerning the demand for its products before the truth

regarding that issue was exposed to the market." Id. at ¶ 337. In addition, Shanmugaraj and Gavin made the following statements suggesting evidence of scienter:

338. Shanmugaraj's and Gavin's own public statements establish that, from the start of the Class Period and well before the Secondary Offering, they knew about the impending conclusion of China's national backbone expansion phase and the forthcoming transition to the provincial buildout. For example:

(a) On August 11, 2016, the first day of the Class Period, Shanmugaraj stated: "We are seeing more activity in the provincial networks of China Mobile, as well. It's not going to be as big as the backbone, but it will be significant."

(b) On September 14, 2016, Shanmugaraj stated: "[S]o [China] start[s] out with a backbone infrastructure buildout and then they move into provincial networks. And provincial networks are more like regional networks, and then you have the metro networks within there, and so it comes in multiple phases."

(c) On November 10, 2016, Shanmugaraj stated: "We see continued demand in the China market as carriers transition from backbone and provincial backbone network buildouts to provincial metro and access networks in 2017."

339. However, as shown in the Loss Causation/Economic Loss Section below, starting on January 10, 2017 and continuing through the end of the Class Period, Defendants made a series of partial corrective disclosures that slowly and incrementally acknowledged the differences between the national backbone phase and the provincial buildout phase, the resulting demand uncertainty, and the implications and consequences of the known unpredictability of demand. For example:

(a) On January 10, 2017, Shanmugaraj stated: "And again from a processing [] perspective, the backbone was all done in one fell swoop, I think it was -- it all happened over a very short span of time. What we see over the provincial networks is going to be more spread out[.]"

(b) On May 9, 2017, Gavin stated: "The provincial
network expansion is part of the phase 13 as you would
have heard, that is going to come in smaller pieces
and that gets approved what we hear is in the next 30
to 60 days and that's what we say, we need a few
months to get clarity on the provincial piece of and
that will also come as not as one big deal as multiple
deals. . . . [Y]ou are going to see the national
backbone continue sooner but the provincial -- we need
a little bit more time happened before we can call
exactly when the timing of the provincial bills happen
and also when the volume picks up[.]"

Id. at ¶¶ 338-39.  Additionally, the Plaintiffs allege that

Acacia received information directly from its largest

customers regarding their sales forecasts for the upcoming

years, suggesting that Acacia should have known of the

impending decline in sales for those customers.  The

Plaintiffs state:

340. Additionally, not only did Acacia receive its
largest customers' "expected forecasts for . . .
products several months in advance," as stated in SEC
filings, Shanmugaraj himself touted frequent
communications with Acacia's largest customers
regarding quarterly and even yearly forecasts.  For
example, on March 1, 2017, Shanmugaraj stated: "So it
is very strong as you know is a handful of customers
and then their customers especially the larger ones.
With our all customers there is multiple levels of
discussions with them.  There is a periodic
operations, forecast, sales level discussions which is
more tactical saying what the quarter looks like and
what the order flow.  It is a little bit more along
also, what does the yearly forecast look like?  They
have a very good view of this is what the year turns
out to be and even with our own customers we have
technology sharing strategy sessions with them."

Id. at ¶ 340.

The Proposed Amended Complaint fails adequately to allege that Acacia acted with scienter.  The Plaintiffs attempt to bolster their claims of scienter by alleging that Acacia had the motive and opportunity to commit fraud, as well as asserting allegations of unusual insider trading.  These claims fail, however, because alleging "motive and opportunity" is an "inadequate method for pleading scienter in a securities fraud case under the PSLRA."  <u>Lirette</u> v. <u>Shiva Corp.</u>, 27 F. Supp. 2d 268, 281 (D. Mass. 1998).  While "[a]llegations of unusual insider trading by a defendant during the class period can support a strong inference of scienter," the Plaintiffs' claims must fail because they fail to show how these specific sales were in fact unusual or suspicious.  <u>Id.</u> at 283.  A plaintiff "bears the burden of showing that sales by insiders were in fact unusual or suspicious in amount or timing," and "[o]ne fact necessary to a showing of unusualness is the amount of trading that the insider conducted before or after the class period." <u>Id.</u>  Here, the Plaintiffs do not explain why these sales made during the class period fall into the category of "unusual." <u>Id.</u>  They do not provide information regarding the amount of trading done before or after the class period to clarify why these specific trades were unusual.  <u>Id.</u>  "Thus, [Plaintiffs'] allegations about [Acacia's] trades do not support a strong inference of scienter."  <u>Id.</u>

The Plaintiffs attempt to allege scienter by directing the Court to statements made by Shanmugaraj and Gavin that demonstrate that Acacia knew of the uncertainties in demand surrounding the China national backbone phase and the provincial buildout phase, as well as the sales forecast for its largest customers.  This claim fails because the Proposed Amended Complaint does not contain specific allegations to show that the Defendants knew or were reckless in not knowing that any statements were false when made.  See In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 214 (1st Cir. 2005) (holding plaintiffs did not plead scienter with a "a conclusory assertion that the defendant knew the true facts, or knew that the challenged statement was false," but rather needed to allege "particularized facts which give strong support to that conclusion").  The Proposed Amended Complaint, as well as the initial amended complaint, lacks any allegations or references to "internal records or witnessed discussions" to suggest that the Acacia or any of the other Defendants understood that the statements they were making were misleading.  See In re Ariad, 842 F.3d at 751.  Rather, the facts indicate optimism for the future of business with China, ADVA, and ZTE.  These are not the actions of a company that suspects a decline in demand and sales.  See Local No. 8 IBEW Retirement Plan & Trust v. Vertex Pharm., Inc., 838 F.3d 76, 81-82 (1st Cir. 2016) (continued

[48]

investments suggests company "must have thought that positive results were possible, even if not probable").  The Plaintiffs' assertions that Acacia "knew that demand from the provincial buildout was inherently unpredictable," Prop. Am. Comp. ¶ 341, because it "receive[d] its largest customers' 'expected forecasts for . . . products several months in advance,'" id. at ¶ 340, are "'precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate' to withstand the special pleading requirements in securities fraud cases."  Lirette, 27 F. Supp. 2d at 283 (quoting Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998)).

For these reasons, count IV is dismissed.  Given that the Plaintiffs failed to plead a primary violation under Section 10(b), count V is also dismissed.  See Winters v. Stemberg, 529 F. Supp. 2d 237, 253 (D. Mass. 2008) ("To state a claim of securities fraud under section 20(a), a plaintiff is required to plead: (1) a primary violation of the securities laws; and (2) that the defendant exercised actual power or control over the primary violator.").

### E.  Dismissal with Prejudice

The Court dismisses the Plaintiffs' Proposed Amended Complaint in its entirety with prejudice because the Plaintiffs have not cured the deficiencies in their claims.  See Urman v. Novelos Therapeutics, Inc., 867 F. Supp. 2d 190, 198 (D. Mass.

2012) (Gorton, J.) (dismissing second amended complaint with prejudice after "plaintiffs once again fail to state actionable claims for securities fraud and control person liability").

### III. CONCLUSION

For the foregoing reasons, the Court DENIES the Plaintiffs' Motion for Leave to Amend the Consolidated Amended Complaint as futile.  ECF No. 160.  The Court GRANTS the Acacia Defendants', the Selling Defendants', and the Underwriter Defendants' motions to dismiss the complaint.  ECF Nos. 98, 101, 105.  The Court DENIES OFS's motion to dismiss the complaint as moot because the Plaintiffs no longer allege any indiscretions by it in their Proposed Amended Complaint.  ECF No. 103.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE