**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STEVEN THARP, Individually and On Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   v.<br><br>ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAJ, and JOHN F. GAVIN,<br><br>              Defendants. | No. 17-cv-11504-WGY<br>(LEAD DOCKET)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FEDERAL PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT** |
| KAREN COLGAN, Derivatively on Behalf of ACACIA COMMUNICATIONS, INC.,<br><br>              Plaintiff,<br><br>   v.<br><br>MURUGESAN SHANMUGARAJ, BENNY P. MIKKELSEN, JOHN F. GAVIN, FRANCIS J. MURPHY, BHUPENDRA C. SHAH, CHRISTIAN J. RASMUSSEN, MEHRDAD GIVEHCHI, VINCENT T. ROCHE, STAN J. REISS, ERIC A. SWANSON, PETER Y. CHUNG, and JOHN RITCHIE,<br><br>             Defendants,<br><br>   and<br><br>ACACIA COMMUNICATIONS, INC.,<br><br>             Nominal Defendant. | No. 17-cv-12350-WGY |

[Caption continued on next page.]

JONATHAN WONG, Derivatively on Behalf of ACACIA COMMUNICATIONS, INC.,

        Plaintiff,

    v.

MURUGESAN SHANMUGARAJ, JOHN F. GAVIN, BENNY P. MIKKELSEN, FRANCIS J. MURPHY, BHUPENDRA C. SHAH, CHRISTIAN J. RASMUSSEN, MEHRDAD GIVEHCHI, ERIC A. SWANSON, STAN J. REISS, PETER Y. CHUNG, JOHN RITCHIE, and VINCENT T. ROCHE,

        Defendants,

    and

ACACIA COMMUNICATIONS, INC.,

        Nominal Defendant.

No. 17-cv-12550-WGY

---

SANDRA FARAH-FRANCO and RUSSELL GOURLEY, Derivatively on Behalf of Nominal Defendant ACACIA COMMUNICATIONS, INC.,

        Plaintiffs,

    v.

MURUGESAN SHANMUGARAJ, BENNY P. MIKKELSEN, PETER Y. CHUNG, STAN J. REISS, JOHN RITCHIE, VINCENT T. ROCHE, ERIC A. SWANSON, JOHN F. GAVIN, MEHRDAD GIVEHCHI, FRANCIS J. MURPHY, CHRISTIAN J. RASMUSSEN, and BHUPENDRA C. SHAH,

        Defendants,

    and

ACACIA COMMUNICATIONS, INC.,

        Nominal Defendant.

No. 1:18-cv-10465-WGY

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................ 2

    A.    Factual and Procedural History.................................................................. 2

    B.    The Terms of the Proposed Derivative Settlement. ................................. 6

    C.    The Parties Support the Settlement ........................................................... 8

III.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL........... 9

    A.    The Standard for Preliminary Approval .................................................. 9

    B.    The Court Should Grant Preliminary Approval of the Settlement ....................... 10

IV.    THE COURT SHOULD APPROVE THE FORM AND MANNER OF NOTICE......... 15

V.    PROPOSED SCHEDULE OF EVENTS ...................................................................... 17

VI.    CONCLUSION.................................................................................................... 18

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Am. Capital S'holder Deriv. Litig.*,
   No. 11-2424 PJM, 2013 WL 3322294 (D. Md. June 28, 2013) ...............................................10

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
   No. 07 C 2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) .....................................10, 13, 14

*Arace v. Thompson*,
   No. 08 Civ. 7905(DC), 2011 WL 3627716 (S.D.N.Y. Aug. 17, 2011) ..................................16

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*,
   616 F.2d 305 (7th Cir. 1980) ..................................................................................................9

*Cohn v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005)....................................................................................11

*Durrett v. Hous. Auth. of City of Providence*,
   896 F.2d 600 (1st Cir. 1990).................................................................................................10

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995).............................................................................................10, 11

*Langendorf v. Conseco Senior Health Ins. Co.*,
   No. 08-CV-3914, 2009 U.S. Dist. LEXIS 131289 (N.D. Ill. Nov. 18, 2009) ........................13

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) .........................................................................................11, 13

*Martens v. Smith Barney, Inc.*,
   181 F.R.D. 243 (S.D.N.Y. 1998) ..........................................................................................15

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950)..............................................................................................................16

*New Eng. Carpenters Health Benefits Fund v. First Data Bank, Inc.*,
   602 F. Supp. 2d 277 (D. Mass. 2009), *aff'd sub nom.*
   *Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund*,
   582 F.3d 30 (1st Cir. 2009).....................................................................................................14

*In re NVIDIA Corp. Deriv. Litig.*,
   No. C-06-06110-SBA (JCS), 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ..................12, 13

*Parker v. Time Warner Entertainment Co., L.P.*,
   631 F. Supp. 242 (E.D.N.Y. 2009) .......................................................................................14

*Rand v. M/A-Com, Inc.*,
  No. 86-1347-N, 1993 WL 410874 (D. Mass. July 19, 1993) ..................................................10

*In re Relafen Antitrust Litig.*,
  231 F.R.D 52 (D. Mass. 2005) .................................................................................................14

*Schlusselberg v. Colonial Mgmt. Assoc., Inc.*,
  389 F. Supp. 733 (D. Mass. 1974) ...........................................................................................11

*In re Sumitomo Copper Litig.*,
  189 F.R.D. 274 (S.D.N.Y. 1999) .............................................................................................14

*Tiro v. Pub. House Invs., LLC*,
  No. 11 Civ. 7679(CM), 2013 WL 2254551 (S.D.N.Y. May 22, 2013)...................................10

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004)....................................................................................................10

**STATUTES, RULES & REGULATIONS**

FED. R. CIV. P. 23.1(c)...................................................................................................................9

MASS. GEN. LAWS CH. 156D, §7.45 .............................................................................................16

**OTHER AUTHORITIES**

SEC Release No. 33-7233, 60 Fed. Reg. 53458 (Oct. 6, 1995).....................................................16

MANUAL FOR COMPLEX LITIGATION (FOURTH) §13.14 (2004) .........................................................9

MANUAL FOR COMPLEX LITIGATION (THIRD) §30.41 (1995) ..........................................................9

## I.   INTRODUCTION

Plaintiffs and Defendants have reached a settlement (the "Settlement") in the above-captioned actions (the "Federal Actions"), resolving claims brought derivatively on behalf of Acacia Communications, Inc. ("Acacia" or the "Company").[1]  As a result, Plaintiffs now seek an order from the Court: (i) granting preliminary approval of the proposed Settlement; (ii) directing that notice of the proposed Settlement be given to Acacia's stockholders in the proposed form and manner; and (iii) scheduling a hearing before the Court to determine whether the proposed Settlement should be granted final approval.  As set forth in detail herein and in the Stipulation of Settlement attached hereto ("Stipulation"), the proposed Settlement finally resolves all the claims asserted in the Federal Actions, as well as a related shareholder action captioned *Silberberg v. Acacia Commc'ns, Inc.*, No. 2018-0262-TMT, in the Delaware Court of Chancery (the "Delaware Action").

The Settlement is the product of extensive, arm's-length negotiations among the Parties to the Federal Actions and the Delaware Action.  Pursuant to the terms of the Settlement, Acacia has implemented, or agreed to implement, corporate governance reforms that the Plaintiffs sought, so as to strengthen internal controls, improve compliance policies and reporting procedures, and enhance the independence and accountability of the Company's Board of Directors (the "Board") (collectively, the "Corporate Reforms").  It is undisputed that the Company's decision to implement the Corporate Reforms provides real benefits to Acacia and the Company's stockholders.  In sum, the Settlement provides significant and material benefit to the Company, was reached after intensive arm's-length negotiations between experienced and informed counsel on both sides, and is well within the range of what might be approved as fair,

---

[1]      All capitalized terms, unless otherwise defined herein, have the same meaning given to them in the Stipulation.

reasonable, and adequate at a final approval hearing.  Accordingly, Plaintiffs respectfully submit that the Court should grant preliminary approval of the Settlement and provide for notice to Acacia's stockholders.

## II.  BACKGROUND

### A.  Factual and Procedural History

Acacia designs, develops, manufactures, and markets communications equipment.  The Company offers highspeed, coherent optical interconnect products for cloud infrastructure operators and content and communication service providers worldwide.  Acacia's products enable "industry leading speed, density, and power efficiency."  Acacia's stock trades on the NASDAQ Stock Exchange under the ticker symbol "ACIA."  Acacia is a corporation duly organized and existing under the laws of the State of Delaware and maintains its principal place of business and executive offices at Three Mill and Main Place, Suite 400, Maynard, MA 01754. In May 2016, Acacia conducted its initial public offering ("IPO").

In connection with the IPO, certain Company insiders and investors entered into agreements that prohibited them from selling any Acacia common stock until November 8, 2016 (the "Lock-Up Agreements").  Private equity firms that owned a majority of the outstanding shares of Acacia, as well as all of Acacia's officers, directors, and employees, were granted partial early releases from the Lock-Up Agreements.  On October 7, 2016, the Company conducted a secondary stock offering (the "Secondary Offering").  These private equity firms, a majority of the members of Acacia's Board, and certain executives sold Acacia common stock in the Secondary Offering.

Acacia's two largest customers – which together accounted for more than 50% of Acacia's revenues as of the third quarter of 2016 – were ZTE and ADVA.  Acacia's contracts with both ZTE and ADVA required them to provide Acacia with non-binding, regular, rolling

forecasts of their product demands (these contracts also gave ZTE and ADVA broad order cancellation rights). On October 27, 2016, ADVA and ZTE issued earnings releases and forward earnings guidance. More specifically, ZTE announced sales results for the third quarter of 2016 and provided sales guidance for the full 2016 fiscal year that allegedly were lower than market expectations. On the same day, ADVA also announced earnings guidance for 2016 that allegedly was below market expectations. The Company's stock price dropped over 15% on October 27, 2016, closing at $73.66.

On May 31, 2017, Acacia issued a press release and SEC Form 8-K disclosing that it had discovered a quality issue with some of the components manufactured by one of its contract manufacturers. On July 14, 2017, Acacia issued a press release announcing preliminary financial results for the second quarter of 2017, which disclosed that its "results were adversely affected by the quality issue" that Acacia had disclosed previously.

On November 29, 2017, Plaintiff Colgan filed a derivative complaint on behalf of the Company in the U.S. District Court for the District of Massachusetts (the "Court") alleging breaches of fiduciary duty against certain directors and officers of Acacia. On December 22, 2017, Plaintiff Jonathan Wong filed a derivative complaint on behalf of the Company alleging breaches of fiduciary duty against certain directors and officers of Acacia in the Court.

By letters dated December 6, 2017 and December 15, 2017, respectively, Plaintiffs Russell Gourley and Sandra Farah-Franco made demands on the Company pursuant to 8 *Del. C.* §220 ("Section 220") to inspect certain of the Company's books and records. On March 13, 2018, after reviewing documents provided by the Company pursuant the Section 220 demands (the "220 Documents"), Plaintiffs Farah-Franco and Gourley filed a derivative complaint on behalf of the Company in the Court against certain directors and officers of Acacia.

Plaintiffs Gourley and Farah-Franco alleged that Defendants breached their fiduciary duties of loyalty, good faith, and candor and wasted corporate assets, causing harm to Acacia by, among other things: (i) engaging in insider trading themselves, or consciously allowing their co-directors to engage in such trading in excess of $300 million (including trading after the Secondary Offering pursuant to Rule 10b5-1 plans) while allegedly in possession of non-public forecast information from ADVA and ZTE; (ii) failing to establish adequate internal controls; (iii) omitting material information from the offering documents for the Secondary Offering, in violation of the Securities Act of 1933 (the "Securities Act"); and (iv) allowing the Company to omit material information from other filings with the SEC in violation of §10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.

On April 20, 2018, the Court appointed Plaintiffs Colgan, Farah-Franco, and Gourley as lead plaintiffs for the derivative actions.  On May 30, 2018, lead derivative plaintiffs filed a consolidated amended derivative complaint.  By letter dated February 12, 2018, Plaintiff Silberg made a demand on the Company pursuant to Section 220 to inspect certain of the Company's books and records to determine whether the Company's officers and directors breached their fiduciary duties by permitting an early release of the Lock-Up Agreement and selling Company shares while in possession of material non-public information.  Plaintiff Silberg and Acacia agreed on the scope of responsive documents, but they could not agree on the terms for a confidentiality agreement to govern the inspection of the requested records.

On April 9, 2018, Plaintiff Silberg filed the Delaware Action in the Court of Chancery of the State of Delaware ("Chancery Court").  In the Delaware Action, Plaintiff Silberg stated the purpose of the books and records demand, and sought certain changes to the confidentiality agreement proposed by the Company.  On May 1, 2018, Plaintiff Silberg filed a motion for

judgment on the pleadings.  On May 11, 2018, the Company filed its opposition and cross-motion for judgment on the pleadings.  On May 16, 2018, Plaintiff Silberberg filed a reply brief. On May 29, 2018, the Chancery Court held a telephonic hearing and ruled for Plaintiff Silberberg in all respects.  On June 1, 2018, the Chancery Court issued a final order granting Plaintiff Silberberg's motion and entering judgment.  On June 1, 2018, Acacia produced 523 pages of documents to Plaintiff Silberberg.  On June 7, 2018, Acacia produced an additional 557 pages of documents to Plaintiff Silberberg.

In late June 2018, the Parties agreed to mediate these Actions.  The Parties retained Michelle Yoshida ("Ms. Yoshida") of Phillips ADR to mediate their dispute.  Acacia provide certain discovery in advance of the mediation.  On July 16, 2018, the Parties exchanged mediation statements, and the Plaintiffs made a settlement demand.  Prior to the mediation, the Parties separately had multiple phone calls with Ms. Yoshida to discuss the merits of their allegations and their respective positions.  On July 19, 2018, the Parties attended mediation in New York, New York, before Ms. Yoshida.  After a full day session, the Parties reached an agreement in principle on substantive terms to settle the Actions and executed a memorandum of understanding (the "MOU").  This Stipulation memorializes the terms of the Parties' agreement to settle the Actions.

Plaintiffs have owned shares of Acacia common stock since the outset of the Actions and continue to do so. Plaintiffs, having thoroughly considered the facts and law underlying the Actions, and based upon their investigation and prosecution of the Actions and the mediation that led to the Settlement, and after weighing the risks of continued litigation, have determined that it is in the best interests of Acacia and Acacia's stockholders that the Actions be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation, and

that these terms and conditions are fair, reasonable, and adequate to Acacia and Acacia's stockholders.

**B.     The Terms of the Proposed Derivative Settlement.**

In consideration of the Settlement, Acacia has agreed to adopt the corporate governance changes below for a period of three years.

a.     <u>Insider Trading Policy and Compliance</u>. Acacia will form a Trading Compliance Committee, which will consist of the Chief Financial Officer, General Counsel/Principal Legal Officer, and Corporate Counsel.

i.     The Trading Compliance Committee will be responsible for overseeing compliance with the Company's Insider Trading Policy and 10b5-1 Plan Guidelines, including reviewing and approving: (i) all proposed transactions in Acacia stock by the Company's directors and those employees subject to Section 16 of the Securities Exchange Act; (ii) 10b5-1 plans (and any modifications or changes to such plans) entered into by such directors and employees; and (iii) any requests for waivers/exceptions to the Insider Trading Policy and 10b5-1 Plan Guidelines.

ii.     The Audit Committee will be responsible for (i) reviewing and approving the Insider Trading Policy and 10b5-1 Plan Guidelines and any amendments and modifications thereto; and (ii) conducting quarterly reviews of the activities of the Trading Compliance Committee.

iii.     The Trading Compliance Committee will make quarterly reports to the Audit Committee concerning transactions and plans under the Insider Trading Policy and 10b5-1 Plan Guidelines reviewed during the prior quarterly period.

iv.     Acacia will add the following language to its Insider Trading Policy: "In the event of a material violation of this policy, the Company reserves all its available rights and remedies with respect thereto, up to and including termination of employment and disgorgement of profits."

v.     Defendants will disclose Acacia's Insider Trading Policy promptly following the policy's next revision, which will be presented to the Audit Committee and the Board at their next meetings, currently scheduled for October 2018.

vi.     No member of the Trading Compliance Committee will participate in the deliberations, review, or approval of his or her own trading or plans.

b.     <u>Approval of Lock-Up Releases or Black-Out Periods</u>.  The Trading Compliance Committee will provide recommendations to the Audit Committee on whether to approve any requests to waive any lock-up provisions or blackout trading restrictions, which will then be subject to approval by the Audit Committee.  No member of the Audit Committee will participate in the deliberations, review, or approval of any request to waive any lock-up provisions or blackout trading restrictions made by such committee member or committee member's affiliate.

c.     <u>Improved Internal Controls and Reporting</u>.

i.     Acacia will amend Section B.4. of its Governance Guidelines by amending the following provisions as indicated:

*     Current business and financial performance, **including** the degree of achievement of approved objectives, **manufacturing protocols and quality controls,** and the need to address forward-planning issues.

\* Future business prospects and forecasts, including actions, facilities, **product demand,** personnel and financial resources required to achieve forecasted results.

ii. The Audit Committee and Trading Compliance Committee will receive quarterly information concerning demand, manufacturing issues, and quality control issues.

iii. The Disclosure Committee will adopt a resolution at its next meeting to expand the group of quarterly certifying employees beyond executive management, finance, and legal personnel to include selected employees in sales and engineering who have contact with customers and access to forecast data.

iv. The Chair of the Disclosure Committee will report to the Audit Committee on a quarterly basis.

d. <u>Board Composition</u>. As of the mediation date, Acacia was in the process of identifying new independent director candidates. Acacia commits to appoint a new independent director by the end of 2019. Acacia commits to including in the slate of potential candidates no less than a majority of gender diverse candidates and to make gender diversity a top priority in its search.

**C.     The Parties Support the Settlement**

Plaintiffs have owned shares of Acacia common stock since the outset of the Actions and continue to do so. Plaintiffs, having thoroughly considered the facts and law underlying the Actions, and based upon their investigation and prosecution of the Actions and the mediation that led to the Settlement, and after weighing the risks of continued litigation, have determined that it is in the best interests of Acacia and Acacia's stockholders that the Actions be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation, and

that these terms and conditions are fair, reasonable, and adequate to Acacia and Acacia's stockholders.

Likewise, the Defendants and Acacia support the Settlement as in the best interest of the Company.   In addition, the director(s) not named as defendants in any of the above-referenced actions approve this settlement as in the best interests of the Company.

## III.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.   The Standard for Preliminary Approval

Under Rule 23.1(c) of the Federal Rules of Civil Procedure, "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."   Court approval of a derivative settlement involves two steps: (1) determining "whether the proposed settlement is 'within the range of possible approval'" such that notice of the settlement should be provided to stockholders, referred to as preliminary approval; and (2) after such notice has been provided, holding a fairness hearing to determine whether the settlement is fair, reasonable, and adequate, referred to as final approval.  *Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) §13.14 (2004) (setting forth the approval procedure for settlement of a shareholder derivative action).

The purpose of preliminary approval is to determine whether to notify a company's stockholders of the proposed settlement and whether to proceed with a fairness hearing.  *See* MANUAL FOR COMPLEX LITIGATION (THIRD) §30.41 (1995) ("If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies . . . and appears to fall within the range of possible approval, the court should direct that notice . . . be given to the [stockholders] of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement.").

At the preliminary approval stage, the Court need only assess whether the proposed Settlement falls "'within the range of reasonableness.'" *In re Am. Capital S'holder Deriv. Litig.*, No. 11-2424 PJM, 2013 WL 3322294, at *3 (D. Md. June 28, 2013) (quoting *In re Lupron Mktg. & Sales Practices Litig.*, 345 F. Supp. 2d 135, 139 (D. Mass. 2004)); *Rand v. M/A-Com, Inc.*, No. 86-1347-N, 1993 WL 410874, at *3 (D. Mass. July 19, 1993). Thus, in order to grant preliminary approval, the Court need only find that there is probable cause to warrant providing notice to stockholders and conducting a fairness hearing. *See Tiro v. Pub. House Invs., LLC*, No. 11 Civ. 7679(CM), 2013 WL 2254551, at *1 (S.D.N.Y. May 22, 2013) (citing *In Traffic Exec. Ass'n*, 627 F.2d 631, 634 (2d Cir. 1980)); *see also Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302, at *6 (N.D. Ill. July 26, 2011) ("At the preliminary approval stage, . . . the court's task is merely to 'determine whether the proposed settlement is within the range of possible approval,' not to conduct a full-fledged inquiry into whether the settlement meets [the requirements for final approval]."). Here, the Settlement easily meets this standard.

### B.     The Court Should Grant Preliminary Approval of the Settlement

Courts have long held that the public interest favors settlement of complex litigation and is therefore to be encouraged. *See Durrett v. Hous. Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (recognizing a "'clear policy in favor of encouraging settlements'") (quoting *Metro. Hous. Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (explaining that there is a strong policy favoring compromises that resolve litigation "particularly in class actions and other complex cases where substantial judicial

resources can be conserved by avoiding formal litigation"). "Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.'" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (quoting *In re Xcel Energy, Inc., Sec., Deriv. & ERISA Litig.*, 364 F. Supp. 2d 980, 1002 (D. Minn. 2005)); *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983); *see also Maher*, 714 F.2d at 455 ("Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable'");[2] *Gen. Motors Corp.*, 55 F.3d at 784 (noting strong policy favoring compromises that resolve litigation, "particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").

Here, the Corporate Reforms benefit the Company, and are specifically designed to address the early release from lock-ups, insider trading claims, internal controls, and reporting, as well as the lack of independence of the Board, which are at issue in the derivative actions. As such, Plaintiffs sought them so as to prevent any future problems of the type the Plaintiffs alleged the Company has experienced and to improve the Company's corporate governance going forward. This proposed settlement is supported by the Parties, Acacia, and the non-defendant Board members of Acacia as in the best interest of the Company.

The most important factor in determining whether to grant preliminary approval of a derivative settlement is the strength of the case for the plaintiffs on the merits, balanced against the amount offered in the settlement. *Schlusselberg v. Colonial Mgmt. Assoc., Inc.*, 389 F. Supp. 733, 735 (D. Mass. 1974). Here, the Settlement was reached after extensive arm's-length negotiations between and among counsel for the Parties and provides substantial benefits to the Company and its stockholders while eliminating the expense, risk, and delay inherent in such complex litigation, including the very real risk of no recovery. In connection with the

---

[2]  Unless otherwise indicated, all emphasis is added and citations are omitted.

Settlement, Acacia will adopt, or has adopted, a series of significant reforms that improve the Company's overall corporate governance.  Thus, for all the reasons stated herein, the settlement of Plaintiffs' claims on the agreed-upon terms is "within the range of possible approval," notice should be provided to Acacia's stockholders, and the Court should schedule a hearing date in connection with the final approval of the Settlement.

Plaintiffs and their counsel believe that their claims and allegations were and are meritorious.  However, they also recognize the possibility that their claims would not succeed and they would be unable to secure the substantial relief for Acacia and its stockholders achieved by the Settlement, and might even fail to obtain any relief at all.  Were the litigation to continue, numerous complex issues of law and fact would need to be resolved at considerable time and expense to Acacia, the Parties, and the Court, including whether pre-suit demand on the Board was excused and whether Plaintiff's factual allegations were sufficient, threshold questions, which are difficult to overcome.

Moreover, even if Plaintiffs prevailed on a motion to dismiss, numerous substantive issues would remain, requiring intensive discovery, extensive motion practice, expert testimony, a lengthy trial and the possibility of appeals.  In comparison, the Settlement is an excellent immediate result for Acacia, bringing the Company significant corporate governance and oversight reforms.

Corporate governance reforms, such as those negotiated in the Settlement, have supported settlements of countless stockholder derivative actions, as strong corporate governance is fundamental to a corporation's well-being and success.  *See In re NVIDIA Corp. Deriv. Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008).  Indeed, "[c]ourts have recognized that corporate governance reforms such as those achieved here provide

valuable benefits to public companies." *Id.* (quoting *Cohn*, 375 F. Supp. 2d at 853). The corporate governance reforms may, in fact, be more valuable to the Company and its stockholders than any potential monetary award or equitable relief obtained after trial, post-trial motions, and appeals. *See Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment").

"Consideration of the complexity, expense and duration of continued litigation 'is intended to capture the probable costs, in both time and money, of continued litigation.'" *Langendorf v. Conseco Senior Health Ins. Co.*, No. 08-CV-3914, 2009 U.S. Dist. LEXIS 131289, at \*22-23 (N.D. Ill. Nov. 18, 2009) (quoting *Gen. Motors Corp.*, 55 F.3d at 812). "By comparing the significance of immediate recovery with the complexities, expense and likely duration of continued litigation, a court may assess whether it is proper for the parties 'to take the bird in the hand instead of [assuming the risk and cost of pursuing] a prospective flock in the bush.'" *Id.* at \*23 (quoting *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005)). Shareholder derivative actions are notoriously complicated actions that involve complex legal and factual issues that can be litigated to a conclusion on the merits only at great expense over an extended period of time, and the Federal Actions would have been no exception. Absent the Settlement, the claims in the Federal Actions would have continued to be fiercely contested by the Parties. In all likelihood, continued litigation to a resolution at trial and/or on appeal would have taken several more years, at a minimum. "Continuing to litigate this case will require vast expense and a great deal of time, on top of that already expended." *Am. Int'l Grp.*, 2011 WL 3290302, at \*7. Even if Plaintiffs were to prevail on their claims and establish liability, the amount of recoverable damages would still have posed significant issues and would

have been subject to further litigation. *New Eng. Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 602 F. Supp. 2d 277, 281 (D. Mass. 2009), *aff'd sub nom. Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund*, 582 F.3d 30 (1st Cir. 2009); *In re Relafen Antitrust Litig.*, 231 F.R.D 52, 72 (D. Mass. 2005).

"The court is entitled to rely heavily on the opinion of competent counsel" in approving a settlement. *See Am. Int'l Grp.*, 2011 WL 3290302, at *8 (internal quotations omitted). Here, counsel for the Parties have extensive experience in complex litigation of this nature and believe that the Settlement is fair, reasonable, and adequate in light of the circumstances of this case. Because the Settlement was reached only after extensive arm's-length negotiations with a firm understanding of the factual and legal issues presented and the relative strengths and weaknesses of their respective claims and defenses, the assessments of counsel for the Parties on the fairness of the Settlement is entitled to great deference. *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (when settlement negotiations are conducted at arm's-length, "great weight" is accorded to the recommendations of counsel, who are most acquainted with the facts of the underlying litigation").

Although the Settlement was reached at a relatively early stage of the litigation, the Plaintiffs had "sufficient information on the merits of the case to enter into a settlement," and the Court has "sufficient information to evaluate such a settlement." *Parker v. Time Warner Entertainment Co., L.P.*, 631 F. Supp. 242, 259 (E.D.N.Y. 2009). There has already been an extensive exchange of information bearing on the issues and merits of the Federal Actions to justify preliminary approval of the proposed Settlement. In particular, Plaintiffs conducted a comprehensive investigation during the development, prosecution, and settlement of the Federal Actions, including, among other things, inspection of corporate books and records under Section

220.  In addition, the Plaintiffs had the opportunity to thoroughly review the allegations of the federal securities action filed against the Company and its top officers.  Thus, Plaintiffs had access to sufficient material to evaluate the case and assess the adequacy of the Settlement in light of the strengths and weaknesses of their position.  *See Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y. 1998) (recognizing that "[b]ecause much of the point of settling is to avoid litigation expenses such as full discovery, 'it would be inconsistent with the salutary purposes of settlement,' to find that 'extensive pre-trial discovery is a prerequisite to approval' of a settlement" (quoting *Handschu v. Special Servs. Div.*, 787 F.2d 828, 834 (2d Cir. 1986); and *Plummer v. Chem. Bank*, 668 F.2d 654, 660 (2d Cir. 1982)).

## IV.     THE COURT SHOULD APPROVE THE FORM AND MANNER OF NOTICE

Plaintiffs seek Court approval of the proposed form and manner of notice of the Settlement to current Acacia stockholders and seeks entry of an order directing such notice.  The Stipulation provides that the Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing, and Right to Appear ("Notice"), substantially in the form attached to the Stipulation as Exhibit B, shall be attached to a Form 8-K filed with the SEC, and posted on Acacia's website until the Court holds the Settlement Hearing or the Settlement is terminated.  In addition, the Summary Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing, and Right to Appear ("Summary Notice"), substantially in the form attached to the Stipulation as Exhibit C, will be published once in *Investor's Business Daily*.  The proposed Notice and Summary Notice describe in plain English the terms and conditions of the proposed Settlement, including: (i) the payment of Plaintiffs' Counsel's attorneys' fees and expenses; (ii) the facts and considerations that caused the Settling Parties and their respective counsel to conclude that the proposed Settlement is fair, reasonable, adequate, and in Acacia's best interests; (iii) the procedure for objecting to the proposed

Settlement; and (iv) the date, place, and time of the Settlement Hearing.  *See* Stipulation, Exhibits B-C.  The proposed Notice and Summary Notice are reasonably calculated to apprise Acacia stockholders of the pendency and Settlement of the Action and afford them an opportunity to present their objections.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (holding that notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").  The use of website posting coupled with other publication has gained broad acceptance in light of the rapid transition of the investment community from a paper-based to a web-based disclosure system.  *See Use of Electronic Media for Delivery Purposes*, SEC Release No. 33-7233, 60 Fed. Reg. 53458, 53459 (Oct. 6, 1995) ("The Commission believes that the use of electronic media should be at least an equal alternative to the use of paper-based media.").  As such, courts have held that the publication of notice to stockholders – on the company's website and/or in an investor publication, such as *Investor's Business Daily* – "sufficiently apprise[s] . . . shareholders of the nature of the proposed settlement, the upcoming public hearing on the matter, and the opportunity to object."  *Arace v. Thompson*, No. 08 Civ. 7905(DC), 2011 WL 3627716, at *4 (S.D.N.Y. Aug. 17, 2011) (in derivative settlement, approving publication by summary notice in *Investor's Business Daily*) (citing *In re PMC-Sierra, Inc. Deriv. Litig.*, No. 06 Civ. 05330(RS), 2010 U.S. Dist. LEXIS 5818, at *4 (N.D. Cal. Jan. 26, 2010) (approving notice of proposed derivative settlement by publication in *Investor's Business Daily* and on company's website); *see also* Mass. Gen. Laws ch. 156D, §7.45.  Here, the form and manner of the proposed notice, including publication and website posting, constitute the best notice practicable under the circumstances and satisfy the requirements of Fed. R. Civ. P. 23.1, due process, and any other applicable law.

## V.    PROPOSED SCHEDULE OF EVENTS

In connection with preliminary approval of the Settlement, Plaintiffs request that the Court establish dates by which the Notice will be disseminated to Acacia stockholders and by which Acacia stockholders may comment on the Settlement, and a date for the Settlement Hearing.  As set forth in the Preliminary Approval Order, the Plaintiffs propose the following:

| | |
|---|---|
| The Final Settlement Hearing | At least ninety (90) calendar days from the date when the Court enters the Preliminary Approval Order |
| The Company shall file a Form 8-K containing the Notice with the SEC and post the Notice on the Company's website; the Company shall publish the Summary Notice in *Investor's Business Daily* | Fourteen (14) calendar days from the date when the Court enters the Preliminary Approval Order |
| All papers in support of the Settlement and the Fee Award filed with the Court and served upon all parties | At least forty-two (42) calendar days prior to the Settlement Hearing |
| Counsel for the Company shall file with the Court proof, by affidavit or declaration, of dissemination of the Notice | At least ten (10) calendar days prior to the Settlement Hearing |
| Defendants shall file and serve papers, if any, in opposition to the Settlement or Fee Award | At least twenty-one (21) calendar days prior to the Settlement Hearing |
| All papers in opposition to the Settlement or the Fee Award filed with the Court and served upon all parties | At least fourteen (14) calendar days prior to the Settlement Hearing |
| Any reply papers in support of the Settlement or Fee Award and response(s) to objections filed with the Court and served upon all parties | At least seven (7) calendar days prior to the Settlement Hearing |

This schedule, similar to those used in numerous derivative settlements, affords due process to the Company's stockholders with concerning their rights with respect to the Settlement.

17

## VI.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court enter an order: (i) granting preliminary approval of the proposed Settlement; (ii) directing that notice of the proposed Settlement be given to Acacia's stockholders in the proposed form and manner; and (iii) scheduling a hearing before the Court to determine whether the proposed Settlement should be finally approved.

DATED:  September 14, 2018                     **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 _/s/ Geoffrey M. Johnson_
Geoffrey M. Johnson (admitted *pro hac vice*)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44118
Telephone:  (216) 229-6088
Facsimile:   (860) 537-4432
gjohnson@scott-scott.com

Amanda F. Lawrence (BBO# 568737)
David R. Scott
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  (860) 537-5537
Facsimile:   (860) 537-4432
alawrence@scott-scott.com
david.scott@scott-scott.com

Joe Pettigrew
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone:  (619) 233-4565
Facsimile:   (619) 233-0508
jpettigrew@scott-scott.com

Steven R. Wedeking (admitted *pro hac vice*)
Brian J. Robbins
Felipe J. Arroyo (admitted *pro hac vice*)
**ROBBINS ARROYO LLP**
600 B Street, Suite 1900
San Diego, CA 92101

Telephone:  (619) 525-3990
Facsimile:   (619) 525-3991
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com
swedeking@robbinsarroyo.com

*Co-Lead Counsel for Federal Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Geoffrey M. Johnson, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 14th day of September, 2018.

 */s/ Geoffrey M. Johnson*            
Geoffrey M. Johnson (admitted *pro hac vice*)