**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STEVEN THARP, Individually and On Behalf of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>   v.<br><br>ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAJ, and JOHN F. GAVIN,<br><br>                  Defendants. | No. 17-cv-11504-WGY<br>(LEAD DOCKET)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PAYMENT OF SERVICE AWARDS** |
| KAREN COLGAN, Derivatively on Behalf of ACACIA COMMUNICATIONS, INC.,<br><br>                  Plaintiff,<br><br>   v.<br><br>MURUGESAN SHANMUGARAJ, BENNY P. MIKKELSEN, JOHN F. GAVIN, FRANCIS J. MURPHY, BHUPENDRA C. SHAH, CHRISTIAN J. RASMUSSEN, MEHRDAD GIVEHCHI, VINCENT T. ROCHE, STAN J. REISS, ERIC A. SWANSON, PETER Y. CHUNG, and JOHN RITCHIE,<br><br>               Defendants,<br><br>   and<br><br>ACACIA COMMUNICATIONS, INC.,<br><br>             Nominal Defendant. | No. 17-cv-12350-WGY |

[Caption continued on next page.]

JONATHAN WONG, Derivatively on Behalf of ACACIA COMMUNICATIONS, INC.,

               Plaintiff,

    v.

MURUGESAN SHANMUGARAJ, JOHN F. GAVIN, BENNY P. MIKKELSEN, FRANCIS J. MURPHY, BHUPENDRA C. SHAH, CHRISTIAN J. RASMUSSEN, MEHRDAD GIVEHCHI, ERIC A. SWANSON, STAN J. REISS, PETER Y. CHUNG, JOHN RITCHIE, and VINCENT T. ROCHE,

               Defendants,

    and

ACACIA COMMUNICATIONS, INC.,

               Nominal Defendant.

No. 17-cv-12550-WGY

---

SANDRA FARAH-FRANCO and RUSSELL GOURLEY, Derivatively on Behalf of Nominal Defendant ACACIA COMMUNICATIONS, INC.,

               Plaintiffs,

    v.

MURUGESAN SHANMUGARAJ, BENNY P. MIKKELSEN, PETER Y. CHUNG, STAN J. REISS, JOHN RITCHIE, VINCENT T. ROCHE, ERIC A. SWANSON, JOHN F. GAVIN, MEHRDAD GIVEHCHI, FRANCIS J. MURPHY, CHRISTIAN J. RASMUSSEN, and BHUPENDRA C. SHAH,

               Defendants,

    and

ACACIA COMMUNICATIONS, INC.,

               Nominal Defendant.

No. 1:18-cv-10465-WGY

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   BACKGROUND ...................................................................................... 3

      A.    Factual Background ..................................................................... 3

      B.    Procedural History and Settlement ............................................. 6

            1.    The Massachusetts Federal Action ................................... 6

            2.    The Chancery Court Action .............................................. 7

            3.    The Settlement ................................................................. 8

III.  THE REQUESTED FEE AND EXPENSE AWARD IS REASONABLE AND SHOULD
      BE APPROVED ..................................................................................... 10

      A.    The Applicable Standard Supports an Award of Attorneys' Fees and Expenses . 10

      B.    The Settlement Confers Substantial Benefits on Acacia ..................................... 11

      C.    The Efforts of Plaintiffs' Counsel and the Standing and Ability of Counsel ....... 16

      D.    The Contingent Nature of the Fee Supports the Requested Fee Award ............... 18

      E.    The Plaintiffs' Service Award Should Be Approved ........................................... 20

IV.   CONCLUSION ......................................................................................... 20

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Abercrombie & Fitch Co. S'holders Deriv. Litig.*,
    886 A.2d 1271 (Del. 2005) .......................................................................19

*Ams. Mining Corp. v. Theriault*,
    51 A.3d 1213 (Del. 2012) .................................................................11, 15

*In re AXA Fin., Inc. S'holders Litig.*,
    No. 18268, 2002 WL 1283674 (Del. Ch. May 22, 2002).................................12, 19

*Barton v. Clancy*,
    632 F.3d 9 (1st Cir. 2011) .......................................................................11

*Brophy v. Cities Servs. Co.*,
    31 Del. Ch. 241 (1949) ............................................................................7

*In re Caremark Int'l Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996).....................................................................17

*Chrysler Corp. v. Dann*,
    223 A.2d 384 (Del. 1966) ........................................................................18

*Cohn v. Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005).............................................................11

*In re The Coleman Co., Inc. S'holders Litig.*,
    750 A.2d 1202 (Del. Ch. 1999)....................................................................15

*Cty. of York Emps. Ret. Plan v. Jung*,
    No. 651304/2010 (N.Y. Sup. Ct.) ...............................................................16

*In re DaVita Healthcare Partners, Inc. Deriv. Litig.*,
    No. 12-cv-2074-WJM-CBS, 2015 WL 3582265 (D. Colo. June 5, 2015) .............................16

*In re Del Monte Foods Co. S'holders Litig.*,
    No. 6027-VCL, 2011 WL 2535256 (Del. Ch. June 27, 2011)...............................16

*Dow Jones & Co. v. Shields*,
    No. 184,1991, 1992 WL 44907 (Del. Ch. Jan. 10, 1992) .....................................11

*In re Dr. Pepper/Seven Up Cos., Inc. S'holders Litig.*,
    No. 13109, 1996 WL 74214 (Del. Ch. Feb. 9, 1996) .......................................11, 19

*In re First Interstate Bancorp Consol. S'holder Litig,*
    756 A.2d 353 (Del. Ch. 1999) ................................................................12, 18, 19

*Franklin Balance Sheet Inv. Fund v. Crowley,*
    No. 888-VCP, 2007 WL 2495018 (Del. Ch. Aug. 30, 2007) .................................19

*In re Golden State Bancorp Inc. S'holders Litig.,*
    No. 16175, 2000 WL 62964 (Del. Ch. Jan. 7, 2000) .........................................11, 19

*In re Hewlett-Packard Co. S'holder Deriv. Litig.,*
    No. C-12-6003-CRB, 2015 WL 4605786 (N.D. Cal. July 30, 2015), *aff'd,*
    716 F. App'x 603 (9th Cir. 2017) ...........................................................16

*In re Invacare Deriv. Litig.,*
    No. 1:11-cv-01893 (N.D. Ohio) ..............................................................16

*In re Josephson Int'l, Inc. S'holders Litig.,*
    No. 9546, 1988 WL 112909 (Del. Ch. Oct. 19, 1988) .........................................15

*Julian v. E. States Constr. Serv., Inc.,*
    No. 1892-VCP, 2009 WL 154432 (Del. Ch. Jan. 14, 2009) ...................................15

*Korn v. New Castle Cty.,*
    No. 767-CC, 2007 WL 2981939 (Del. Ch. Oct. 3, 2007) ......................................15

*Mills v. Elec. Auto-Lite Co.,*
    396 U.S. 375 (1970) ..........................................................................10

*Nitsche v. Temple,*
    No. 12636-VCG (Del. Ch.) ....................................................................20

*In re Oracle Sec. Litig.,*
    852 F. Supp. 1437 (N.D. Cal. 1994) ..........................................................11

*In re Orchard Enters., Inc. Stockholder Litig.,*
    No. 7840-VCL, 2014 WL 4181912 (Del. Ch. Aug. 22, 2014) ...............................12

*In re OSI Sys., Inc. Deriv. Litig.,*
    No. CV-14-2910-MWF, 2017 WL 5642304 (C.D. Cal. May 2, 2017) .....................16

*In re Pac. Enters. Sec. Litig.,*
    47 F.3d 373 (9th Cir. 1995) ..................................................................18

*Pearson v. Vogelsinger,*
    No 028-VCS (Del. Ch.) ........................................................................20

*In re Plains Res. Inc. S'holders Litig.,*
    No. 071-N, 2005 WL 332811 (Del. Ch. Feb. 4, 2005) ........................................19

*Raider v. Sunderland*,
No. 19357 NC, 2006 WL 75310 (Del. Ch. Jan. 4, 2006) ......................................................20

*Rubery v. Kleinfeld*,
No. 2:12-cv-00844 (W.D. Pa.) ................................................................................................16

*Ryan v. Gifford*,
No. 2213-CC, 2009 WL 18143 (Del. Ch. Jan. 2, 2009) ............................................13, 18, 20

*San Antonio Fire & Police Pension Fund v. Bradbury*,
No. 4446-VCN, 2010 WL 4273171 (Del. Ch. Oct. 28, 2010)....................................11, 13, 17

*In re Sanchez Energy Deriv. Litig.*,
No. 9132-VCG (Del Ch.).........................................................................................................20

*In re Sauer-Danfoss Inc. S'holders Litig.*,
65 A.3d 1116 (Del. Ch. 2011).................................................................................................16

*Schreiber v. Hadson Petroleum Corp.*,
1986 WL 12169 (Del. Ch.) .....................................................................................................15

*Seinfeld v. Coker*,
847 A.2d 330 (Del. Ch. 2000).................................................................................................15

*Sugarland Indus., Inc. v. Thomas*,
420 A.2d 142 (Del. 1980) .......................................................................................................11

*Tandycrafts, Inc. v. Initio Partners*,
562 A.2d 1162 (Del. 1989) .....................................................................................................10

*In re TerraForm Power, Inc. Deriv. Litig.*,
No. 11898-CB (Del. Ch.).........................................................................................................15

*In re Tile Shop Holdings, Inc. Stockholder Derivative Litigation*,
No. 10884-VCG (Del. Ch.).......................................................................................................15

*In re Vitalink Commc'ns Corp. S'holders Litig.*,
No. 12085, 1991 WL 238816 (Del. Ch.) ................................................................................18

OTHER AUTHORITIES

Robert B. Thompson & Randall S. Thomas, *The Public and Private Faces of
Derivative Lawsuits*, 57 VANDERBUILT L. REV. 1747 (2004)..................................................18

Plaintiffs[1] respectfully request that the Court grant Plaintiffs' Counsel's application for: (i) an award of attorneys' fees in the amount of $1,750,000; (ii) reimbursement of expenses in the amount of $34,367.02; and (iii) approval of nominal incentive awards in the amount of $2,500 to be paid to each of the Plaintiffs out of Plaintiffs' Counsel's award of attorneys' fees and expenses.

## I.    PRELIMINARY STATEMENT

This Derivative Action, and the books and records action filed in the Court of Chancery of the State of Delaware (the "Chancery Court"), were brought following the disclosure that officers and directors of Acacia Communications, Inc. ("Acacia" or the "Company"), and their private equity backers, received early releases from stock sale lock-up agreements (the "Lock-Up Agreements") that allowed them to sell hundreds of millions of dollars of Acacia stock just two weeks prior to the disclosure of news that caused Acacia's stock to fall sharply. Specifically, Acacia's two largest customers, which collectively accounted for more than half of Acacia's revenues, both announced weakening demand that caused Acacia's stock price to fall. Further investigation revealed that, due to the close relationship between Acacia and their two largest customers, Acacia received forecasts or other information about demand from these two customers. No information about lessening demand was made public prior to the secondary offering or the insider sales. Critically, but for the early releases from the Lock-Up Agreements, the corporate insiders would not have been able to sell their stock prior to that disclosure.

Plaintiffs extensively investigated the matter, including by exercising their rights under Delaware law to obtain internal corporate books and records related to the insider selling and

---

[1]     Plaintiffs include: (i) Karen Colgan ("Colgan"), Sandra Farah-Franco ("Farah-Franco"), and Russell Gourley ("Gourley" and collectively, with Colgan and Farah-Franco, the "Federal Plaintiffs"), Plaintiffs in the consolidated derivative action pending in this Court; and (ii) Gary Silberberg ("Silberberg"), Plaintiff in *Silberberg v. Acacia Commc'ns, Inc.*, C.A. No. 2018-0262-TMR (Del. Ch.) (the "Delaware Action").

customer demand.  Those litigation efforts included filing actions both in this Court and the Chancery Court.  Plaintiffs made clear to Defendants that they were prepared to vigorously prosecute the Action.  After an in-person mediation session, the parties were able to agree to a settlement that substantially benefits Acacia and its stockholders (the "Settlement").

The Settlement is targeted on improving the corporate governance of the Company as it specifically relates to the misconduct as raised by Plaintiffs.  To that end, the Settlement establishes a Trading and Compliance Committee to implement procedures to independently review insider stock sales in order to prevent any future insider sales based on material non-public information.  It also increases the power of the board of directors (the "Board") to address insider sales, including by providing the right to seek disgorgement of profits, and establishes a Board-level procedure for reviewing and approving waiver of lock-ups or black-out periods.  Moreover, as nearly the entire Board is implicated in the misconduct, as alleged by Plaintiffs, it increases Board independence by requiring the addition of a new independent director.

These corporate governance reforms are the classic types of reforms that courts and academics have long recognized as substantially benefiting a company.  As set forth below, numerous courts have awarded legal fees to plaintiffs for similar corporate governance reforms based on the benefits they confer, and the fee award sought by Plaintiff's Counsel here falls well within the range of cases cited.  Furthermore, Plaintiffs submit the accompanying Declaration of Matthew Cain, Ph.D. (the "Cain Declaration"), a research fellow at Harvard Law School, that estimates the benefit to Acacia from these corporate governance reforms based on highly regarded economic studies.[2]  The fee award is a small percentage of the value of the Settlement to Acacia.  Indeed, not only did the Defendants agree that the Settlement significantly benefits

---

[2]       The Cain Declaration is referenced herein as the "Cain Dec." and attached as Exhibit 1 to Plaintiffs' Motion for Final Approval of the Settlement that is concurrently filed herewith.

the Company, but the Settlement was also approved by the only independent Acacia director who was not named as a Defendant in the lawsuits "as being in the best interests of the Company." Stipulation ¶5.

Therefore, and as set forth more fully below, Plaintiffs respectfully request that the Court approve Plaintiffs' Counsel's application for an award of attorneys' fees, reimbursement of expenses, and payment of service awards.

## II.    BACKGROUND

### A.    Factual Background

Acacia held its initial public offering ("IPO") on or around May 12, 2016 when it sold 4.5 million shares at $23 per share.  Three private equity funds controlled Acacia both before and following its IPO: Summit Partners, L.P. ("Summit"), Commonwealth Capital Ventures IV, L.P. ("Commonwealth"), and Matrix Partners ("Matrix" and collectively, with Summit and Commonwealth, the "Private Equity Funds").  Prior to the IPO, the Private Equity Funds owned approximately 68% of the Company's stock and following the IPO they owned approximately 59%.  Both Summit and Matrix had direct representation on the Acacia Board.  In connection with the IPO, the Private Equity Funds, along with Acacia's officers and directors, entered into the Lock-Up Agreements, which prohibited them from selling any shares of Acacia stock for a period of 180 days following the IPO, or until November 8, 2016.

Both prior to and following the IPO, Acacia had an extremely concentrated customer base.  Specifically, in 2016, 2015, and 2014, Acacia respectfully derived 58%, 50%, and 58% of its overall revenues from its two largest customers: ZTE Kangxun Telecom Co. Ltd. ("ZTE") and ADVA Optical Networking ("ADVA").  Given the concentration of its business, Acacia included provisions in its sale contracts with ZTE and ADVA that required these customers to provide the Company with rolling forecasts of their expected demand months in advance of the

delivery date.   These provisions allowed Acacia to adjust production levels in order to meet customer demand and gave it rare concrete insight into the Company's future performance.

Acacia's stock performed extremely well in the months following the IPO, increasing approximately 415% to $95.67 on August 11, 2016.   At the time, the Company's Chief Executive Officer touted the Company's success and insisted that Acacia saw growing demand internationally, particularly in China where ZTE was based.

The Private Equity Funds, as well as the Company's officers and directors, caused the Company to hold a secondary offering on or about October 7, 2018 in which they sold approximately $290 million worth of Acacia stock for $100 per share, less a $3.50 underwriters' discount.   Six of the Company's then-seven directors, each of the Private Equity Funds, and several officers sold stock in the secondary offering.   Immediately prior to the secondary offering, Acacia took the unusual step of releasing unaudited preliminary results for the third quarter of 2016 that were positive for the Company, likely in order to drive up interest in the second offering.   The Private Equity Funds and Acacia's officers and directors obtained partial early releases from their Lock-Up Agreements, so that they could sell shares a full month earlier than they otherwise could have.

The early releases from the Lock-Up Agreements and the massive insider sales were suspiciously timed and benefited the Defendants by allowing them to sell their stock in the secondary offering at a much higher price than if they had waited to sell after the Lock-Up Agreements naturally expired.   Specifically, less than two weeks after the closing of the secondary offering, on October 27, 2016, both ZTE and ADVA announced disappointing quarterly results and underwhelming forward guidance.   ZTE announced that its demand in China was slowing and ADVA announced that it was three months behind in rolling out its

CloudConnect technology, which used Acacia components.

In response, Acacia's stock price plummeted 14%, closing at $73.66 per share. By November 7, 2016, the day before the Lock-Up Agreements were initially set to expire, Acacia's stock price fell to $65.67 per share. Therefore, the Private Equity Funds and the Company's officers and directors received nearly $100 million more in stock sale proceeds than they would have if they waited for their Lock-Up Agreements to expire.

Plaintiffs' position is that the Private Equity Funds and the Company's officers and directors had no legitimate reason to obtain early releases from the Lock-Up Agreements, and Plaintiffs' submit that there was no analysis concerning whether obtaining early releases from the Lock-Up Agreements was appropriate.[3] Rather, they obtained the releases solely so that they could sell their shares prior to the public release of negative news by ZTE and ADVA. Moreover, because of the close relationship Acacia had with its two largest customers, Company insiders must have known that their demand was significantly softening before the secondary offering. Thus, Plaintiffs believe viable claims exist that the Defendants, in breach of their fiduciary duties, used material non-public information to profit.

Furthermore, over the following seven months until May 2017, Acacia continued to hide the true extent of its weakening demand, as well as quality defect issues, for some of its products as insiders continued to sell stock at artificially inflated prices. The Company insisted that it's financial outlook was positive and demand was strong. Then, on May 9, 2017, Acacia provided guidance for the second quarter of 2017 that was approximately 30% lower than what the market had expected. In doing so, Acacia finally admitted that the Company was experiencing lower demand from its top customers. Additionally, the Company concealed a manufacturing quality

---

[3]     Plaintiffs believe this position is supported by the internal Company documents they obtained after serving books and records demands on the Company.

defect, which resulted in significant supply constraints, until May 31, 2017.  The full impact of the lowered demand and manufacturing quality issues would not be felt until Acacia disclosed its second quarter 2017 results in mid-July 2017 when the stock closed around $39.00 per share, 61% lower than the price of the secondary offering.

All told, Acacia insiders and the Private Equity Funds sold nearly $330 million worth of stock in the secondary offering and the months that followed at artificially inflated prices.

## B.    Procedural History and Settlement

Acacia stockholders investigated and challenged the conduct of the Defendants by filing derivative actions in this Court and filing and litigating a books and records action in the Delaware Chancery Court.

### 1.    The Massachusetts Federal Action

On November 29, 2017, Plaintiff Colgan filed a derivative complaint in this Court on behalf of the Company, alleging breaches of fiduciary duty, unjust enrichment, and waste, against certain directors and officers of Acacia, as well as violations of the Securities Exchange Act of 1934 (the "Exchange Act").

By letters dated December 6, 2017 and December 15, 2017, Plaintiffs Gourley and Farah-Franco made their respective demands on the Company pursuant to 8 *Del. C.* §220 ("Section 220") to inspect certain of the Company's books and records.  The parties then spent the following month meeting and conferring on the scope of Acacia's Section 220 production and the terms of a Non-Disclosure Agreement ("NDA").  Plaintiffs Gourley and Farah-Franco memorialized the terms of their agreement with Acacia in a letter dated January 25, 2018.  After reaching agreement on the scope of production and NDA, on February 6 and 13, 2018, the Company produced Board meeting minutes and materials relating to the topics set forth in the demand.  All told, Acacia produced 395 pages of documents to Plaintiffs Gourley and Farah-

Franco.  After reviewing such documents, on March 13, 2018, Plaintiffs Gourley and Farah-Franco filed a derivative complaint on behalf of the Company alleging breaches of fiduciary duty against certain directors and officers of Acacia, as well as violations of the Exchange Act.

On April 20, 2018, the Court appointed the Federal Plaintiffs as Lead Plaintiffs for all related derivative actions pending in this Court, including one filed by Plaintiff Jonathan Wong on December 22, 2017.  On May 30, 2018, the Federal Plaintiffs filed a consolidated amended derivative complaint alleging breaches of fiduciary duty, waste, and unjust enrichment against certain directors and officers of Acacia, as well as violations of the Securities Act of 1933 and the Exchange Act.

### 2.     The Chancery Court Action

On February 12, 2018, Plaintiff Silberg made a demand on the Company pursuant to Section 220 to inspect certain of the Company's books and records to determine whether stockholders could assert a *Brophy*[4] claim against the Company's officers and directors for breaching their fiduciary duties by obtaining early releases from the Lock-Up Agreements and selling Company shares while in possession of material non-public information.

The Company refused to produce documents in response to Silberg's demand unless he agreed to terms in a confidentiality agreement that would inappropriately restrict his use of such documents.  Therefore, on April 9, 2018, Silberg filed the Delaware Action in the Chancery Court seeking an order compelling the Company to produce documents pursuant to an appropriately tailored confidentiality agreement.  On May 1, 2018, Silberg filed a motion for judgment on the pleadings.  On May 11, 2018, the Company filed its opposition and cross-motion for judgment on the pleadings.  On May 16, 2018, Silberg filed a reply brief.  On May

---

[4]       *Brophy v. Cities Servs. Co.*, 31 Del. Ch. 241 (1949).

29, 2018, the Chancery Court held a telephonic hearing and ruled for Silberberg in all respects. After the Chancery Court issued its final order granting Silberberg's motion on June 1, 2018, the Company produced 1,080 pages of documents to Silberberg.

After reviewing such documents, Silberberg determined to coordinate his efforts to with those of the Federal Plaintiffs.

### 3.    The Settlement

In late June 2018, the parties agreed to mediate these actions and retained Michelle Yoshida of Phillips ADR to mediate their dispute.  On July 16, 2018, the parties exchanged their mediation statements, and the Federal Plaintiffs and Plaintiff Silberberg made a settlement demand.  On July 19, 2018, the parties attended an in-person mediation in New York, New York, before Ms. Yoshida.  After a full-day session, the parties reached an agreement-in-principal on the substantive terms of the Settlement that they are now presenting to the Court for approval.

The principal terms of the Settlement include the following corporate governance enhancements that are designed to prevent improper insider stock sales in the future, increase the Board's ability to take action if violations occur, and enhance Board oversight of insider sales, disclosures, and manufacturing quality controls.

Plaintiffs' core allegation of misconduct is that Defendants sold Acacia stock while in possession of material non-public information and obtained early releases from the Lock-Up Agreements to do so.   To address this allegation and prevent similar misconduct from reoccurring, the Settlement provides that:

- Acacia will form a new Trading Compliance Committee, consisting of the Chief Financial Officer, General Counsel, and Corporate Counsel, that will oversee compliance with the Company's Insider Trading Policy, including reviewing and approving: (i) all transactions in Acacia stock by the Company's directors and employees subject to §16 of the Exchange Act; (ii) all 10b5-1 plans for such directors and employees; and (iii) any requests for waivers/exceptions to the Company's Insider Trading Policy or 10b5-1 Plan Guidelines.  The Insider Trading

Compliance Committee will report quarterly to the Company's Audit Committee, which will be responsible for reviewing and approving the Insider Trading Policy and 10b5-1 Plan Guidelines and reviewing the activities of the Insider Trading Compliance Committee on a quarterly basis;

- Acacia will amend its Insider Trading Policy to state that the Company reserves the right to terminate employees and disgorge profits in the event of material violations of the policy and will publicly disclose the full policy; and

- all waivers of stock sale lock-ups or blackout trading restrictions must be first reviewed by Acacia's Trading Complaint Committee then approved by the Audit Committee.  No member of the Insider Trading Compliance or Audit Committees shall be permitted to participate in the deliberation, review, or approval of his or her own, or affiliated entity's, trading plan or waiver request.

The independence of a board of directors is critical to provide appropriate oversight and guidance to management.  It is particularly important in this context where all but one of the Company's current directors are implicated in the improper insider sales, as alleged by Plaintiffs. To address this lack of independence, the Settlement requires Acacia to add a new independent director by the end of 2019.[5]  This will help ensure an independent voice will be present in the boardroom to speak out in the future.  Moreover, Acacia currently maintains an all-male Board. Diversity in the boardroom is important so that a variety of perspectives and ideas can be advanced and discussed.  As a result, the Settlement also requires Acacia to include a majority of gender diverse candidates on its short list of director candidates and will commit to making gender diversity a top priority in its search.

Plaintiffs' other core allegation is that Acacia had manufacturing and quality control issues that were known to insiders, but not disclosed to the public.  To address this allegation and ensure such information is properly disclosed in the future, the Settlement provides that:

- Acacia will amend its Corporate Governance Guidelines to make clear that directors

---

[5]        Acacia advised Plaintiffs that it had started a search for a new independent Board member candidate prior to the mediation and proposed settlement, but absent the settlement, it was under no obligation to add a new independent director.

are responsible for determining effective systems are in place for periodic and timely reporting to the Board on the Company's manufacturing protocols and quality controls and the Company's product demands;

- Acacia's Audit Committee and Trading Compliance Committee will receive quarterly information concerning product demand, manufacturing issues, and quality control issues; and

- Acacia's Disclosure Committee will expand the group of employees that report to it quarterly to include selected employees in sales and engineering who have contact with customers and access to forecast data.  The Chair of the Disclosure Committee will report to the Audit Committee on a quarterly basis.

Each of these corporate governance reforms directly address the misconduct, as alleged by Plaintiffs, and collectively, they provide a substantial benefit to Acacia and its stockholders. In addition, submitted concurrently with this motion is the Cain Declaration which explains academic studies that support the substantial value of the proposed settlement to Acacia and its stockholders and seeks to quantify the value of the benefits.  The Settlement was also approved by the only independent Acacia director, who has not been named a defendant in any action, "as being in the best interests of the Company."  Stipulation ¶5.  These benefits justify approval in full of Plaintiffs' Counsel's requested award of attorneys' fees, reimbursement of expenses, and payment of service awards.

## III.   THE REQUESTED FEE AND EXPENSE AWARD IS REASONABLE AND SHOULD BE APPROVED

### A.   The Applicable Standard Supports an Award of Attorneys' Fees and Expenses

Courts may grant attorneys' fees and expenses to a plaintiff who successfully resolves an action with similar benefits for both the plaintiff and a group of others.  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 391-392 (1970); *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164

(Del. 1989).[6]   Under the corporate benefit doctrine, "'the Court may order the payment of counsel fees and related expenses to a plaintiff whose efforts result in … the conferring of a corporate benefit.' Such results need not be pecuniary, so long as the litigation produces a substantial benefit to the corporation or its stockholders." *San Antonio Fire & Police Pension Fund v. Bradbury*, No. 4446-VCN, 2010 WL 4273171, at *7 (Del. Ch. Oct. 28, 2010) (citing *Tandycrafts*, 562 A.2d at 1164).   There is "no set method or fixed formula to assess an application for attorneys['] fees[,]" and courts are directed to "examine the totality of circumstances." *In re Golden State Bancorp Inc. S'holders Litig.*, No. 16175, 2000 WL 62964, at *3 (Del. Ch. Jan. 7, 2000).

Courts typically consider the value of the benefits achieved in the action, efforts of counsel, difficulty of the litigation, contingent nature of the fee, and counsel's skill, standing, and ability. *See id.*; *Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005); *In re Dr. Pepper/Seven Up Cos., Inc. S'holders Litig.*, No. 13109, 1996 WL 74214, at *4 (Del. Ch. Feb. 9, 1996) (citing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del. 1980)).   A court may also consider fee awards in comparable cases involving similar benefits in determining a reasonable fee. *Dow Jones & Co. v. Shields*, No. 184,1991, 1992 WL 44907, at *3 (Del. Ch. Jan. 10, 1992) (reviewing similar fee awards and concluding the award was not excessive by comparison).

### B.   The Settlement Confers Substantial Benefits on Acacia

The benefits achieved by the litigation are given the most weight in determining a fee award. *Sugarland*, 420 A.2d at 149-50; *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del.

---

[6]        Plaintiffs' fee request is governed by federal law, as to the federal question claims, and Delaware law, as to the supplemental jurisdiction state law claims. *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011) (a "federal court . . . exercising supplemental jurisdiction over a state law claim must apply state substantive law" (citing *Hoyos v. Telecorp Commc'ns, Inc.*, 488 F.3d 1, 5 (1st Cir. 2007)).   In any event, there is no meaningful difference between Delaware and federal law when it comes to determining reasonable attorneys' fees in derivative litigation. *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445 (N.D. Cal. 1994).

2012); *In re Orchard Enters., Inc. Stockholder Litig.*, No. 7840-VCL, 2014 WL 4181912 (Del. Ch. Aug. 22, 2014); *In re AXA Fin., Inc. S'holders Litig.*, No. 18268, 2002 WL 1283674, at *7 (Del. Ch. May 22, 2002) ("[T]his court has recognized in the past that the hourly rate represented by a fee award is a secondary consideration, the first issue being the size of the benefit created."). As set forth above, the Settlement significantly benefits Acacia by requiring it to implement important corporate governance reforms that are specifically designed to prevent the reoccurrence of the Defendants' misconduct, as alleged by the Plaintiffs.

*First*, the Settlement requires Acacia to implement a set of reforms that directly address Plaintiffs' core allegations, *i.e.*, that Acacia's insiders obtained early releases from Lock-Up Agreements that allowed them to sell hundreds of millions worth of shares at artificially inflated prices while in the possession of material non-public information concerning customer demand. This includes the creation of a brand new Trading Compliance Committee consisting of three top officers. That committee must approve all transactions in Acacia stock by directors and Section 16 officers, including any waivers to Company policies. That committee must report to the Board's Audit Committee at least quarterly and the Audit Committee must approve any waiver of any Lock-Up Agreement or trading blackout window. Critically, no member of the Trading Compliance Committee or Audit Committee will be permitted to review or approve any of their own, or their affiliates, trading. Collectively, these reforms ensure that independent individuals with no interest in any given stock sale will determine whether any such sale violates company policy or federal insider trading law. If these provisions existed at the time of the secondary offering, they would have likely ensured no one traded on material non-public information.

*Second*, nearly the entire Board was implicated in the misconduct as alleged by Plaintiffs. Furthermore, the entire Board is male. Therefore, the Settlement requires Acacia to add a new

independent director by the end of 2019.  It also requires Acacia to include a majority of gender diverse candidates on its short list and to make gender diversity a priority in its search.  This will add an independent perspective to the Board that can ensure someone will speak up to prevent wrongdoing and a diverse perspective that can provide insights that will benefit the Company.

*Third*, after the bulk of the insider selling that occurred in the Company's October 2016 secondary offering, Plaintiffs alleged that Acacia still failed to adequately disclose weakening customer demand and significant manufacturing quality defects.  Therefore, the Settlement also requires the Audit Committee and Trading Compliance Committee receive regular quarterly information regarding these issues and amends the Corporate Governance Guidelines to make clear that directors are responsible for establishing effective reporting systems.  Moreover, it expands the individuals responsible for reporting to the Company's Disclosure Committee to include employees with direct knowledge of customer demand and manufacturing quality. These reforms ensure that the Board will have appropriate information in the future, so that it can ensure accurate information about customer demand and manufacturing quality is disclosed.

Corporate governance reforms like these unquestionably bring valuable benefits to corporations, such as Acacia, and justify approval of Plaintiffs' requested fee and expense award. *See, e.g.*, *San Antonio Fire*, 2010 WL 4273171, at *13 (noting that "[a]lthough the Court cannot calculate the benefit achieved as a precise number, that does not detract from the significance of the non-monetary relief produced by [plaintiffs'] efforts[,]" and that the corporate governance reform "may be recognized as having a very real, even if unquantifiable, benefit"); *Ryan v. Gifford*, No. 2213-CC, 2009 WL 18143, at *10 (Del. Ch. Jan. 2, 2009) (recognizing that "governance reforms can provide substantial benefits and are appropriately considered by the Court when evaluating a proposed settlement").

13

Plaintiffs' Counsel retained Matthew Cain (hereinafter, "Cain"), a Visiting Research Fellow at Harvard Law School and former Economic Fellow/Financial Economist for the U.S. Securities and Exchange Commission ("SEC"), to review the corporate governance enhancements included in the Settlement and provide an estimate as to their value based on peer reviewed academic studies.  *See* Cain Dec.  Cain relied on several studies published in well-regarded corporate finance journals to approximate the value of the Settlement to Acacia.  *Id.* ¶¶27-43.  In doing so, he divided the benefits of the Settlement into two categories: (i) all of the corporate governance enhancements other than the addition of a new independent director; and (ii) the new independent director.  *Id.*

To value the first category of corporate governance enhancements, Cain used academic studies that analyzed the change in corporate valuations after the enactment of corporate governance improvements.  *Id.* ¶¶27-35.  Based on those studies, Cain conservatively estimated that the value of the Settlement reforms to Acacia, other than the addition of the independent director, is approximately 4.3% to 5.4% of the Company's market capitalization at the time the Settlement was agreed upon, or $57 million to $71 million.  *Id.* ¶36.  To estimate the value of the addition of a new independent director, Cain used a study that analyzed the impact to corporate value upon the sudden death of an independent director.  *Id.* ¶38.  That studied concluded that the value of an independent director ranges from 0.85% to 5.01% of a company's market capitalization.  *Id.* ¶39.  Applying the low end of that range to Acacia, Cain concluded that the value of the addition of a new independent director was approximately $11 million.  *Id.* ¶40.

Therefore, Cain concluded that the total value of the Settlement to Acacia is approximately $68 million to $82 million.  *Id.* ¶43.  Thus, Plaintiffs' Counsel's requested fee award is only 2.1% to 2.6% of the value of the Settlement.  This is well within the range of fees

awarded in past cases.  *Ams. Mining Corp.*, 51 A.3d at 1259 ("When a case settles early, the Court of Chancery tends to award 10–15% of the monetary benefit conferred.").[7]

Moreover, Plaintiffs' Counsel's requested fee and expense award compares favorably with fees awarded in other recent derivative cases that resulted in benefits similar to those achieved for Acacia here.  For example, in *In re TerraForm Power, Inc. Derivative Litigation*, the Court approved a $3 million fee award in connection with a settlement where a main benefit, among others, was the addition of a new independent board member, which the Acacia Settlement also provides, as well as increasing officer and operating independence from the company's controller.  No. 11898-CB, Transcript (Del. Ch. Dec. 19, 2016; Dec. 30, 2016). There, the Court noted that the addition of an independent director is a "meaningful benefit" and "is relief that would have been difficult for the Court to judicially order and certainly is a good thing."  *Id.* at 20-21.  Similarly, in *In re Tile Shop Holdings, Inc. Stockholder Derivative Litigation*, No. 10884-VCG (Del. Ch. Aug. 23, 2018), the Court approved a $1,250,000 fee award in connection with settlement that provided important non-monetary benefits that primarily consisted of the appointment of a new independent director and creation of an executive-level compliance department tasked with overseeing and enforcing a revised Code of Business Conduct and Ethics.

These are just some examples of numerous cases where courts have recognized the significant value of the addition of new independent directors and other corporate governance

---

[7]      *See also Julian v. E. States Constr. Serv., Inc.*, No. 1892-VCP, 2009 WL 154432 (Del. Ch. Jan. 14, 2009) (awarding a total of 8% when little time and effort were invested before settlement); *Korn v. New Castle Cty.*, No. 767-CC, 2007 WL 2981939 (Del. Ch. Oct. 3, 2007) (awarding 10% when "there was limited discovery, no briefing, and no oral argument"); *Seinfeld v. Coker*, 847 A.2d 330 (Del. Ch. 2000) (awarding 10% when case settled after limited document discovery and no motion practice); *In re The Coleman Co., Inc. S'holders Litig.*, 750 A.2d 1202 (Del. Ch. 1999) (awarding 10% where counsel did not take a single deposition or file or defend a pretrial motion); *In re Josephson Int'l, Inc. S'holders Litig.*, No. 9546, 1988 WL 112909 (Del. Ch. Oct. 19, 1988) (awarding 18% when case settled after 10 days of document discovery); *Schreiber v. Hadson Petroleum Corp.*, 1986 WL 12169 (Del. Ch. Oct. 29, 1986) (awarding 16% when case settled "[s]hortly after suit was filed").

reforms. *See In re OSI Sys., Inc. Deriv. Litig.*, No. CV-14-2910-MWF (MRWx), 2017 WL 5642304 (C.D. Cal. May 2, 2017) (approving a $1.6 million fee award for the addition of a new independent director and other governance reforms, including revisions to committee charters and the company's insider trading policy); *In re Invacare Deriv. Litig.*, No. 1:11-cv-01893 (N.D. Ohio July 9, 2012) (approving $1.3 million fee award for corporate governance reforms, including increased board oversight responsibilities and reporting controls); *Cty. of York Emps. Ret. Plan v. Jung*, No. 651304/2010 (N.Y. Sup. Ct. July 7, 2016) (approving $4 million fee award in connection with a settlement enhancing board and management compliance and reporting functions and imposing policies to punish employees for misconduct); *In re Hewlett-Packard Co. S'holder Deriv. Litig.*, No. C-12-6003-CRB, 2015 WL 4605786 (N.D. Cal. July 30, 2015), *aff'd*, 716 F. App'x 603 (9th Cir. 2017) (approving $4.6 million fee award in connection with a settlement that included greater board involvement and oversight of M&A process); *In re DaVita Healthcare Partners, Inc. Deriv. Litig.*, No. 12-cv-2074-WJM-CBS, 2015 WL 3582265 (D. Colo. June 5, 2015) (approving $6.2 million fee award in connection with settlement that enhanced board and committee independence, oversight, and power and the company's compliance program); *Rubery v. Kleinfeld*, No. 2:12-cv-00844 (W.D. Pa. Jan. 20, 2015) (approving $3.75 million fee award in connection with settlement that created new ethics and compliance officer positions and enhanced anti-corruption policies).

### C.    The Efforts of Plaintiffs' Counsel and the Standing and Ability of Counsel

While the benefit brought by a settlement is the primary factor courts look to in awarding an attorneys' fee, the time and effort of counsel can serve as a cross-check on the reasonableness of a fee award. *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1138 (Del. Ch. 2011); *In re Del Monte Foods Co. S'holders Litig.*, No. 6027-VCL, 2011 WL 2535256, at *12 (Del. Ch. June 27, 2011).

Here, Plaintiffs' Counsel secured significant corporate governance enhancements for Acacia.  The results speak to their dedicated efforts on behalf of Acacia and its stockholders, as well as the quality of their work.  Plaintiffs' Counsel's efforts include: (i) reviewing publicly available information, including filings by Acacia with the SEC, press releases, news reports, analyst reports, investor conference transcripts, court opinions, and other matters of public record; (ii) reviewing non-public internal Company information, including documents obtained from the Company pursuant to multiple demands for inspection of books and records under Delaware General Corporation Law §220 (8 *Del. C.* §220); (iii) researching the applicable law with respect to the claims alleged in the Action and the potential defenses thereto; (iv) preparing and filing a consolidated derivative complaint; (v) preparing and filing a Delaware books and records complaint and litigating that action; (vi) participating in informal conferences with Defendants' counsel; (vii) drafting a settlement demand and mediation statement; and (viii) participating in a mediation and negotiating the Settlement with Defendants.  *See* Baker Dec. ¶2; Bottini Dec. ¶2; Brown Dec. ¶2; Johnson Dec. ¶2; Wales Dec. ¶¶2-3; Wedeking Dec. ¶2; Weinberger Dec. ¶2.[8]  Plaintiffs' Counsel provided high-quality services to Acacia and its stockholders, reflecting the qualifications, experience, and dedication of their lawyers and professional staff.  *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 972 (Del. Ch. 1996) (noting that "[t]he services rendered required a high degree of sophistication and expertise").

In addition, in considering a fee award, the Court must consider the "standing and ability of Plaintiff's Counsel."  *San Antonio Fire*, 2010 WL 4273171, at *13.  Here, Plaintiffs' Counsel are all well-respected defenders of stockholder rights with a significant track record of success.

---

[8]       The Declarations of Francis A. Bottini, Jr. ("Bottini Dec."), Timothy Brown ("Brown Dec."), Steven R. Wedeking ("Wedeking Dec."), Joshua Baker ("Baker Dec."), David Wales ("Wales Dec."), Ned Weinberger ("Weinberger Dec."), and Geoffrey M. Johnson ("Johnson Dec.") are respectively attached hereto as Exhibits 1-7.

*See* Baker Dec., Ex. C; Bottini Dec., Ex. C; Brown Dec., Ex. C; Johnson Dec., Ex. C; Wales Dec., Ex. E; Wedeking Dec., Ex. C; Weinberger Dec., Ex. C.   Plaintiffs' Counsel have collectively brought dozens of derivative actions to successful conclusions and its lawyers have earned recognition in the field of stockholder rights litigation.   *Id.*   In addition, the quality of opposing counsel sets in higher relief the significance of the results that Plaintiffs' Counsel were able to achieve and further supports Plaintiffs' Counsel's request for attorney fees and expenses.

### D.  The Contingent Nature of the Fee Supports the Requested Fee Award

Courts also recognize that counsel is typically "entitled to a much larger fee when the compensation is contingent than when it is fixed on an hourly or contractual basis." *Ryan*, 2009 WL 18143, at *13.   Here, Plaintiffs' Counsel litigated this Action on a fully contingent basis knowing that they would likely entail hundreds of hours of firm time and hundreds of thousands of dollars in upfront costs that might not be recouped for years, if ever.

Stockholder derivative litigation involves significant contingency risks.   *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (noting that "the odds of winning [a] derivative lawsuit [are] extremely small").[9]   According to one study, only one out of three stockholder derivative suits defeat a motion to dismiss, while fewer than one in five see a judgment for plaintiffs or a settlement.[10] Therefore, public policy supports "reward[ing] this sort of risk taking in determining the amount of a fee award." *First Interstate*, 756 A.2d at 365. Where benefits from a settlement are non-monetary, as is the case with the Settlement, courts

---

[9]      *See also Chrysler Corp. v. Dann*, 223 A.2d 384, 389 (Del. 1966) (affirming award of attorneys' fees, in part, "in consideration of the contingent nature of the litigation"); *In re First Interstate Bancorp Consol. S'holder Litig*, 756 A.2d 353, 363 (Del. Ch. 1999) (in considering award of attorneys' fees, court considers factors including "'the contingent nature of the case'"); *In re Vitalink Commc'ns Corp. S'holders Litig.*, No. 12085, 1991 WL 238816, at *17 (Del. Ch. Nov. 8, 1991) ("In all fairness, the contingent nature of [counsel's] fee agreement demands a higher fee for [their] work.").

[10]      Robert B. Thompson & Randall S. Thomas, *The Public and Private Faces of Derivative Lawsuits*, 57 VANDERBUILT L. REV. 1747 (2004).

typically "add[] a premium to the plaintiffs' attorneys['] typical noncontingency fee in proportion to the benefit the plaintiffs' attorneys achieved for their clients." *Golden State*, 2000 WL 62964, at *3.[11]

Here Plaintiffs' Counsel expended 1,689.75 hours in attorney and professional staff time prosecuting this Action through November 6, 2018, incurred $1,015,959.50 in total lodestar, and incurred $34,367.02 in necessary litigation expenses.  Baker Dec. ¶¶4, 6; Bottini Dec. ¶¶4, 7; Brown Dec. ¶¶4, 6; Johnson Dec. ¶¶4, 6; Wales Dec. ¶¶5, 8; Wedeking Dec. ¶¶4, 7; Weinberger Dec. ¶¶4, 7.  The requested fee is approximately 1.72 times the overall lodestar for this time period and an average hourly rate of approximately $1,035.00.  This requested fee amount is reasonable and compares favorably with multipliers and hourly rates approved in other cases.[12]

Under public policy, stockholders of corporations that are harmed by directors and officers who breach their corporate fiduciary duties should have ready access to counsel who have the ability and experience to pursue complex corporate litigation.  To that end, "[f]ee awards should encourage future meritorious lawsuits by compensating the plaintiffs' attorneys for their lost opportunity cost (typically their hourly rate), the risks associated with the litigation, and a premium."  *Franklin Balance Sheet Inv. Fund v. Crowley*, No. 888-VCP, 2007 WL 2495018, at *12 (Del. Ch. Aug. 30, 2007).  The Court should approve Plaintiffs' Counsel's

---

[11]    *See, e.g.*, *Golden State*, 2000 WL 62964, at *3 (awarding a 25% risk premium despite a "modest benefit"); *Dr. Pepper/Seven Up*, 1996 WL 74214, at *5 (awarding a "modest premium over the pay that plaintiffs' attorneys command in a noncontingency undertaking[,]" where the benefit achieved was "not as substantial" as in other cases); *First Interstate*, 756 A.2d at 364-65 (awarding an approximately 50% premium over standard hourly rates, plus reimbursement of expenses, even though there was "a relatively weak correlation between [counsel's] efforts and the outcome or benefit claimed"); *In re Plains Res. Inc. S'holders Litig.*, No. 071-N, 2005 WL 332811, at *6 (Del. Ch. Feb. 4, 2005) (awarding fee representing "roughly $1,165 per hour . . . a 150% premium over the blended rates of plaintiffs' counsel").

[12]    *See, e.g.*, *In re Abercrombie & Fitch Co. S'holders Deriv. Litig.*, 886 A.2d 1271, 1273 (Del. 2005) (affirming fee award equal to 2.39 times lodestar, which the court had characterized as "'well within the range of reasonableness for this kind of litigation'"); *AXA Fin.*, 2002 WL 1283674, at *7 (fee award "represent[ed] an hourly rate of more than $2,630").

request for an award of reasonable attorneys' fees and expenses to promote this public policy of encouraging competent experienced counsel to undertake important stockholder litigation.

### E.    The Plaintiffs' Service Award Should Be Approved

Plaintiffs' Counsel seeks a service award of $2,500 payable to each Plaintiff out of Plaintiffs' Counsel's fee and expense award.  *See Raider v. Sunderland*, No. 19357 NC, 2006 WL 75310 (Del. Ch. Jan. 4, 2006) (discussing justifications for incentive bonus and awarding $42,400 to plaintiff).  During the litigation, Plaintiffs participated meaningfully, including by carefully reviewing the initial Section 220 requests, the complaints and briefing, and other developments in the investigation and lawsuit.  Courts regularly approve similar service awards for plaintiffs who actively participate in the litigation process.  *See, e.g.*, *Ryan*, 2009 WL 18143, at \*14 (awarding $5,000 to each plaintiff); *see In re Sanchez Energy Deriv. Litig.*, No. 9132-VCG (Del Ch. Nov. 6, 2017) (awarding $5,000 to each plaintiff); *Nitsche v. Temple*, No. 12636-VCG, (Del. Ch. May 26, 2017) (awarding to $5,000 to plaintiff "in consideration of his participation in this Action as a derivative representative"); *Pearson v. Vogelsinger*, No 028-VCS, (Del. Ch. Nov. 27, 2006) (awarding a $5,000 service award).  The proposed $2,500 service awards are thus reasonable and should be approved.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court approve the Settlement and Plaintiffs' request for attorneys' fees and expenses in the amount of $1,784,367.02, including service awards of $2,500 to each Plaintiff.

DATED:  November 7, 2018          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

   */s/ Geoffrey M. Johnson*
GEOFFREY M. JOHNSON (*pro hac vice*)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44118
Telephone: (216) 229-6088

20

Facsimile:  (860) 537-4432
gjohnson@scott-scott.com

DAVID R. SCOTT
AMANDA F. LAWRENCE (BBO #568737)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

JOE PETTIGREW
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619)233-4565
Facsimile: (619)233-0508
jpettigrew@scott-scott.com

BRIAN J. ROBBINS
FELIPE J. ARROYO (*pro hac vice*)
STEVEN R. WEDEKING (*pro hac vice*)
**ROBBINS ARROYO LLP**
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com
swedeking@robbinsarroyo.com

*Co-Lead Counsel for Plaintiffs Karen Colgan,
Sandra Farah-Franco, and Russell Gourley*

JOSH BAKER
PHILLIP KIM
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
jbaker@rosenlegal.com
pkim@rosenlegal.com

21

MATTHEW H. LEE
TIMOTHY W. BROWN
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile:  (516) 344-6204
mlee@thebrownlawfirm.com
tbrown@thebrownlawfirm.com

*Additional Counsel for Plaintiffs*

DAVID WALES
JOHN VIELANDI
**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
DWales@blbglaw.com
john.vielandi@blbglaw.com

NED WEINBERGER
MARK RICHARDSON
THOMAS CURRY
**LABATON SUCHAROW LLP**
300 Delaware Avenue, Suite 1340
Wilmington, DE 19801
Telephone: (302) 573-2540
Facsimile:  (302) 573-2529
nweinberger@labaton.com
mrichardson@labaton.com
tcurry@labaton.com

FRANCIS A. BOTTINI, JR.
**BOTTINI & BOTTINI, INC.**
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002
fbottini@bottinilaw.com

*Counsel for Plaintiff Silberberg*

22

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 7th day of November, 2018.

_/s/ Geoffrey M. Johnson_____
GEOFFREY M. JOHNSON (*pro hac vice*)