# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN THARP, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>ACACIA COMMUNICATIONS, INC., MURUGESAN SHANMUGARAJ, and JOHN F. GAVIN,<br><br>    Defendants. | No. 17-cv-11504-WGY<br>(LEAD DOCKET)<br><br>**REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT; AND PLAINTIFFS' COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND PAYMENT OF SERVICE AWARDS** |
| KAREN COLGAN, Derivatively on Behalf of ACACIA COMMUNICATIONS, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>MURUGESAN SHANMUGARAJ, BENNY P. MIKKELSEN, JOHN F. GAVIN, FRANCIS J. MURPHY, BHUPENDRA C. SHAH, CHRISTIAN J. RASMUSSEN, MEHRDAD GIVEHCHI, VINCENT T. ROCHE, STAN J. REISS, ERIC A. SWANSON, PETER Y. CHUNG, and JOHN RITCHIE,<br><br>    Defendants,<br><br>and<br><br>ACACIA COMMUNICATIONS, INC.,<br><br>    Nominal Defendant. | No. 17-cv-12350-WGY |

[Caption continued on next page.]

## PUBLIC REDACTED VERSION

| | |
|---|---|
| JONATHAN WONG, Derivatively on Behalf of ACACIA COMMUNICATIONS, INC., | No. 17-cv-12550-WGY |
| Plaintiff, | |
| v. | |
| MURUGESAN SHANMUGARAJ, JOHN F. GAVIN, BENNY P. MIKKELSEN, FRANCIS J. MURPHY, BHUPENDRA C. SHAH, CHRISTIAN J. RASMUSSEN, MEHRDAD GIVEHCHI, ERIC A. SWANSON, STAN J. REISS, PETER Y. CHUNG, JOHN RITCHIE, and VINCENT T. ROCHE, | |
| Defendants, | |
| and | |
| ACACIA COMMUNICATIONS, INC., | |
| Nominal Defendant. | |
| SANDRA FARAH-FRANCO and RUSSELL GOURLEY, Derivatively on Behalf of Nominal Defendant ACACIA COMMUNICATIONS, INC., | No. 1:18-cv-10465-WGY |
| Plaintiffs, | |
| v. | |
| MURUGESAN SHANMUGARAJ, BENNY P. MIKKELSEN, PETER Y. CHUNG, STAN J. REISS, JOHN RITCHIE, VINCENT T. ROCHE, ERIC A. SWANSON, JOHN F. GAVIN, MEHRDAD GIVEHCHI, FRANCIS J. MURPHY, CHRISTIAN J. RASMUSSEN, and BHUPENDRA C. SHAH, | |
| Defendants, | |
| and | |
| ACACIA COMMUNICATIONS, INC., | |
| Nominal Defendant. | |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.       DEFENDANTS' ARGUMENT THAT PLAINTIFFS' CLAIMS WERE
           NOT MERITORIOUS WHEN FILED FAILS ........................................ 2

         A.      The *Dann* Standard Applies Only to Mootness Applications .................... 2

         B.      The Stockholder Derivative Claims Are Meritorious ................................ 6

    II.      THE SETTLEMENT PROVIDES SUBSTANTIAL BENEFITS TO
           ACACIA ................................................................................................ 9

    III.    PLAINTIFFS' COUNSEL'S LODESTAR IS A REASONABLE CROSS-
           CHECK .................................................................................................. 15

    IV.    THE LACK OF STOCKHOLDER OBJECTIONS SUPPORTS
           SETTLEMENT ....................................................................................... 18

CONCLUSION ........................................................................................................... 19

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Allied Artists Pictures Corp. v. Baron,*
413 A.2d 876 (Del. 1980) ...........................................................................6

*In re AOL Time Warner S'Holder Deriv. Litig.,*
No. 02 Civ. 6302(SWK), 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ................18

*Bushansky v. Carlucci,*
No. 17-cv-12091-ADB (D. Mass.) ........................................................14

*Chrysler Corp v. Dann,*
223 A.2d 384 (Del. 1966) ............................................................... *passim*

*City of Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974)........................................................................18

*In re Cox Commc'ns, Inc. S'holders Litig.,*
879 A.2d 604 (Del. Ch. 2005)......................................................... *passim*

*Deary v. City of Gloucester,*
9 F.3d 191 (1st Cir. 1993)..........................................................................16

*In re Del Monte Foods Co. S'holders Litig.,*
No. 6027-VCL, 2011 WL 2535256 (Del. Ch. June 27, 2011)................................16

*In re Delphi Corp. Sec., Deriv. & "ERISA" Litig.,*
248 F.R.D. 483 (E.D. Mich. 2008) ........................................................19

*eBay Domestic Holdings, Inc. v. Newmark,*
16 A.3d 1 (Del. Ch. 2010)..........................................................................6

*In re Fleet/Norstar Sec. Litig.,*
935 F. Supp. 99 (D.R.I. 1996)......................................................................6

*Freedman v. Adams,*
No. 4199-VCN, 2012 WL 1345638 (Del. Ch. Mar. 30, 2012)...............................6

*Greenfield v. Frank B. Hall & Co., Inc.,*
No. 8480, 1992 WL 301348 (Del. Ch. Oct. 19, 1992)..........................................6

*Gubricky on behalf of Chipotle Mexican Grill, Inc. v. Ells,*
No. 16-CV-2011-WJM-KLM, 2018 WL 1621166 (D. Colo. Apr. 4, 2018) ...........14

*Guidry v. Clare,*
442 F. Supp. 2d 282 (E.D. Va. 2006) ......................................................16

ii

*Heien v. Archstone*,
    837 F.3d 97 (1st Cir. 2016) ...................................................................................16

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ...........................................................................................16

*In re Invacare Deriv. Litig.*,
    No. 1:11-cv-01893 (N.D. Ohio) .........................................................................15

*In re Jefferies Grp., Inc. S'holders Litig.*,
    No. 8059-CB, 2015 WL 3540662 (Del. Ch. June 5, 2015) ....................................18

*La. Power & Light Co. v. Kellstrom*,
    50 F.3d 319 (5th Cir. 1995) ................................................................................16

*Maley v. Del Glob. Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)...................................................................18

*New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc.*,
    No. 05-11148-PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009).......................9, 16

*In re Oclaro, Inc. Deriv. Litig.*,
    No. C-11-3176 EMC, 2014 WL 4684993 (N.D. Cal. Sept. 19, 2014) .............14, 15

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...............................................................19

*In re Oracle Corp., Deriv. Litig.*,
    867 A.2d 904 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005).............................7

*In re OSI Sys., Inc. Deriv. Litig.*,
    No. CV-14-2910-MWF (MRWx), 2017 WL 5642304 (C.D. Cal. May 2, 2017)...................15

*Pension Fund v. Hooley*,
    No. 12-cv-10767-GAO (D. Mass.) ......................................................................14

*Pontiac Gen. Emps. Ret. Sys. v. Ballantine*,
    No. 9789-VCL (Del. Ch.) ...................................................................................13

*Ryan v. Gifford*,
    No. 2213-CC, 2009 WL 18143 (Del. Ch. Jan. 2, 2009) ........................................18

*In re S.S. Body Armor I, Inc.*,
    No. 10-11255 (CSS), 2018 WL 3199248 (D. Del. June 29, 2018)..........................16

*Sandy v. Pincus*,
    152 A.3d 124 (Del. 2016) .....................................................................................8

*In re Sauer-Danfoss Inc. S'holders Litig.*,
    65 A.3d 1116 (Del. Ch. 2011) ................................................................................16

*Seinfeld v. Coker*,
    847 A.2d 330 (Del. Ch. 2000) ..................................................................................9

*Silverberg v. Gold*,
    No. 7646-VCP, 2013 WL 6859282 (Del. Ch. Dec. 31, 2013) ...................................7

*Strougo ex rel. Braz. Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ....................................................................18

*In re Tile Shop Holdings, Inc. Stockholder Deriv. Litig.*,
    No. 10884-VCG (Del. Ch.) .....................................................................................15

*Van Ingen v. Ha-Ngoc*,
    No. 14-cv-11672 (D. Mass. Mar. 23, 2017) ...........................................................14

*In re Volkswagen & Audi Warranty Extension Litig.*,
    89 F. Supp. 3d 155 (D. Mass. 2015) .......................................................................18

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ...............................................................................16

## PRELIMINARY STATEMENT

As set forth in Plaintiffs' and Plaintiffs' Counsel's opening Settlement and Fee Briefs (the "Opening Briefs"),[1] the prosecution of this Action by Plaintiffs' Counsel resulted in a settlement that provides substantial benefits to Acacia Communications, Inc. ("Acacia" or the "Company") and its stockholders.

Plaintiffs filed these Actions after numerous directors and officers of Acacia, and their private equity affiliates, received early releases from Lock-Up Agreements that allowed them to sell hundreds of millions of dollars of Acacia stock just two weeks prior to the disclosure of negative news.  The early release of a lock-up and insiders selling company stock on non-public information is a classic *Brophy* violation under Delaware law.  Ultimately, after an in-person mediation session, Plaintiffs and Defendants agreed to the Settlement, which improves the corporate governance of Acacia specifically as it relates to the misconduct as alleged by Plaintiffs.  The benefits of the Settlement are substantial and include the creation of a Trading Compliance Committee, increased oversight of insider trading by the Company's Audit Committee, increased information flow to officers and directors responsible for public disclosures, and the addition of a new independent director to the Board.  These corporate governance reforms are valuable to Acacia and its stockholders, support the Settlement, and justify Plaintiffs' Counsel's requested award of fees and expenses.

Defendants contort themselves to: (i) agree that these reforms are substantial enough to approve the Settlement, so that they obtain litigation releases; and (ii) dispute that these reforms are substantial enough to justify a commensurate award of attorneys' fees.  Defendants cannot have it both ways – either the Settlement provides substantial benefits that justify its approval,

---

[1]    All capitalized terms not otherwise defined here in shall have the meaning set forth in the Memorandum of Points and Authorities in Support of Plaintiffs' Counsel's Motion for Attorneys' Fees, Reimbursement of Expenses, and Payment of Service Awards  (ECF No. 186) (the "Opening Fee Brief").

and an award of appropriate attorneys' fees, or it does not. If the Court agrees with the Defendants' position that the benefits provided by the Settlement are minimal, then it should decline to approve the Settlement itself in addition to rejecting Plaintiffs' Counsel application for an award of attorneys' fees and expenses.

However, Plaintiffs' Counsel respectfully submit that the Settlement does provide substantial benefits and, in recognition of those benefits, the Court should approve the Settlement, as well as Plaintiffs' Counsel's application for: (i) an award of attorneys' fees in the amount of $1,750,000; (ii) reimbursement of expenses in the amount of $34,367.02; and (iii) approval of nominal incentive awards in the amount of $2,500 to be paid to each of the Plaintiffs out of Plaintiffs' Counsel's award of attorneys' fees and expenses.

## ARGUMENT

### I.    DEFENDANTS' ARGUMENT THAT PLAINTIFFS' CLAIMS WERE NOT MERITORIOUS WHEN FILED FAILS

#### A.    The *Dann* Standard Applies Only to Mootness Applications

Defendants claim that Plaintiffs are not entitled to recover attorneys' fees and expenses unless they can establish that their claims were meritorious when filed. The parties settled this Action before the Defendants responded to Plaintiffs' Complaint. There is no motion to dismiss pending before the Court. Nevertheless, Defendants ask the Court to view this case the same as a class action, rule on a hypothetical motion to dismiss that has never been briefed, and then argue that should the Court rule in Defendants' favor, Plaintiffs' Counsel should not be awarded a fee. Defendants' position is not the law.

To support their argument, Defendants cite to the well-known *Dann* standard set forth in *Chrysler Corp v. Dann*, 223 A.2d 384 (Del. 1966). Delaware courts have made it clear, however, that the *Dann* standard and the meritorious when filed condition applies ***only*** when

2

there is uncertainty regarding whether a plaintiff's lawsuit actually caused the defendants to make the corporate reforms and thus has no bearing in this Action.  *See In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 635 (Del. Ch. 2005).

This uncertainty, which does not exist in the present Action, typically happens when defendants moot a stockholder derivative or class action lawsuit by taking unilateral action to benefit the class or company.  *Id.*  In such a situation, the law provides plaintiffs a presumption that their lawsuit caused defendants to adopt therapeutic reforms, entitling them to an award of attorneys' fees.  However, in order to ensure plaintiffs did not abuse this presumption when their claims were mooted before a decision on a motion to dismiss, the law also requires plaintiffs to establish their complaint was meritorious when filed.  *Id.*  Critically, no Delaware court has ***ever*** applied the *Dann* standard when defendants have ***admitted*** that they have made the corporate reforms in order to settle the derivative claims plaintiffs have alleged in their suit.

*Cox* – which is the seminal Delaware case on the *Dann* standard – is directly on point.  There, the plaintiffs were challenging the Cox family's ***proposal*** to purchase all of Cox Communication's public shares at $32.00 per share.  *Id.* at 607-08.  The proposal expressly anticipated that the Cox family would negotiate the terms of a definitive agreement, if any, with a special committee of directors.  *Id* at 607.  Numerous stockholders filed complaints before there was a transaction to challenge and before the special committee could even begin its work.  *Id.* at 608.  Ultimately, the Cox family reached an agreement with the special committee to pay $34.75 per share and, in conjunction with that agreement, settled the litigation with the plaintiffs on the same terms negotiated with the special committee, plus the payment of attorneys' fees.  *Id*. at 608-12.

3

A Cox Communications stockholder objected to the fee, claiming that plaintiffs' counsel was not entitled to any fee under the *Dann* standard because plaintiffs' going private lawsuit was not meritorious when filed.  The Delaware Chancery Court rejected the objection and explained that the *Dann* standard only applies in certain limited contexts:

> The quintessential one is when a derivative action is filed making a claim of wrongdoing, when the corporation later takes action consistent with the objectives of the derivative action, the derivative action is therefore mooted, and the plaintiffs' lawyers claim that they should be paid a fee for causing the beneficial action.

*Id.* at 635.

Delaware courts apply the *Dann* standard to mootness cases as it can be difficult for the court to determine whether the lawsuit caused the defendants to implement the corporate reforms: "The difficulty in [the mootness] context is determining whether the action that the defendants took really resulted in any proximate way the pendency of the derivative action."  *Id.* This rule does not and should not be extended to the settlement context because "[o]ne can easily imagine situations when it is highly debatable whether a complaint would survive a motion to dismiss and the uncertainty of that proposition is what drove a favorable settlement for the class."  *Id.* at 639.  Moreover, extending this rule would be an inefficient use of judicial resources.  It would require parties to shoehorn motion to dismiss arguments into settlement applications and require the Court to "replicat[e] the intensive rigor of a formal Rule 12(b)(6) opinion[.]"  *Id.*  Litigants agree to settlements in part to avoid spending the resources necessary to make such arguments.

Thus, the purpose of the meritorious when filed requirement is to distinguish between mootness situations where plaintiffs deserve to recover attorneys' fees because their litigation caused a benefit, and those situations where there is no causal link between the filing of the suit and the benefits defendants' unilaterally adopted.  *Id.* at 634-40.  As the *Cox* Court concluded:

> [I]n the end, I think [extending the *Dann* standard to situations where Defendants concede the causal link between the actions and the lawsuit] goes too far and seeks to extend a practice doctrine designed to govern a very different context in a way that is unnecessary to ensure the integrity of the representative litigation process and that is likely to generate excessive litigation costs.

*Id.* at 639.

The reasoning in *Cox* directly applies here. This is not a case where there is any uncertainty or question regarding the causal connection between Plaintiffs' lawsuit and Defendants' decision to implement the reforms, as they were required by the Settlement. Defendants did not voluntarily implement the Settlement's reforms. The reforms are required by the Memorandum of Understanding ("MOU") and subsequent Stipulation and Agreement of Settlement (ECF No. 180-1) (the "Stipulation"). Furthermore, the Stipulation specifically states that:

> Acacia acknowledges that the pendency, prosecution, and settlement of the Actions and the litigation efforts of Plaintiffs and Plaintiffs' Counsel were a substantial factor in the Company's decision to agree to the corporate governance changes described in paragraphs 6(a), 6(b), and 6(c) below, and a factor in the Company's decision to agree to the corporate governance change described in paragraph 6(d) below.

Stipulation ¶4.

The MOU provides that the parties would negotiate, in good faith, reasonable attorneys fees, not as the Defendants argue here that no attoenys fees should be awarded. Similarly, the Stipulation also contemplates that Acacia will pay Plaintiffs' reasonable fees and expenses as awarded by the Court, with Defendants reserving their right to object to the amount of the fee and expense award. *See* Stipulation ¶17 ("Acacia (directly or through its insurers) shall pay or cause to be paid the attorneys' fees, expenses, and Plaintiffs' incentive award as awarded by the Court."); *id.* ¶18 ("Payment of the Fee Award shall constitute final and complete payment for the

Plaintiffs' attorneys' fees and expenses that have been incurred or will be incurred in connection with the filing and prosecution of the Actions and the resolution of the claims alleged therein.").

In sum, it is well-established that plaintiffs need not establish their claims were meritorious when filed – even though they were – when defendants admit and acknowledge that they are making corporate reforms as a result of a plaintiffs' lawsuit. Defendants only implemented substantial corporate reforms because Plaintiffs filed and litigated this Action. As a result, an award of attorneys' fees and expenses is unquestionably warranted. To argue otherwise misstates the law and would force the Court to needlessly litigate and rule on a hypothetical Rule 12(b)(6) motion that is not before the Court.[2]

## B.    The Stockholder Derivative Claims Are Meritorious

Plaintiffs' claims were meritorious when filed. In arguing otherwise, Defendants attempt to miscast Plaintiffs' claims as indistinguishable from the federal securities law class action claims previously dismissed by this Court. However, Plaintiffs' core claims are *Brophy* claims under Delaware law.

To state a *Brophy* claim, a plaintiff need only "show that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because [he or] she was motivated, in whole or in part,

---

[2]    Tellingly, none of the cases that Defendants cite in their papers are close to being on point. *See Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876 (Del. 1980) (*Dann* standard applied where plaintiff was seeing attorney fees after derivative lawsuit was mooted by merger of company into new corporation); *Greenfield v. Frank B. Hall & Co., Inc.*, No. 8480, 1992 WL 301348, at *1 (Del. Ch. Oct. 19, 1992) (*Dann* standard applied where lawsuit was mooted by settlement in ***another*** shareholder derivative case); *Freedman v. Adams*, No. 4199-VCN, 2012 WL 1345638 (Del. Ch. Mar. 30, 2012) (derivative case mooted by changes that a corporation unilaterally made to compensation plan); *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1 (Del. Ch. 2010) (refusing to award minority shareholder attorneys' fees under fee shifting statue where there was ***no*** settlement and where majority shareholder won trial on breach of fiduciary duty claims). Indeed, out of the literally thousands of shareholder derivative settlements over the past 30 years, Defendants were able to find only ***one*** case where a district court erroneously applied the *Dann* standard outside of the mootness context. *See, e.g.*, *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 113 (D.R.I. 1996). The court in *Fleet/Norstar* applied the *Dann* standard to a derivative settlement without any analysis or explanation for why the court was applying it outside of the mootness context and, in doing so, the court erroneously misconstrued and misapplied established law.

by the substance of that information." *In re Oracle Corp., Deriv. Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005); *see also Silverberg v. Gold*, No. 7646-VCP, 2013 WL 6859282, at *1-3 (Del. Ch. Dec. 31, 2013) (denying motion to dismiss on *Brophy* claim in case where facts are virtually identical to those pled here).  Importantly, these requirements make no mention of the need for a misstatement or of safe harbors for forward-looking statements or relevant risk disclosures, which were the primary grounds on which this Court dismissed the federal securities law class action against Acacia.  *See* ECF No. 168 at 30-50.

Thus, a *Brophy* claim is distinct from, and can survive without, an actionable federal Exchange Act claim.  The facts presented here, including the documents produced by Acacia in response to the various books and records demands, are sufficient to establish a *Brophy* claim under Delaware law.

As described in Plaintiffs' Opening Briefs, the Private Equity Funds and Company insiders that controlled Acacia were parties to Lock-Up Agreements that prohibited them from selling Acacia stock for six months following the Company's IPO, or until November 8, 2016.  Nonetheless, these Private Equity Funds and insiders caused Acacia to hold the Secondary Offering on or about October 7, 2016.  In connection with the Secondary Offering, they obtained early releases from the Lock-Up Agreements, which enabled them to sell approximately $290 million worth of Acacia stock at $100.00 per share, less a $3.50 underwriters' discount.  Less than two weeks later, Acacia's top two customers announced disappointing quarterly results and underwhelming forward guidance.

In response, the Company's stock price fell to $65.76 by November 7, 2016, the day before the Lock-Up Agreements were initially set to expire.  Therefore, the selling stockholders received nearly $100 million more in sale proceeds than they would have if they waited for their

Lock-Up Agreements to naturally expire. Notably, while the Consolidated Amended Complaint in this Action contained allegations about these Lock-Up Agreement waivers, the operative complaint in the parallel securities class action did not, thus further distinguishing this derivative action from the class action. *See* ECF No. 167 ¶¶114-18; *see generally* ECF No. 79.[3]

All but one of the Company's then-directors received Lock-Up waivers and sold stock in the Secondary Offering either personally or through an affiliated entity. Defendants now claim that there was nothing improper about those waivers because they were approved by the sole director that did not participate in the Secondary Offering. However, ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

Thus, the clear and undeniable inference is that the selling stockholders deliberately sought a release from the Lock-Up Agreements in order to sell Acacia stock prior to the previously agreed upon November 8, 2016 date. This is all that is required to plead a meritorious *Brophy* claim. *See Sandy v. Pincus*, 152 A.3d 124 (Del. 2016) (upholding *Brophy* claim where controlling stockholder obtained early release from a lock-up and sold stock with insider information).

---

[3]    Moreover, the Delaware Action focused on and targeted these Lock-Up waivers, insider trading, and *Brophy* claims.

## II.     THE SETTLEMENT PROVIDES SUBSTANTIAL BENEFITS TO ACACIA

The benefits provided by the Settlement are the most important factor in determining an appropriate award of attorneys' fees.  *See Seinfeld v. Coker*, 847 A.2d 330, 336 (Del. Ch. 2000).  The Settlement provides numerous and substantial benefits to Acacia that support approval of the Settlement and justify Plaintiffs' Counsel's requested award of fees and expenses.  This is why the lone Acacia director not named as a Defendant in any of the Actions approved the Settlement "as being in the best interests of the Company."  Stipulation ¶5.

*First*, the Settlement requires Acacia to adopt and formalize a variety of policies and procedures designed to ensure insiders will not be able to trade Acacia securities in the future based on material non-public information.

Defendants attempt to downplay the importance of these reforms by suggesting that they were already in place at Acacia prior to the Settlement.  Not so.  Previously, the Chief Financial Officer ("CFO") and General Counsel were responsible for approving the trades and 10b5-1 plans of directors and officers.  However, now this function has been formalized in the Trading Compliance Committee that includes an additional member, the Corporate Counsel (Dec. Ex. 3 at 2),[4] which reduces the likelihood that the CFO and General Counsel could work together to undermine any review process.  Previously, there was no restriction on the ability of the CFO or General Counsel to participate in the review process and deliberations concerning their own trading; they were only prohibited from formally approving their own trading.  *Id.* Ex. 5 §3.2(a).  Removing interested parties from related deliberations prevents them from infecting the review process.  This is particularly appropriate here because the CFO is one of the individuals who sold shares in the Secondary Offering. ██████████████████████████████████

---

[4]        "Dec." referes to the Declaraton of Janene I. Asgeirsson (ECF No. 189) that was filed in support of Defendants' Opposition to Plaintiffs' Counsel's Motion for Attorneys' Fees (ECF. No. 188) ("Defs. Opp.").

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

The rest of the Settlement's provisions relating to insider trading are all new, including the requirements that the Audit Committee: (i) review the activities of the Trading Compliance Committee on "a quarterly basis" (*id.* Ex. 1 §§C.21, 22); (ii) "review and approve the Company's Insider Trading Policy and 10b5-1 Plan Guidelines/Limits" (*id.* §C.21); (iii) approve "any request to waive any lock-up provisions or blackout trading restrictions" after the Trading Compliance Committee makes a recommendation (*id.*); and (iv) not permit any member to "participate in the deliberations . . . or approval of any [of their own] request[s] to waive" (*id.*).

The Settlement also requires the Company to both amend its Insider Trading Policy to expressly state that the Company has the right to disgorge profits in the event of a material violation and disclose the Insider Trading Policy publicly for the first time. *See* Stipulation ¶¶6(a)(iv)-(v).

Defendants also assert, without any documentation supporting such a policy, that the waiver of any Lock-Up Agreement already required a vote of the Board. Dec. ¶6. ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████    The Settlement prohibits individuals from participating in the deliberations or approval of their own trading.

**Second**, the Settlement requires Acacia to add a new independent director by the end of 2019 and make gender diversity a priority in its search.  Defendants claim this is a minimal benefit because the Company was already in the process of looking for a new independent director and was prioritizing gender diversity.  While the Company may have been informally considering adding a new director, the Company's Board and Nominating and Corporate Governance Committee minutes suggest that Acacia did not retain a search firm to identify director candidates until after Plaintiffs sent their Settlement Demand, which demanded the addition of a new independent director, to Defendants on July 13, 2018.  Dec. Exs. 15-16.  The Company did not begin interviewing potential candidates until September 2018, well after the parties agreed to the Settlement.  *Id.* ¶10 & Ex. 17.

Moreover, absent the Settlement, the Company was not required to add a new independent director.  Acacia could have abandoned that search and prioritization at any time and proceeded with its incumbent Board.  The Settlement creates a legal obligation, which did not previously exist, that the Company follow through on adding another director.  That is a clear benefit provided by the Settlement

Defendants' claim that adding a new independent director only provides a minimal benefit because all but two of the Company's directors are "independent" ignores the core alleged misconduct.  ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████    The addition of a truly independent director that is not implicated in any of these suspicious stock sales is unquestionably a substantial benefit.

**Third**, the Settlement requires Acacia to amend its Corporate Governance Guidelines to stipulate that the Board must ensure that effective systems are in place for reporting to the Board on the Company's manufacturing protocols and quality controls, as well as product demand. To that end, the Settlement requires the Audit Committee and Trading Compliance Committee to receive quarterly updates on such information, and it expands the group of employees that report to the Disclosure Committee to include employees with firsthand knowledge of such issues. Defendants now attempt to downplay these reforms by arguing they are inconsistent with Plaintiffs' allegations that the Board was aware of softening customer demand and issues with manufacturing quality.[5] Of course, Plaintiffs believe Acacia insiders were aware of these issues and sold stock with that material non-public information. However, Defendants have always insisted the members of the Board were not aware of these issues. Therefore, these reforms will ensure that the Board will be aware of such issues going forward and prevent insiders from arguing otherwise if they engage in further suspicious stock sales.

Collectively, this set of corporate governance reforms provides substantial and valuable benefits to Acacia. In order to help illustrate the value of these benefits and as previously requested by other courts, Plaintiffs' Counsel submitted the Declaration of Matthew Cain, Ph.D. (ECF No. 184-1) (the "Cain Declaration"), a Visiting Research Fellow at Harvard Law School and former Economic Fellow/Financial Economist for the U.S. Securities and Exchange

---

[5]    Defendants claim the Board already received regular updates concerning such information, but cite to no board minutes or materials in support of this claim. Regardless, formalizing the requirements for any such reporting will ensure the Board receives appropriate information.

Commission, in which he used several studies to approximate the value of the Settlement as $68-82 million. *See, e.g.*, *Pontiac Gen. Emps. Ret. Sys. v. Ballantine*, No. 9789-VCL, Settlement Hearing Transcript at 14:20-23 (Del. Ch. May 8, 2015) ("I wish I had some sort of economic proxy to give me some sense of what the value of [the non-monetary settlement benefits] was so I wasn't just pulling a number out of the air.") (attached hereto as Exhibit 1).

Defendants attack the Cain Declaration by arguing the studies used to approximate the value of the Settlement are not appropriate comparables.[6]  Of course, no study is likely to perfectly address the terms of any given Settlement.  Nonetheless, the Cain Declaration used studies that analyze the effects on companies' market capitalizations after being forced to implement reforms designed to limit insider trading abuses and after suddenly losing an independent director.  These are analogous to the benefits provided by the Settlement.[7]  Regardless, the Court can use the Cain Declaration, based on well regarded academic studies, and the approximate value of the Settlement derived from these studies, to recognize that the provisions of the Settlement are valuable, support approval of the Settlement, and justify the requested fee and expense award.

Defendants argument denigrating the terms of the Settlement to avoid paying a reasonable amount of attorneys fees, should be rejected.  As the *Cox* Court explained, "[t]o have an objector come forward and concede that the settlement was favorable but contest the fee

---

[6]      Defendants also attack two assumptions inherent in the Cain Declaration: that the allegations of malfeasance were meritorious and the Lock-Up waivers are relevant.  As explained above, both assumptions are appropriate.

[7]      Defendants criticize the Cain Declaration for stating that the value of adding a new independent director ranges from 0.85% to 5.01% of a company's market cap because the 5.01% figure is "merely the result from a statistical cross-check that the authors expressly warn 'should be interpreted with caution.'"  Defs. Opp. at 13.  However, Defendants ignore that Cain specifically used the low end of the range, or 0.85%, in calculating the estimated value of the Settlement.  Cain Declaration ¶40.

under *Dann* would be inequitable and serve no proper purpose."  *Cox*, 879 A.2d at 639.

Plaintiffs' Counsel strongly believe the benefits of the Settlement are substantial.

Moreover, in arguing the Court should award Plaintiffs' Counsel a minimal fee,

Defendants compare the benefits achieved by the Settlement to a variety of cases that are readily

distinguishable and provide significantly weaker corporate governance benefits:

- *Van Ingen v. Ha-Ngoc*, No. 14-cv-11672 (D. Mass. Mar. 23, 2017).  This settlement provided for a variety of minor conditions and reforms, including increased attendance and monitoring requirements for directors, a requirement that a majority of the board remain independent (five out of six directors were already independent), and the hiring of a risk compliance officer.  The settlement did create a new committee or add a new independent director to the board.

- *Operative Plasterers' & Cement Masons' Local Union Officers' & Emps.' Pension Fund v. Hooley*, No. 12-cv-10767-GAO (D. Mass. Dec. 17, 2014).  This settlement only included requirements that the company provide more information to its clients concerning foreign exchange transactions.  The settlement did not implement any corporate governance measures.

- *Bushansky v. Carlucci*, No. 17-cv-12091-ADB (D. Mass. May 17, 2018).  This settlement primarily included the hiring of additional junior executives, ability of an officer to call a meeting of a compliance committee, and ability of the compliance committee to hire additional advisors.  The settlement did not create a new committee, add a new independent director, or improve informational reporting to its board.

- *In re Oclaro, Inc. Deriv. Litig.*, No. C-11-3176 EMC, 2014 WL 4684993 (N.D. Cal. Sept. 19, 2014).  This settlement separated the roles of chairman and chief executive officer, limited the number of public company boards directors could sit on, affirmed the company would continue to comply with NASDAQ's listing requirements, and required the audit committee to meet a minimum of four times per year.  The settlement did not create a new committee, commit to adding a new independent director, or improve informational reporting to its board.

- *Gubricky on behalf of Chipotle Mexican Grill, Inc. v. Ells*, No. 16-CV-2011-WJM-KLM, 2018 WL 1621166 (D. Colo. Apr. 4, 2018).  The only reform provided by this settlement that was not already in place at the company was an amendment to the company's whistleblower program.  The settlement did not create a new committee that did not already exist, did not add new directors that the company did not already appoint, and did not improve informational reporting to the board.

14

Defendants further attempt to distinguish the actual comparable cases cited by Plaintiffs' Counsel by ignoring the most important element (benefits provided by respective settlements) and focusing on extraneous or less relevant factors, such as whether the fee was contested, the strength of the claims asserted, and the procedural posture of the cases.  In fact, the requested award of attorneys' fees and expenses compares favorably with cases such as *In re OSI Sys., Inc. Deriv. Litig.*, where the Court approved a $1.6 million fee award for the addition of a new independent director and other governance reforms, including revisions to committee charters and the company's insider trading policy. No. CV-14-2910-MWF (MRWx), 2017 WL 5642304 (C.D. Cal. May 2, 2017).  Similarly, in *In re Tile Shop Holdings, Inc. Stockholder Deriv. Litig.*, the Court approved a $1,250,000 fee award in connection with a settlement where the main benefit was the appointment of a new independent director and creation of an executive-level compliance department tasked with overseeing and enforcing a revised Code of Business Conduct and Ethics.  No. 10884-VCG (Del. Ch. Aug. 23, 2018); *see also In re Invacare Deriv. Litig.*, No. 1:11-cv-01893 (N.D. Ohio July 9, 2012) (approving $1.3 million fee award for corporate governance reforms, including increased board oversight responsibilities and reporting controls).

## III.    PLAINTIFFS' COUNSEL'S LODESTAR IS A REASONABLE CROSS-CHECK

As set forth above and in the Opening Fee Brief, Plaintiffs' Counsel's requested fee is based on the substantial benefit conferred upon Acacia, not the lodestar of Plaintiffs' Counsel. Defendants do not dispute that the substantial benefit doctrine is an appropriate method to determine a reasonable fee in this case.  Indeed, Defendants recognize "the most important [] factor[]" in determining the fee is the "extent of the corporate benefit conferred."  Defs. Opp. at 5.

Nonetheless, to further support the reasonableness of the requested fee, Plaintiffs' Counsel also provide their lodestar as a cross-check to aid the Court. While the lodestar approach analysis is not required, it may be used as a check or validation of the reasonableness of requested attorneys' fees. *See New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc.*, No. 05-11148-PBS, 2009 WL 2408560, at *1 (D. Mass. Aug. 3, 2009); *see also In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1138 (Del. Ch. 2011); *In re Del Monte Foods Co. S'holders Litig.*, No. 6027-VCL, 2011 WL 2535256, at *12 (Del. Ch. June 27, 2011).

Defendants incorrectly claim Plaintiffs' Counsel did not submit enough information concerning their lodestar by citing several inapposite cases where determining the reasonableness of a fee award was based solely on the lodestar.[8] While fee applications determined solely pursuant to the lodestar method may require more detailed records, "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting, and courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re S.S. Body Armor I, Inc.*, No. 10-11255 (CSS), 2018 WL 3199248, at *4 n.13 (D. Del. June 29, 2018); *see also In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 263 (D. Del. 2002) ("When performing the lodestar analysis as a cross check on the fee award, the court may find it sufficient to review time summaries, rather than the actual billing records."). The time summaries submitted by Plaintiffs' Counsel in this case are sufficient to cross-check that the requested fee is reasonable.

---

[8]    *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (addressing fee-shifting rules under civil rights statutes for vindicating prisoner rights); *Heien v. Archstone*, 837 F.3d 97, 100 (1st Cir. 2016) (addressing time and hours where the "fee is determined according to the lodestar approach"); *Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006) (employing lodestar method to assess reasonable reimbursement for fees and cost to be awarded to defense counsel for violation of Rule 11); *Deary v. City of Gloucester*, 9 F.3d 191, 197 (1st Cir. 1993) (district courts "must carry out more than a conclusory examination of the hours and rates requested" "in awarding fees and costs in civil rights cases."); *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323-24 (5th Cir. 1995) (using the lodestar method as the sole method to determine reasonableness of fees to be shifted).

Defendants are well aware of the significant effort and time Plaintiffs' Counsel devoted to this Action. Plaintiffs' Counsel conducted thorough and independent investigations of the facts and the legal sufficiency of the claims by collecting and reviewing significant public and non-public information concerning Acacia and the misconduct as alleged in the Action. This investigation included significant efforts to obtain non-public documents pursuant to Section 220.

With the benefit of their investigations, Plaintiffs' Counsel independently prepared multiple complaints, including the *Colgan*, *Wong*, *Farrah-Franco*, Consolidated Amended, and Delaware complaints. Defendants argue that the number of complaints filed suggest piling on and duplicative work. Defs. Opp. at 19. But, Defendants ignore that the complaints were filed before the actions were consolidated and cite no authority that pre-consolidation work should not be included in Plaintiffs' Counsel's lodestar.[9] Defendants also ignore that the Delaware plaintiff filed a Section 220 complaint, prevailed on its books and records action, and only afterwards did Defendants agree to mediation and ultimately the settlement. Defendants acknowledge that the claims in the Delaware action were part of the reason they agreed to this Action's Settlement.

Then, to resolve this Action, Plaintiffs' Counsel participated in informal conferences and a full-day mediation with Defendants' counsel and an independent mediator and prepared the necessary settlement papers.[10] Defendants' criticism of the inclusion of time spent after a settlement-in-principal had been reached is also misplaced.[11]

---

[9]     Defendants suggestion that Robbins Arroyo included time for the dismissed action filed by Glade Dennis lacks any support. The Declaration of Steven R. Wedeking specifically indicated Robbins Arroyo acted as counsel for Karen Colgan and Co-Lead Counsel for Lead Plaintiffs in this Action. ECF No. 186-3 at 2. It did not include any time for any activity related to the *Dennis* action.

[10]     As noted above, Defendants' argument that Plaintiffs' Counsel simply piggybacked on the federal securities law class action is incorrect. Not only did Plaintiffs assert distinct meritorious claims, but their efforts actually resulted in substantial benefits to the Company.

[11]     Defendants' cited cases do not support the overarching proposition that an award based on the substantial

In sum, the time summaries submitted by Plaintiffs' Counsel are sufficient to cross-check that the requested fee is reasonable. [12]  They reflect the time spent by Plaintiffs' Counsel litigating this Action (and the Delaware Action) for the benefit of Acacia.  Said time results in a multiplier of approximately 1.72 times which is reasonable multiplier based on other cases with similar results.  *See* Opening Fee Brief at 19 n.12.

## IV.   THE LACK OF STOCKHOLDER OBJECTIONS SUPPORTS SETTLEMENT

Notice of the Settlement, hearing, and right of stockholders to object to the Settlement and requested award of attorneys' fees in the amount of $1,750,000 was provided in accordance with the Court's Preliminary Approval Order.  *See* ECF No. 192.  The deadline for shareholders to object to the proposed Settlement was December 5, 2018.  No stockholder submitted an objection.  This fact weighs heavily in favor of final approval.  *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ("reaction of the class to the settlement" can support approval); *In re AOL Time Warner S'Holder Deriv. Litig.*, No. 02 Civ. 6302(SWK), 2006 WL 2572114, at *6 (S.D.N.Y. Sept. 6, 2006) ("'lack of objections may well evidence the fairness of the Settlement'"); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002) (lack of objection following notice "attests to the approval of the Class with respect to the Settlement and the fee and expense application"); *Strougo ex rel. Braz. Equity Fund, Inc. v.*

---

benefit doctrine is unreasonable simply because the lodestar used in the cross-check includes time incurred post agreement-in-principle.  *See In re Jefferies Grp., Inc. S'holders Litig.*, No. 8059-CB, 2015 WL 3540662, at *3-4 (Del. Ch. June 5, 2015) (awarding attorneys based on percentage of the gross value of the settlement without any reduction for lodestars that included time for leadership and post agreement-in-principle work); *see also In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 172 (D. Mass. 2015) ("'As a general rule, time spent in establishing and defending a fee, or objecting to an unduly small award, should be included in the final calculation of the award. Exclusion of such services would dilute the value of the award, and so frustrate the purpose of [awarding attorneys' fees].'" (internal citation omitted and alterations in original)).  Indeed, time spent obtaining approval of a settlement is relevant in assessing counsel's effort in litigation.  *Ryan v. Gifford*, No. 2213-CC, 2009 WL 18143, at *14 (Del. Ch. Jan. 2, 2009) (awarding fees based on the substantial benefit conferred and including "negotiat[ing] and argu[ing] for approval of the Settlement" in the Court's assessment of the efforts of counsel.).

[12]      Of course, if the Court would like additional information, Plaintiffs' Counsel are happy to submit more detailed records upon request.

*Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) ("It has repeatedly been held that 'one indication of the fairness of a settlement is the lack of or small number of objections.'"); *In re Delphi Corp. Sec., Deriv. & "ERISA" Litig.*, 248 F.R.D. 483, 498-99 (E.D. Mich. 2008) (small number of objections indicate settlement's adequacy); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (three objections out of tens of thousands of shareholders "'raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members'").

## CONCLUSION

For all of the forgoing reasons, the Court should grant Plaintiffs' Motion for Final Approval of Settlement and Plaintiffs' Counsel's Motion for Attorneys' Fees, Reimbursement of Expenses, and Payment of Service Awards.

DATED:  December 12, 2018              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

   */s/ Geoffrey M. Johnson*
GEOFFREY M. JOHNSON (*pro hac vice*)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44118
Telephone: (216) 229-6088
Facsimile:  (860) 537-4432
gjohnson@scott-scott.com

DAVID R. SCOTT
AMANDA F. LAWRENCE (BBO #568737)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

JOE PETTIGREW
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101

Telephone: (619)233-4565
Facsimile: (619)233-0508
jpettigrew@scott-scott.com

BRIAN J. ROBBINS
FELIPE J. ARROYO (*pro hac vice*)
STEVEN R. WEDEKING (*pro hac vice*)
**ROBBINS ARROYO LLP**
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com
swedeking@robbinsarroyo.com

*Co-Lead Counsel for Plaintiffs Karen Colgan,*
*Sandra Farah-Franco, and Russell Gourley*

JOSH BAKER
PHILLIP KIM
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
jbaker@rosenlegal.com
pkim@rosenlegal.com

MATTHEW H. LEE
TIMOTHY W. BROWN
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile:  (516) 344-6204
mlee@thebrownlawfirm.com
tbrown@thebrownlawfirm.com

*Additional Counsel for Plaintiffs*

DAVID WALES
JOHN VIELANDI
**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020-1104

Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
DWales@blbglaw.com
john.vielandi@blbglaw.com

NED WEINBERGER
MARK RICHARDSON
THOMAS CURRY
**LABATON SUCHAROW LLP**
300 Delaware Avenue, Suite 1340
Wilmington, DE 19801
Telephone: (302) 573-2540
Facsimile:  (302) 573-2529
nweinberger@labaton.com
mrichardson@labaton.com
tcurry@labaton.com

FRANCIS A. BOTTINI, JR.
**BOTTINI & BOTTINI, INC.**
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002
fbottini@bottinilaw.com

*Counsel for Plaintiff Silberberg*

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this 12th day of December, 2018.

 */s/ Geoffrey M. Johnson*          
GEOFFREY M. JOHNSON (*pro hac vice*)
